IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

RONALD V. WEILBACHER,

      Plaintiff,

v.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,

      Defendant.
_____/
Case No. 3:05-CV-0204-TMB


COPY

DEPOSITION OF DANNY WITHERS

Pages 1 - 67 inclusive

Wednesday, July, 12, 9:00 a.m.

Anchorage, Alaska

EXHIBIT __A__
Page __1__ of __27__

Page 1

Danny Withers                                    Deposition                                    July 12, 2006

### Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
 2
 3   RONALD V. WEILBACHER,
 4           Plaintiff,
 5        v.
 6   PROGRESSIVE NORTHWESTERN
     INSURANCE COMPANY,
 7
 8           Defendant.
 9   _____/
     Case No. 3:05-CV-0204-TMB
10
11        DEPOSITION OF DANNY WITHERS,
12   taken on behalf of the plaintiff, pursuant to notice,
13   at the offices of Alaska Stenotype Reporters, 511 West
14   Ninth Avenue, Anchorage, Alaska, before Cynthia J. Kenan,
15   Court Reporter for Alaska Stenotype Reporters and Notary
16   Public for the State of Alaska.
17
18
19
20
21
22
23
24
25
```

(COPY stamp overlaid on document)

### Page 3

```
 1             A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:    Kenneth W. Legacki, P.C.
                       By: Kenneth W. Legacki
 4                     425 G Street
                       Suite 920
 5                     Anchorage, Alaska 99501
                       907/278-4848
 6
 7
     For Defendants:   Guess & Rudd
 8                     By: Gary A. Zipkin
                           Aisha Tinker Bray
 9                     510 L Street
                       Suite 700
10                     Anchorage, Alaska 99501
                       907/793-2299
11
12   Also Present:     Bob Lohr
                       Jay Wesolowski
13
     Reported By:      Cynthia Kenan
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1                    I-N-D-E-X
 2
 3   EXAMINATION BY:                       PAGE
 4   Mr. Legacki                             5
 5
 6   EXHIBITS:
        1  Insurance Policy                 11
 7      2  Document                         16
        3  PACMAN note 02/14/04                  19
 8      4  PACMAN note 02/15/04                  20
        5  PACMAN note 03/31/05                  23
 9      6  Letter from attorney             29
        7  PACMAN note 07/26/06                  33
10      8  Gillespie Decision               34
        9  Teel Decision                    41
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 5

```
 1        Anchorage, Alaska, Wednesday, July 12, 2006, 9:00 a.m.
 2              GARY WITHERS,
 3        Called as a witness herein on behalf of the
 4        Plaintiff, having been duly sworn upon oath
 5        by Cynthia Kenan, Notary Public, was examined
 6        and testified as follows:
 7              EXAMINATION
 8   Q    (By Mr. Legacki) Sir, would you please
 9   state your name for the record and spell your last
10   name, please?
11   A    Danny Withers, W-i-t-h-e-r-s.
12   Q    And what do you prefer to be called, Mr.
13   Withers, Danny or --
14   A    Danny.
15   Q    Obviously you've been deposed before; is that
16   correct?
17   A    That's correct.
18   Q    How times, approximately?
19   A    Oh, probably half a dozen times.
20   Q    Relating to what, if you could tell me?
21   A    Claims adjusting.
22   Q    Claims adjusting?
23   A    Over the years, yes.
24   Q    How long have you been a claims adjuster?
25   A    Approximately 25 years, I would say.
```

EXHIBIT A
Page 2 of 27

Danny Withers — Deposition — July 12, 2006

**Page 6**

1  Q  All those years with Progressive or other --
2  A  I was with other companies.
3  Q  What other companies?
4  A  Started with The Hartford Insurance company
5  and then I was with Crum & Forster commercial
6  insurance. Then I was with Industrial Indemnity,
7  which is their sister company. It's actually the same
8  corporation. I worked for GAB for a short period of
9  time and then Progressive.
10 Q  And how long have you been with Progressive?
11 A  This is my ninth year.
12 Q  Okay. Are you the most senior adjuster at
13 Progressive here at Anchorage?
14 A  I believe so.
15 Q  And there is a manager above you; is that
16 correct?
17 A  Correct.
18 Q  And who is that?
19 A  Right now it's Shawn Griswold.
20 Q  Okay. Does he do adjusting as well?
21 A  No.
22 Q  Okay. So in the Anchorage office you're the
23 head adjuster that gets all the catastrophic claims;
24 is that correct?
25 A  Most of them, but there's two other adjusters

**Page 7**

1  in this office that also handles those type claims.
2  Q  Handle what?
3  A  The type claims I handle.
4  Q  And you are the adjuster in the Weilbacher
5  case; is that correct?
6  A  That's correct.
7  Q  So when you adjust a case, what do you do
8  when you're looking at it? What are the -- go through
9  the steps. The claim comes in and what happens then?
10 A  Well, the first thing, determine coverage,
11 coverage investigation and then basic liability
12 investigation and that's it initially.
13 Q  And so in this particular case there was no
14 issue about coverage? There was no issue about
15 liability, correct?
16 A  In the Weilbacher case?
17 Q  Yes.
18 A  No.
19 Q  Okay. As a senior adjuster, what do you do
20 to research an issue as to whether or not to decline
21 or pay or not pay? What do you do? Do you do any
22 legal research? Do you consult with management? What
23 exactly do you do with the claim?
24 A  Well, I don't do any legal research myself.
25 I'm familiar with you know, Alaska law and case law

**Page 8**

1  that might be pertinent to the particular claim I am
2  investigating, you know. Sometimes I confer with our
3  defense counsels on issues that might come up in a
4  coverage investigation or liability investigation.
5  Q  Why has Progressive refused to pay
6  Mr. Weilbacher his money under AS09.15.010?
7  A  Well, because if I understand Mr.
8  Weilbacher's claim, it's a claim for loss of
9  consortium, loss of society and according to the
10 contract that we're dealing with in this loss, that is
11 a derivative claim of a single bodily injury limit
12 which Progressive paid.
13 Q  What do you mean by derivative?
14 A  It means it's derivative of the single bodily
15 injury. It's a claim that's derivative of the
16 wrongful death claim in this case.
17 Q  So it's derivative of the wrongful death
18 claim?
19 A  Right.
20 Q  Okay. What is a direct claim? Do you
21 understand what a direct claim is?
22     MR. ZIPKIN: Calls for legal conclusion.
23     THE WITNESS: Well, a direct claim is a claim
24 that a person may have because of a bodily injury.
25 Q  (By Mr. Legacki) Okay. So you're saying

