Danny Withers                           Deposition                          July 12, 2006

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF ALASKA
 2
 3   RONALD V. WEILBACHER,
 4         Plaintiff,
 5      v.
 6   PROGRESSIVE NORTHWESTERN
     INSURANCE COMPANY,
 7
 8         Defendant.
 9   _____/
     Case No. 3:05-CV-0204-TMB
10
11
12
            DEPOSITION OF DANNY WITHERS
13
14
           Pages 1 - 67 inclusive
15
        Wednesday, July, 12, 9:00 a.m.
16
             Anchorage, Alaska
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF ALASKA
 2
 3   RONALD V. WEILBACHER,
 4         Plaintiff,
 5      v.
 6   PROGRESSIVE NORTHWESTERN
     INSURANCE COMPANY,
 7
 8         Defendant.
 9   _____/
     Case No. 3:05-CV-0204-TMB
10
11      DEPOSITION OF DANNY WITHERS,
12   taken on behalf of the plaintiff, pursuant to notice,
13   at the offices of Alaska Stenotype Reporters, 511 West
14   Ninth Avenue, Anchorage, Alaska, before Cynthia J. Kenan,
15   Court Reporter for Alaska Stenotype Reporters and Notary
16   Public for the State of Alaska.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:       Kenneth W. Legacki, P.C.
                          By: Kenneth W. Legacki
 4                        425 G Street
                          Suite 920
 5                        Anchorage, Alaska 99501
                          907/278-4848
 6
 7
     For Defendants:      Guess & Rudd
 8                        By: Gary A. Zipkin
                          Aisha Tinker Bray
 9                        510 L Street
                          Suite 700
10                        Anchorage, Alaska  99501
                          907/793-2299
11
12   Also Present:        Bob Lohr
                          Jay Wesolowski
13
     Reported By:         Cynthia Kenan
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               I-N-D-E-X
 2
 3   EXAMINATION BY:                    PAGE
 4   Mr. Legacki                         5
 5
 6   EXHIBITS:
       1  Insurance Policy              11
 7     2  Document                      16
       3  PACMAN note 02/14/04              19
 8     4  PACMAN note 02/15/04              20
       5  PACMAN note 03/31/05              23
 9     6  Letter from attorney          29
       7  PACMAN note 07/26/06              33
10     8  Gillespie Decision            34
       9  Teel Decision                 41
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT ___J___      1 (Pages 1 to 4)
Page ___1___ of ___16___

Danny Withers                           Deposition                           July 12, 2006

Page 5

1  Anchorage, Alaska, Wednesday, July 12, 2006, 9:00 a.m.
2                    GARY WITHERS,
3       Called as a witness herein on behalf of the
4       Plaintiff, having been duly sworn upon oath
5       by Cynthia Kenan, Notary Public, was examined
6       and testified as follows:
7                    EXAMINATION
8       Q   (By Mr. Legacki) Sir, would you please
9   state your name for the record and spell your last
10  name, please?
11      A   Danny Withers, W-i-t-h-e-r-s.
12      Q   And what do you prefer to be called, Mr.
13  Withers, Danny or --
14      A   Danny.
15      Q   Obviously you've been deposed before; is that
16  correct?
17      A   That's correct.
18      Q   How times, approximately?
19      A   Oh, probably half a dozen times.
20      Q   Relating to what, if you could tell me?
21      A   Claims adjusting.
22      Q   Claims adjusting?
23      A   Over the years, yes.
24      Q   How long have you been a claims adjuster?
25      A   Approximately 25 years, I would say.

Page 6

1       Q   All those years with Progressive or other --
2       A   I was with other companies.
3       Q   What other companies?
4       A   Started with The Hartford Insurance company
5   and then I was with Crum & Forster commercial
6   insurance. Then I was with Industrial Indemnity,
7   which is their sister company. It's actually the same
8   corporation. I worked for GAB for a short period of
9   time and then Progressive.
10      Q   And how long have you been with Progressive?
11      A   This is my ninth year.
12      Q   Okay. Are you the most senior adjuster at
13  Progressive here at Anchorage?
14      A   I believe so.
15      Q   And there is a manager above you; is that
16  correct?
17      A   Correct.
18      Q   And who is that?
19      A   Right now it's Shawn Griswold.
20      Q   Okay. Does he do adjusting as well?
21      A   No.
22      Q   Okay. So in the Anchorage office you're the
23  head adjuster that gets all the catastrophic claims;
24  is that correct?
25      A   Most of them, but there's two other adjusters

Page 7

1   in this office that also handles those type claims.
2       Q   Handle what?
3       A   The type claims I handle.
4       Q   And you are the adjuster in the Weilbacher
5   case; is that correct?
6       A   That's correct.
7       Q   So when you adjust a case, what do you do
8   when you're looking at it? What are the -- go through
9   the steps. The claim comes in and what happens then?
10      A   Well, the first thing, determine coverage,
11  coverage investigation and then basic liability
12  investigation and that's it initially.
13      Q   And so in this particular case there was no
14  issue about coverage? There was no issue about
15  liability, correct?
16      A   In the Weilbacher case?
17      Q   Yes.
18      A   No.
19      Q   Okay. As a senior adjuster, what do you do
20  to research an issue as to whether or not to decline
21  or pay or not pay? What do you do? Do you do any
22  legal research? Do you consult with management? What
23  exactly do you do with the claim?
24      A   Well, I don't do any legal research myself.
25  I'm familiar with you know, Alaska law and case law

Page 8

1   that might be pertinent to the particular claim I am
2   investigating, you know. Sometimes I confer with our
3   defense counsels on issues that might come up in a
4   coverage investigation or liability investigation.
5       Q   Why has Progressive refused to pay
6   Mr. Weilbacher his money under AS09.15.010?
7       A   Well, because if I understand Mr.
8   Weilbacher's claim, it's a claim for loss of
9   consortium, loss of society and according to the
10  contract that we're dealing with in this loss, that is
11  a derivative claim of a single bodily injury limit
12  which Progressive paid.
13      Q   What do you mean by derivative?
14      A   It means it's derivative of the single bodily
15  injury. It's a claim that's derivative of the
16  wrongful death claim in this case.
17      Q   So it's derivative of the wrongful death
18  claim?
19      A   Right.
20      Q   Okay. What is a direct claim? Do you
21  understand what a direct claim is?
22          MR. ZIPKIN: Calls for legal conclusion.
23          THE WITNESS: Well, a direct claim is a claim
24  that a person may have because of a bodily injury.
25      Q   (By Mr. Legacki) Okay. So you're saying

Danny Withers					Deposition					July 12, 2006

Page 9

1  that under the contract, Mr. Weilbacher cannot
2  collect under AS09.15.010 because you consider it
3  derivative rather than direct?
4      MR. ZIPKIN: Object to the form.
5      THE WITNESS: That's correct.
6   Q  (By Mr. Legacki) Could you tell me what
7  the purpose is of -- under insurance coverage?
8   A  Well, if there's a -- if the liability
9  insurance available to the tortfeasor is inadequate to
10 cover the damages, then underinsured would come into
11 play.
12  Q  So in this particular case, the death of
13 Heidi Weilbacher, and the tortfeasor, Mr. Esper did
14 not have enough coverage to pay all the claims -- the
15 value of the claim of Heidi Weilbacher; is that
16 correct?
17  A  That's correct.
18  Q  And nor did they have enough money to
19 compensate the direct claims of Mr. and Mrs.
20 Weilbacher; is that correct?
21  A  That's correct, yes.
22      MR. ZIPKIN: I object to the word direct
23 without it being defined. I object to the reference
24 to the word direct.
25      MR. LEGACKI: I'm sorry, you object to the

Page 10

1  word direct?
2      MR. ZIPKIN: Yes, because it hasn't been
3  defined for purposes of the deposition.
4   Q  (By Mr. Legacki) Would you define direct?
5  Would you mind telling me what direct means, a
6  direct claim as you understand it?
7   A  Well, as I understand it, it's a claim that
8  arises out of bodily injury or property damage as
9  defined by the policy.
10  Q  Okay could you explain to me for the sake of
11 Mr. Zipkin, explain for the record what is the
12 difference between a direct claim and a derivative
13 claim?
14      MR. ZIPKIN: That assumes facts not in
15 evidence and it calls for a legal conclusion. You're
16 making the distinction between direct and derivative.
17 The witness has never done that.
18  Q  (By Mr. Legacki) Could you explain to me
19 the difference of your understanding of the direct
20 claim and derivative claim?
21  A  Well, a direct claim is a claim that arises
22 out of bodily injury as defined by the policy and a
23 derivative claim is a claim that arises out of that
24 bodily injury to the person that's involved there.
25  Q  Okay.

