IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

RONALD V. WEILBACHER,

        Plaintiff,

v.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,

        Defendant.

_____/

Case No. 3:05-CV-0204-TMB



DEPOSITION OF DANNY WITHERS

Pages 1 - 67 inclusive

Wednesday, July, 12, 9:00 a.m.

Anchorage, Alaska



Page 1

Page 26

1  between NIED and loss of society?
2    A   Well, NIED, as we recognize in Alaska, the
3  way I understand Alaska law, could be subject to a
4  separate policy limit.
5    Q   What's the difference between somebody who's
6  suffering negligence and emotional distress and
7  somebody suffering from loss of society? Can you
8  explain the difference to me?
9        MR. ZIPKIN: Calls for a legal conclusion.
10       THE WITNESS: Well, negligent infliction of
11  emotional distress is more of a bystander-type claim,
12  somebody that sees something happen or maybe they're
13  -- they go directly to the accident scene after the
14  accident and I'm defining it the way I understand
15  Alaska law.
16   Q   (By Mr. Legacki) I'm not talking about
17  Alaska law. What's the common -- what do you think
18  of a person -- what is the difference between NIED,
19  a parent suffering emotional distress versus a
20  parent suffering loss of society?
21       Describe to me the feeling, emotions or --
22  what distinguishes the two?
23       MR. ZIPKIN: Object to form. Compound.
24  Calls for a legal conclusion.
25       THE WITNESS: The manifestation of injury.

Page 27

1    Q   (By Mr. Legacki) What does that mean?
2    A   It would be for probably NIED, negligence
3  inflicts emotional distress.
4    Q   I'm sorry, I don't understand. What do you
5  mean by manifestation of injury?
6    A   That you've got some kind of an injury and
7  because of it, be it mental or emotional, you've got
8  an injury.
9    Q   Are you saying that a person who has a loss
10  of society doesn't have the same injury?
11   A   I don't know.
12   Q   How about loss of consortium?
13       MR. ZIPKIN: Object to form.
14       THE WITNESS: A physical injury, I don't
15  think it's a physical injury, no.
16   Q   (By Mr. Legacki) So you're just saying if
17  a person has a loss of society they're not suffering
18  from any physical injury?
19   A   I'm not saying that. I said I don't think
20  they have a physical injury.
21   Q   What if a person did have a physical injury
22  from the death of a daughter?
23       MR. ZIPKIN: Object to the form, incomplete
24  question.
25       THE WITNESS: I don't know.

Page 28

1    Q   (By Mr. Legacki) So when you look at it,
2  the difference between NIED and the loss of society,
3  you look at it from a legal context, not from a
4  personal context as to what the difference is
5  between the two?
6    A   Yes.
7        MR. ZIPKIN: Mischaracterizes.
8    Q   Now?
9    Q   (By Mr. Legacki) Now further going into
10  your note here, Exhibit Number 5, was "he" -- I
11  guess this means the attorney -- "thinks Teel v.
12  Progressive gives authority for direct claim for
13  loss of consortium."
14       Did you ever analyze that statement? Did you
15  try to figure out whether or not the attorney was
16  correct in there?
17   A   Yes, I did, I conferred with someone to get
18  some other opinion on that.
19   Q   Who did you confer with?
20   A   Dan Quinn.
21   Q   Anyone else?
22   A   No.
23   Q   Dan Quinn of Richmond & Quinn?
24   A   That's correct.
25   Q   And he gave you an opinion?

Page 29

1        MR. ZIPKIN: Without revealing.
2    Q   (By Mr. Legacki) Without revealing, he
3  gave you an opinion?
4        MR. ZIPKIN: I think even that much is
5  attorney-client, so I instruct you not to answer about
6  what Mr. Quinn gave you.
7    Q   (By Mr. Legacki) Did you discuss the case
8  with Mr. Quinn?
9    A   I did.
10   Q   Okay. Exhibit number 6, please.
11       (Exhibit Number 6 was marked.)
12       Do you see that, sir?
13   A   Correct, yes, I do.
14   Q   And it goes: "Letter from attorney." This is
15  dated June 26 '05.
16       "He continues to allege direct claim under
17  AS O9.15.O1O which gives parent a separate and independent
18  cause of action for damages due to the death of a child."
19       So are you saying there that you agree with
20  me that AS O9.15.O1O gives a parent separate and
21  independent cause of action for damages due to the
22  death of a child?
23   A   No, I'm saying that that's what you told me.
24   Q   Well does -- you have here AS O9.15.O1O, you
25  state "which gives parent a separate and independent

