CASENAME>

WITNESS>
DATE>

## Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3     _____
 4     RONALD V. WEILBACHER,        )
                                    )
 5            Plaintiff,            )
                                    )
 6     vs.                          )
                                    )
 7     PROGRESSIVE NORTHWESTERN INSURANCE )
       COMPANY,                     )
 8                                  )
              Defendant.            )
 9     _____)
       Case No. 3:05-cv-204-TMB
10
11
12
13
14     VIDEOTAPED DEPOSITION OF RONALD V. WEILBACHER
       _____
15
16             Monday, August 21, 2006
                      9:13 a.m.
17
18         Taken by Counsel for Defendant
                        at
19             Guess & Rudd, P.C.
            510 L Street, Suite 700
20              Anchorage, Alaska
21
22
23
24
25
```

## Page 2

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2
 3     For Plaintiff:
 4        Kenneth W. Legacki, Esq.
          425 G Street, Suite 920
 5        Anchorage, Alaska 99501
          (907) 258-2422
 6
 7
 8     For Defendant:
 9        Gary A. Zipkin, Esq.
          Aisha Tinker Bray, Esq.
10        GUESS & RUDD, P.C.
          510 L Street, Suite 700
11        Anchorage, Alaska 99501
          (907) 793-2200
12
13
14     Videographer:
15        Martha Enslow, CLVS
          PACIFIC RIM REPORTING
16
17     Court Reporter:
18        Sonja L. Reeves, RPR
          PACIFIC RIM REPORTING
19        711 M Street, Suite 4
          Anchorage, Alaska 99501
20
21
22
23
24
25
```

## Page 3

```
 1                    I-N-D-E-X
 2
 3     EXAMINATION BY                    PAGE
 4        Mr. Zipkin                       5
 5
 6     EXHIBITS
 7      1  Letter of 2/2/04 from Legacki to    18
           Withers (5 pgs.)
 8
        2  Denali Alaskan Insurance Information  19
 9         (6 pgs.)
10      3  Plaintiff's Supplemental Responses to  45
           Progressive's First Set of Discovery
11         Requests (15 pgs.)
12      4  Letter of 4/19/05 from Withers to    51
           Legacki (1 pg.)
13
        5  Letter of 4/11/05 from Legacki to    58
14         Withers (1 pg.)
15      6  Part III - Uninsured/Underinsured    63
           Motorist Coverage (13 pgs.)
16
        7  Declaration Page (1 pg.)        72
17
        8  Copy of Check (2 pgs.)          89
18
        9  Plaintiff's Final Witness List (6 pgs.)  92
19
       10  Letter of 3/8/05 from Legacki to    103
20         Withers (1 pg.)
21      11 Letter of 11/18/03 from Liberty    105
           Mutual to Legacki (2 pgs.)
22
       12  Letter of 11/18/03 from Liberty    109
23         Mutual to Legacki (2 pgs.)
24
25
```

## Page 4

```
 1         ANCHORAGE, ALASKA; AUGUST 21, 2006
 2                   9:13 a.m.
 3                     -o0o-
 4         VIDEOGRAPHER:  My name is Martha Enslow.  I
 5     am the videographer for Pacific Rim Reporting.  It is
 6     the 21st day of August, the year 2006.  We are on record
 7     at 9:13 a.m.
 8         We are at the offices of Guess & Rudd to
 9     take the deposition of Ronald Weilbacher in Case Number
10     3:05-cv-204-TMB, Ronald Weilbacher versus Progressive
11     Northwestern Insurance Company.
12         This deposition is being taken on behalf of
13     the plaintiff, Ronald Weilbacher.  At this time, I would
14     like everyone in the room to identify themselves
15     verbally.
16         MR. WEILBACHER:  I'm Ron Weilbacher.
17         MR. ZIPKIN:  Gary Zipkin for Progressive
18     Northwestern.
19         MS. TINKER BRAY:  Aisha Tinker Bray for
20     Progressive.
21         MR. LEGACKI:  Ken Legacki for
22     Mr. Weilbacher.
23         MR. ZIPKIN:  And just to make the record
24     clear, you said this deposition is being taken on behalf
25     of Mr. Weilbacher.  Actually, it is being taken on
```

