CASENAME&gt;                                                                                           WITNESS&gt;
                                                                                                    DATE&gt;

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ALASKA
 3   _____
 4   RONALD V. WEILBACHER,         )
                                   )
 5        Plaintiff,               )
                                   )
 6   vs.                           )
                                   )
 7   PROGRESSIVE NORTHWESTERN INSURANCE )
     COMPANY,                      )
 8                                 )
          Defendant.               )
 9   _____)
     Case No. 3:05-cv-204-TMB
10
11
12
13
14        VIDEOTAPED DEPOSITION OF RONALD V. WEILBACHER
15   _____
16         Monday, August 21, 2006
              9:13 a.m.
17
18        Taken by Counsel for Defendant
                     at
19            Guess & Rudd, P.C.
          510 L Street, Suite 700
20            Anchorage, Alaska
21
22
23
24
25
```

## Page 2

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:
 4      Kenneth W. Legacki, Esq.
        425 G Street, Suite 920
 5      Anchorage, Alaska 99501
        (907) 258-2422
 6
 7
 8   For Defendant:
 9      Gary A. Zipkin, Esq.
        Aisha Tinker Bray, Esq.
10      GUESS & RUDD, P.C.
        510 L Street, Suite 700
11      Anchorage, Alaska 99501
        (907) 793-2200
12
13
14   Videographer:
15      Martha Enslow, CLVS
        PACIFIC RIM REPORTING
16
17   Court Reporter:
18      Sonja L. Reeves, RPR
        PACIFIC RIM REPORTING
19      711 M Street, Suite 4
        Anchorage, Alaska 99501
20
21
22
23
24
25
```

## Page 3

```
 1                 I-N-D-E-X
 2
 3   EXAMINATION BY                    PAGE
 4      Mr. Zipkin                       5
 5
 6   EXHIBITS
 7    1   Letter of 2/2/04 from Legacki to    18
          Withers (5 pgs.)
 8
      2   Denali Alaskan Insurance Information 19
 9        (6 pgs.)
10    3   Plaintiff's Supplemental Responses to 45
          Progressive's First Set of Discovery
11        Requests (15 pgs.)
12    4   Letter of 4/19/05 from Withers to    51
          Legacki (1 pg.)
13
14    5   Letter of 4/11/05 from Legacki to    58
          Withers (1 pg.)
15    6   Part III - Uninsured/Underinsured    63
          Motorist Coverage (13 pgs.)
16
      7   Declaration Page (1 pg.)             72
17
      8   Copy of Check (2 pgs.)               89
18
      9   Plaintiff's Final Witness List (6 pgs.) 92
19
     10   Letter of 3/8/05 from Legacki to    103
20        Withers (1 pg.)
21   11   Letter of 11/18/03 from Liberty    105
          Mutual to Legacki (2 pgs.)
22
     12   Letter of 11/18/03 from Liberty    109
23        Mutual to Legacki (2 pgs.)
24
25
```

## Page 4

```
 1          ANCHORAGE, ALASKA; AUGUST 21, 2006
 2                   9:13 a.m.
 3                    -o0o-
 4          VIDEOGRAPHER:  My name is Martha Enslow.  I
 5   am the videographer for Pacific Rim Reporting.  It is
 6   the 21st day of August, the year 2006.  We are on record
 7   at 9:13 a.m.
 8          We are at the offices of Guess & Rudd to
 9   take the deposition of Ronald Weilbacher in Case Number
10   3:05-cv-204-TMB, Ronald Weilbacher versus Progressive
11   Northwestern Insurance Company.
12          This deposition is being taken on behalf of
13   the plaintiff, Ronald Weilbacher.  At this time, I would
14   like everyone in the room to identify themselves
15   verbally.
16          MR. WEILBACHER:  I'm Ron Weilbacher.
17          MR. ZIPKIN:  Gary Zipkin for Progressive
18   Northwestern.
19          MS. TINKER BRAY:  Aisha Tinker Bray for
20   Progressive.
21          MR. LEGACKI:  Ken Legacki for
22   Mr. Weilbacher.
23          MR. ZIPKIN:  And just to make the record
24   clear, you said this deposition is being taken on behalf
25   of Mr. Weilbacher.  Actually, it is being taken on
```

CASENAME&gt;                                                                                          WITNESS&gt;
                                                                                                    DATE&gt;