**Page 9**

1  that under the contract, Mr. Weilbacher cannot
2  collect under AS09.15.010 because you consider it
3  derivative rather than direct?
4     MR. ZIPKIN: Object to the form.
5     THE WITNESS: That's correct.
6  Q  (By Mr. Legacki) Could you tell me what
7  the purpose is of -- under insurance coverage?
8  A  Well, if there's a -- if the liability
9  insurance available to the tortfeasor is inadequate to
10 cover the damages, then underinsured would come into
11 play.
12 Q  So in this particular case, the death of
13 Heidi Weilbacher, and the tortfeasor, Mr. Esper did
14 not have enough coverage to pay all the claims -- the
15 value of the claim of Heidi Weilbacher; is that
16 correct?
17 A  That's correct.
18 Q  And nor did they have enough money to
19 compensate the direct claims of Mr. and Mrs.
20 Weilbacher; is that correct?
21 A  That's correct, yes.
22     MR. ZIPKIN: I object to the word direct
23 without it being defined. I object to the reference
24 to the word direct.
25     MR. LEGACKI: I'm sorry, you object to the

3 (Pages 6 to 9)

Danny Withers                         Deposition                         July 12, 2006

### Page 10

1  word direct?
2      MR. ZIPKIN: Yes, because it hasn't been
3  defined for purposes of the deposition.
4  Q  (By Mr. Legacki) Would you define direct?
5  Would you mind telling me what direct means, a
6  direct claim as you understand it?
7  A  Well, as I understand it, it's a claim that
8  arises out of bodily injury or property damage as
9  defined by the policy.
10 Q  Okay could you explain to me for the sake of
11 Mr. Zipkin, explain for the record what is the
12 difference between a direct claim and a derivative
13 claim?
14     MR. ZIPKIN: That assumes facts not in
15 evidence and it calls for a legal conclusion. You're
16 making the distinction between direct and derivative.
17 The witness has never done that.
18 Q  (By Mr. Legacki) Could you explain to me
19 the difference of your understanding of the direct
20 claim and derivative claim?
21 A  Well, a direct claim is a claim that arises
22 out of bodily injury as defined by the policy and a
23 derivative claim is a claim that arises out of that
24 bodily injury to the person that's involved there.
25 Q  Okay.

### Page 11

1  A  That's the best I can explain it.
2  Q  Let's mark this as Exhibit 1, please.
3     (Exhibit Number 1 was marked.)
4     Sir, I'd like to hand you Exhibit 1 that is
5  Bates stamped No. 100375 and it was given to me by
6  Progressive as a copy of the insurance policy that is
7  at issue in this case. Do you see that, sir?
8  A  Yes, uh-huh.
9  Q  I'm looking at the first paragraph there. It
10 says, "Insuring Agreement, Uninsured/Underinsured
11 Motorist Bodily Injury Coverage."
12     Do you see that?
13 A  Uh-huh.
14 Q  This is Page 20. It states: "Subject to the
15 limit of liability."
16     What does that mean?
17 A  It means it's subject to the limits provided
18 on the declaration page of the policy.
19 Q  And what's the limit in this case?
20 A  I believe there were 100,000 per person and
21 100,000 per accident.
22 Q  Was it a hundred, three hundred or --
23 A  One hundred, three hundred.
24 Q  So a hundred per person, three hundred total
25 for the accident; is that correct?

### Page 12

1  A  That's correct.
2  Q  And Mr. Weilbacher paid a premium for the
3  uninsured/underinsured motorist; is that correct?
4  A  That's correct.
5  Q  And it was for a hundred, three hundred?
6  A  That is correct.
7  Q  States, "We will pay for damages, other than
8  punitive or exemplary damages which insured person is
9  legally entitled to recover from the owner or operator
10 of an uninsured/underinsured motor vehicle because of
11 bodily injury." Is that correct?
12 A  Correct.
13 Q  And if Mr. Weilbacher was injured as defined
14 by law, he would be entitled to recover it under the
15 uninsured motorist coverage, correct?
16 A  Correct.
17     MR. ZIPKIN: Well, that's an incomplete
18 question, incomplete hypothetical.
19 Q  (By Mr. Legacki) Let's have this marked
20 as Exhibit 2.
21     (Exhibit Number 2 was marked.)
22 Q  (By Mr. Legacki) Do you see that, sir?
23     MR. ZIPKIN: You haven't given it to him yet.
24 Q  (By Mr. Legacki) Now, the issue in this
25 particular case is whether or not Mr. Weilbacher

### Page 13

1  suffered a bodily injury; is that correct?
2     MR. ZIPKIN: Object to the form.
3     THE WITNESS: Well, I don't know if Mr.
4  Weilbacher suffered bodily injury, no.
5  Q  (By Mr. Legacki) That is the issue; isn't
6  that correct?
7     MR. ZIPKIN: Object to form.
8     THE WITNESS: No, I don't think so.
9  Q  (By Mr. Legacki) What's the issue in the
10 case?
11 A  The issue the way I understand it in this
12 case is whether or not he has a claim because of
13 bodily injury to his daughter.
14 Q  You don't -- well, isn't it true that
15 Mr. Weilbacher filed a claim under AS 09.15.010 under
16 the Gillespie decision that asserts he has an
17 independent claim?
18 A  Well, he's asserting a claim but whether or
19 not -- I'm not -- you said he was injured, and I don't
20 know if he was injured or not but he asserted a claim.
21 Q  So the issue of the case is whether or not
22 when his daughter died was he considered an
23 independent claim for the death of his daughter,
24 correct?
25     MR. ZIPKIN: Object to form. That's

EXHIBIT A
Page 4 of 22

Danny Withers Deposition July 12, 2006

**Page 14**

1 incorrect.
2 THE WITNESS: Yes that's the issue.
3 Q (By Mr. Legacki) Okay. And the statute
4 allows him to file an independent claim, correct,
5 AS O9.15.010?
6 A Yes, he can file a claim.
7 Q Okay. And it gives him a right to collect
8 for the death of his daughter independent of any
9 wrongful death action.
10 A I believe so.
11 Q Okay. Now if the statute says that he can
12 file a direct claim for the death of his daughter and
13 if its his own independent claim, why does the
14 paragraph we read in Exhibit 1 not cover that?
15 MR. ZIPKIN: Object. It mischaracterizes the
16 testimony and you're confusing independent with
17 direct. If you can answer, go ahead.
18 Q (By Mr. Legacki) Is there a difference
19 between an independent and a direct claim?
20 A Well, the answer to your question is he can
21 file the claim, but it's subject to the single bodily
22 injury limit. It's -- his claim is derivative of his
23 daughter's wrongful death claim.
24 Q Well, okay, let's assume that he sued the
25 tortfeasor, okay? Can he file a lawsuit directly

**Page 15**

1 against the tortfeasor under AS O9.15.010 for the loss
2 of society?
3 A I believe he could.
4 Q Okay. Now, we've read on Exhibit No. 1 the
5 paragraph that Progressive will pay for damages which
6 an injured person is legally entitled to recover from
7 the owner or operator of an uninsured/underinsured
8 motor vehicle because of bodily injury; is that
9 correct?
10 A That's correct.
11 Q And doesn't the Gillespie decision say that a
12 parent suffers a bodily injury when their child is
13 killed?
14 MR. ZIPKIN: Object to the form.
15 Mischaracterizes the case.
16 THE WITNESS: I don't know if the Gillespie
17 decision says he suffers a bodily injury.
18 Q (By Mr. Legacki) You read the Gillespie
19 -- you said you were familiar with Alaska cases,
20 right? You are familiar with the Gillespie
21 decision?
22 A I have heard of the Gillespie decision but
23 I'm not that familiar with it.
24 Q I thought you said you knew Alaska case laws
25 regarding these issues?