Page 11

1   A  That's the best I can explain it.
2   Q  Let's mark this as Exhibit 1, please.
3      (Exhibit Number 1 was marked.)
4      Sir, I'd like to hand you Exhibit 1 that is
5  Bates stamped No. 100375 and it was given to me by
6  Progressive as a copy of the insurance policy that is
7  at issue in this case. Do you see that, sir?
8   A  Yes, uh-huh.
9   Q  I'm looking at the first paragraph there. It
10 says, "Insuring Agreement, Uninsured/Underinsured
11 Motorist Bodily Injury Coverage."
12     Do you see that?
13  A  Uh-huh.
14  Q  This is Page 20. It states: "Subject to the
15 limit of liability."
16     What does that mean?
17  A  It means it's subject to the limits provided
18 on the declaration page of the policy.
19  Q  And what's the limit in this case?
20  A  I believe there were 100,000 per person and
21 100,000 per accident.
22  Q  Was it a hundred, three hundred or --
23  A  One hundred, three hundred.
24  Q  So a hundred per person, three hundred total
25 for the accident; is that correct?

Page 12

1   A  That's correct.
2   Q  And Mr. Weilbacher paid a premium for the
3  uninsured/underinsured motorist; is that correct?
4   A  That's correct.
5   Q  And it was for a hundred, three hundred?
6   A  That is correct.
7   Q  States, "We will pay for damages, other than
8  punitive or exemplary damages which insured person is
9  legally entitled to recover from the owner or operator
10 of an uninsured/underinsured motor vehicle because of
11 bodily injury." Is that correct?
12  A  Correct.
13  Q  And if Mr. Weilbacher was injured as defined
14 by law, he would be entitled to recover it under the
15 uninsured motorist coverage, correct?
16  A  Correct.
17     MR. ZIPKIN: Well, that's an incomplete
18 question, incomplete hypothetical.
19  Q  (By Mr. Legacki) Let's have this marked
20 as Exhibit 2.
21     (Exhibit Number 2 was marked.)
22  Q  (By Mr. Legacki) Do you see that, sir?
23     MR. ZIPKIN: You haven't given it to him yet.
24  Q  (By Mr. Legacki) Now, the issue in this
25 particular case is whether or not Mr. Weilbacher

Danny Withers                                Deposition                                July 12, 2006

Page 13

1  suffered a bodily injury; is that correct?
2      MR. ZIPKIN: Object to the form.
3      THE WITNESS: Well, I don't know if Mr.
4  Weilbacher suffered bodily injury, no.
5      Q  (By Mr. Legacki) That is the issue; isn't
6  that correct?
7      MR. ZIPKIN: Object to form.
8      THE WITNESS: No, I don't think so.
9      Q  (By Mr. Legacki) What's the issue in the
10 case?
11     A  The issue the way I understand it in this
12 case is whether or not he has a claim because of
13 bodily injury to his daughter.
14     Q  You don't -- well, isn't it true that
15 Mr. Weilbacher filed a claim under AS 09.15.010 under
16 the Gillespie decision that asserts he has an
17 independent claim?
18     A  Well, he's asserting a claim but whether or
19 not -- I'm not -- you said he was injured, and I don't
20 know if he was injured or not but he asserted a claim.
21     Q  So the issue of the case is whether or not
22 when his daughter died was he considered an
23 independent claim for the death of his daughter,
24 correct?
25     MR. ZIPKIN: Object to form. That's

Page 14

1  incorrect.
2      THE WITNESS: Yes that's the issue.
3      Q  (By Mr. Legacki) Okay. And the statute
4  allows him to file an independent claim, correct,
5  AS 09.15.010?
6      A  Yes, he can file a claim.
7      Q  Okay. And it gives him a right to collect
8  for the death of his daughter independent of any
9  wrongful death action.
10     A  I believe so.
11     Q  Okay. Now if the statute says that he can
12 file a direct claim for the death of his daughter and
13 if its his own independent claim, why does the
14 paragraph we read in Exhibit 1 not cover that?
15     MR. ZIPKIN: Object. It mischaracterizes the
16 testimony and you're confusing independent with
17 direct. If you can answer, go ahead.
18     Q  (By Mr. Legacki) Is there a difference
19 between an independent and a direct claim?
20     A  Well, the answer to your question is he can
21 file the claim, but it's subject to the single bodily
22 injury limit. It's -- his claim is derivative of his
23 daughter's wrongful death claim.
24     Q  Well, okay, let's assume that he sued the
25 tortfeasor, okay? Can he file a lawsuit directly

Page 15

1  against the tortfeasor under AS O9.15.010 for the loss
2  of society?
3      A  I believe he could.
4      Q  Okay. Now, we've read on Exhibit No. 1 the
5  paragraph that Progressive will pay for damages which
6  an injured person is legally entitled to recover from
7  the owner or operator of an uninsured/underinsured
8  motor vehicle because of bodily injury; is that
9  correct?
10     A  That's correct.
11     Q  And doesn't the Gillespie decision say that a
12 parent suffers a bodily injury when their child is
13 killed?
14     MR. ZIPKIN: Object to the form.
15 Mischaracterizes the case.
16     THE WITNESS: I don't know if the Gillespie
17 decision says he suffers a bodily injury.
18     Q  (By Mr. Legacki) You read the Gillespie
19 -- you said you were familiar with Alaska cases,
20 right? You are familiar with the Gillespie
21 decision?
22     A  I have heard of the Gillespie decision but
23 I'm not that familiar with it.
24     Q  I thought you said you knew Alaska case laws
25 regarding these issues?

Page 16

1      A  I said I'm familiar with it, but I don't know
2  every case, you know.
3      (Exhibit No. 2 was marked.)
4      Q  Now, let's look at Exhibit No. 2. It states:
5  "The bodily injury of limit of liability under Part
6  III for each person includes a total of all claims
7  made for such bodily injury;" is that correct?
8      A  That's correct.
9      Q  And then it has "and", right?
10     A  Right.
11     Q  What does that mean when you put an "and" in
12 a clause?
13     A  Well, it means and --
14     Q  Either/or?
15     A  No. I think it means including or in
16 addition to.
17     Q  So you have to have all that or it is two
18 separate?
19     A  I'm not sure I understand what you mean.
20     Q  Well, I'm reading this. It says: "The bodily
21 injury limit of liability under this Part III for each
22 person includes the total of all claims made for such
23 bodily injury," right?
24     A  Right.
25     Q  So if somebody's injured, they receive

Danny Withers                                   Deposition                                   July 12, 2006

### Page 17

1  compensation for that bodily injury, correct, for that
2  individual?
3    A   Right.
4    Q   Okay. And then it goes: "And all claims" --
5  which, this is separate now -- "All claims derive from
6  such bodily injury including but not limited to, loss
7  of society, loss of companionship, loss of services,
8  loss of consortium, and wrongful death," correct?
9    A   Right.
10   Q   Now, when you have these derivative claims --
11 are they common law claims or statutory claims we're
12 referring to?
13       MR. ZIPKIN: Object to form and you're
14 calling for legal conclusions.
15       THE WITNESS: Well, it may be -- there may be
16 both. But, you know, it's mostly common law claims, I
17 believe.
18   Q   (By Mr. Legacki) Okay. So the derivative
19 claims here are actually related to the common law
20 claims and not statutory claims, correct?
21       MR. ZIPKIN: Same objections.
22       THE WITNESS: Well, it would be, you know, it
23 could be both. All claims derived from such bodily
24 injury could be common law; could be statutory, could
25 be both.

### Page 18

1    Q   (By Mr. Legacki) What is it? You're the
2  one that declined the coverage. I'd like to know
3  why -- what does this mean to you? Does this mean
4  both statutory and common law claims?
5    A   Yes, I believe so.
6    Q   So you are saying that you can write a
7  contract clause that could be contravened by the same
8  statute?
9        MR. ZIPKIN: Object. Mischaracterizes his
10 testimony. Object to form.
11       THE WITNESS: I don't think it does
12 contravene the statute.
13   Q   (By Mr. Legacki) I'm sorry?
14   A   I don't think it is adverse to the statute.
15   Q   So, you don't see there that there is two
16 different separate -- "and separate" makes it two
17 different clauses, one for individual bodily injury
18 and the other one for derivative bodily injury? Or
19 let me rephrase that, that the first part of that
20 clause states direct or independent causes of action
21 for bodily injury and the second part is for
22 derivative claim of bodily injury?
23       MR. ZIPKIN: Asked and answered.
24       THE WITNESS: I think it derives all claims
25 from that bodily injury that occurs to the person

### Page 19

1  that's injured or in the case, wrongful death. Any
2  claims derived from that injury, that includes those
3  claims, whether they're common law or statutory
4  claims.
5        (Exhibit Number 3 was marked.)
6    Q   I hand you Exhibit Number 3, please. Can you
7  tell me what that is, sir, paginated number 100329,
8  the Face Sheet Note Inquiry using the PACMAN system?
9    A   These are log notes.
10   Q   All right.
11   A   Computerized log notes.
12   Q   All right. You state at the bottom there:
13 "The individual's claims of father/mother will include
14 loss of consortium and loss of society;" is that
15 correct?
16   A   Uh-huh.
17   Q   What do you mean by "individual's claims"?
18   A   Means that they have an individual claim for
19 loss of consortium or loss of society.
20   Q   In their own right?
21   A   Yes. But they're still subject to the single
22 bodily injury limit derivative active of that limit.
23   Q   But you recognize that they -- in fact, your
24 counsel conceded that they did have a right to
25 individual claim and under AS O9.15.O1O.