Page 30

1  cause of action for damage due to the death of a
2  child."?
3    A  Yes, that's what I was saying that you allege
4  under that statute that --
5    Q  Well, AS 09.15.010 gives a separate and
6  independent cause of action for damages for the death
7  of a child?
8        MR. ZIPKIN: Calls for legal conclusion.
9  This witness is not a lawyer.
10       THE WITNESS: I'm not sure what that statute
11 is. I don't recall what that --
12   Q  (By Mr. Legacki) Did you look it up?
13 After you got this correspondence did you go to see
14 what I was talking about?
15   A  I don't recall if I did or not.
16   Q  Why not? Why didn't you go look and see what
17 AS 09.15.010 said?
18       MR. ZIPKIN: Object to form. Assumes he
19 didn't.
20       THE WITNESS: I didn't think I needed to.
21   Q  (By Mr. Legacki) Why is that?
22   A  Because the claims, the particular claims
23 that you were making under the contract were
24 derivative claims of a single policy limit we had
25 already paid.

Page 31

1    Q  Did you check to see that you may be wrong in
2  that, that the policy may be wrong? Did you ever
3  check to see, wait a minute, this may be something
4  different?
5    A  No, I didn't.
6    Q  He also cites Gillespie v. Beta Construction.
7  Did you look at Gillespie? You were familiar with the
8  Gillespie case?
9    A  I have heard of the case, but I don't recall
10 exactly what it talks about.
11   Q  It goes: "Our argument is that although this
12 does give claim to parent, it is derivative of the
13 wrongful death per contract."
14       Is that correct?
15   A  That's correct.
16   Q  And then: "AS 09.15.010 simply allows parent
17 to pursue claim."
18       Where did you get that from?
19   A  You know, probably from Dan Quinn. I asked
20 him about it.
21   Q  So you got that statement because of what Dan
22 Quinn told you?
23       MR. ZIPKIN: To the extent that the witness
24 has said that in response to a question that wasn't
25 directly asking what Dan Quinn said, I was unable to

Page 32

1  direct him not to reveal attorney-client
2  communications, but to the extent that this question
3  clearly asked for attorney-client communications, I
4  instruct the witness not to answer.
5    Q  (By Mr. Legacki) So when you wrote
6  this --
7        MR. ZIPKIN: I move to strike the prior
8  answer.
9    Q  (By Mr. Legacki) Is this from your own
10 personal knowledge or is it from an attorney?
11       MR. ZIPKIN: That invades the attorney-client
12 privilege and I instruct you not to answer.
13       MR. LEGACKI: Well, I have a waiver, if he's
14 got it. I'm going to ask him where he got this
15 information from. I mean, I've got to know the source
16 of the information, Gary. That's a waiver then, if
17 you want to go that far.
18       MR. ZIPKIN: I don't believe we have waived
19 it.
20   Q  (By Mr. Legacki) Where did you come up
21 with -- you wrote this on your notes, and I have the
22 notes in front of you, given the introduction from
23 Progressive's lawyers and you wrote "AS 09.15.010
24 simply allows parent to pursue a claim."
25       Did you read the Gillespie decision or did

Page 33

1  you read the statute or anything like that?
2    A  You know, I don't recall.
3    Q  Well, don't you think you had a duty to read
4  -- when an attorney writes and said you had a duty to
5  pay under the policy, under AS 09.15.010, you have a
6  duty to look at the statute and look at the case that
7  he cites in support of it?
8        MR. ZIPKIN: I object to form.
9        THE WITNESS: Yes, and I got this from
10 someplace, but I don't recall where I got it.
11       (Exhibit Number 7 was marked.)
12   Q  (By Mr. Legacki) And this is dated July
13 26, '05. You redacted something there, so we don't
14 have the true context. "However we feel all claims
15 except for NIED are derivative of the limit we paid
16 to estate for wrongful death. There is no evidence
17 of NIED claims in initial investigation. However" --
18 And then you go on: "Attorney is specifically making
19 claims for loss of society consortium and argues
20 these are separate claims subject to separate limit
21 which we dispute." Is that correct?
22       MR. ZIPKIN: I object. I think you're
23 assuming this is his entry but I'm not sure that --
24   Q  (By Mr. Legacki) Is this your entry?
25       MR. ZIPKIN: Oh, okay, I'm sorry.