EXHIBIT ___D___
Page ___i___ of ___b___

CASENAME>

WITNESS>
DATE>

Page 93

1  Dolifka, D-o-l-i-f-k-a.  Who is he?
2    A.  He is a friend of mine in Soldotna.
3    Q.  He is an attorney as well, right?
4    A.  Yes, he is.
5    Q.  Has he ever done any legal work for you?
6    A.  He has in the past.
7    Q.  Has he done any legal work in connection with
8  this case, to your knowledge?
9    A.  Not to my knowledge.
10   Q.  Has he given you any -- well, let me back up.  Do
11 you claim any attorney-client relationship with him
12 relating to this case?
13      In other words, is he your attorney or one of
14 your attorneys in this matter?
15   A.  I don't believe so.
16   Q.  Because if he was, I am not allowed to ask what
17 kind of conversations you may have had with him.
18      But you are not claiming an attorney-client
19 privilege with him?
20   A.  Not that I know of.
21   Q.  Not that you know of?
22   A.  No.
23   Q.  Has Dale Dolifka given you any information or
24 made any statements at all about whether Progressive is
25 right or wrong in this case?

Page 94

1    A.  I don't know.  I couldn't answer that.  I don't
2  remember.  I don't think I ever talked to him about it.
3    Q.  Is he a friend of the family or what?
4    A.  Yes.  He is a close friend.  He knew Heidi real
5  well too.  I know his kids.
6    Q.  The next name is John Ebsary, E-b-s-a-r-y.  Who
7  is he?
8    A.  He is a friend of mine.  He has been a friend of
9  mine for a few years, 10 or 15 years.  Also knew Heidi
10 and does things with her.
11   Q.  He lives in Washington?
12   A.  Maple Valley.
13   Q.  Did he used to live in Alaska or what?
14   A.  No.  He has spent a whole summer here before.  He
15 would visit here a number of times.
16   Q.  Let's jump down to number seven, Steven Moe,
17 M-o-e in Ninilchik.  Who is Mr. Moe?
18   A.  A good friend.
19   Q.  Eight is Mary Beth Rathbun.  I guess we now have
20 the spelling of her name, R-a-t-h-b-u-n.  And why is she
21 here?
22   A.  She has been a friend for quite a few years.  I
23 don't know how many.
24   Q.  Did she ever handle any of your insurance needs
25 relating to your personal auto policy?

Page 95

1    A.  No.
2    Q.  And she did have something to do with your
3  commercial auto policies?
4    A.  No.
5    Q.  Who is Mary Ring?
6    A.  My mother.
7    Q.  And Jerry Ring?
8    A.  Her husband.
9    Q.  Who is Vicki Santos, S-a-n-t-o-s.
10   A.  My daughter.
11   Q.  How old is she?
12   A.  37.  I don't know.
13   Q.  It's okay.
14   A.  It's close.
15   Q.  Good job.  It's not crucial.  I'm not trying to
16 trip you up on dates.  Who is Bob Saxton, S-a-x-t-o-n?
17   A.  A close friend.
18   Q.  Who is Carl with a "C" Staley, S-t-a-l-e-y?
19   A.  Close friend.
20   Q.  It says Tempe, Arizona.  Did he ever live in the
21 Soldotna area?
22   A.  He has a cabin there or a small house on the
23 river, I guess.
24   Q.  Then the next one is Ann, A-n-n, Stockman,
25 S-t-o-c-k-m-a-n, Dr. Ann Stockman.  Who is she?

Page 96

1    A.  A doctor I go see.
2    Q.  Is she a psychologist or psychiatrist, do you
3  know?
4    A.  Yes.
5    Q.  Do you know which?
6    A.  I don't know which.  All of the above, I guess.
7    Q.  When was the last time you saw her for any
8  reason?
9    A.  A few weeks ago.
10   Q.  Do you see her on a regular basis or irregular?
11   A.  Whenever.
12   Q.  A few weeks ago?  You had an appointment with
13 her?
14   A.  Yeah.
15   Q.  Here in Anchorage?
16   A.  Yeah.
17   Q.  So you came up to Anchorage like at the beginning
18 of August?
19   A.  I don't know what the date was.
20   Q.  Does it basically take you away from your
21 business for a whole day to see her?
22   A.  No.
23   Q.  How do you arrange it so it doesn't take you away
24 from your business for a whole day?
25   A.  Soldotna is not that far.