Page 85

1    Q. I didn't want a legal understanding. I wanted
2    your lay ordinary person's understanding. Who was
3    injured in the accident?
4    A. It was Heidi.
5    Q. And your loss flows from her death, right?
6    A. I guess.
7    Q. Well, what do you mean you guess? Isn't it as
8    sure as the sun rises, in some states?
9    A. Every day.
10   Q. Every day?
11   A. Every day.
12   Q. And that all flows because of her tragic wrongful
13   death. She should not have died and you should have
14   your daughter, right? Those are obvious things.
15       I'm not trying to cause pain. I'm just trying to
16   make sure that we understand each other.
17       MR. ZIPKIN: Let's take a break.
18       VIDEOGRAPHER: Off record 11:21 a.m. This
19   is the end of tape number two.
20       (There was a short break.)
21       VIDEOGRAPHER: On record 11:24 a.m. This is
22   the start of tape number three.
23   Q. R.W., do you have a fishing guiding license or
24   are you an outfitter?
25   A. I consider it everything.

Page 86

1    Q. Isn't there -- I'm told, that there is --
2    A. Who told you?
3    Q. Aisha Tinker Bray. I'm told by Aisha Tinker Bray
4    that there is actually a written and oral exam for those
5    who have licenses as fishing guides.
6    A. Yeah.
7    Q. Did you take the oral and written exam?
8    A. When I got mine, it was back in '79 or '80, and
9    the association put the test together, so everybody had
10   the answers.
11   Q. Are you saying that you basically had the answers
12   to the questions before you took the exam?
13   A. I am very thankful.
14   Q. And have you had to take the exam more than once
15   or just in '79?
16   A. Just then. But nowadays they got to where you
17   can go to a two-day course and you are pretty well
18   guaranteed it.
19   Q. Have you taken the course?
20   A. No. That's for a Coast Guard license.
21   Q. Is it fair to say that you don't fully understand
22   the reasoning Progressive gave for denying you a
23   separate $100,000 payment?
24   A. Say that one more time.
25   Q. Is it fair to say that you don't fully understand

Page 87

1    why it is that Progressive refused to pay you an extra
2    $100,000?
3    A. Yes.
4    Q. Is it fair to say that after looking at the
5    policy you don't fully understand what the words in the
6    policy mean?
7    A. Yes.
8    Q. As you sit here, would you agree that it's
9    possible that Progressive has in fact set forth its
10   position in a way that the court might understand?
11   A. I'm not sure on that.
12   Q. Are you able to explain to me if you feel this
13   way -- well, let me back up and ask. Has Progressive
14   mistreated you in this case?
15   A. I'm not sure.
16   Q. That leads to my next question because I was
17   going to say if you feel that Progressive has mistreated
18   you are you able to lay it out for me as to what they
19   did wrong and when they did it and how they did it
20   wrong?
21   A. I'm not sure.
22   Q. If the law required Progressive to give you an
23   opportunity to purchase higher limits for
24   uninsured/underinsured motorist, would you agree that,
25   as we have already discussed, it is at least possible

Page 88

1    that they did that in the application?
2    A. Say that one more time.
3    Q. If the law required Progressive to give you the
4    opportunity to purchase higher limits for
5    uninsured/underinsured motorist limits, would you agree,
6    as we discussed in the application, it is at least
7    possible that that's what this application did was give
8    you that opportunity?
9    A. Somewhat. I would think the law should have been
10   -- you know, like I say, I am learning a lot more about
11   insurance, but I think it should be explained more to
12   people.
13   Q. Are you able to say from any source, any source
14   at all --
15   A. I thought I had everything. If that was given to
16   me like it was, I was under the impression I had
17   everything I needed.
18   Q. Everything you needed meaning the highest
19   possible coverages?
20   A. That's what I always wanted.
21   Q. So you think the insurance agent at Denali fell
22   down on the job by not getting you $1 million in
23   coverage?
24   A. I'm not sure.
25   Q. If the law is that an insurance company that