**Page 16**

1 A I said I'm familiar with it, but I don't know
2 every case, you know.
3 (Exhibit No. 2 was marked.)
4 Q Now, let's look at Exhibit No. 2. It states:
5 "The bodily injury of limit of liability under Part
6 III for each person includes a total of all claims
7 made for such bodily injury;" is that correct?
8 A That's correct.
9 Q And then it has "and", right?
10 A Right.
11 Q What does that mean when you put an "and" in
12 a clause?
13 A Well, it means and --
14 Q Either/or?
15 A No. I think it means including or in
16 addition to.
17 Q So you have to have all that or it is two
18 separate?
19 A I'm not sure I understand what you mean.
20 Q Well, I'm reading this. It says: "The bodily
21 injury limit of liability under this Part III for each
22 person includes the total of all claims made for such
23 bodily injury," right?
24 A Right.
25 Q So if somebody's injured, they receive

**Page 17**

1 compensation for that bodily injury, correct, for that
2 individual?
3 A Right.
4 Q Okay. And then it goes: "And all claims" --
5 which, this is separate now -- "All claims derive from
6 such bodily injury including but not limited to, loss
7 of society, loss of companionship, loss of services,
8 loss of consortium, and wrongful death," correct?
9 A Right.
10 Q Now, when you have these derivative claims --
11 are they common law claims or statutory claims we're
12 referring to?
13 MR. ZIPKIN: Object to form and you're
14 calling for legal conclusions.
15 THE WITNESS: Well, it may be -- there may be
16 both. But, you know, it's mostly common law claims, I
17 believe.
18 Q (By Mr. Legacki) Okay. So the derivative
19 claims here are actually related to the common law
20 claims and not statutory claims, correct?
21 MR. ZIPKIN: Same objections.
22 THE WITNESS: Well, it would be, you know, it
23 could be both. All claims derived from such bodily
24 injury could be common law; could be statutory, could
25 be both.

EXHIBIT A
Page 5 of 27

5 (Pages 14 to 17)

Page 18

1    Q   (By Mr. Legacki) What is it? You're the
2  one that declined the coverage. I'd like to know
3  why -- what does this mean to you? Does this mean
4  both statutory and common law claims?
5    A   Yes, I believe so.
6    Q   So you are saying that you can write a
7  contract clause that could be contravened by the same
8  statute?
9        MR. ZIPKIN: Object. Mischaracterizes his
10 testimony. Object to form.
11       THE WITNESS: I don't think it does
12 contravene the statute.
13   Q   (By Mr. Legacki) I'm sorry?
14   A   I don't think it is adverse to the statute.
15   Q   So, you don't see there that there is two
16 different separate -- "and separate" makes it two
17 different clauses, one for individual bodily injury
18 and the other one for derivative bodily injury? Or
19 let me rephrase that, that the first part of that
20 clause states direct or independent causes of action
21 for bodily injury and the second part is for
22 derivative claim of bodily injury?
23       MR. ZIPKIN: Asked and answered.
24       THE WITNESS: I think it derives all claims
25 from that bodily injury that occurs to the person

Page 19

1  that's injured or in the case, wrongful death. Any
2  claims derived from that injury, that includes those
3  claims, whether they're common law or statutory
4  claims.
5        (Exhibit Number 3 was marked.)
6    Q   I hand you Exhibit Number 3, please. Can you
7  tell me what that is, sir, paginated number 100329,
8  the Face Sheet Note Inquiry using the PACMAN system?
9    A   These are log notes.
10   Q   All right.
11   A   Computerized log notes.
12   Q   All right. You state at the bottom there:
13 "The individual's claims of father/mother will include
14 loss of consortium and loss of society;" is that
15 correct?
16   A   Uh-huh.
17   Q   What do you mean by "individual's claims"?
18   A   Means that they have an individual claim for
19 loss of consortium or loss of society.
20   Q   In their own right?
21   A   Yes. But they're still subject to the single
22 bodily injury limit derivative active of that limit.
23   Q   But you recognize that they -- in fact, your
24 counsel conceded that they did have a right to
25 individual claim and under AS O9.15.O1O.

Page 20

1    Are you aware of that?
2    A   Yes.
3    Q   And that's an individual claim independent of
4  the derivative claim?
5        MR. ZIPKIN: Objection; mischaracterizes.
6  Object to the form; putting words in his mouth.
7        THE WITNESS: It's not independent of the
8  derivative claim under the contract. They have an
9  independent claim, but it's still subject to the
10 single bodily injury -- it's derivative of that limit.
11       (Exhibit Number 4 was marked.)
12   Q   (By Mr. Legacki) Do you recognize that,
13 sir?
14   A   Yes, uh-huh.
15   Q   This is another PACMAN note of yours, I think
16 it's dated February 15 '04, 2004?
17   A   Uh-huh.
18   Q   The parents' individual claim put a value of
19 50,000 to 75,000 each for the wrongful death of their
20 15-year-old daughter?
21   A   Yes.
22   Q   Why do you -- how did you come to the value
23 of 50/75,000?
24   A   It's an estimate of what their individual
25 claims might be worth.