### Page 20

1        Are you aware of that?
2    A   Yes.
3    Q   And that's an individual claim independent of
4  the derivative claim?
5        MR. ZIPKIN: Objection; mischaracterizes.
6  Object to the form; putting words in his mouth.
7        THE WITNESS: It's not independent of the
8  derivative claim under the contract. They have an
9  independent claim, but it's still subject to the
10 single bodily injury -- it's derivative of that limit.
11       (Exhibit Number 4 was marked.)
12   Q   (By Mr. Legacki) Do you recognize that,
13 sir?
14   A   Yes, uh-huh.
15   Q   This is another PACMAN note of yours, I think
16 it's dated February 15 '04, 2004?
17   A   Uh-huh.
18   Q   The parents' individual claim put a value of
19 50,000 to 75,000 each for the wrongful death of their
20 15-year-old daughter?
21   A   Yes.
22   Q   Why do you -- how did you come to the value
23 of 50/75,000?
24   A   It's an estimate of what their individual
25 claims might be worth.

Danny Withers                                    Deposition                                    July 12, 2006

Page 21

1   Q   How did you get that figure?
2   A   Mostly just off of experience, the kind of
3   value those claims might have.
4   Q   You put a value of a lost child at somewhere
5   between 50 and $75,000?
6   A   Well, I'm talking about the loss of society
7   and loss of consortium-type claims.
8   Q   That's all you value the loss of a child? Is
9   there anything that tells me in your experience you
10  value the loss of a child at only 50 to $75,000?
11      MR. ZIPKIN: Mischaracterizes his testimony.
12      THE WITNESS: It might be worth more than
13  that, but that's, you know, that's an estimate. I
14  don't -- you know something that in my experience, a
15  jury might award.
16  Q   (By Mr. Legacki) And what experience is
17  that?
18  A   Just over the years, cases I've had.
19  Q   Could you tell me which cases where the jury
20  only awarded 50 to $75,000 for the loss of a child?
21  A   I can't recall any.
22  Q   Did you go to a book? Did you go to any jury
23  verdict research or anything like that?
24      MR. ZIPKIN: Give him -- if I can, Mr.
25  Withers, give me a moment to interpose an objection

Page 22

1   before you answer.
2       THE WITNESS: Okay.
3       MR. ZIPKIN: Thank you.
4   A   All right.
5   Q   (By Mr. Legacki) Do you have any
6   children?
7   A   I do.
8   Q   Do you think they're only worth 50 to
9   $75,000?
10      MR. ZIPKIN: Mischaracterizes the testimony.
11  If I may say, he hasn't said that 50 to 75,0000 is the
12  value of the loss of a child. He's talking about loss
13  of society, not loss of a child. You're confusing
14  wrongful death and loss of consortium.
15  Q   (By Mr. Legacki) I mean, would you be
16  happy with 50 to $75,000 for the loss of your
17  daughter?
18      MR. ZIPKIN: Same objections.
19      THE WITNESS: You know, you can't put the
20  value on the loss of a child; that's not what we're
21  dealing with here. We're dealing with, you know, the
22  loss of consortium, loss of society.
23  Q   (By Mr. Legacki) Define loss of society.
24      MR. ZIPKIN: Calls for a legal conclusion.
25      THE WITNESS: Companionship, I don't know,

Page 23

1   companionship, being around that person. That's what
2   I understand it to be.
3   Q   (By Mr. Legacki) I'm sorry?
4   A   That's what I understand it to be.
5   Q   How about loss of consortium?
6       MR. ZIPKIN: Assumes they're different.
7       THE WITNESS: Loss of consortium is similar
8   to the same thing, but the way I understand loss of
9   consortium is more husband and wife, you know,
10  situations where they are -- have to do one for
11  another, or things around the house, being together,
12  that they're no longer able to do because of the
13  injury.
14  Q   (By Mr. Legacki) Can you imagine any
15  other injury or loss greater than the pain of losing
16  a child?
17  A   I'm sorry?
18  Q   Can you imagine any other greater loss of
19  injury or pain or suffering than a parent losing a
20  child?
21  A   Probably not, no. Probably pretty tough.
22      (Exhibit No. 5 was marked.)
23  Q   There is Bates Number 100333; is that
24  correct?
25  A   Correct.

Page 24

1   Q   Okay and it's your PACMAN note dated
2   March 31st, '05?
3   A   Correct.
4   Q   And that's where you say "just call
5   attorney." I'm assuming it's me?
6   A   Uh-huh.
7   Q   And advised that Progressive agrees
8   non-insured; is that Mr. Weilbacher or who is "I"?
9   A   What was that again?
10  Q   You have "call attorney; advised that
11  Progressive agrees that NI does have IM coverage."
12  A   Named insured.
13  Q   Named insured does have. What does "IM" mean
14  or is that UM?
15      MR. ZIPKIN: I think you have a bit of the
16  margin cut off on this unfortunately. I think you're
17  missing some letters.
18      THE WITNESS: I think it's a U, UIM.
19  Q   (By Mr. Legacki) Uninsured motorist
20  coverage?
21  A   Correct, uh-huh.
22  Q   "But any claims for NIED do not meet the
23  elements set out in Alaska case law." Is that
24  correct?
25  A   Right.

Danny Withers                     Deposition                     July 12, 2006

Page 25

1  Q   And then he says -- and then you wrote down
2  "he says," meaning Mr. Weilbacher's attorney, "his
3  client has claim for loss of society and loss of
4  consortium. I told him these are derivative of the --
5  what does "the W.D." mean?
6  A   Wrongful death.
7  Q   "Wrongful death limit and there can be no
8  direct claim." Do you see that?
9  A   Correct.
10 Q   So you wrote down "no direct claim." What
11 did you mean by "no direct claim"?
12 A   Well, in that case, I meant that there would
13 not -- that there would be no direct -- there would
14 not be a separate bodily injury available -- bodily
15 injury limit available for these particular claims.
16 That's what I meant by that.
17 Q   And you have there "NIED." What is that,
18 negligent infliction of emotional distress?
19 A   That's correct.
20 Q   How do you define that?
21    MR. ZIPKIN: Calls for a legal conclusion.
22    THE WITNESS: How do I define it?
23    MR. LEGACKI: Yes.
24    THE WITNESS: I don't know how I define it.
25 Q   (By Mr. Legacki) What's the difference

Page 26

1  between NIED and loss of society?
2  A   Well, NIED, as we recognize in Alaska, the
3  way I understand Alaska law, could be subject to a
4  separate policy limit.
5  Q   What's the difference between somebody who's
6  suffering negligence and emotional distress and
7  somebody suffering from loss of society? Can you
8  explain the difference to me?
9     MR. ZIPKIN: Calls for a legal conclusion.
10    THE WITNESS: Well, negligent infliction of
11 emotional distress is more of a bystander-type claim,
12 somebody that sees something happen or maybe they're
13 -- they go directly to the accident scene after the
14 accident and I'm defining it the way I understand
15 Alaska law.
16 Q   (By Mr. Legacki) I'm not talking about
17 Alaska law. What's the common -- what do you think
18 of a person -- what is the difference between NIED,
19 a parent suffering emotional distress versus a
20 parent suffering loss of society?
21    Describe to me the feeling, emotions or --
22 what distinguishes the two?
23    MR. ZIPKIN: Object to form. Compound.
24 Calls for a legal conclusion.
25    THE WITNESS: The manifestation of injury.

Page 27

1  Q   (By Mr. Legacki) What does that mean?
2  A   It would be for probably NIED, negligence
3  inflicts emotional distress.
4  Q   I'm sorry, I don't understand. What do you
5  mean by manifestation of injury?
6  A   That you've got some kind of an injury and
7  because of it, be it mental or emotional, you've got
8  an injury.
9  Q   Are you saying that a person who has a loss
10 of society doesn't have the same injury?
11 A   I don't know.
12 Q   How about loss of consortium?
13    MR. ZIPKIN: Object to form.
14    THE WITNESS: A physical injury, I don't
15 think it's a physical injury, no.
16 Q   (By Mr. Legacki) So you're just saying if
17 a person has a loss of society they're not suffering
18 from any physical injury?
19 A   I'm not saying that. I said I don't think
20 they have a physical injury.
21 Q   What if a person did have a physical injury
22 from the death of a daughter?
23    MR. ZIPKIN: Object to the form, incomplete
24 question.
25    THE WITNESS: I don't know.