### Page 54

1  in place on that particular claim.
2     Q   To your knowledge has Progressive ever paid
3  under that, paid under AS O9.15.010?
4        MR. ZIPKIN: Objection. Pay what?
5        THE WITNESS: Yes, pay what? I don't
6  understand.
7     Q   (By Mr. Legacki) Have you paid a claim
8  under AS O9.15.O1O?
9     A   Probably have, yes.
10    Q   Why?
11    A   I did in this case.
12    Q   You did?
13    A   Didn't I pay your client $100,000?
14    Q   No.
15       MR. ZIPKIN: Well, the answer is yes. I don't
16 mean to get into colloquy with counsel, but a payment
17 was made. It was made to resolve not only the
18 wrongful death UIM claim, but also any loss of
19 consortium or loss of society claims. It is a
20 combined payment for all. That is our legal position
21 and I believe that's what the witness is trying to
22 explain.
23       THE WITNESS: That's what I'm trying to say.
24 I paid all claims under that single policy limit.
25    Q   (By Mr. Legacki) How about just a claim

### Page 55

1  to a parent under AS O9.15.O1O?
2     A   Probably have. I can't name any specific
3  case, but I think we probably have.
4     Q   As a separate policy per person limit?
5     A   No. Within a policy limit, a single policy
6  limit we may have included a claim for that, an
7  independent claim for that but paid it within one
8  single policy limit.
9     Q   Per person limit, you mean?
10    A   Right.
11    Q   Have you ever paid under AS O9.15.O1O a claim
12 as a separate person limit?
13    A   No.
14    Q   Has anyone at Progressive ever done that?
15    A   Not to my knowledge, no.
16    Q   Has it been presented before asking to be a
17 claim, like Weilbachers' as a separate per person
18 limit? Has it ever been presented to you or anybody
19 at Progressive to your knowledge?
20    A   Possibly, but it was always paid within one
21 single policy limit.
22    Q   What did you review before you came here
23 today?
24    A   I reviewed some of the letters,
25 correspondence between you and I. I reviewed the

### Page 56

1  briefs in the Wald case, and parts of the policy that
2  apply to this particular claim.
3     Q   Why did you review the briefs in the Wald
4  case?
5     A   Well, somebody bought up the issue, and I
6  can't recall who it was, that Progressive took a
7  different position in the WALD case as the loss of
8  society, loss of consortium, and I wanted to look at
9  that again. Which we did not. We took the same
10 position that we're taking in the case.
11    Q   So the Supreme Court would be wrong when they
12 said -- when they mentioned one case that Progressive
13 took a position as a separate policy they didn't
14 exhaust because they did not have a separate policy?
15       MR. ZIPKIN: Object to form and it
16 mischaracterizes the Supreme Court. In context they
17 did not say that. You can answer if you can.
18       THE WITNESS: I don't think the Supreme Court
19 said that.
20    Q   (By Mr. Legacki) What else did you review
21 today?
22    A   Today?
23    Q   Or review before coming here today to prepare
24 for your testimony?
25    A   I think that's all.

### Page 57

1     Q   Did you talk to counsel?
2     A   Yes, I did yesterday.
3     Q   And what was discussed?
4        MR. ZIPKIN: Well, that's attorney-client. I
5  instruct him not to answer, conversations between
6  counsel and the witness.
7        MR. LEGACKI: That's fine. So you're
8  asserting attorney-client privilege for him?
9        MR. ZIPKIN: Yes.
10       MR. LEGACKI: Okay.
11       MR. ZIPKIN: If I may just say, although we
12 did have a break for reading purposes, the witness has
13 not had a break and it's been an hour and a half. If
14 you would like a break or if the court reporter would
15 like a break --
16       MR. LEGACKI: I apologize, so he can take a
17 break.
18       MR. ZIPKIN: -- and let them have five
19 minutes.
20       (A brief break taken.)
21       MR. ZIPKIN: I just want the record to
22 reflect that I have handed Mr. Legacki unredacted
23 copies of face sheet notes pertaining to the witness's
24 phone conversation with Dan Quinn. Progressive has
25 decided we are, in fact, going to waive any