CASENAME>

WITNESS><br>DATE>

**Page 97**

1 Q. So you drive up to Anchorage, you see her and
2 then you drive back?
3 A. I might have flown. I don't know. I don't
4 remember. I might have just talked to her on the phone.
5 Q. It's only a couple of weeks ago and you can't
6 remember whether it was in person or on the phone?
7 A. It was in person and then there was just a short
8 time on the phone too.
9 Q. Does she prescribe any medications for you?
10 A. No.
11 Q. Have you taken any medications directly as a
12 result of your loss of your daughter?
13 A. I won't take anything. I won't take an aspirin.
14 Q. How long have you known Ann Stockman,
15 Dr. Stockman?
16 A. I don't know. Since the accident.
17 Q. You did not know her before the accident?
18 A. No.
19 Q. Who recommended that you see her, if anyone?
20 A. A friend of mine.
21 Q. Who was the friend who gave you some names?
22 A. Karen.
23 Q. Do you know Karen's last name?
24 A. No.
25 Q. Is there any reason why Karen isn't listed as one

**Page 98**

1 of your witnesses?
2 A. I didn't know -- no, there is no reason.
3 Q. Is she someone who knows you pretty well?
4 A. Not that well. Karen is -- I asked Karen.
5 That's Ken Legacki's secretary.
6 Q. Was it Mr. Legacki's office that suggested you
7 see Dr. Stockman?
8 A. No.
9 Q. It was Karen at Mr. Legacki's office?
10 A. They gave me a list of names of people who could
11 help me.
12 Q. Did you ask for the names or did they just give
13 them to you on your own?
14 A. I didn't know where to go.
15 Q. That wasn't my question. Did you ask for a name
16 or did they just make some suggestions?
17 A. I don't know how it came about. I think Ken told
18 me when I talked to him one time maybe I should see
19 somebody if I was having that kind of trouble.
20 Q. I'm sorry.
21 A. I didn't want to ask Cathie.
22 Q. So the suggestion to see Dr. Stockman came from
23 Mr. Legacki?
24 A. No, it came from me. I didn't know where to go.
25 Q. I thought you said Mr. Legacki told you that if

**Page 99**

1 you were having that kind of trouble maybe you should go
2 see someone?
3 A. I did.
4 Q. Doesn't that sound like it came from Mr. Legacki?
5 A. Pardon me?
6 Q. Doesn't it sound like the suggestion then came
7 from Mr. Legacki?
8 A. It was my idea, but I don't know anybody.
9 Q. Well, how many visits would you say you have had
10 total with Dr. Stockman, let's say, in-person visits?
11 A. Not very many.
12 Q. Can you give me an estimate?
13 A. Half a dozen maybe at the most.
14 Q. How many would you say the least would be? Six
15 at the most.
16 A. I don't know. I don't know how many times.
17 Q. How many times have you spoken with Dr. Stockman
18 by phone?
19 A. A couple of times.
20 Q. Were those substantive or just to arrange
21 appointments?
22 A. Both. I don't know how many times I just called
23 her up and said -- I don't know how many times.
24 Q. Have you ever asked Dr. Stockman to give you
25 copies of records so that you could produce them in this

**Page 100**

1 case if they relate to counseling for your grief?
2 Wouldn't you say they are pretty relevant?
3 A. I asked Dr. Stockman never to tell anybody I was
4 there.
5 Q. Well, your lawyer has listed her as a witness you
6 guys intend to call to testify.
7 A. Yeah.
8 Q. Wouldn't you agree then that if you are going to
9 name her that we ought to get the records? Would you
10 agree to sign a release of authorization so we can get
11 those records?
12 A. I don't know. I couldn't answer that.
13 MR. ZIPKIN: Well, I'll ask you,
14 Mr. Legacki. Will you sign a release so we can get
15 those records?
16 MR. LEGACKI: Discovery is over.
17 MR. ZIPKIN: Well, actually, it's not over
18 in the sense that we both agreed that I can take this
19 deposition after the close of discovery.
20 MR. LEGACKI: Right.
21 MR. ZIPKIN: And this is the first
22 opportunity I have ever had to talk to your client about
23 this.
24 MR. LEGACKI: You had plenty of
25 opportunities. You scheduled it at a late date.