CASENAME> WITNESS>
DATE>

Page 89

1  denies a claim, and here they have agreed you have
2  coverage, but that you only have coverage under one
3  check for $100,000 --
4      Let me back up and ask that. Strike that.
5      Do you agree that you were named on the check for
6  $100,000 that was paid by Progressive? It named the
7  Estate of Heidi Weilbacher. It named --
8      A. I didn't see the check. Did I sign the check?
9  Who signed the check?
10      (Exhibit No. 8 marked.)
11     Q. I'm showing you Exhibit No. 8. This is a copy of
12  a check from Progressive Northwestern Insurance Company
13  on policy 65824951-0, and it actually is a payment for
14  $117,256, right? Do you see that?
15     A. Uh-huh.
16     Q. I'm sorry. We need a verbal.
17     A. I see it.
18     Q. And it says in terms of who the payees are,
19  Kenneth W. Legacki, PC, in trust for the Estate of Heidi
20  Weilbacher; Ron Weilbacher and Cathie Mauro. Do you see
21  that?
22     A. Yes.
23     Q. So you were in fact named on this check, right?
24     A. My name is there.
25     Q. Do you remember endorsing the check so it could

Page 90

1  be deposited?
2     A. I don't know if I did or not.
3     Q. If Progressive paid a full one per person or each
4  person limit of $100,000, plus I'm not asking you to
5  explain why they have these add-ons that total another
6  $17,000 or so, if they paid that limit, can you tell me
7  why you think Progressive owes you any additional money?
8      MR. LEGACKI: Objection; assumes facts not
9  in evidence. Objection to legal conclusion. Objection
10  to foundation.
11     Q. He is entitled to make objections. At some
12  point, the court will rule on those objections, but my
13  question stands.
14     Based on the check that you have here in front of
15  you, which includes your name, for $117,256, can you
16  tell me why Progressive owes you any additional money?
17     A. I don't know. I am not sure what you are getting
18  at.
19     Q. I just want to know why. You are the plaintiff
20  in this lawsuit. You have made a claim against my
21  client.
22     Why do you believe my client owes you one dime
23  more than what it paid in this check?
24     A. This here, how come Heidi's name is on it? It
25  goes to her estate?

Page 91

1     Q. Yes. As it says, the Estate of Heidi Weilbacher.
2  It was made payable to the Estate of Heidi Weilbacher
3  and also to you and also to Cathie Mauro.
4     A. So to the three of us?
5     Q. Yes. One check to the three of you for $117,256.
6     A. Shouldn't there be a check for everyone?
7     Q. In what amount?
8     A. I'm not sure.
9     Q. Can you tell me, if you know, the basis for any
10  claim that you have against my client for any more money
11  than is represented in that check in front of you?
12     A. This check was for Heidi's part of her suffering,
13  I guess. I'm looking for mine. There is three of us on
14  here. Should be paid to all of us the amount.
15     Q. We just went through the policy, right, where it
16  talked about claims for loss of companionship, loss of
17  society as not getting a separate per person limit, but
18  being part of a single per person limit.
19     Can you explain to me why Progressive, in view of
20  the policy --
21     A. No, I can't explain to you anything about
22  Progressive right now.
23     Q. Okay. In terms of your damages, do you claim
24  that you have suffered any damages because of what
25  Progressive has done?

Page 92

1     In other words, we know Mr. Esper in that
2  accident caused you damage because of the loss of your
3  daughter. Has anything that Progressive has done caused
4  you damage?
5     A. I can't answer that. I don't know.
6     Q. Just a second. Give me a moment.
7      (Exhibit No. 9 marked.)
8     Q. I'm showing you Exhibit No. 9, R.W. You can just
9  push all the other paper aside. It's not crucial for
10  now.
11     What Exhibit No. 9 is is Plaintiff's Final
12  Witness List in this lawsuit. It gives us a list of
13  individual 23 names, before we get to the categories, 23
14  different names.
15     And I would just like to have you quickly tell me
16  why these people are on this witness list. Bo, the
17  first one is Bo, B-o, Ansel, A-n-s-e-l. Why is Bo Ansel
18  listed?
19     A. He knows me and Heidi.
20     Q. Is he a neighbor or what?
21     A. A friend.
22     Q. A friend? What sort of business is he in?
23     A. He is in real estate and he is a fishing
24  outfitter.
25     Q. Dale Dolifka is number two. Dale, D-a-l-e,