Page 21

1    Q   How did you get that figure?
2    A   Mostly just off of experience, the kind of
3  value those claims might have.
4    Q   You put a value of a lost child at somewhere
5  between 50 and $75,000?
6    A   Well, I'm talking about the loss of society
7  and loss of consortium-type claims.
8    Q   That's all you value the loss of a child? Is
9  there anything that tells me in your experience you
10 value the loss of a child at only 50 to $75,000?
11       MR. ZIPKIN: Mischaracterizes his testimony.
12       THE WITNESS: It might be worth more than
13 that, but that's, you know, that's an estimate. I
14 don't -- you know something that in my experience, a
15 jury might award.
16   Q   (By Mr. Legacki) And what experience is
17 that?
18   A   Just over the years, cases I've had.
19   Q   Could you tell me which cases where the jury
20 only awarded 50 to $75,000 for the loss of a child?
21   A   I can't recall any.
22   Q   Did you go to a book? Did you go to any jury
23 verdict research or anything like that?
24       MR. ZIPKIN: Give him -- if I can, Mr.
25 Withers, give me a moment to interpose an objection

Danny Withers — Deposition — July 12, 2006

### Page 22

1. before you answer.
2. THE WITNESS: Okay.
3. MR. ZIPKIN: Thank you.
4. A All right.
5. Q (By Mr. Legacki) Do you have any
6. children?
7. A I do.
8. Q Do you think they're only worth 50 to
9. $75,000?
10. MR. ZIPKIN: Mischaracterizes the testimony.
11. If I may say, he hasn't said that 50 to 75,0000 is the
12. value of the loss of a child. He's talking about loss
13. of society, not loss of a child. You're confusing
14. wrongful death and loss of consortium.
15. Q (By Mr. Legacki) I mean, would you be
16. happy with 50 to $75,000 for the loss of your
17. daughter?
18. MR. ZIPKIN: Same objections.
19. THE WITNESS: You know, you can't put the
20. value on the loss of a child; that's not what we're
21. dealing with here. We're dealing with, you know, the
22. loss of consortium, loss of society.
23. Q (By Mr. Legacki) Define loss of society.
24. MR. ZIPKIN: Calls for a legal conclusion.
25. THE WITNESS: Companionship, I don't know,

### Page 23

1. companionship, being around that person. That's what
2. I understand it to be.
3. Q (By Mr. Legacki) I'm sorry?
4. A That's what I understand it to be.
5. Q How about loss of consortium?
6. MR. ZIPKIN: Assumes they're different.
7. THE WITNESS: Loss of consortium is similar
8. to the same thing, but the way I understand loss of
9. consortium is more husband and wife, you know,
10. situations where they are -- have to do one for
11. another, or things around the house, being together,
12. that they're no longer able to do because of the
13. injury.
14. Q (By Mr. Legacki) Can you imagine any
15. other injury or loss greater than the pain of losing
16. a child?
17. A I'm sorry?
18. Q Can you imagine any other greater loss of
19. injury or pain or suffering than a parent losing a
20. child?
21. A Probably not, no. Probably pretty tough.
22. (Exhibit No. 5 was marked.)
23. Q There is Bates Number 100333; is that
24. correct?
25. A Correct.

### Page 24

1. Q Okay and it's your PACMAN note dated
2. March 31st, '05?
3. A Correct.
4. Q And that's where you say "just call
5. attorney." I'm assuming it's me?
6. A Uh-huh.
7. Q And advised that Progressive agrees
8. non-insured; is that Mr. Weilbacher or who is "I"?
9. A What was that again?
10. Q You have "call attorney; advised that
11. Progressive agrees that NI does have IM coverage."
12. A Named insured.
13. Q Named insured does have. What does "IM" mean
14. or is that UM?
15. MR. ZIPKIN: I think you have a bit of the
16. margin cut off on this unfortunately. I think you're
17. missing some letters.
18. THE WITNESS: I think it's a U, UIM.
19. Q (By Mr. Legacki) Uninsured motorist
20. coverage?
21. A Correct, uh-huh.
22. Q "But any claims for NIED do not meet the
23. elements set out in Alaska case law." Is that
24. correct?
25. A Right.

### Page 25

1. Q And then he says -- and then you wrote down
2. "he says," meaning Mr. Weilbacher's attorney, "his
3. client has claim for loss of society and loss of
4. consortium. I told him these are derivative of the --
5. what does "the W.D." mean?
6. A Wrongful death.
7. Q "Wrongful death limit and there can be no
8. direct claim." Do you see that?
9. A Correct.
10. Q So you wrote down "no direct claim." What
11. did you mean by "no direct claim"?
12. A Well, in that case, I meant that there would
13. not -- that there would be no direct -- there would
14. not be a separate bodily injury available -- bodily
15. injury limit available for these particular claims.
16. That's what I meant by that.
17. Q And you have there "NIED." What is that,
18. negligent infliction of emotional distress?
19. A That's correct.
20. Q How do you define that?
21. MR. ZIPKIN: Calls for a legal conclusion.
22. THE WITNESS: How do I define it?
23. MR. LEGACKI: Yes.
24. THE WITNESS: I don't know how I define it.
25. Q (By Mr. Legacki) What's the difference

7 (Pages 22 to 25)

EXHIBIT A
Page 7 of 27

Page 26

1  between NIED and loss of society?
2     A   Well, NIED, as we recognize in Alaska, the
3  way I understand Alaska law, could be subject to a
4  separate policy limit.
5     Q   What's the difference between somebody who's
6  suffering negligence and emotional distress and
7  somebody suffering from loss of society?  Can you
8  explain the difference to me?
9         MR. ZIPKIN:  Calls for a legal conclusion.
10        THE WITNESS:  Well, negligent infliction of
11 emotional distress is more of a bystander-type claim,
12 somebody that sees something happen or maybe they're
13 -- they go directly to the accident scene after the
14 accident and I'm defining it the way I understand
15 Alaska law.
16    Q   (By Mr. Legacki) I'm not talking about
17 Alaska law.  What's the common -- what do you think
18 of a person -- what is the difference between NIED,
19 a parent suffering emotional distress versus a
20 parent suffering loss of society?
21        Describe to me the feeling, emotions or --
22 what distinguishes the two?
23        MR. ZIPKIN:  Object to form.  Compound.
24 Calls for a legal conclusion.
25        THE WITNESS:  The manifestation of injury.

Page 27

1     Q   (By Mr. Legacki) What does that mean?
2     A   It would be for probably NIED, negligence
3  inflicts emotional distress.
4     Q   I'm sorry, I don't understand.  What do you
5  mean by manifestation of injury?
6     A   That you've got some kind of an injury and
7  because of it, be it mental or emotional, you've got
8  an injury.
9     Q   Are you saying that a person who has a loss
10 of society doesn't have the same injury?
11    A   I don't know.
12    Q   How about loss of consortium?
13        MR. ZIPKIN:  Object to form.
14        THE WITNESS:  A physical injury, I don't
15 think it's a physical injury, no.
16    Q   (By Mr. Legacki) So you're just saying if
17 a person has a loss of society they're not suffering
18 from any physical injury?
19    A   I'm not saying that.  I said I don't think
20 they have a physical injury.
21    Q   What if a person did have a physical injury
22 from the death of a daughter?
23        MR. ZIPKIN:  Object to the form, incomplete
24 question.
25        THE WITNESS:  I don't know.