Page 28

1  Q   (By Mr. Legacki) So when you look at it,
2  the difference between NIED and the loss of society,
3  you look at it from a legal context, not from a
4  personal context as to what the difference is
5  between the two?
6  A   Yes.
7     MR. ZIPKIN: Mischaracterizes.
8  Q   Now?
9  Q   (By Mr. Legacki) Now further going into
10 your note here, Exhibit Number 5, was "he" -- I
11 guess this means the attorney -- "thinks Teel v.
12 Progressive gives authority for direct claim for
13 loss of consortium."
14    Did you ever analyze that statement? Did you
15 try to figure out whether or not the attorney was
16 correct in there?
17 A   Yes, I did, I conferred with someone to get
18 some other opinion on that.
19 Q   Who did you confer with?
20 A   Dan Quinn.
21 Q   Anyone else?
22 A   No.
23 Q   Dan Quinn of Richmond & Quinn?
24 A   That's correct.
25 Q   And he gave you an opinion?

Danny Withers                                Deposition                               July 12, 2006

### Page 29

1  MR. ZIPKIN: Without revealing.
2  Q  (By Mr. Legacki) Without revealing, he
3  gave you an opinion?
4  MR. ZIPKIN: I think even that much is
5  attorney-client, so I instruct you not to answer about
6  what Mr. Quinn gave you.
7  Q  (By Mr. Legacki) Did you discuss the case
8  with Mr. Quinn?
9  A  I did.
10  Q  Okay. Exhibit number 6, please.
11  (Exhibit Number 6 was marked.)
12  Do you see that, sir?
13  A  Correct, yes, I do.
14  Q  And it goes: "Letter from attorney." This is
15  dated June 26 '05.
16  "He continues to allege direct claim under
17  AS 09.15.010 which gives parent a separate and independent
18  cause of action for damages due to the death of a child."
19  So are you saying there that you agree with
20  me that AS 09.15.010 gives a parent separate and
21  independent cause of action for damages due to the
22  death of a child?
23  A  No, I'm saying that that's what you told me.
24  Q  Well does -- you have here AS 09.15.010, you
25  state "which gives parent a separate and independent

### Page 30

1  cause of action for damage due to the death of a
2  child."?
3  A  Yes, that's what I was saying that you allege
4  under that statute that --
5  Q  Well, AS 09.15.010 gives a separate and
6  independent cause of action for damages for the death
7  of a child?
8  MR. ZIPKIN: Calls for legal conclusion.
9  This witness is not a lawyer.
10  THE WITNESS: I'm not sure what that statute
11  is. I don't recall what that --
12  Q  (By Mr. Legacki) Did you look it up?
13  After you got this correspondence did you go to see
14  what I was talking about?
15  A  I don't recall if I did or not.
16  Q  Why not? Why didn't you go look and see what
17  AS 09.15.010 said?
18  MR. ZIPKIN: Object to form. Assumes he
19  didn't.
20  THE WITNESS: I didn't think I needed to.
21  Q  (By Mr. Legacki) Why is that?
22  A  Because the claims, the particular claims
23  that you were making under the contract were
24  derivative claims of a single policy limit we had
25  already paid.

### Page 31

1  Q  Did you check to see that you may be wrong in
2  that, that the policy may be wrong? Did you ever
3  check to see, wait a minute, this may be something
4  different?
5  A  No, I didn't.
6  Q  He also cites Gillespie v. Beta Construction.
7  Did you look at Gillespie? You were familiar with the
8  Gillespie case?
9  A  I have heard of the case, but I don't recall
10  exactly what it talks about.
11  Q  It goes: "Our argument is that although this
12  does give claim to parent, it is derivative of the
13  wrongful death per contract."
14  Is that correct?
15  A  That's correct.
16  Q  And then: "AS 09.15.010 simply allows parent
17  to pursue claim."
18  Where did you get that from?
19  A  You know, probably from Dan Quinn. I asked
20  him about it.
21  Q  So you got that statement because of what Dan
22  Quinn told you?
23  MR. ZIPKIN: To the extent that the witness
24  has said that in response to a question that wasn't
25  directly asking what Dan Quinn said, I was unable to

### Page 32

1  direct him not to reveal attorney-client
2  communications, but to the extent that this question
3  clearly asked for attorney-client communications, I
4  instruct the witness not to answer.
5  Q  (By Mr. Legacki) So when you wrote
6  this --
7  MR. ZIPKIN: I move to strike the prior
8  answer.
9  Q  (By Mr. Legacki) Is this from your own
10  personal knowledge or is it from an attorney?
11  MR. ZIPKIN: That invades the attorney-client
12  privilege and I instruct you not to answer.
13  MR. LEGACKI: Well, I have a waiver, if he's
14  got it. I'm going to ask him where he got this
15  information from. I mean, I've got to know the source
16  of the information, Gary. That's a waiver then, if
17  you want to go that far.
18  MR. ZIPKIN: I don't believe we have waived
19  it.
20  Q  (By Mr. Legacki) Where did you come up
21  with -- you wrote this on your notes, and I have the
22  notes in front of you, given the introduction from
23  Progressive's lawyers and you wrote "AS 09.15.010
24  simply allows parent to pursue a claim."
25  Did you read the Gillespie decision or did

Danny Withers                    Deposition                    July 12, 2006

Page 33

1  you read the statute or anything like that?
2  A  You know, I don't recall.
3  Q  Well, don't you think you had a duty to read
4  -- when an attorney writes and said you had a duty to
5  pay under the policy, under AS 09.15.010, you have a
6  duty to look at the statute and look at the case that
7  he cites in support of it?
8       MR. ZIPKIN:  I object to form.
9       THE WITNESS:  Yes, and I got this from
10 someplace, but I don't recall where I got it.
11      (Exhibit Number 7 was marked.)
12 Q  (By Mr. Legacki) And this is dated July
13 26, '05. You redacted something there, so we don't
14 have the true context. "However we feel all claims
15 except for NIED are derivative of the limit we paid
16 to estate for wrongful death. There is no evidence
17 of NIED claims in initial investigation. However" --
18 And then you go on: "Attorney is specifically making
19 claims for loss of society consortium and argues
20 these are separate claims subject to separate limit
21 which we dispute." Is that correct?
22      MR. ZIPKIN:  I object. I think you're
23 assuming this is his entry but I'm not sure that --
24 Q  (By Mr. Legacki) Is this your entry?
25      MR. ZIPKIN:  Oh, okay, I'm sorry.

Page 34

1       MR. LEGACKI:  I'm sorry, did I miss
2  something?
3       MR. ZIPKIN:  Might be my mistake.  Go ahead,
4  I'm sorry.
5       THE WITNESS:  It's my entry.
6       MR. LEGACKI:  I'm sorry?
7       THE WITNESS:  Yes, it's my entry.
8  Q  (By Mr. Legacki) Well, let's look at the
9  Gillespie decision. Have this marked, please.
10      (Exhibit Number 8 was marked.)
11 Q  (By Mr. Legacki) Do you want to take a
12 moment to read that, sir? Do you need a moment?
13      MR. ZIPKIN:  I think the witness should have
14 an opportunity to review the entire document --
15      MR. LEGACKI:  Sure. Off record, I guess, of
16 five minutes.
17      (Brief break.)
18 Q  (By Mr. Legacki) On Exhibit 7 where it's
19 paginated 10034 --
20      MR. ZIPKIN:  Exhibit 6.
21      THE WITNESS:  Exhibit 6?
22      MR. LEGACKI:  Yes.
23      THE WITNESS:  Okay.
24 Q  (By Mr. Legacki) You state there
25 "AS 09.15.010 simply allows parent to pursue a claim."

Page 35

1       Do you see that, the last sentence?
2  A  Uh-huh.
3  Q  I want you to look at -- on page 1273 of
4  Gillespie.
5  A  Okay.
6  Q  And footnote number 3?
7  A  Down at the bottom?
8  Q  Yes.
9  A  Okay.
10 Q  It rejects that proposition, doesn't it?
11      MR. ZIPKIN:  Objection, calls for a legal
12 conclusion. Mischaracterizes his answer.
13 Q  (By Mr. Legacki) It states that it's not
14 procedural, it's a substantive cause of action?
15 A  I don't know.
16 Q  I'm sorry?
17 A  Footnote -- I don't know. Footnote 3 says:
18 "Beta cites to State Farm Mutual Insurance Company v.
19 Wainscot."
20 Q  "Where the district court for the State of
21 Alaska held that AS 09.15.010 was only procedural and
22 did not confer a new right of recovery in the parent.
23 We chose not to follow the reasoning in Wainscot."
24      MR. ZIPKIN:  What's the question?
25 Q  (By Mr. Legacki) Do you see that, sir?