**Page 58**

1  attorney-client privilege with respect to that conversation
2  which has already been discussed in general, but I did
3  instruct the witness during those questions not to answer
4  and we have decided to waive that privilege and so I have
5  given Mr. Legacki unredacted copies of Bates 100333 and
6  100334. I have added the designation capital "A" after
7  both of those numbers just so it's clear to everybody how
8  to distinguish the redacted from the unredacted. If you
9  wish to inquire about the areas I told him not to answer,
10 you are free to do so.
11   Q  (By Mr. Legacki) Tell me about your
12 conversations with Mr. Quinn, how they came about
13 and how many conversations were there?
14   A  What part do you want to know?
15   Q  Everything.
16   A  Well, I don't know if I can recall
17 everything. I remember calling him about -- when you
18 brought up the Teel case and Dan told me that that was
19 more about a contract of an insured person and really
20 it wasn't all on point as far as the issue about loss
21 of society or loss of consortium being derivative or
22 non-derivative.
23   Q  Did he put anything in writing?
24   A  No, I don't think -- no, he didn't. I don't
25 believe so.

**Page 59**

1   Q  Did you put anything in writing to him?
2   A  No, I don't believe so. It was all verbal,
3  telephone conversations.
4   Q  So you called him and asked him -- tell me
5  about that. How did that start?
6   A  If I recall, when you brought up the Teel
7  case, I just called him and asked him about the Teel
8  case and if this changed anything as far as the policy
9  contract and how we address loss of consortium and
10 loss of society claims as derivative or
11 non-derivative and from what I recall he said no. It has
12 nothing to do with that.
13   Q  Did you ask him whether or not Gillespie
14 versus Brta Construction allows for an independent
15 direct cause of action for the parent?
16      MR. ZIPKIN: Object to form when you confuse
17 independent with direct. But go ahead.
18      THE WITNESS: I don't recall. It's been a
19 while ago.
20   Q  (By Mr. Legacki) Did you ask him whether
21 or nor AS O9.15.O1O allows for an independent claim
22 for the parent?
23   A  You know, I don't recall specifically if I
24 did. But if that came up, I think he mentioned that
25 it was an independent claim but is still subject to

**Page 60**

1  the contract as to derivative or non-derivative and in
2  this case it's a derivative claim.
3   Q  Well, you agree with me then, if the contract
4  does not conform to the statute that the contract --
5  the statute prevails over the contract?
6      MR. ZIPKIN: Object to form. He hasn't said
7  that.
8   Q  (By Mr. Legacki) Well, let me ask, would
9  you agree with me that if there is a conflict
10 between the contract and the statute, the statute
11 prevails?
12   A  If there is a conflict, but there's not a
13 conflict here I don't believe.
14   Q  You don't believe. But did you ask Dan
15 whether or not there's a conflict between the statute,
16 an independent claim for a parent versus what you
17 consider to be derivative?
18   A  You know, I don't recall.
19   Q  Let's go back to Exhibit No. 1, please.
20      Do you see that, sir?
21   A  I see it.
22   Q  This language here: "We will pay damages
23 other than punitive or exemplary damages which the
24 insured person is legally entitled to recover from the
25 owner or operator of an uninsured/underinsured motor

**Page 61**

1  vehicle because of bodily injury."
2      Why is it that the independent cause action
3  under AS O9.15.O1O is not covered under this as a
4  direct action or independent action rather than as you
5  call it, a derivative action?
6   A  It is covered as an independent, independent
7  claim but is still subject to the per person bodily
8  injury limit. It's derivative of that limit.
9   Q  So you're saying -- you're putting it under
10 the child's claim rather than independent; is that
11 what you're saying?
12   A  No. I'm saying that it's derivative of the
13 child's claim and subject to one single bodily injury
14 limit. It's an independent claim as the wrongful
15 death is independent, but they're both subject to one
16 single bodily injury.
17   Q  Well, doesn't the Gillespie decision state
18 that claim under AS O9.15.O1 is different than a death
19 claim?
20   A  I believe so.
21   Q  So it's a separate claim isn't it, separate
22 per person claim?
23      MR. ZIPKIN: I object to form. Which
24 question are you asking?
25   Q  (By Mr. Legacki) If Ronald Weilbacher