CASENAME>

WITNESS>
DATE>

Page 101

1    MR. ZIPKIN: That's, of course, a gross
2  misrepresentation by you, but why get into that, just
3  one of many gross representations by you.
4    MR. LEGACKI: Gary, read the letters of your
5  associate there regarding discovery and close of
6  discovery and all of that other stuff.
7    And in fact, I think that answers your own
8  questions. Generally, I am very agreeable, but
9  according to your associate there in the letters,
10  discovery is over.
11    MR. ZIPKIN: That's what you just said,
12  discovery is over.
13    MR. LEGACKI: That's what she says,
14  discovery is over.
15    MR. ZIPKIN: Obviously, this deposition is
16  taking place now and it is taking place now because we
17  repeatedly attempted to set this up during the course of
18  discovery and you --
19    MR. LEGACKI: This is a witness list that
20  was filed back in, when is it, May of 2006.
21    MR. ZIPKIN: Very true, and the first --
22    MR. LEGACKI: She was listed on the
23  preliminary witness list as well.
24    MR. ZIPKIN: Very true, and the first time I
25  get to ask any questions of your client about it is

Page 102

1  today.
2    MR. LEGACKI: She was listed. There is
3  nothing hidden here, Gary.
4    MR. ZIPKIN: Nothing is hidden. Will you
5  have your client sign a release for information from
6  Dr. Stockman?
7    MR. LEGACKI: No.
8    Q. Who is Neil, N-e-i-l, Tieszen, T-i-e-s-z-e-n?
9    A. A close friend.
10   Q. Who is Elisa, E-l-i-s-a, Vidales, V-i-d-a-l-e-s?
11   A. A friend.
12   Q. And who is Bob Weilbacher in Edgewood?
13   A. My brother.
14   Q. Who is Lisa Weilbacher in Washington?
15   A. My daughter.
16   Q. How old is Lisa, roughly?
17   A. 41.
18   Q. Who is Charlie Weimer, W-e-i-m-e-r?
19   A. A good friend of mine.
20   Q. Who is Dirk, D-i-r-k-, Whitehead, just like it
21  sounds?
22   A. A friend of mine.
23   Q. Have any of the individuals that we have just
24  gone over, have any of them given you any opinions
25  regarding Progressive's position in this case?

Page 103

1    A. No.
2    Q. Have any of them tried to give you any analysis
3  of what the policy means or doesn't mean?
4    A. No.
5    Q. Liberty Mutual, do you know whether Cathie Mauro
6  or Peter Mauro have a Liberty Mutual insurance policy?
7    A. I don't know who they are insured with.
8    Q. Are you making a claim for any insurance benefits
9  under the Liberty Mutual policy that was issued to Peter
10  and Cathie Mauro?
11   A. I don't know.
12   (Exhibit No. 10 marked.)
13   Q. I'm showing you No. 10. Exhibit No. 10, a letter
14  from Ken Legacki dated March 8, 2005 to Danny Withers at
15  Progressive.
16   At the bottom of the letter, the last paragraph
17  right before the sincerely, I'll quote, it says, "For
18  your information, Liberty Mutual has agreed with my
19  analysis of the Allstate case and are allowing the
20  mother to recover under the underinsured motorist
21  provision of the policy."
22   Do you see that?
23   A. Yes.
24   Q. Did you receive a copy of this letter at or about
25  the time it went out in the mail?

Page 104

1    A. I don't believe so. I don't know.
2    Q. Is it your understanding or is it not your
3  understanding that Liberty Mutual has agreed to pay a
4  separate per person limit under its underinsured
5  motorist coverage to Cathie Mauro?
6    A. I don't know.
7    Q. Would you agree that --
8    A. We don't talk about insurance, her and I, really.
9    Q. How about this simple point: Would you agree
10  that your attorney, when he is dealing with Progressive,
11  should be dealing with Progressive in an honest way?
12   You think your lawyer ought to be honest when he
13  is talking to Progressive?
14   A. That's his line of work, not mine.
15   Q. You wouldn't want to hire a lawyer who wasn't
16  being honest with the other side, would you?
17   A. I'm not sure what's going on there.
18   Q. Are you aware of any information other than from
19  Mr. Legacki to indicate that Liberty Mutual actually has
20  agreed to make some extra payment to Cathie Mauro
21  directly with her own per person money?
22   A. Ken has never talked to me about that.
23   Q. So as you sit here, you don't know whether
24  Liberty Mutual has refused to make a separate per person
25  payment to Cathie Mauro or to you? You don't know that,