CASENAME> WITNESS>
DATE>

Page 101

1   MR. ZIPKIN: That's, of course, a gross
2   misrepresentation by you, but why get into that, just
3   one of many gross representations by you.
4   MR. LEGACKI: Gary, read the letters of your
5   associate there regarding discovery and close of
6   discovery and all of that other stuff.
7   And in fact, I think that answers your own
8   questions. Generally, I am very agreeable, but
9   according to your associate there in the letters,
10  discovery is over.
11  MR. ZIPKIN: That's what you just said,
12  discovery is over.
13  MR. LEGACKI: That's what she says,
14  discovery is over.
15  MR. ZIPKIN: Obviously, this deposition is
16  taking place now and it is taking place now because we
17  repeatedly attempted to set this up during the course of
18  discovery and you --
19  MR. LEGACKI: This is a witness list that
20  was filed back in, when is it, May of 2006.
21  MR. ZIPKIN: Very true, and the first --
22  MR. LEGACKI: She was listed on the
23  preliminary witness list as well.
24  MR. ZIPKIN: Very true, and the first time I
25  get to ask any questions of your client about it is

Page 102

1   today.
2   MR. LEGACKI: She was listed. There is
3   nothing hidden here, Gary.
4   MR. ZIPKIN: Nothing is hidden. Will you
5   have your client sign a release for information from
6   Dr. Stockman?
7   MR. LEGACKI: No.
8   Q. Who is Neil, N-e-i-l, Tieszen, T-i-e-s-z-e-n?
9   A. A close friend.
10  Q. Who is Elisa, E-l-i-s-a, Vidales, V-i-d-a-l-e-s?
11  A. A friend.
12  Q. And who is Bob Weilbacher in Edgewood?
13  A. My brother.
14  Q. Who is Lisa Weilbacher in Washington?
15  A. My daughter.
16  Q. How old is Lisa, roughly?
17  A. 41.
18  Q. Who is Charlie Weimer, W-e-i-m-e-r?
19  A. A good friend of mine.
20  Q. Who is Dirk, D-i-r-k-, Whitehead, just like it
21  sounds?
22  A. A friend of mine.
23  Q. Have any of the individuals that we have just
24  gone over, have any of them given you any opinions
25  regarding Progressive's position in this case?

Page 103

1   A. No.
2   Q. Have any of them tried to give you any analysis
3   of what the policy means or doesn't mean?
4   A. No.
5   Q. Liberty Mutual, do you know whether Cathie Mauro
6   or Peter Mauro have a Liberty Mutual insurance policy?
7   A. I don't know who they are insured with.
8   Q. Are you making a claim for any insurance benefits
9   under the Liberty Mutual policy that was issued to Peter
10  and Cathie Mauro?
11  A. I don't know.
12  (Exhibit No. 10 marked.)
13  Q. I'm showing you No. 10. Exhibit No. 10, a letter
14  from Ken Legacki dated March 8, 2005 to Danny Withers at
15  Progressive.
16  At the bottom of the letter, the last paragraph
17  right before the sincerely, I'll quote, it says, "For
18  your information, Liberty Mutual has agreed with my
19  analysis of the Allstate case and are allowing the
20  mother to recover under the underinsured motorist
21  provision of the policy."
22  Do you see that?
23  A. Yes.
24  Q. Did you receive a copy of this letter at or about
25  the time it went out in the mail?

Page 104

1   A. I don't believe so. I don't know.
2   Q. Is it your understanding or is it not your
3   understanding that Liberty Mutual has agreed to pay a
4   separate per person limit under its underinsured
5   motorist coverage to Cathie Mauro?
6   A. I don't know.
7   Q. Would you agree that --
8   A. We don't talk about insurance, her and I, really.
9   Q. How about this simple point: Would you agree
10  that your attorney, when he is dealing with Progressive,
11  should be dealing with Progressive in an honest way?
12  You think your lawyer ought to be honest when he
13  is talking to Progressive?
14  A. That's his line of work, not mine.
15  Q. You wouldn't want to hire a lawyer who wasn't
16  being honest with the other side, would you?
17  A. I'm not sure what's going on there.
18  Q. Are you aware of any information other than from
19  Mr. Legacki to indicate that Liberty Mutual actually has
20  agreed to make some extra payment to Cathie Mauro
21  directly with her own per person money?
22  A. Ken has never talked to me about that.
23  Q. So as you sit here, you don't know whether
24  Liberty Mutual has refused to make a separate per person
25  payment to Cathie Mauro or to you? You don't know that,