Page 28

1     Q   (By Mr. Legacki) So when you look at it,
2  the difference between NIED and the loss of society,
3  you look at it from a legal context, not from a
4  personal context as to what the difference is
5  between the two?
6     A   Yes.
7         MR. ZIPKIN:  Mischaracterizes.
8     Q   Now?
9     Q   (By Mr. Legacki) Now further going into
10 your note here, Exhibit Number 5, was "he" -- I
11 guess this means the attorney -- "thinks Teel v.
12 Progressive gives authority for direct claim for
13 loss of consortium."
14        Did you ever analyze that statement?  Did you
15 try to figure out whether or not the attorney was
16 correct in there?
17    A   Yes, I did, I conferred with someone to get
18 some other opinion on that.
19    Q   Who did you confer with?
20    A   Dan Quinn.
21    Q   Anyone else?
22    A   No.
23    Q   Dan Quinn of Richmond & Quinn?
24    A   That's correct.
25    Q   And he gave you an opinion?

Page 29

1         MR. ZIPKIN:  Without revealing.
2     Q   (By Mr. Legacki) Without revealing, he
3  gave you an opinion?
4         MR. ZIPKIN:  I think even that much is
5  attorney-client, so I instruct you not to answer about
6  what Mr. Quinn gave you.
7     Q   (By Mr. Legacki) Did you discuss the case
8  with Mr. Quinn?
9     A   I did.
10    Q   Okay.  Exhibit number 6, please.
11        (Exhibit Number 6 was marked.)
12        Do you see that, sir?
13    A   Correct, yes, I do.
14    Q   And it goes: "Letter from attorney."  This is
15 dated June 26 '05.
16        "He continues to allege direct claim under
17 AS 09.15.010 which gives parent a separate and independent
18 cause of action for damages due to the death of a child."
19        So are you saying there that you agree with
20 me that AS 09.15.010 gives a parent separate and
21 independent cause of action for damages due to the
22 death of a child?
23    A   No, I'm saying that that's what you told me.
24    Q   Well does -- you have here AS 09.15.010, you
25 state "which gives parent a separate and independent

### Page 30

1  cause of action for damage due to the death of a
2  child."?
3      A  Yes, that's what I was saying that you allege
4  under that statute that --
5      Q  Well, AS 09.15.010 gives a separate and
6  independent cause of action for damages for the death
7  of a child?
8         MR. ZIPKIN:  Calls for legal conclusion.
9  This witness is not a lawyer.
10        THE WITNESS:  I'm not sure what that statute
11 is. I don't recall what that --
12     Q  (By Mr. Legacki) Did you look it up?
13 After you got this correspondence did you go to see
14 what I was talking about?
15     A  I don't recall if I did or not.
16     Q  Why not? Why didn't you go look and see what
17 AS 09.15.010 said?
18        MR. ZIPKIN:  Object to form. Assumes he
19 didn't.
20        THE WITNESS:  I didn't think I needed to.
21     Q  (By Mr. Legacki) Why is that?
22     A  Because the claims, the particular claims
23 that you were making under the contract were
24 derivative claims of a single policy limit we had
25 already paid.

### Page 31

1      Q  Did you check to see that you may be wrong in
2  that, that the policy may be wrong? Did you ever
3  check to see, wait a minute, this may be something
4  different?
5      A  No, I didn't.
6      Q  He also cites Gillespie v. Beta Construction.
7  Did you look at Gillespie? You were familiar with the
8  Gillespie case?
9      A  I have heard of the case, but I don't recall
10 exactly what it talks about.
11     Q  It goes: "Our argument is that although this
12 does give claim to parent, it is derivative of the
13 wrongful death per contract."
14        Is that correct?
15     A  That's correct.
16     Q  And then: "AS 09.15.010 simply allows parent
17 to pursue claim."
18        Where did you get that from?
19     A  You know, probably from Dan Quinn. I asked
20 him about it.
21     Q  So you got that statement because of what Dan
22 Quinn told you?
23        MR. ZIPKIN:  To the extent that the witness
24 has said that in response to a question that wasn't
25 directly asking what Dan Quinn said, I was unable to

### Page 32

1  direct him not to reveal attorney-client
2  communications, but to the extent that this question
3  clearly asked for attorney-client communications, I
4  instruct the witness not to answer.
5      Q  (By Mr. Legacki) So when you wrote
6  this --
7         MR. ZIPKIN:  I move to strike the prior
8  answer.
9      Q  (By Mr. Legacki) Is this from your own
10 personal knowledge or is it from an attorney?
11        MR. ZIPKIN:  That invades the attorney-client
12 privilege and I instruct you not to answer.
13        MR. LEGACKI:  Well, I have a waiver, if he's
14 got it. I'm going to ask him where he got this
15 information from. I mean, I've got to know the source
16 of the information, Gary. That's a waiver then, if
17 you want to go that far.
18        MR. ZIPKIN:  I don't believe we have waived
19 it.
20     Q  (By Mr. Legacki) Where did you come up
21 with -- you wrote this on your notes, and I have the
22 notes in front of you, given the introduction from
23 Progressive's lawyers and you wrote "AS 09.15.010
24 simply allows parent to pursue a claim."
25        Did you read the Gillespie decision or did

### Page 33

1  you read the statute or anything like that?
2      A  You know, I don't recall.
3      Q  Well, don't you think you had a duty to read
4  -- when an attorney writes and said you had a duty to
5  pay under the policy, under AS 09.15.010, you have a
6  duty to look at the statute and look at the case that
7  he cites in support of it?
8         MR. ZIPKIN:  I object to form.
9         THE WITNESS:  Yes, and I got this from
10 someplace, but I don't recall where I got it.
11        (Exhibit Number 7 was marked.)
12     Q  (By Mr. Legacki) And this is dated July
13 26, '05. You redacted something there, so we don't
14 have the true context. "However we feel all claims
15 except for NIED are derivative of the limit we paid
16 to estate for wrongful death. There is no evidence
17 of NIED claims in initial investigation. However" --
18 And then you go on: "Attorney is specifically making
19 claims for loss of society consortium and argues
20 these are separate claims subject to separate limit
21 which we dispute." Is that correct?
22        MR. ZIPKIN:  I object. I think you're
23 assuming this is his entry but I'm not sure that --
24     Q  (By Mr. Legacki) Is this your entry?
25        MR. ZIPKIN:  Oh, okay, I'm sorry.

EXHIBIT A
Page 9 of 27

Danny Withers                           Deposition                          July 12, 2006

Page 34

1     MR. LEGACKI: I'm sorry, did I miss
2  something?
3     MR. ZIPKIN: Might be my mistake. Go ahead,
4  I'm sorry.
5     THE WITNESS: It's my entry.
6     MR. LEGACKI: I'm sorry?
7     THE WITNESS: Yes, it's my entry.
8   Q  (By Mr. Legacki) Well, let's look at the
9  Gillespie decision. Have this marked, please.
10    (Exhibit Number 8 was marked.)
11  Q  (By Mr. Legacki) Do you want to take a
12 moment to read that, sir? Do you need a moment?
13    MR. ZIPKIN: I think the witness should have
14 an opportunity to review the entire document --
15    MR. LEGACKI: Sure. Off record, I guess, of
16 five minutes.
17    (Brief break.)
18  Q  (By Mr. Legacki) On Exhibit 7 where it's
19 paginated 10034 --
20    MR. ZIPKIN: Exhibit 6.
21    THE WITNESS: Exhibit 6?
22    MR. LEGACKI: Yes.
23    THE WITNESS: Okay.
24  Q  (By Mr. Legacki) You state there
25 "AS O9.15.O1O simply allows parent to pursue a claim."