Page 36

1  A  Yes, I see that.
2  Q  Okay. And that is different than what you
3  stated here in Exhibit Number 6, right, that
4  AS 09.15.010 simply allows parent to pursue a claim?
5       MR. ZIPKIN:  Object to form.
6       THE WITNESS:  I don't know if that is
7  different.
8       MR. ZIPKIN:  You're mischaracterizing Exhibit
9  6.
10      THE WITNESS:  I don't know, what's your
11 question?
12 Q  (By Mr. Legacki) You think that after
13 reading that footnote you still would agree that
14 your statement there in Exhibit Number 6 that the
15 statute only allows a parent to pursue a claim --
16      MR. ZIPKIN:  That's an incomplete reference
17 to Exhibit 6. Exhibit 6 should be read in its
18 entirety.
19      THE WITNESS:  He gives him an independent
20 claim. I still believe that, yes.
21 Q  In fact, if you go up at the paragraph where
22 it has the numeral 2, it says: "The Gillespies
23 however, are not without recourse. Another statute,
24 AS 09.15.010 provides in part a parent may maintain an
25 action as plaintiff for the injury or death of a child

Page 37

1  below the age of majority. We have not yet addressed
2  whether or not AS 09.15.010 creates a separate,
3  independent parental cause of action. We now hold
4  that it does."
5       MR. ZIPKIN: What's the question?
6     Q  (By Mr. Legacki) Do you see that, sir?
7     A  Yes.
8     Q  So does that give the parent a independent
9  claim?
10    A  Yes, it does.
11    Q  Against the tortfeasor?
12    A  Yes.
13    Q  And it's not derivative of the child's
14  injury, is it?
15    A  It is derivative.
16    Q  It is derivative?
17    A  To have an independent claim but is still a
18  derivative to the injury of the child.
19    Q  But it says independent, not derivative?
20    A  Well, you can still have an independent claim
21  but it's still derivative of the single policy limit.
22    Q  Where did you get that from? How did you
23  come up with that conclusion that independent is
24  different from derivative?
25       MR. ZIPKIN: Now we're just arguing. Asked

Page 38

1  and answered.
2       MR. LEGACKI: Well, he's an adjuster.
3     Q  I mean, isn't independent the same as a
4  direct cause of action?
5     A  No.
6     Q  What is the difference between the two?
7     A  Well, an independent claim is a claim that
8  they can pursue independently but is still derivative
9  of the single policy limit for bodily injury.
10    Q  But doesn't the statute say that it's not
11  derivative, it's independent?
12       MR. ZIPKIN: That mischaracterizes the
13  statute. It says no such thing.
14       THE WITNESS: No.
15    Q  (By Mr. Legacki) It says on page 1274 at
16  the top: "Thus we conclude that a parent's right of
17  action under AS 09.15.010 includes the right to
18  recover loss of society damages."
19       MR. ZIPKIN: Is there a question?
20    Q  (By Mr. Legacki) Is that right? Do you
21  see that there?
22    A  Yes, it says that.
23    Q  So do you read that as that saying, the
24  Supreme Court, that the parent has a separate claim
25  from the child?

Page 39

1     A  They --
2     Q  I'm sorry?
3     A  They have an independent claim.
4     Q  A separate claim than from the child,
5  correct?
6     A  That's correct, but it's --
7     Q  On their own individual claim?
8     A  But it's still derivative of the single
9  bodily injury limit.
10    Q  In Gillespie on page 1273, the court states
11  right above paragraph number 2: "The Gillespies, then,
12  cannot claim loss of society under the wrongful death
13  statute." Do you see that?
14    A  Where are you reading that?
15    Q  Where it says -- at paragraph number 2, where
16  "The Gillespies, howsoever, are not without recourse."
17    A  Okay.
18    Q  The sentence right above that.
19    A  The sentence above 2?
20    Q  Yes, "The Gillespies, then, cannot claim loss
21  of society under the wrongful death statute."
22    A  I see that.
23    Q  Okay. Now, I asked you earlier about the
24  language for bodily injury whether or not the loss of
25  society in that clause indicates -- was that for --

Page 40

1  you said wrongful death, that applies to wrongful
2  death, right?
3       MR. ZIPKIN: Mischaracterizes. Object to
4  form. Compound. Confused.
5     Q  (By Mr. Legacki) Can you answer the
6  question?
7     A  Ask the question again, now.
8     Q  When we went through that clause in Exhibit 2
9  regarding -- defining bodily injury --
10    A  Yes.
11    Q  -- you said that the loss of society
12  referenced there was because of loss of society and
13  the wrongful death action, correct?
14       MR. ZIPKIN: Mischaracterizes.
15       THE WITNESS: I believe so.
16    Q  (By Mr. Legacki) Does the policy,
17  Progressive policy, exclude direct actions and
18  direct claims of the parents?
19    A  What do you mean by direct claims?
20    Q  Well, if a parent has a direct claim for say,
21  an NIED, is that excluded?
22    A  No.
23    Q  If the court finds that -- well, why is it
24  then when you have a statutory claim then for the loss
25  of society that's not a direct claim?

Danny Withers                                        Deposition                                        July 12, 2006

Page 41

1      A    It an independent claim. In other words,
2   it's independent. They have a claim. But it's still
3   a derivative claim of a single bodily injury limit.
4      Q    Well, is an NIED claim of a parent
5   independent?
6      A    Yes.
7      Q    So what's the difference between an
8   independent NIED claim than an independent loss of
9   society claim under AS O9.15.O1O?
10     A    I don't know if there is any difference.
11     Q    I'm going hand you Exhibit No. 9.
12         (Exhibit Number 9 was marked.)
13         I'm going to hand you Exhibit Number 9. This
14  is the Teel decision. This is the case I referred you
15  to that you reviewed to decline coverage; is that
16  correct or declined to pay on the policy?
17         MR. ZIPKIN: Object to form.
18         THE WITNESS: I don't recall if I reviewed
19  this case. I may have. I don't recall.
20     Q    (By Mr. Legacki) Well I'd like to refer
21  you to page 5.
22         MR. ZIPKIN: In that case I ask then, again,
23  that the witness be given a chance to review the case.
24         MR. LEGACKI: Review it if you like, sir.
25  Off record. Okay.

Page 42

1      (Brief break.)
2      Q    (By Mr. Legacki) I'd like to refer you to
3   page 5.
4      A    Okay.
5      Q    It states that Teel's claim is direct, the
6   paragraph on the first side of the colum, the middle
7   of the page.
8      A    Okay.
9      Q    "That Teel's claim is direct does not bar the
10  claim. The wording of Allstate's policy does not
11  exclude direct claims. It states that one would be
12  entitled to recover so long as one's damages were
13  because of bodily injury to an occupant of the insured
14  vehicle." And then it goes on to define -- "Webster's
15  Dictionary defines the term 'because of' to mean 'by
16  reason of' or 'on account of'. Legal causation is a
17  stricter standard, generally requiring that 'but for'
18  the occurrence of the event the injury would not have
19  occurred, and the event was a significant and
20  important cause of the injury. In light of both the
21  common and legal definitions of causation, we cannot
22  say that the policy language excludes an NIED claim."
23         The reason I'm asking you now sir, do you
24  think the Progressive policy excludes a independent
25  claim of the Weilbachers under AS O9.15.O1O?

Page 43

1      A    That it excludes that claim? No, I don't
2   think it does.
3      Q    Sir, you are compensated by Progressive; is
4   that correct? You get paid for the work you do?
5      A    Yes.
6      Q    Okay. And do you get a salary?
7      A    Yes.
8      Q    Do you also get any bonuses for profit
9   sharing or gain sharing or anything like that?
10     A    Is that relevant to this?
11     Q    Yes.
12     A    How?
13     Q    Answer your question, please.
14         MR. ZIPKIN: I think the questions regarding
15  gain sharing, if that's what you want to go into --
16         MR. LEGACKI: I'm sorry?
17         MR. ZIPKIN: I think questions regarding gain
18  sharing, if that is what you wish to explore, are
19  unrelated entirely to the breach of contract claim, so
20  I object.
21         MR. LEGACKI: Well, we have a breach and bad
22  faith both.
23     Q    (By Mr. Legacki) So would you answer the
24  question, please?
25     A    Yes.