EXHIBIT____D____
Page____4____of____6____

CASENAME>

WITNESS><br>DATE>

Page 117

```
 1   personally, just the company?
 2      A.  Yeah.
 3      Q.  Any other cases jump to your mind that you
 4   actually testified in?
 5      A.  Yeah.  There is one way, way back, as a matter of
 6   fact, that's not in here.  I was in an automobile wreck
 7   back in '76, I think it was, and I was in court on it.
 8      Q.  Were you injured in the accident?
 9      A.  Yes, I was.
10      Q.  Did you make a claim for bodily injury damages?
11      A.  I did.
12      Q.  Were you represented by an attorney?
13      A.  I was.
14      Q.  Who was the attorney, if you remember?
15      A.  Dave Crossman, I think.
16      Q.  Did the case -- I'm sorry.
17      A.  I'm pretty sure that's the name.
18      Q.  Did the case go to a trial or was it settled
19   short of trial?
20      A.  It was in trial.
21      Q.  It did go to a trial?
22      A.  Uh-huh.
23      Q.  The answer is yes?  And you testified at the
24   trial, I assume?
25      A.  Yes.
```

Page 118

```
 1      Q.  What was the result of the trial?
 2      A.  I don't remember.  It wasn't -- you know, they
 3   covered all the expenses.
 4      Q.  "They" being whom?
 5      A.  The other insurance company.
 6      Q.  All your damages were paid for by the insurance
 7   company for the person who hit you?
 8      A.  Uh-huh.
 9      Q.  I'm sorry.  The answer is yes?
10      A.  Yes.
11      Q.  I'm not trying to be technical.
12      A.  I'm trying to remember.  It's been 30 years or
13   something.
14      Q.  Sure.  It goes back a long time.  Do you have any
15   recollection of whether you had to make or did make a
16   claim against your own insurance policy for underinsured
17   motorist coverage?
18      A.  No, I never.
19      Q.  Do you know the name of the insurance company for
20   the person who hit you?
21      A.  No.
22      Q.  Do you remember how much money was involved at
23   the very end of the day, how much you were paid?
24      A.  $3,000 or $4,000, I think.
25      Q.  So you have actually testified almost half a
```

Page 119

```
 1   dozen times or so over the years?
 2      A.  I would say that was about the only time.  The
 3   other time all I did was say, "Yes, I own the van."
 4      Q.  Okay.  Just give me a second.
 5         MR. ZIPKIN:  Let's go off record.
 6         VIDEOGRAPHER:  Off record 12:14 p.m.
 7         (There was a short break.)
 8         VIDEOGRAPHER:  On record 12:18 p.m.
 9      Q.  Thank you, R.W., and I appreciate your patience
10   with my questions today.  I'm just about done.
11         We asked in these discovery requests -- looks
12   like it's page 11.  Can you turn to page 11, and then it
13   goes on to page 12.
14         At the bottom of page 11, we were talking about
15   the witnesses you have identified in this case, all the
16   witnesses, and I read all of those names starting with
17   Bo Ansel.  Page 11 here, you said at the last line on
18   the page, the very last line, "The listed individuals
19   will testify concerning the depth of the sorrow, anguish
20   and hurt that Mr. Weilbacher suffered because of the
21   loss of his daughter and how he is a changed man."
22      A.  Where are you at now?
23      Q.  I'm on 11.  I think we're okay.  I'm on this last
24   line.  It's the last line on 11, which I just read, the
25   last line on 11, the very last line, "The listed
```