Page 35

1  Do you see that, the last sentence?
2   A  Uh-huh.
3   Q  I want you to look at -- on page 1273 of
4  Gillespie.
5   A  Okay.
6   Q  And footnote number 3?
7   A  Down at the bottom?
8   Q  Yes.
9   A  Okay.
10  Q  It rejects that proposition, doesn't it?
11    MR. ZIPKIN: Objection, calls for a legal
12 conclusion. Mischaracterizes his answer.
13  Q  (By Mr. Legacki) It states that it's not
14 procedural, it's a substantive cause of action?
15  A  I don't know.
16  Q  I'm sorry?
17  A  Footnote -- I don't know. Footnote 3 says:
18 "Beta cites to State Farm Mutual Insurance Company v.
19 Wainscot."
20  Q  "Where the district court for the State of
21 Alaska held that AS O9.15.O1O was only procedural and
22 did not confer a new right of recovery in the parent.
23 We chose not to follow the reasoning in Wainscot."
24    MR. ZIPKIN: What's the question?
25  Q  (By Mr. Legacki) Do you see that, sir?

Page 36

1   A  Yes, I see that.
2   Q  Okay. And that is different than what you
3  stated here in Exhibit Number 6, right, that
4  AS O9.15.O1O simply allows parent to pursue a claim?
5     MR. ZIPKIN: Object to form.
6     THE WITNESS: I don't know if that is
7  different.
8     MR. ZIPKIN: You're mischaracterizing Exhibit
9  6.
10    THE WITNESS: I don't know, what's your
11 question?
12  Q  (By Mr. Legacki) You think that after
13 reading that footnote you still would agree that
14 your statement there in Exhibit Number 6 that the
15 statute only allows a parent to pursue a claim --
16    MR. ZIPKIN: That's an incomplete reference
17 to Exhibit 6. Exhibit 6 should be read in its
18 entirety.
19    THE WITNESS: He gives him an independent
20 claim. I still believe that, yes.
21  Q  In fact, if you go up at the paragraph where
22 it has the numeral 2, it says: "The Gillespies
23 however, are not without recourse. Another statute,
24 AS O9.15.O1O provides in part a parent may maintain an
25 action as plaintiff for the injury or death of a child

Page 37

1  below the age of majority. We have not yet addressed
2  whether or not AS O9.15.O1O creates a separate,
3  independent parental cause of action. We now hold
4  that it does."
5     MR. ZIPKIN: What's the question?
6   Q  (By Mr. Legacki) Do you see that, sir?
7   A  Yes.
8   Q  So does that give the parent a independent
9  claim?
10  A  Yes, it does.
11  Q  Against the tortfeasor?
12  A  Yes.
13  Q  And it's not derivative of the child's
14 injury, is it?
15  A  It is derivative.
16  Q  It is derivative?
17  A  To have an independent claim but is still a
18 derivative to the injury of the child.
19  Q  But it says independent, not derivative?
20  A  Well, you can still have an independent claim
21 but it's still derivative of the single policy limit.
22  Q  Where did you get that from? How did you
23 come up with that conclusion that independent is
24 different from derivative?
25    MR. ZIPKIN: Now we're just arguing. Asked

10 (Pages 34 to 37)

EXHIBIT A
Page 10 of 27

Danny Withers — Deposition — July 12, 2006

**Page 38**

1  and answered.
2  MR. LEGACKI: Well, he's an adjuster.
3  Q  I mean, isn't independent the same as a
4  direct cause of action?
5  A  No.
6  Q  What is the difference between the two?
7  A  Well, an independent claim is a claim that
8  they can pursue independently but is still derivative
9  of the single policy limit for bodily injury.
10  Q  But doesn't the statute say that it's not
11  derivative, it's independent?
12  MR. ZIPKIN: That mischaracterizes the
13  statute. It says no such thing.
14  THE WITNESS: No.
15  Q  (By Mr. Legacki) It says on page 1274 at
16  the top: "Thus we conclude that a parent's right of
17  action under AS 09.15.010 includes the right to
18  recover loss of society damages."
19  MR. ZIPKIN: Is there a question?
20  Q  (By Mr. Legacki) Is that right? Do you
21  see that there?
22  A  Yes, it says that.
23  Q  So do you read that as that saying, the
24  Supreme Court, that the parent has a separate claim
25  from the child?

**Page 39**

1  A  They --
2  Q  I'm sorry?
3  A  They have an independent claim.
4  Q  A separate claim than from the child,
5  correct?
6  A  That's correct, but it's --
7  Q  On their own individual claim?
8  A  But it's still derivative of the single
9  bodily injury limit.
10  Q  In Gillespie on page 1273, the court states
11  right above paragraph number 2: "The Gillespies, then,
12  cannot claim loss of society under the wrongful death
13  statute." Do you see that?
14  A  Where are you reading that?
15  Q  Where it says -- at paragraph number 2, where
16  "The Gillespies, howsoever, are not without recourse."
17  A  Okay.
18  Q  The sentence right above that.
19  A  The sentence above 2?
20  Q  Yes, "The Gillespies, then, cannot claim loss
21  of society under the wrongful death statute."
22  A  I see that.
23  Q  Okay. Now, I asked you earlier about the
24  language for bodily injury whether or not the loss of
25  society in that clause indicates -- was that for --

**Page 40**

1  you said wrongful death, that applies to wrongful
2  death, right?
3  MR. ZIPKIN: Mischaracterizes. Object to
4  form. Compound. Confused.
5  Q  (By Mr. Legacki) Can you answer the
6  question?
7  A  Ask the question again, now.
8  Q  When we went through that clause in Exhibit 2
9  regarding -- defining bodily injury --
10  A  Yes.
11  Q  -- you said that the loss of society
12  referenced there was because of loss of society and
13  the wrongful death action, correct?
14  MR. ZIPKIN: Mischaracterizes.
15  THE WITNESS: I believe so.
16  Q  (By Mr. Legacki) Does the policy,
17  Progressive policy, exclude direct actions and
18  direct claims of the parents?
19  A  What do you mean by direct claims?
20  Q  Well, if a parent has a direct claim for say,
21  an NIED, is that excluded?
22  A  No.
23  Q  If the court finds that -- well, why is it
24  then when you have a statutory claim then for the loss
25  of society that's not a direct claim?