Page 44

1      Q    Could you tell me about that?
2      A    What do you want to know?
3      Q    I want to know everything. Tell me about the
4   gain sharing program, how you get bonuses. How do you
5   increase your income?
6      A    I don't know anything about it.
7      Q    What do you mean you don't know anything
8   about it?
9      A    Well, I might get a bonus at the end of the
10  year; I might not.
11     Q    For what? What is the bonus based on?
12     A    It's referred to as gain sharing.
13     Q    So you have no idea why you get this bonus,
14  what the reasons are?
15     A    Not really.
16     Q    You have no idea what you need to do to get
17  that extra money?
18         MR. ZIPKIN: Assumes facts not in evidence.
19         THE WITNESS: I don't know how it's done,
20  no.
21     Q    (By Mr. Legacki) You have been with
22  Progressive for nine years and you're a senior
23  adjuster, number two in the office except for -- are
24  you number one in the office or is there somebody
25  above you?

Danny Withers                               Deposition                                July 12, 2006

Page 45

1   A   Above me, how do you mean?
2   Q   In the office here in Anchorage?
3   A   Yes, there's someone above me, a manager,
4   yes.
5   Q   A manager, okay. And you're the head
6   adjuster, right?
7   A   I don't know if you would characterize me as
8   the head adjuster, no.
9   Q   But you're the catastrophic injury? You're
10  the one with the most experience, correct?
11      MR. ZIPKIN: Object to form.
12  Q   (By Mr. Legacki) You are the catastrophic
13  injury adjuster; is that correct?
14  A   If you want to refer to it as that, I suppose
15  so.
16  Q   And you have the most experience in the
17  office?
18  A   I suppose so.
19  Q   And you're sitting here telling me you don't
20  know what gain share is?
21  A   Well, I know it's bonus or gain share money.
22  I don't know how they -- how it comes about, how they
23  calculate it. I don't have anything to do with that.
24  Q   How do they tell you that you can get more
25  money above your salary? What is it that you have to

Page 46

1   do to get that extra money?
2       MR. ZIPKIN: Assumes facts not in evidence;
3   objection.
4   Q   (By Mr. Legacki) Well, did you get extra
5   money? You get extra money; you know what gain
6   share is, right?
7   A   Yes.
8   Q   So tell me, what is it that you have to do to
9   get that extra money?
10  A   My job.
11  Q   What is your job?
12  A   Adjusting claims.
13  Q   And if you're able to beat claims, adjust
14  claims down, you get a profit from that, correct?
15  A   No.
16  Q   What is gain share then?
17  A   It's based on the -- how profitable the
18  company is, I assume.
19  Q   And how would the companies become
20  profitable? By denying claims, correct?
21  A   I don't think so.
22  Q   So as you stand here today, you don't know
23  anything about gain share?
24      MR. ZIPKIN: That mischaracterizes --
25  Q   (By Mr. Legacki) Other than you get --

Page 47

1   there's a program called gain share?
2       MR. ZIPKIN: That mischaracterizes what he
3   has said.
4       THE WITNESS: That's the extent of my
5   knowledge of it, yes.
6   Q   You don't know how it's formulated?
7   A   Specifically no, I don't.
8   Q   Do you ever get reviews? Are you reviewed?
9   A   Yes, uh-huh.
10  Q   And during these reviews did they mention
11  anything regarding gain share and how you're working
12  toward profiting under gain share?
13  A   No.
14  Q   They review how many claims you've been able
15  to gain profit off of, that kind of thing, where you
16  get the value under the excess of --
17      MR. ZIPKIN: Object to form and the
18  deliberate mischaracterization of what they do as
19  profit based in claims.
20      MR. LEGACKI: I'm trying to find out.
21      MR. ZIPKIN: No, you're just assuming it is.
22  Q   (By Mr. Legacki) So if you get a -- if a
23  claim value worth, say, a hundred thousand and you
24  settle for eighty thousand, do you get an "atta boy"
25  and bonus for that?

Page 48

1   A   No.
2   Q   Why were you so reluctant to talk about gain
3   share?
4       MR. ZIPKIN: Mischaracterizes and is
5   argumentative.
6       THE WITNESS: I'm not reluctant to talk about
7   it. I just don't know that much about it.
8   Q   (By Mr. Legacki) What did you issue the
9   objection and why is that relevant?
10      MR. ZIPKIN: You don't have to answer that.
11  You had a right to ask what the relevance was. You
12  don't have to explain that.
13  Q   (By Mr. Legacki) Why did it upset you
14  that I asked about gain share? You were upset that
15  I asked about gain share, right? You didn't like
16  that question?
17  A   I didn't say I was upset, did I?
18  Q   No, but you didn't like it, did you?
19      MR. ZIPKIN: This is argumentative and you
20  don't have to answer that question; you just don't. I
21  raised the objection that it's not related to the
22  contract claim. That's good enough.
23      MR. LEGACKI: How about bad faith claim?
24      MR. ZIPKIN: I didn't stop you from answering
25  the questions. So he has answered as best as he can.

Danny Withers                     Deposition                     July 12, 2006

Page 49

1    But if it's purely argumentative, I don't think he has
2    to answer that.
3        THE WITNESS: No, it didn't really upset me.
4    I just don't know that much about it.
5        Q  (By Mr. Legacki) So as you sit there
6    under oath, you get bonuses and increase in pay and
7    you don't know why you get that? You don't know
8    what you have to do to perform to get that?
9        MR. ZIPKIN: Object to form.
10       THE WITNESS: You know, not really.
11       Q  (By Mr. Legacki) Now you were the
12   adjuster in the Weilbacher case; is that correct?
13       A  That's correct.
14       Q  Was the issue of direct claim under
15   AS O9.15.O1O involved in that case as well?
16       MR. ZIPKIN: The question itself contains a
17   mischaracterization.
18       THE WITNESS: I don't think so. I don't
19   think it was involved in that, not that I recall.
20       Q  Wasn't there an issue of whether or not they
21   could collect under the Gillespie Wald case?
22       A  No, the Wald case was mainly a question of
23   exhaustion of liability limits to get underinsured.
24       Q  Well, wasn't the issue of the Gillespie
25   involved in that as well, the separate policy?

Page 50

1        A  Elements of it may have been, yes.
2        Q  And is there correspondence on that between
3    you and the attorney, Laurel Peterson gotten an issue?
4        A  I don't believe that there was correspondence
5    between me and Laurel Peterson. I don't recall, not
6    direct correspondence, no. That was in litigation and
7    there they have been correspondence between him and
8    defense counsel, which was Dan Quinn.
9        Q  Do you know of any other cases where the
10   issue of paying a claim under AS O9.15.O1O that have
11   arisen?
12       A  Do I know of any other cases?
13       MR. ZIPKIN: I'm sorry, just for
14   clarification. Are you asking Progressive claims that
15   he's handled with Progressive or --
16       MR. LEGACKI: No, I'm just asking if he's
17   aware of them?
18       THE WITNESS: Am I aware of any cases that I
19   handled?
20       Q  (By Mr. Legacki) Any at all, whether you
21   handled it or another adjuster has handled it or
22   anything else.
23       A  I'm sure there is, but I don't recall any
24   specific cases.
25       Q  So this is a common issue, whether or not you

Page 51

1    can collect a direct claim under AS O9.15.O1O?
2        A  It's come up before, yes.
3        Q  In what context has it come up before?
4        A  Under the same context in the case, whether
5    or not loss of society, loss of consortium is
6    derivative or non-derivative.
7        Q  What cases are they?
8        A  I can't recall any offhand.
9        Q  How many are there?
10       A  I have no idea offhand.
11       Q  Has Progressive ever addressed this issue in
12   Alaska before?
13       A  I think it's come up before, yes.
14       Q  And what cases with Progressive?
15       A  Well, I can't recall any.
16       Q  Do you talk about it at the office to the
17   other adjusters about this issue?
18       A  I think so, yes.
19       Q  I'm sorry?
20       A  Yes, I think so.
21       Q  And what have you -- have you discussed this
22   at a meeting, how was it discussed?
23       MR. ZIPKIN: Object to form. It's compound.
24       THE WITNESS: Under this particular insurance
25   contract whether or not loss of society, loss

Page 52

1    consortium is a derivative claim or a nonderivative
2    claim.
3        Q  (By Mr. Legacki) Any memos been written
4    on that?
5        A  I don't think so. I don't recall.
6        Q  Well, how does this discussion come up, at a
7    meeting or --
8        A  It might come up day to day on a specific
9    claim or something, you know, a different claim. I
10   don't know, I can't recall any specific claims. But
11   it's a question that arises every now and then.
12       Q  You say day to day?
13       A  Week to week, I don't know. It's an issue
14   that has arisen in the past.
15       Q  And tell me how these meetings go. Do you
16   sit around and discuss it or do you look at it or --
17       A  No, it's not a meeting. It may come up with
18   another adjuster handling a claim like that.
19       Q  And they come up to you and talk to you about
20   it?
21       A  I don't recall specifically, no.
22       Q  How many cases are there? Seems like you
23   said, there's day to day, or week to week. There must
24   be more than one. There must be several that come up;
25   is that correct?