Page 120

```
 1   individuals will testify concerning the depth of the
 2   sorrow, anguish and hurt that Mr. Weilbacher suffered
 3   because of the loss of his daughter and how he is a
 4   changed man since his daughter died.  He has known each
 5   of these individuals for well over 15 years."
 6         Do you see where it says that?
 7      A.  Yeah.
 8      Q.  But when we were going through these names, and
 9   you were very kind to go through and tell me who was a
10   friend, but when it came to Dr. Stockman, you haven't
11   known her for over 15 years, right?
12      A.  No.
13      Q.  And she isn't a friend of yours, right?  She has
14   actually been treating you, right, or counseling you,
15   however the phrase?
16      A.  Or whatever.
17      Q.  In other words, when you gave us these initial
18   discovery responses, which we can have marked.  I guess
19   we don't have a separate copy.  I'll just show you.
20         When you first gave us a list of witnesses, you
21   said they will testify concerning the depth of the
22   sorrow, same things we just read.  You have listed
23   numerous friends and business associates who can testify
24   about how the death of his daughter affected him, and
25   you gave us this list.
```

EXHIBIT  D
Page  5  of  6

CASENAME>

WITNESS>
DATE>

Page 121

1  When we got to Ann Stockman, I mean, there is
2  nothing that tells us, is there, that she is just not a
3  friend who can testify about the loss?  Was there
4  anything about your response that sort of told us she
5  was treating you?
6  A. Yeah.
7  Q. What?
8  A. What do you mean by what?  What part didn't you
9  understand?
10  Q. I mean, we have this list of people.
11  A. I got a list of friends here who I have known a
12  very long time, yeah.
13  Q. But instead of saying you have known each of
14  these individuals for well over 15 years, when it comes
15  to Dr. Stockman, you don't know her for over 15 years
16  and you have seen her for treatment, right?
17  A. That's true.
18  Q. So the general statement that every one of them
19  is a friend that you have known for 15 years doesn't
20  quite apply to Dr. Stockman, right?  She is in a
21  separate category?  Isn't that a fair statement?
22  A. From what is here?  I don't know.  I don't know
23  what you are trying to say.  Did I answer your question
24  yes or no?
25  Q. I think you have.

Page 122

1  A. I haven't known her 15 years.  I answered that,
2  didn't I?
3  Q. Yes, you did.
4  A. So what else do you want to know about something
5  I really don't like talking about, Counsel?
6  Q. I wasn't trying to get into what the therapy was
7  about or what the sessions were about.  It's a separate
8  point really between me and Mr. Legacki that I was
9  pointing out.
10  A. I was kind of getting that idea.
11  Q. We think it would have been helpful if she had
12  been identified as someone who was treating you as a
13  result of this accident as opposed to someone you have
14  known for 15 years.
15  But that's between me and Mr. Legacki.
16  MR. ZIPKIN:  With that, I have no further
17  questions, sir.  Any cross?  We're done.
18  VIDEOGRAPHER:  Off record 12:23 p.m.  This
19  is the end of the deposition.
20  (Proceedings concluded at 12:23 p.m.)
21  (Signature reserved.)
22  -o0o-

Page 123

1  CERTIFICATE
2
3  I, SONJA L. REEVES, Registered Professional Reporter
4  and Notary Public in and for the State of Alaska, do
5  hereby certify that the witness in the foregoing
6  proceedings was duly sworn; that the proceedings were
7  then taken before me at the time and place herein set
8  forth; that the testimony and proceedings were reported
9  stenographically by me and later transcribed by computer
10  transcription; that the foregoing is a true record of
11  the testimony and proceedings taken at that time; and
12  that I am not a party to nor have I any interest in the
13  outcome of the action herein contained.
14  IN WITNESS WHEREOF, I have hereunto set my hand and
15  affixed my seal this 23rd day of August 2006.
16
17
18  _____
19  SONJA L. REEVES, RPR
20  My Commission Expires 8/7/07

Page 124

WITNESS CERTIFICATE
RE: WEILBACHER V. PROGRESSIVE
CASE NO. 3:05-cv-204-TMB
DEPOSITION OF: RONALD V. WEILBACHER
DATE TAKEN: AUGUST 21, 2006

I hereby certify that I have read the foregoing
deposition and accept it as true and correct, with the
following exceptions:

Page  Line  Description/Reason for Change

SIGNATURE      DATE

Please sign your name and date it on the above line.  As
needed, use additional paper to note corrections, dating
and signing each page.
(SLR)