**Page 41**

1  A  It an independent claim. In other words,
2  it's independent. They have a claim. But it's still
3  a derivative claim of a single bodily injury limit.
4  Q  Well, is an NIED claim of a parent
5  independent?
6  A  Yes.
7  Q  So what's the difference between an
8  independent NIED claim than an independent loss of
9  society claim under AS 09.15.010?
10  A  I don't know if there is any difference.
11  Q  I'm going hand you Exhibit No. 9.
12  (Exhibit Number 9 was marked.)
13  I'm going to hand you Exhibit Number 9. This
14  is the Teel decision. This is the case I referred you
15  to that you reviewed to decline coverage; is that
16  correct or declined to pay on the policy?
17  MR. ZIPKIN: Object to form.
18  THE WITNESS: I don't recall if I reviewed
19  this case. I may have. I don't recall.
20  Q  (By Mr. Legacki) Well I'd like to refer
21  you to page 5.
22  MR. ZIPKIN: In that case I ask then, again,
23  that the witness be given a chance to review the case.
24  MR. LEGACKI: Review it if you like, sir.
25  Off record. Okay.

EXHIBIT A, Page 11 of 27

Page 42

1    (Brief break.)
2    Q   (By Mr. Legacki) I'd like to refer you to
3 page 5.
4    A   Okay.
5    Q   It states that Teel's claim is direct, the
6 paragraph on the first side of the colum, the middle
7 of the page.
8    A   Okay.
9    Q   "That Teel's claim is direct does not bar the
10 claim. The wording of Allstate's policy does not
11 exclude direct claims. It states that one would be
12 entitled to recover so long as one's damages were
13 because of bodily injury to an occupant of the insured
14 vehicle." And then it goes on to define -- "Webster's
15 Dictionary defines the term 'because of' to mean 'by
16 reason of' or 'on account of'. Legal causation is a
17 stricter standard, generally requiring that 'but for'
18 the occurrence of the event the injury would not have
19 occurred, and the event was a significant and
20 important cause of the injury. In light of both the
21 common and legal definitions of causation, we cannot
22 say that the policy language excludes an NIED claim."
23    The reason I'm asking you now sir, do you
24 think the Progressive policy excludes a independent
25 claim of the Weilbachers under AS 09.15.010?

Page 43

1    A   That it excludes that claim? No, I don't
2 think it does.
3    Q   Sir, you are compensated by Progressive; is
4 that correct? You get paid for the work you do?
5    A   Yes.
6    Q   Okay. And do you get a salary?
7    A   Yes.
8    Q   Do you also get any bonuses for profit
9 sharing or gain sharing or anything like that?
10    A   Is that relevant to this?
11    Q   Yes.
12    A   How?
13    Q   Answer your question, please.
14    MR. ZIPKIN: I think the questions regarding
15 gain sharing, if that's what you want to go into --
16    MR. LEGACKI: I'm sorry?
17    MR. ZIPKIN: I think questions regarding gain
18 sharing, if that is what you wish to explore, are
19 unrelated entirely to the breach of contract claim, so
20 I object.
21    MR. LEGACKI: Well, we have a breach and bad
22 faith both.
23    Q   (By Mr. Legacki) So would you answer the
24 question, please?
25    A   Yes.

Page 44

1    Q   Could you tell me about that?
2    A   What do you want to know?
3    Q   I want to know everything. Tell me about the
4 gain sharing program, how you get bonuses. How do you
5 increase your income?
6    A   I don't know anything about it.
7    Q   What do you mean you don't know anything
8 about it?
9    A   Well, I might get a bonus at the end of the
10 year; I might not.
11    Q   For what? What is the bonus based on?
12    A   It's referred to as gain sharing.
13    Q   So you have no idea why you get this bonus,
14 what the reasons are?
15    A   Not really.
16    Q   You have no idea what you need to do to get
17 that extra money?
18    MR. ZIPKIN: Assumes facts not in evidence.
19    THE WITNESS: I don't know how it's done,
20 no.
21    Q   (By Mr. Legacki) You have been with
22 Progressive for nine years and you're a senior
23 adjuster, number two in the office except for -- are
24 you number one in the office or is there somebody
25 above you?

Page 45

1    A   Above me, how do you mean?
2    Q   In the office here in Anchorage?
3    A   Yes, there's someone above me, a manager,
4 yes.
5    Q   A manager, okay. And you're the head
6 adjuster, right?
7    A   I don't know if you would characterize me as
8 the head adjuster, no.
9    Q   But you're the catastrophic injury? You're
10 the one with the most experience, correct?
11    MR. ZIPKIN: Object to form.
12    Q   (By Mr. Legacki) You are the catastrophic
13 injury adjuster; is that correct?
14    A   If you want to refer to it as that, I suppose
15 so.
16    Q   And you have the most experience in the
17 office?
18    A   I suppose so.
19    Q   And you're sitting here telling me you don't
20 know what gain share is?
21    A   Well, I know it's bonus or gain share money.
22 I don't know how they -- how it comes about, how they
23 calculate it. I don't have anything to do with that.
24    Q   How do they tell you that you can get more
25 money above your salary? What is it that you have to

EXHIBIT A
Page 12 of 27

Danny Withers                    Deposition                    July 12, 2006

Page 46

1  do to get that extra money?
2      MR. ZIPKIN: Assumes facts not in evidence;
3  objection.
4      Q  (By Mr. Legacki) Well, did you get extra
5  money? You get extra money; you know what gain
6  share is, right?
7      A  Yes.
8      Q  So tell me, what is it that you have to do to
9  get that extra money?
10     A  My job.
11     Q  What is your job?
12     A  Adjusting claims.
13     Q  And if you're able to beat claims, adjust
14 claims down, you get a profit from that, correct?
15     A  No.
16     Q  What is gain share then?
17     A  It's based on the -- how profitable the
18 company is, I assume.
19     Q  And how would the companies become
20 profitable? By denying claims, correct?
21     A  I don't think so.
22     Q  So as you stand here today, you don't know
23 anything about gain share?
24     MR. ZIPKIN: That mischaracterizes --
25     Q  (By Mr. Legacki) Other than you get --

Page 47

1  there's a program called gain share?
2      MR. ZIPKIN: That mischaracterizes what he
3  has said.
4      THE WITNESS: That's the extent of my
5  knowledge of it, yes.
6      Q  You don't know how it's formulated?
7      A  Specifically no, I don't.
8      Q  Do you ever get reviews? Are you reviewed?
9      A  Yes, uh-huh.
10     Q  And during these reviews did they mention
11 anything regarding gain share and how you're working
12 toward profiting under gain share?
13     A  No.
14     Q  They review how many claims you've been able
15 to gain profit off of, that kind of thing, where you
16 get the value under the excess of --
17     MR. ZIPKIN: Object to form and the
18 deliberate mischaracterization of what they do as
19 profit based in claims.
20     MR. LEGACKI: I'm trying to find out.
21     MR. ZIPKIN: No, you're just assuming it is.
22     Q  (By Mr. Legacki) So if you get a -- if a
23 claim value worth, say, a hundred thousand and you
24 settle for eighty thousand, do you get an "atta boy"
25 and bonus for that?