Danny Withers                     Deposition                          July 12, 2006

Page 53

1      MR. ZIPKIN: Mischaracterizes and object to
2  form.
3      THE WITNESS: You know, I don't know how many
4  cases there are. All I can tell you is the issue has
5  come up before.
6    Q   (By Mr. Legacki) And did you go back and
7  look at how Progressive handled the issue before?
8    A   We've always handled it the same way.
9    Q   So the other cases in Alaska where --
10 obviously these are in court cases?
11   A   There may be. I don't recall any specific
12 cases.
13   Q   Do you refer to any database, is there any
14 group of documents at Progressive that you can go
15 refer to regarding this issue?
16   A   No, we looked at the specific policy that's
17 relevant to the case.
18   Q   Do you ever look at memos and say, "Geez, how
19 did we handle this before?"
20   A   No, we look at the policy that's applicable
21 to whatever the claim had.
22   Q   So each time this issue comes up it's an ad
23 hoc, just comes up any time anyone raises the issue of
24 AS 09.15.010, it's a reinvent the wheel kind of thing?
25   A   No. You look at the particular policy that's

Page 54

1  in place on that particular claim.
2    Q   To your knowledge has Progressive ever paid
3  under that, paid under AS 09.15.010?
4      MR. ZIPKIN: Objection. Pay what?
5      THE WITNESS: Yes, pay what? I don't
6  understand.
7    Q   (By Mr. Legacki) Have you paid a claim
8  under AS 09.15.010?
9    A   Probably have, yes.
10   Q   Why?
11   A   I did in this case.
12   Q   You did?
13   A   Didn't I pay your client $100,000?
14   Q   No.
15     MR. ZIPKIN: Well, the answer is yes. I don't
16 mean to get into colloquy with counsel, but a payment
17 was made. It was made to resolve not only the
18 wrongful death UIM claim, but also any loss of
19 consortium or loss of society claims. It is a
20 combined payment for all. That is our legal position
21 and I believe that's what the witness is trying to
22 explain.
23     THE WITNESS: That's what I'm trying to say.
24 I paid all claims under that single policy limit.
25   Q   (By Mr. Legacki) How about just a claim

Page 55

1  to a parent under AS 09.15.010?
2    A   Probably have. I can't name any specific
3  case, but I think we probably have.
4    Q   As a separate policy per person limit?
5    A   No. Within a policy limit, a single policy
6  limit we may have included a claim for that, an
7  independent claim for that but paid it within one
8  single policy limit.
9    Q   Per person limit, you mean?
10   A   Right.
11   Q   Have you ever paid under AS 09.15.010 a claim
12 as a separate person limit?
13   A   No.
14   Q   Has anyone at Progressive ever done that?
15   A   Not to my knowledge, no.
16   Q   Has it been presented before asking to be a
17 claim, like Weilbachers' as a separate per person
18 limit? Has it ever been presented to you or anybody
19 at Progressive to your knowledge?
20   A   Possibly, but it was always paid within one
21 single policy limit.
22   Q   What did you review before you came here
23 today?
24   A   I reviewed some of the letters,
25 correspondence between you and I. I reviewed the

Page 56

1  briefs in the Wald case, and parts of the policy that
2  apply to this particular claim.
3    Q   Why did you review the briefs in the Wald
4  case?
5    A   Well, somebody bought up the issue, and I
6  can't recall who it was, that Progressive took a
7  different position in the WALD case as the loss of
8  society, loss of consortium, and I wanted to look at
9  that again. Which we did not. We took the same
10 position that we're taking in the case.
11   Q   So the Supreme Court would be wrong when they
12 said -- when they mentioned one case that Progressive
13 took a position as a separate policy they didn't
14 exhaust because they did not have a separate policy?
15     MR. ZIPKIN: Object to form and it
16 mischaracterizes the Supreme Court. In context they
17 did not say that. You can answer if you can.
18     THE WITNESS: I don't think the Supreme Court
19 said that.
20   Q   (By Mr. Legacki) What else did you review
21 today?
22   A   Today?
23   Q   Or review before coming here today to prepare
24 for your testimony?
25   A   I think that's all.

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT __J__ 14 (Pages 53 to 56)
Page __14__ of __18__

Danny Withers					Deposition					July 12, 2006

Page 57

1  Q  Did you talk to counsel?
2  A  Yes, I did yesterday.
3  Q  And what was discussed?
4      MR. ZIPKIN: Well, that's attorney-client. I
5  instruct him not to answer, conversations between
6  counsel and the witness.
7      MR. LEGACKI: That's fine. So you're
8  asserting attorney-client privilege for him?
9      MR. ZIPKIN: Yes.
10     MR. LEGACKI: Okay.
11     MR. ZIPKIN: If I may just say, although we
12 did have a break for reading purposes, the witness has
13 not had a break and it's been an hour and a half. If
14 you would like a break or if the court reporter would
15 like a break --
16     MR. LEGACKI: I apologize, so he can take a
17 break.
18     MR. ZIPKIN: -- and let them have five
19 minutes.
20     (A brief break taken.)
21     MR. ZIPKIN: I just want the record to
22 reflect that I have handed Mr. Legacki unredacted
23 copies of face sheet notes pertaining to the witness's
24 phone conversation with Dan Quinn. Progressive has
25 decided we are, in fact, going to waive any

Page 58

1  attorney-client privilege with respect to that conversation
2  which has already been discussed in general, but I did
3  instruct the witness during those questions not to answer
4  and we have decided to waive that privilege and so I have
5  given Mr. Legacki unredacted copies of Bates 100333 and
6  100334. I have added the designation capital "A" after
7  both of those numbers just so it's clear to everybody how
8  to distinguish the redacted from the unredacted. If you
9  wish to inquire about the areas I told him not to answer,
10 you are free to do so.
11     Q  (By Mr. Legacki) Tell me about your
12 conversations with Mr. Quinn, how they came about
13 and how many conversations were there?
14     A  What part do you want to know?
15     Q  Everything.
16     A  Well, I don't know if I can recall
17 everything. I remember calling him about -- when you
18 brought up the Teel case and Dan told me that that was
19 more about a contract of an insured person and really
20 it wasn't all on point as far as the issue about loss
21 of society or loss of consortium being derivative or
22 non-derivative.
23     Q  Did he put anything in writing?
24     A  No, I don't think -- no, he didn't. I don't
25 believe so.

Page 59

1  Q  Did you put anything in writing to him?
2  A  No, I don't believe so. It was all verbal,
3  telephone conversations.
4  Q  So you called him and asked him -- tell me
5  about that. How did that start?
6  A  If I recall, when you brought up the Teel
7  case, I just called him and asked him about the Teel
8  case and if this changed anything as far as the policy
9  contract and how we address loss of consortium and
10 loss of society claims as derivative or
11 non-derivative and from what I recall he said no. It has
12 nothing to do with that.
13     Q  Did you ask him whether or not Gillespie
14 versus Brta Construction allows for an independent
15 direct cause of action for the parent?
16     MR. ZIPKIN: Object to form when you confuse
17 independent with direct. But go ahead.
18     THE WITNESS: I don't recall. It's been a
19 while ago.
20     Q  (By Mr. Legacki) Did you ask him whether
21 or nor AS O9.15.O1O allows for an independent claim
22 for the parent?
23     A  You know, I don't recall specifically if I
24 did. But if that came up, I think he mentioned that
25 it was an independent claim but is still subject to

Page 60

1  the contract as to derivative or non-derivative and in
2  this case it's a derivative claim.
3      Q  Well, you agree with me then, if the contract
4  does not conform to the statute that the contract --
5  the statute prevails over the contract?
6      MR. ZIPKIN: Object to form. He hasn't said
7  that.
8      Q  (By Mr. Legacki) Well, let me ask, would
9  you agree with me that if there is a conflict
10 between the contract and the statute, the statute
11 prevails?
12     A  If there is a conflict, but there's not a
13 conflict here I don't believe.
14     Q  You don't believe. But did you ask Dan
15 whether or not there's a conflict between the statute,
16 an independent claim for a parent versus what you
17 consider to be derivative?
18     A  You know, I don't recall.
19     Q  Let's go back to Exhibit No. 1, please.
20        Do you see that, sir?
21     A  I see it.
22     Q  This language here: "We will pay damages
23 other than punitive or exemplary damages which the
24 insured person is legally entitled to recover from the
25 owner or operator of an uninsured/underinsured motor