Page 48

1      A  No.
2      Q  Why were you so reluctant to talk about gain
3  share?
4      MR. ZIPKIN: Mischaracterizes and is
5  argumentative.
6      THE WITNESS: I'm not reluctant to talk about
7  it. I just don't know that much about it.
8      Q  (By Mr. Legacki) What did you issue the
9  objection and why is that relevant?
10     MR. ZIPKIN: You don't have to answer that.
11 You had a right to ask what the relevance was. You
12 don't have to explain that.
13     Q  (By Mr. Legacki) Why did it upset you
14 that I asked about gain share? You were upset that
15 I asked about gain share, right? You didn't like
16 that question?
17     A  I didn't say I was upset, did I?
18     Q  No, but you didn't like it, did you?
19     MR. ZIPKIN: This is argumentative and you
20 don't have to answer that question; you just don't. I
21 raised the objection that it's not related to the
22 contract claim. That's good enough.
23     MR. LEGACKI: How about bad faith claim?
24     MR. ZIPKIN: I didn't stop you from answering
25 the questions. So he has answered as best as he can.

Page 49

1  But if it's purely argumentative, I don't think he has
2  to answer that.
3      THE WITNESS: No, it didn't really upset me.
4  I just don't know that much about it.
5      Q  (By Mr. Legacki) So as you sit there
6  under oath, you get bonuses and increase in pay and
7  you don't know why you get that? You don't know
8  what you have to do to perform to get that?
9      MR. ZIPKIN: Object to form.
10     THE WITNESS: You know, not really.
11     Q  (By Mr. Legacki) Now you were the
12 adjuster in the Weilbacher case; is that correct?
13     A  That's correct.
14     Q  Was the issue of direct claim under
15 AS 09.15.010 involved in that case as well?
16     MR. ZIPKIN: The question itself contains a
17 mischaracterization.
18     THE WITNESS: I don't think so. I don't
19 think it was involved in that, not that I recall.
20     Q  Wasn't there an issue of whether or not they
21 could collect under the Gillespie Wald case?
22     A  No, the Wald case was mainly a question of
23 exhaustion of liability limits to get underinsured.
24     Q  Well, wasn't the issue of the Gillespie
25 involved in that as well, the separate policy?

EXHIBIT A
Page 13 of 27

13 (Pages 46 to 49)
Alaska Stenotype Reporters (907) 276-1680

Danny Withers — Deposition — July 12, 2006

### Page 50

1    A    Elements of it may have been, yes.
2    Q    And is there correspondence on that between
3 you and the attorney, Laurel Peterson gotten an issue?
4    A    I don't believe that there was correspondence
5 between me and Laurel Peterson. I don't recall, not
6 direct correspondence, no. That was in litigation and
7 there they have been correspondence between him and
8 defense counsel, which was Dan Quinn.
9    Q    Do you know of any other cases where the
10 issue of paying a claim under AS 09.15.010 that have
11 arisen?
12    A    Do I know of any other cases?
13         MR. ZIPKIN: I'm sorry, just for
14 clarification. Are you asking Progressive claims that
15 he's handled with Progressive or --
16         MR. LEGACKI: No, I'm just asking if he's
17 aware of them?
18         THE WITNESS: Am I aware of any cases that I
19 handled?
20    Q    (By Mr. Legacki) Any at all, whether you
21 handled it or another adjuster has handled it or
22 anything else.
23    A    I'm sure there is, but I don't recall any
24 specific cases.
25    Q    So this is a common issue, whether or not you

### Page 51

1 can collect a direct claim under AS 09.15.010?
2    A    It's come up before, yes.
3    Q    In what context has it come up before?
4    A    Under the same context in the case, whether
5 or not loss of society, loss of consortium is
6 derivative or non-derivative.
7    Q    What cases are they?
8    A    I can't recall any offhand.
9    Q    How many are there?
10    A    I have no idea offhand.
11    Q    Has Progressive ever addressed this issue in
12 Alaska before?
13    A    I think it's come up before, yes.
14    Q    And what cases with Progressive?
15    A    Well, I can't recall any.
16    Q    Do you talk about it at the office to the
17 other adjusters about this issue?
18    A    I think so, yes.
19    Q    I'm sorry?
20    A    Yes, I think so.
21    Q    And what have you -- have you discussed this
22 at a meeting, how was it discussed?
23         MR. ZIPKIN: Object to form. It's compound.
24         THE WITNESS: Under this particular insurance
25 contract whether or not loss of society, loss

### Page 52

1 consortium is a derivative claim or a nonderivative
2 claim.
3    Q    (By Mr. Legacki) Any memos been written
4 on that?
5    A    I don't think so. I don't recall.
6    Q    Well, how does this discussion come up, at a
7 meeting or --
8    A    It might come up day to day on a specific
9 claim or something, you know, a different claim. I
10 don't know, I can't recall any specific claims. But
11 it's a question that arises every now and then.
12    Q    You say day to day?
13    A    Week to week, I don't know. It's an issue
14 that has arisen in the past.
15    Q    And tell me how these meetings go. Do you
16 sit around and discuss it or do you look at it or --
17    A    No, it's not a meeting. It may come up with
18 another adjuster handling a claim like that.
19    Q    And they come up to you and talk to you about
20 it?
21    A    I don't recall specifically, no.
22    Q    How many cases are there? Seems like you
23 said, there's day to day, or week to week. There must
24 be more than one. There must be several that come up;
25 is that correct?

### Page 53

1         MR. ZIPKIN: Mischaracterizes and object to
2 form.
3         THE WITNESS: You know, I don't know how many
4 cases there are. All I can tell you is the issue has
5 come up before.
6    Q    (By Mr. Legacki) And did you go back and
7 look at how Progressive handled the issue before?
8    A    We've always handled it the same way.
9    Q    So the other cases in Alaska where --
10 obviously these are in court cases?
11    A    There may be. I don't recall any specific
12 cases.
13    Q    Do you refer to any database, is there any
14 group of documents at Progressive that you can go
15 refer to regarding this issue?
16    A    No, we looked at the specific policy that's
17 relevant to the case.
18    Q    Do you ever look at memos and say, "Geez, how
19 did we handle this before?"
20    A    No, we look at the policy that's applicable
21 to whatever the claim had.
22    Q    So each time this issue comes up it's an ad
23 hoc, just comes up any time anyone raises the issue of
24 AS 09.15.010, it's a reinvent the wheel kind of thing?
25    A    No. You look at the particular policy that's

EXHIBIT A
Page 14 of 27

14 (Pages 50 to 53)