Danny Withers                                Deposition                                July 12, 2006

Page 61

1  vehicle because of bodily injury."
2       Why is it that the independent cause action
3  under AS O9.15.O1O is not covered under this as a
4  direct action or independent action rather than as you
5  call it, a derivative action?
6     A   It is covered as an independent, independent
7  claim but is still subject to the per person bodily
8  injury limit. It's derivative of that limit.
9     Q   So you're saying -- you're putting it under
10 the child's claim rather than independent; is that
11 what you're saying?
12    A   No. I'm saying that it's derivative of the
13 child's claim and subject to one single bodily injury
14 limit. It's an independent claim as the wrongful
15 death is independent, but they're both subject to one
16 single bodily injury.
17    Q   Well, doesn't the Gillespie decision state
18 that claim under AS O9.15.O1 is different than a death
19 claim?
20    A   I believe so.
21    Q   So it's a separate claim isn't it, separate
22 per person claim?
23        MR. ZIPKIN: I object to form. Which
24 question are you asking?
25    Q   (By Mr. Legacki) If Ronald Weilbacher

Page 62

1  sued Esper, the tortfeasor, he would have a
2  separate, independent direct claim against Esper
3  under AS O9.15.O1O different and distinct from any
4  derivative claim that he would have, correct?
5        MR. ZIPKIN: Object to form. You used three
6  different words, separate, independent and direct and
7  may not be equal but if you can answer, go ahead.
8        THE WITNESS: He has a separate, independent
9  claim but is still subject -- it's derivative of the
10 single bodily injury limit.
11    Q   (By Mr. Legacki) But does the tortfeasor
12 have a separate bodily limit when you sue him? He
13 has an independent claim, Ron Weilbacher, not as
14 father of Heidi Weilbacher; Ron Weilbacher
15 individually has a claim against Esper, correct?
16    A   That's correct.
17    Q   And it's a separate claim different from what
18 the estate of Heidi Weilbacher claimed, correct?
19    A   It's an independent claim. It's separate
20 from the wrongful death.
21    Q   Right and it's his own right. He can collect
22 as an injured party because of the death of his
23 daughter, correct?
24    A   Correct.
25    Q   Isn't that a separate person, a separate

Page 63

1  claim?
2     A   It's a separate claim, but it's still subject
3  to the single bodily injury limit.
4     Q   Because that's what the contract says?
5     A   Exactly.
6     Q   And if the contract is a contravention of the
7  law of the statute, then the statute prevails,
8  correct?
9        MR. ZIPKIN: Assumes facts not in evidence.
10       THE WITNESS: I don't think it's in conflict
11 with the statute.
12    Q   (By Mr. Legacki) Well, let me ask you a
13 question: How is somebody to know if they read a
14 statute that says they have an independent claim,
15 how are they supposed to read and understand it's
16 derivative of say, the estate claim?
17    A   Read the policy. That's what it says.
18    Q   I'm sorry?
19    A   Read the policy. The policy contract says
20 that.
21    Q   But the statute says something different?
22       MR. ZIPKIN: Objection.
23       MR. LEGACKI: But doesn't the Gillespie
24 decision say --
25       MR. ZIPKIN: That's incorrect. That's a

Page 64

1  misstatement of the law.
2        THE WITNESS: No, I don't think it does.
3     Q   (By Mr. Legacki) Doesn't the Gillespie
4  say it's a separate and distinct claim?
5     A   Yes.
6     Q   So if the average person is reading the
7  paragraph in Exhibit 1 about we will pay for damages
8  -- other punitive or exemplarily damages which insured
9  person becomes legally entitled to recover from the
10 owner or operator of an uninsured/underinsured motor
11 vehicle, wouldn't you think that he's got his own
12 claim, separate claim?
13       MR. ZIPKIN: Objection. The policy has to be
14 read as a whole, not one sentence.
15    Q   (By The Witness) Would you agree with me?
16    A   You would think that, yes.
17    Q   Let me take a break for a couple of minutes
18 to read my notes, please.
19       (A brief break was taken.)
20    Q   (By Mr. Legacki) When you submitted the
21 check to Mr. Weilbacher, why did you include Cathy
22 Morrow?
23    A   Because if I recall, she was a co-personal
24 representative of the estate for Heidi.
25    Q   So that's why you gave her --

Danny Withers                                         Deposition                                              July 12, 2006

Page 65

1  A  I believe so.
2  Q  So as co-representative of the estate, was
3  she entitled to a derivative claim of the claim?
4  A  I don't think she was entitled to a
5  derivative claim, no.
6  Q  But you still made the check out to her?
7  A  Yes, because she was the personal
8  representative of the estate, as I recall, of the
9  wrongful death claim.
10  Q  I have no further questions.
11      MR. ZIPKIN: I have no questions. I guess
12  we're done. I do request and will say on the record
13  that the witness be given an opportunity to review and
14  sign as always because we don't waive that. And as I
15  said to the reporter off the record at the beginning,
16  I will pay for an extra copy of the deposition so that
17  it can be sent to the witness along with the signature
18  page and correction sheet so he can keep his own copy.
19  And I do request -- are you ordering?
20      MR. LEGACKI: (Nods affirmatively.)
21      MR. ZIPKIN: Since he's nodding that he's
22  ordering, I would like a compressed copy for me and an
23  Etranscript. I don't need a page-for-page one.
24      (Proceedings concluded at 10:56 a.m.)
25

Page 66

1      WITNESS CERTIFICATE
2  Ronald v. Weilbacher vs. Progressive Northwestern Insurance
   Company, No. 3:05-CV-0204-TMB
3
       DANNY WITHERS
4
       I hereby certify that I have read the foregoing
5  deposition and accept it as true and correct, with the
   following exceptions:
6
   _____
7  Page  Line    CHANGE/CORRECTION and REASON
   _____
8
9   __  __  _____
10  __  __  _____
11  __  __  _____
12  __  __  _____
13  __  __  _____
14  __  __  _____
15  __  __  _____
16  __  __  _____
17  __  __  _____
18  __  __  _____
19  __  __  _____
20  __  __  _____
21  __  __  _____
22  __  __  _____
23  __  __  _____
    Date Read      (Sign name here)
24
    (Use additional paper to note corrections as needed, dating
25  and signing each one.)     (CJK)

Page 67

1       REPORTER'S CERTIFICATE
2       I, CYNTHIA J. KENAN, hereby certify:
3       That I am a Court Reporter for Alaska Stenotype
4  Reporters and Notary Public for the State of Alaska; that
5  the foregoing proceedings were taken by me in computerized
6  machine shorthand and thereafter transcribed by me; that
7  the transcript constitutes a full, true and correct record
8  of said proceedings taken on the date and time indicated
9  therein.
10      Further, that I am a disinterested person to
11  said action.
12      IN WITNESS WHEREOF, I have hereunto
13  subscribed my hand and affixed my official seal this
14  23rd day of July, 2006.
15
16
17  _____
        CYNTHIA J. KENAN
18       Court Reporter
19   My Commission Expires 5.5.10
20
21
22
23
24
25

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT __J__ 17 (Pages 65 to 67)
Page _17_ of _18_

Danny Withers           Deposition            July 12, 2006

```
                                                    Page 66
 1                    WITNESS CERTIFICATE

 2   Ronald v. Weilbacher vs. Progressive Northwestern Insurance
     Company, No. 3:05-CV-0204-TMB
 3
                        DANNY WITHERS
 4
         I hereby certify that I have read the foregoing
 5   deposition and accept it as true and correct, with the
     following exceptions:
 6
     ============================================================
 7   Page   Line       CHANGE/CORRECTION and REASON
     ============================================================
 8

 9    13    21    AS I READ THE QUESTION, IT IS

10   ___   ___   DIFFICULT TO UNDERSTAND. MR. WEILBACHER

11   ___   ___   HAS AN INDEPENDENT CLAIM, HOWEVER,

12   ___   ___   THE ISSUE AS TO THE CLAIM BEING

13   ___   ___   DERIVATIVE OF THE WRONGFUL DEATH

14   ___   ___   CLAIM IS TO BE DECIDED BY THE

15   ___   ___   COURT. I BELIEVE IT TO BE

16   ___   ___   DERIVATIVE.

17   ___   ___   _____

18    41    7    _____

19         10    I DON'T KNOW THE DIFFERENCE,

20   ___   ___   I'M NOT A LAWYER.

21   ___   ___   _____

22   ___   ___   _____

23    8-4-06              [signature]
     Date Read              (Sign name here)
24
     (Use additional paper to note corrections as needed, dating
25   and signing each one.)          (CJK)
```

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT ___J___
Page __18__ of __18__