CASENAME>                                                                    WITNESS>
                                                                             DATE>

## Page 1

```
     IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF ALASKA
  _____
  RONALD V. WEILBACHER,          )
                                 )
         Plaintiff,              )
                                 )
  vs.                            )
                                 )
  PROGRESSIVE NORTHWESTERN INSURANCE )
  COMPANY,                       )
                                 )
         Defendant.              )
  _____)
  Case No. 3:05-cv-204-TMB



         VIDEOTAPED DEPOSITION OF RONALD V. WEILBACHER


                 Monday, August 21, 2006
                       9:13 a.m.

              Taken by Counsel for Defendant
                           at
                    Guess & Rudd, P.C.
                 510 L Street, Suite 700
                    Anchorage, Alaska
```

## Page 2

```
                   A-P-P-E-A-R-A-N-C-E-S

  For Plaintiff:
      Kenneth W. Legacki, Esq.
      425 G Street, Suite 920
      Anchorage, Alaska 99501
      (907) 258-2422


  For Defendant:
      Gary A. Zipkin, Esq.
      Aisha Tinker Bray, Esq.
      GUESS & RUDD, P.C.
      510 L Street, Suite 700
      Anchorage, Alaska 99501
      (907) 793-2200


  Videographer:
      Martha Enslow, CLVS
      PACIFIC RIM REPORTING

  Court Reporter:
      Sonja L. Reeves, RPR
      PACIFIC RIM REPORTING
      711 M Street, Suite 4
      Anchorage, Alaska 99501
```

## Page 3

```
                       I-N-D-E-X

  EXAMINATION BY                            PAGE
     Mr. Zipkin                              5

  EXHIBITS
   1   Letter of 2/2/04 from Legacki to      18
       Withers (5 pgs.)

   2   Denali Alaskan Insurance Information  19
       (6 pgs.)

   3   Plaintiff's Supplemental Responses to 45
       Progressive's First Set of Discovery
       Requests (15 pgs.)

   4   Letter of 4/19/05 from Withers to     51
       Legacki (1 pg.)

   5   Letter of 4/11/05 from Legacki to     58
       Withers (1 pg.)

   6   Part III - Uninsured/Underinsured     63
       Motorist Coverage (13 pgs.)

   7   Declaration Page (1 pg.)              72

   8   Copy of Check (2 pgs.)                89

   9   Plaintiff's Final Witness List (6 pgs.)  92

  10   Letter of 3/8/05 from Legacki to     103
       Withers (1 pg.)

  11   Letter of 11/18/03 from Liberty      105
       Mutual to Legacki (2 pgs.)

  12   Letter of 11/18/03 from Liberty      109
       Mutual to Legacki (2 pgs.)
```

## Page 4

```
  1          ANCHORAGE, ALASKA; AUGUST 21, 2006
  2                      9:13 a.m.
  3                       -o0o-
  4          VIDEOGRAPHER:  My name is Martha Enslow.  I
  5  am the videographer for Pacific Rim Reporting.  It is
  6  the 21st day of August, the year 2006.  We are on record
  7  at 9:13 a.m.
  8          We are at the offices of Guess & Rudd to
  9  take the deposition of Ronald Weilbacher in Case Number
 10  3:05-cv-204-TMB, Ronald Weilbacher versus Progressive
 11  Northwestern Insurance Company.
 12          This deposition is being taken on behalf of
 13  the plaintiff, Ronald Weilbacher.  At this time, I would
 14  like everyone in the room to identify themselves
 15  verbally.
 16          MR. WEILBACHER:  I'm Ron Weilbacher.
 17          MR. ZIPKIN:  Gary Zipkin for Progressive
 18  Northwestern.
 19          MS. TINKER BRAY:  Aisha Tinker Bray for
 20  Progressive.
 21          MR. LEGACKI:  Ken Legacki for
 22  Mr. Weilbacher.
 23          MR. ZIPKIN:  And just to make the record
 24  clear, you said this deposition is being taken on behalf
 25  of Mr. Weilbacher.  Actually, it is being taken on
```

CASENAME>                                                                WITNESS>
                                                                         DATE>

Page 5

1  behalf of Progressive Northwestern.
2          VIDEOGRAPHER: Are there any stipulations?
3          MR. ZIPKIN: None. I assume we will agree
4  to follow the Alaska rules on depositions.
5                  -o0o-
6          RONALD V. WEILBACHER,
7       deponent herein, being sworn on oath,
8       was examined and testified as follows:
9               EXAMINATION
10 BY MR. ZIPKIN:
11    Q. Please state your full name for the record, sir.
12    A. Ronald Victor Weilbacher.
13    Q. I noticed when we first came in, I introduced
14 myself, Gary Zipkin, representing Progressive
15 Northwestern, and you said, "R.W."
16    A. I just automatically go by R.W.
17    Q. Is it okay if I refer to you as R.W.? That works
18 for you?
19    A. Sure.
20    Q. What is your residence address?
21    A. It's 46500 Big Eddie Road, Soldotna.
22    Q. And you have a separate P.O. Box?
23    A. P.O. Box 3824.
24    Q. In Soldotna?
25    A. Soldotna. And then also P.O. Box 1918.

Page 6

1     Q. What are the zip codes for those?
2     A. 99669.
3     Q. And how long have you lived at the Big Eddie
4  address?
5     A. 11 years.
6     Q. Have you, R.W., reviewed any materials,
7  documents, specifically to prepare yourself for this
8  deposition here today?
9     A. I read a little bit, not much.
10    Q. Can you recall what it was that you looked at?
11    A. I'm not too sure. I think it was a letter or
12 just a starting paper.
13       I went through a couple pieces of -- yeah, you
14 guys -- the petition, I guess, toward this, and that's
15 about it. And then you guys did a couple of letters,
16 but I didn't really go through them that much.
17    Q. I appreciate your best efforts to remember. You
18 said the "starting papers". Sometimes people --
19    A. I went through some paper that told me to be
20 here.
21    Q. I see. Okay. A lawsuit is often started with
22 the filing of a complaint. In this case, there was a
23 complaint filed on your behalf by your attorney.
24       Did you happen to review the complaint in
25 preparation for today?

Page 7

1     A. I just -- I think I just read it is all, but just
2  quickly. I don't have much time. I am right in the
3  middle of my season right now.
4     Q. Is that guiding?
5     A. Yes. Well, I don't go out in the boat, very
6  little.
7     Q. Managerial responsibilities?
8     A. Yes.
9     Q. What's the name of the guiding service?
10    A. R.W.'s.
11    Q. Is it limited to the Kenai or do you go to the
12 Kasilof? Where do you go?
13    A. Anything on the Kenai Peninsula. If I don't have
14 a guide, I'll get you one.
15    Q. In preparation for today, do you know whether you
16 reviewed or you even glanced at the Progressive
17 Northwestern automobile insurance policy that was issued
18 to you?
19    A. I glanced at just a little piece of it.
20    Q. The piece, would that have, if you know, related
21 to the section of the policy that relates to
22 uninsured/underinsured motorist coverage?
23       Did you look at that portion?
24    A. I'm not sure. If you showed it to me, I would be
25 able to answer that better.

Page 8

1     Q. That's something we'll definitely get to here.
2  You said you looked at some correspondence, some
3  letters; is that right?
4     A. Yes.
5     Q. Let me ask this sort of general question: Did
6  you typically receive copies of letters, your own copies
7  of letters that your lawyer would send to Progressive,
8  Mr. Legacki would send?
9     A. Yes.
10    Q. In the normal course, you would receive in the
11 mail copies of letters that Mr. Legacki had sent to my
12 client? Does that sound right?
13    A. I'm not sure. I don't really open everything up
14 and look at it.
15    Q. And did Mr. Legacki generally send you copies,
16 your own copies of letters he would receive from the
17 Progressive adjuster, in this case Danny Withers?
18    A. Yes.
19    Q. So you feel generally, as far as you know, you
20 were kept fairly informed of the exchange of
21 communications, written communications?
22    A. You know, this has been going on the past 90 days
23 or more so, and I have got 70 people in camp and I'm
24 pretty busy.
25    Q. I understand.

CASENAME>                                                                WITNESS>
                                                                         DATE>

Page 9

1    A. I kind of -- I don't understand reading the stuff
2    that much anyway, so.
3    Q. What is your educational background, R.W.?
4    A. In which way? Schooling?
5    Q. Schooling, education.
6    A. I completed the ninth grade.
7    Q. Where was that?
8    A. In Yakima.
9    Q. Did you ever subsequently get a GED or any other
10   high school equivalency?
11   A. No.
12   Q. Any additional academic classes after the ninth
13   grade?
14   A. No.
15   Q. Do you hold any licenses, occupational licenses,
16   issued from any portion of the state, division of
17   occupational licenses?
18   A. I have a business license.
19   Q. How long have you had a business license roughly?
20   A. 28 years.
21   Q. Did you fill out the paperwork yourself or did
22   you have someone do that for you?
23   A. I did it.
24   Q. Any other -- do you have to keep up a guiding
25   license, for example? Do you have to keep that current?

Page 10

1    Is there any paperwork associated with that?
2    A. Every year you go in there, but it's the same
3    every year.
4    Q. Same form?
5    A. You just sign your name.
6    Q. Do you have someone who handles paperwork for
7    your guiding business or do you pretty much run the
8    business in terms of the paperwork yourself?
9    A. Which part of the paperwork?
10   Q. You have to generate bills, for example? You
11   have to purchase supplies? Do you handle --
12   A. I use a credit card.
13   Q. But do you make all the purchases?
14   A. No, I don't make them all.
15   Q. Some people rely on a business partner or
16   business manager to run paperwork, to the extent there
17   is paperwork.
18       Do you have a business manager or do you
19   basically run the business yourself?
20   A. What do you mean now? When you are talking the
21   paperwork, like I use a credit card, and I have a person
22   that has a credit card too, and if they use it, when I
23   get the statement I can see where the money was spent.
24   Q. Who is this person who also --
25   A. There is Mary Beth.

Page 11

1    Q. Is that her full name or does she have a last
2    name as well?
3    A. Rathbun.
4    Q. If you can help me spell -- how does she spell
5    that?
6    A. I don't know.
7    Q. Can I hear it again?
8    A. Rathbun. Then there is also -- I have a handyman
9    more or less, a friend that stays around there and I got
10   him a card now, you know, if he needs to pick up
11   something.
12   Q. What's his name, sir?
13   A. Dick Anderson.
14   Q. How many vehicles do you currently own?
15   A. About seven.
16   Q. What insurance companies insure those vehicles
17   currently, as of today?
18   A. I believe it's Allstate.
19   Q. Do you believe that all seven are insured through
20   Allstate or are some of them not insured?
21   A. You know, I have a personal one, insurance, and I
22   have a business insurance policy, and I'm not sure about
23   the business.
24   Q. Your personal automobile insurance policy is with
25   Allstate?

Page 12

1    A. Yes.
2    Q. How long has it been with Allstate?
3    A. Since I left Progressive.
4    Q. When did you leave Progressive?
5    A. I'm not sure. Three, maybe four. I don't know
6    how many years.
7    Q. Who is your current Allstate agent, insurance
8    agent?
9    A. I go through Accord of Alaska, I believe it's
10   called. And the gal down there, I don't know the one
11   that handles my personal one. I just kind of had this
12   other gal do it who does my business one, puts
13   everything together for me.
14   Q. Who is that? Is that this Mary Beth?
15   A. No. Mary Beth is with me.
16   Q. You are referring to the Allstate person. My
17   confusion.
18   A. I'm referring to the Accord person. It's Bonnie,
19   and her last name I couldn't tell you. It's worse than
20   mine.
21   Q. As far as you know, Bonnie at Accord of Alaska --
22   A. In Homer.
23   Q. In Homer. Thank you. -- handles or is
24   responsible for getting your business auto policy?
25   A. Everything on my business. She puts everything

CASENAME>  WITNESS>
DATE>

Page 13

1   together for me, boats, property, buildings.
2       Q.  And with regard to the personal insurance that
3   you have through Allstate --
4       A.  It's one of the gals down there, but I couldn't
5   tell you what her name is.  I don't remember.
6       Q.  Do you recall that you visited their office to
7   complete an application for insurance?
8       A.  I didn't do that.  They did it for me.
9       Q.  Did you ever sign an application?  Did they, say,
10  fax it to you or something?
11      A.  No, they came to me.  And then Bonnie, she had
12  the other one too, but yet she doesn't do the personal,
13  but she would take the paperwork back to them.
14      Q.  They divide up commercial from personal within
15  their office?
16      A.  I wanted a personal one in case I rent a car.
17  The business one wouldn't do car rentals.
18      Q.  What liability limits are you carrying currently
19  with Allstate on your personal auto policy?
20      A.  I'm not sure.
21      Q.  What uninsured motorist/underinsured motorist
22  coverage limits are you carrying on your personal
23  automobile policy currently?
24      A.  I'm not sure what it is.
25      Q.  Has Allstate --

Page 14

1       A.  I know I'm paying a lot of money for it, whatever
2   it is, but I want full coverage.
3       Q.  What do you understand full coverage to mean, the
4   highest possible?
5       A.  Well, if I get hit, yeah.  I mean, if I get hit,
6   I want everything taken care of.  You know, there is a
7   deductible.  I'm not sure how much that is, but there is
8   a deductible.
9       Q.  If we're speaking about the value of your
10  vehicle, if we're just limiting the discussion for a
11  moment to that, full coverage might mean that you want
12  to make sure that you have coverage for your vehicle
13  that pays you 100 percent of the value of your vehicle.
14      Do you agree with that concept?  Does that make
15  sense?
16      A.  I also want coverage to where I don't get sued.
17      Q.  Okay.  So then on liability, that's often
18  referred to as liability coverage, do you know whether
19  you carry the highest possible limit of liability
20  coverage sold in this state?
21      A.  Well, I would imagine because I don't want to get
22  sued.
23      Q.  Do you know whether --
24      A.  I have some personal property and I don't want to
25  lose anything.

Page 15

1       Q.  Do you know whether you carry, sir, what is
2   sometimes referred to as an umbrella policy that
3   provides even additional excess liability coverage above
4   the policy you got from Allstate?
5       A.  I'm not sure what I got.  I couldn't tell you.
6   All I can tell you is I pay a lot of money for it.
7       Q.  Has the person you deal with at Accord of Alaska
8   on the personal auto, I'm only talking about personal
9   auto right now, has that person communicated to you the
10  availability of optional higher limits for uninsured/
11  underinsured motorist coverage up to $1 million per
12  person, $2 million per accident?
13      A.  No.  I never really talked that much to her.  I
14  talked to Bonnie and I just told Bonnie I wanted to
15  switch insurance and what they could do for me, and I
16  said I wanted a good policy.
17      Q.  Has any insurance company, to your knowledge,
18  through their representatives, ever communicated to you
19  your right to purchase uninsured/underinsured motorist
20  coverage up to $1 million per person for bodily injury
21  sustained in an accident and up to $2 million per
22  accident?
23      Has any insurance company ever done that?
24      A.  Not that I know of.
25      Q.  Are you at all uncertain?  In other words, it's

Page 16

1   one thing to say "no".  It's another thing to say "not
2   that I know of".
3       A.  When I got this last policy and since the
4   accident where I lost Heidi, I told them I didn't want
5   to have any problems, I wanted the best I can get.  And
6   they quoted me prices.
7       Q.  And you took what you were told was the best you
8   could get?  That's what you chose?
9       A.  I took what I thought was going to be enough
10  money.  I think I'm paying like about $2,500, $2,600.  I
11  thought that was enough to be paying.
12      Q.  Is that $2,500, $2,600 total for both personal
13  and business policies or is that just on your personal?
14      A.  I'm thinking I'm paying that on my personal.  I
15  had one truck on it and then I had a minivan on it for
16  just four months out of the year.
17      Q.  Is the minivan covered currently right now?
18      A.  Yes.
19      Q.  So at the moment, you have two vehicles on your
20  Allstate policy?
21      A.  Uh-huh.  On the other one I got -- I think I got
22  three.  I'm not sure.  I got two vehicles I don't let
23  off my property.
24      Q.  Are you talking about your business policy?
25      A.  Yeah.  There is two vehicles I don't even

CASENAME>                                                                                              WITNESS>
                                                                                                        DATE>

Page 17

1   license.  Then I have another vehicle which is just
2   sitting in storage.
3       Q.  As I heard your answer, and I apologize if I got
4   it at all confused, I thought what you were saying was
5   they offered you various options for purchasing
6   liability and underinsured motorist coverage and you
7   picked one of those.  Does that sound right?
8       A.  Uh-huh.
9       Q.  Are you saying that you picked the most expensive
10  one they offered you or something less than the most
11  expensive one?
12      A.  I said I picked the one I thought I was paying
13  enough money for.
14      Q.  I'm trying to figure out if that means the
15  highest or somewhere below the highest.
16      A.  It's up toward the top.
17      Q.  But it's not the top?
18      A.  I don't believe it was the top, but it was close
19  to it.  You know, if you don't want to have your car
20  paid for, if it's your fault, then you are out the
21  money.
22      Q.  Did Progressive Northwestern, at the time you
23  purchased the policy at issue in this case, did
24  Progressive Northwestern give you the opportunity to
25  purchase higher limits for uninsured/underinsured

Page 18

1   motorist coverage than you actually decided to purchase?
2       A.  I don't remember.  I just told her what I needed.
3   I needed full coverage, and she faxed everything down to
4   me.  I think I have had more than one person talking to
5   me about that with Progressive because I believe there
6   were a couple of them left.
7            (Exhibit No. 1 marked.)
8       Q.  I'm handing you Exhibit No. 1, R.W., and take all
9   the time you need, take a look at it.  I'll represent
10  just for the record it's a letter from Mr. Legacki dated
11  February 2, 2004 to Danny Withers at Progressive
12  relating to this matter.
13       And my focus for this purpose is on the second
14  page, but you are free to look at anything.  There is a
15  paragraph at the top of the second page.  I'll just read
16  it into the record.
17       "There is still a question as to whether or not
18  Progressive offered Mr. Weilbacher underinsured coverage
19  of up to $1 million.  Mr. Weilbacher has no recollection
20  of being offered that option.  Nor does he have any
21  recollection of declining that coverage.
22       In reviewing the records, there does not appear
23  to be any indication of him declining the $1 million
24  underinsured coverage, or for that matter that
25  Progressive even offered him that coverage."

Page 19

1       Do you see that?
2       A.  Yes.
3       Q.  Is that a letter that, as far as you know, you
4   did receive a copy of in the mail?
5       A.  I might have, but I don't remember ever seeing
6   this.
7       Q.  Is Mr. Legacki's --
8       A.  February 2nd?
9       Q.  Is Mr. Legacki's representation here correct or
10  incorrect or do you know?
11      A.  No.  It's correct.
12           (Exhibit No. 2 marked.)
13      Q.  I'm handing you what's been marked as Exhibit
14  No. 2.  Did you purchase your Progressive Northwestern
15  policy from Denali Alaskan Insurance, if you recall?
16      A.  I believe so.
17      Q.  You will see at the top of Exhibit No. 2 it
18  refers to a fax coming from Denali Alaskan Insurance.
19  You will see that on the first page there is information
20  with your name.
21       It says, "Ron V. Weilbacher, P.O. Box 3824,
22  Soldotna, policy term 12 months."  Then I see there is a
23  credit card authorization on the first page.
24       Does that look like your signature, sir?
25      A.  Yes.

Page 20

1       Q.  Below that it has driver information, just
2   starting there for a moment.  It says, "Complete for
3   applicant spouse and all persons age 14 and over
4   residing with applicant."
5        Was Heidi Weilbacher residing with you when you
6   purchased the Progressive Northwestern policy?
7       A.  Yes.
8       Q.  Was she age 14 or over?
9       A.  She was about that.  In 2000?
10      Q.  Yes.  As of the end of 2000, December 21.
11      A.  She would have been close to it.
12      Q.  Was she 14 or over?
13      A.  13.
14      Q.  She was 13?
15      A.  13 or 14, somewhere in there.  She was born in
16  '86.
17      Q.  What date, if I can say, what date?
18      A.  The end of July.
19      Q.  In '86.  So as of July 2000, she would have then
20  turned 14?
21      A.  Yes, she would have.
22      Q.  So would you agree with me that by December of
23  2000, she was 14?
24      A.  Uh-huh.
25      Q.  I'm sorry.  The answer is yes?

CASENAME>                                                                    WITNESS>
                                                                             DATE>

Page 21

1    A. Yes.
2    Q. Shouldn't she have been listed, identified by you
3    as a resident of your household who was 14 or over?
4    A. I guess if I would have read this better at the
5    time, I would have had her listed. All I did is sign my
6    name where she had the circles.
7    Q. Did the agent at Denali Alaskan go through the
8    questions with you either in person or over the phone?
9    In other words, the questions --
10   A. Who is the person on this? Who is the person
11   that did this?
12   Q. Well, that was going to be one of my questions to
13   you actually. It says --
14   A. I would have had -- you know, the date 12/21, I
15   don't do insurance in December. I like to do everything
16   in May. I like to pay for a year.
17   Q. Well, let me ask this --
18   A. That's the trouble I have with everything. I
19   want everything done in May on everything, everything
20   paperwork. I have even tried to get all my licenses,
21   but the state won't do it to where they are going to
22   send you something.
23       I'm not sure on this date on this even. I don't
24   remember doing insurance in December.
25   Q. Okay. Well, turn, if you would, please just for

Page 22

1    a moment to the fifth page, please. At the bottom right
2    there are numbers sometimes called Bates numbers. It's
3    100095.
4        Do you see your signature at the bottom of the
5    page under what's called "applicant signature"?
6    A. Yes, I do.
7    Q. Doesn't it bear the date of 12/21/00?
8    A. It does.
9    Q. Didn't you actually write that date yourself?
10   A. That's my handwriting.
11   Q. Are you now satisfied that you likely, for
12   whatever reason, completed this application in December
13   of the year 2000?
14   A. I would say I did, but I don't remember that.
15   Q. You have no reason to question your signature and
16   date?
17   A. Why would they fax it to me on August 22nd
18   though? That's '03. I don't know. Well, that's my
19   signature and I wrote that date in.
20   Q. So as of December --
21   A. I can't say I recall doing this in December
22   though. December 21st, huh. That's my date.
23   Q. Your signature, your date, December 21st. As of
24   that date, Heidi Weilbacher was residing with you. She
25   was over 14 and you agree, don't you, she should have

Page 23

1    been identified if you were asked the question --
2        If you were asked the question, "Who resides with
3    you who is 14 or older," you should have identified her,
4    correct?
5    A. Yeah.
6    Q. If you look at the second page, sir, for a
7    moment. Do you see that there are underwriting
8    questions? You see that phrase in the middle of the
9    page, and these are standard questions that insurance
10   agents are required to ask, and it talks about prior
11   insurance, and the answer is yes.
12       Let's just go through this for a moment. Did you
13   in fact have prior personal automobile insurance before
14   purchasing this Progressive policy?
15   A. I'm under the impression I had it with
16   Progressive before this.
17   Q. Do you know when you first started with
18   Progressive?
19   A. No. I started with -- I thought I had it for
20   quite a few years.
21   Q. It talks about prior policy effective date,
22   July 5th. It says, "Prior policy expiration date July
23   5, '01, so it went for a year from the year 2000 to the
24   year 2001."
25       Prior carrier, it just says "other standard",

Page 24

1    whatever that means. Then we go down to coverages. It
2    says, first of all, "1995 Dodge".
3    A. On this prior insurance?
4    Q. Yes.
5    A. Was it with Progressive?
6    Q. I'm just here to find out what you know. That's
7    how this works. Under coverage it says "1995 Dodge."
8    Is that the vehicle that you had insured under the
9    Progressive policy?
10   A. At that time, I believe I did have a '95 Dodge.
11   Q. And the next thing we see, you see the letters BI
12   and then the dash capital PD? I'll just represent that
13   that suggests bodily injury property damage for
14   liability coverage and that it has the numbers 100, 300,
15   50. Do you know what those numbers mean?
16   A. No.
17   Q. Do you know what they mean even now, that if
18   someone purchases a personal automobile policy for
19   liability, just focusing on liability coverage, what you
20   might owe to someone if you cause an accident, do you
21   know as you sit here now what the numbers 100/300, what
22   they mean, what their significance is?
23   A. I got a little bit more of an idea now today,
24   yes.
25   Q. What is your understanding as you sit here today

CASENAME> WITNESS>
DATE>

Page 25

1  of what those numbers mean?
2    A. It's on different coverages.
3    Q. Well, I'm just focusing on the first one.
4    A. What is the first one?
5    Q. Where it says "BI/PD, 100/300/50." Just focusing
6  on that coverage, as you sit here now, do you have an
7  understanding of what those numbers refer to?
8    A. I feel I got a little bit more, but I'm not sure
9  what you are trying -- what you want.
10   Q. I'm just trying to understand what you
11 understand.
12   A. There is a $300,000 total.
13   Q. Is it your understanding as you sit here that the
14 numbers refer to not $100, but $100,000, and not just
15 $300, but $300,000? Do you understand that?
16   A. I'm not sure. This isn't --
17   Q. It's not your area?
18   A. Yeah.
19   Q. Fair enough, but I want to know even now after
20 you have switched and now you have had Allstate for the
21 last three years, even now when someone says you have
22 liabilities limits of 100/300, you are not positive what
23 that means even now?
24   A. I think it's full coverage, what they are going
25 to pay.

Page 26

1    Q. If someone sues you for $1 million, you hurt
2  somebody and it's your fault and they sue you for $1
3  million --
4    A. I expect to be covered.
5    Q. If you purchase a policy that has $100,000 per
6  person coverage and $300,000 per accident coverage, and
7  you get sued for $1 million, do you believe you have
8  full coverage?
9    A. I feel if I got my insurance and if somebody is
10 going to sue me, I want to be covered.
11   Q. Do you understand that --
12   A. I know I have got -- when I ask for insurance, I
13 don't want to lose what I have. I want to be covered.
14   Q. Having said that --
15   A. I have heard other people -- people are always
16 telling you to be incorporated or whatever to where you
17 don't lose, but I have never done that. I have just
18 always got insurance to cover me.
19   Q. You do understand, correct me if I'm wrong, that
20 insurance companies when they issue a policy that there
21 is a certain or finite limit to what they will pay?
22     There is a limit above which they won't pay. Do
23 you understand that concept of insurance?
24   A. I believe so.
25   Q. All right. And that you can buy different

Page 27

1  limits. You understand that as well?
2    A. Yes.
3    Q. You can buy the minimum that the state requires
4  or you can buy twice that or three times that, four
5  times that, but, in any event, whatever you buy, you are
6  buying something that has a limit? Does that all make
7  sense?
8    A. Usually, like I have on my other insurance they
9  force you to buy so much, whatever it is. I'm not sure
10 what it is.
11   Q. Well, I'm speaking here about personal auto
12 policies. You do understand that insurance companies
13 issue policies that have limits to what they will pay?
14 You understand that concept, right?
15   A. I'm not sure.
16   Q. In other words, the amount that you pay per year,
17 you said you pay something like $2,500 per year?
18   A. I think I am now.
19   Q. Currently. Do you understand that the amount you
20 are paying per year correlates, responds to the amount
21 that the insurance company is obligating itself to pay
22 if you get a claim?
23     The amount you pay relates to how much coverage
24 you have?
25   A. I hope I am covered, yeah.

Page 28

1    Q. And you have already told us that you didn't pick
2  the top, top, top one. You picked an amount that you
3  were comfortable with, so you understood that you could
4  have paid more money and gotten even more coverage,
5  right?
6    A. I feel like I picked a pretty good one according
7  to them. They told me it would be good.
8    Q. But you could have picked a higher one and gotten
9  more coverage?
10   A. There wasn't that much difference. There was
11 only like $100 or something.
12   Q. That extra $100 was going to get you something
13 more than what you got?
14   A. What it would have got me, I don't know. I'm
15 trying to get it lowered. A different vehicle, you
16 think they would lower it.
17   Q. But I just want to make sure we're communicating
18 on this point, that this $100 more you could have paid
19 would have meant something slightly better in the way of
20 coverage?
21   A. I don't know what it would have meant.
22   Q. Wouldn't have meant lower coverage to pay more,
23 would it? That wouldn't make any sense, would it?
24   A. They told me I was pretty well covered at that
25 $2,500 right in there.

CASENAME>                                                                WITNESS>
                                                                         DATE>

Page 29

1   Q. So you didn't purchase the additional coverage?
2   A. I don't know what the additional coverage was or
3   what it would have meant.
4   Q. And when you see these numbers, even now after
5   three years with Allstate, let alone the years with
6   Progressive, when you see the numbers "100, 300" for a
7   liability coverage, meaning the amount the insurance
8   company is going to pay to protect you in case you hit
9   somebody and you hurt somebody, even now you don't know
10  what those numbers mean, 100, 300, what they relate to?
11  A. I know more now.
12  Q. Tell me what you know now.
13  A. That's going to be the total amount.
14  Q. The total amount of what?
15  A. What they will pay.
16  Q. What is the total amount they will pay?
17  A. $300,000.
18  Q. For what?
19  A. I guess the BI/PD, whatever it is.
20  Q. Do you know if that's -- so let's assume that you
21  get in an accident with me and just for this example you
22  are at fault. I am not at fault. I get hurt. I am
23  hurt. I have $300,000 in damages.
24      Will your policy, this policy that we're talking
25  about here, the Progressive policy, assuming you are at

Page 30

1   fault and assuming I really have $300,000 damages, will
2   this policy pay me $300,000 in damages?
3   A. What are your damages?
4   Q. $300,000 medical bills?
5   A. They should.
6   Q. So you don't understand that the 300 --
7   A. They should pay all of your medical bills.
8   Q. What if I have half a million in medical bills?
9   A. If it was my fault?
10  Q. Yes, it's your fault.
11  A. I would expect my insurance company to pay it.
12  Q. So it doesn't matter what these numbers say? If
13  the person you hurt has solid, real solid damages of
14  $500,000 just in medical, I am in the hospital for three
15  years, you believe the company has to pay it?
16  A. Yes.
17  Q. Not you? Your company?
18  A. Right.
19  Q. Where do you -- where does that understanding
20  come from that the insurance company can't say, "Look,
21  R.W., you could have purchased more coverage, but really
22  the only coverage you purchased here limited to $100,000
23  what Mr. Zipkin is going to get from your policy. The
24  most we're going to pay Mr. Zipkin is $100,000."
25      Because that's what the "100" refers to. One

Page 31

1   person injured, only one person hurt, Mr. Zipkin in the
2   car with you -- in the car that you hit. If the
3   insurance company comes back and says, "That's all we
4   have is $100,000 for Mr. Zipkin," what is your
5   understanding based on that they have to pay more?
6   A. I don't know.
7   Q. In other words, it would be nice -- let me see if
8   I can phrase this right.
9   A. There is a lot of other numbers here too, a lot
10  of other meanings or whatever too.
11  Q. Okay. But aside from what Progressive said or
12  what you understood from Progressive, even right this
13  minute with Allstate, the same example.
14      If you just hypothetically cause an accident and
15  it was with Mr. Zipkin and Mr. Zipkin had $500,000 in
16  medical, you would expect Allstate to pay that full
17  $500,000?
18  A. True.
19  Q. Regardless of what the policy says?
20      MR. LEGACKI: You are being argumentative
21  with him, okay, Gary. You are going around in circles.
22  You are being argumentative with him.
23      He said he called a broker and said, "I want
24  a good policy." He said if he caused $500,000 worth of
25  damage, he expects the insurance company to pay. That's

Page 32

1   between him and his broker.
2       Okay. You are getting argumentative here
3   with him and I don't understand why.
4       MR. ZIPKIN: I move to strike all your
5   comments. I ask you to limit your objections to those
6   contemplated by the rules.
7       And I don't believe I'm getting at all
8   argumentative with the witness.
9   Q. I'm trying to understand the basis upon which
10  you, R.W., believe that regardless of what the policy
11  may say you would expect the insurance company to pay
12  whatever the damages are that you cause.
13      What is the basis for that, other than your hope
14  and fondest wish?
15  A. I'm not sure.
16  Q. Going back to this Exhibit No. 2 for a moment.
17  If you turn -- the second page we already talked about.
18  If you turn to the third page, it has "applicant
19  questionnaire" at the top. It says, "Please have the
20  applicant complete this section and initial each
21  response."
22      By the way, I see "R.W." by the initials there
23  for those three questions. Are those your initials?
24  A. Yes.
25  Q. "Have all the residents of your household been

disclosed on this application including all residents age 14 and over, children away from home or in college who drive your vehicle on a regular and frequent basis."
You said, "Yes, they have all been disclosed." Right?
A. I initialed right where she told me to.
Q. Who told you to initial it?
A. Whoever was doing it at the time.
Q. Did you tell her, "I have a 14-year-old"?
A. I believe this was all faxed to me.
Q. Faxed to you. I think that's clear.
Did you tell the person who faxed it to you, "I have a 14-year-old," and they said, "That's okay. Go ahead --"
A. They knew I had my daughter.
Q. Did they know she was 14?
A. I don't know. I don't believe so.
Q. Are you saying that the agent instructed you to answer falsely the answer to number one, that you should have said no and you said yes because you were told to lie on the application?
MR. LEGACKI: Objection; argumentative. That's not an appropriate question.
Q. Were you told to answer falsely?
A. No.

Q. That answer was your answer, not somebody else's answer, right?
A. I was told to initial where the Xs were.
Q. Did they have Xs on this before they sent it to you?
A. They faxed it to me.
Q. Those are not your Xs then?
A. I don't believe so. I have had the insurance people pretty well just do the paperwork for me.
Q. Did they ask you on the phone whether you had anyone in the household who was 14 or over?
A. I don't remember talking to them on the phone, what they asked me.
Q. So they might have asked you, they might not have asked you whether you had someone in the household who was over 14? Is that a fair summary?
A. I don't know.
Q. If someone asked you to answer -- if someone checks a question for you where you are going to sign your name --
A. I don't know. I might have even put the X there, but I don't know.
Q. Let's assume --
A. I don't remember really. All I know is I can remember putting a policy when I seen something just to

hurry up and get it over with and get it faxed back because I do remember they wanted it back right away.
Q. But even if you are in a hurry, you are going to answer truthfully, right?
A. I will be truthful to you.
Q. And you were going to be truthful to the insurance company, weren't you?
A. I'm not one to lie.
Q. Okay. So let's assume that someone even checked it "yes" when the answer correctly is no. If you are going to put your initials on there, you are going to scratch out the "yes" and check the "no", aren't you, because you are truthful?
MR. LEGACKI: Assuming he did not tell. He is saying he did tell.
Q. I don't think actually Mr. Legacki said something that's at all truthful, but let's just take up on that. Did you -- Mr. Legacki says you told the people at Denali Alaskan that you had a 14-year-old daughter in the residence. Did you?
A. They knew my daughter.
Q. That wasn't the question. That wasn't the question. Did you tell the people at Denali Alaskan that you had a 14-year-old daughter, not that you had a daughter, that you had a 14-year-old daughter?

A. I don't think my daughter was ever brought up in it.
Q. So Mr. Legacki is wrong again. Okay. So did anybody tell you to answer yes when the answer should have been no on number one?
A. No, I don't believe anybody would have told me to make the answers.
Q. So it's your answer and you were trying to be truthful, but on this answer the answer is incorrect, isn't it?
A. I guess I didn't have her age right.
Q. If we turn to the next page, please, sir, the very next page. Under a section called "uninsured/underinsured motorist offer," this language here says that we have offered you uninsured/underinsured motorist bodily injury coverage and uninsured/underinsured motorist property damages.
And it says, "You may purchase these coverages with limits less than, equal to or greater than your limits of liability coverage."
Then it says, "Available limits of UM/UIM," which it has defined above, and it has all of these different limits, doesn't it, $50,000 each person, $100,000 each accident. Do you see those numbers?
A. I see the numbers.

Page 37

1  Q. They keep getting larger and larger, right, all
2  the way up to $1 million each person, $2 million each
3  accident? Do you see that?
4  A. Uh-huh.
5  Q. So this is an application you received by fax,
6  which you signed and faxed back, so isn't it true that
7  Progressive Northwestern told you that you may purchase
8  uninsured/underinsured motorist coverage with limits all
9  the way up to $1 million each person, $2 million each
10 accident? Isn't that true?
11 A. I thought this is what I had everything here.
12 When I get this paper, you know, it was faxed to me, I
13 didn't really read it thoroughly, I would say, but I
14 mean, I thought this was the policy and I signed it at
15 the end, I would say.
16 Q. Fair enough.
17 A. That's where I signed it at the bottom.
18 Q. Do you agree as you look at it now, do you agree
19 as you look at it now that Progressive Northwestern did
20 give you the opportunity to purchase
21 uninsured/underinsured motorist coverage all the way up
22 to $1 million each person, $2 million each accident?
23 A. I'm not sure.
24 Q. What leads you to doubt or have any question
25 about it?

Page 38

1  A. I'm just not sure.
2  Q. Isn't that what the words basically say here?
3  "You may purchase this coverage with limits less than,
4  equal to or greater," and it says "available limits
5  are," and it goes all the way up. The highest one is $1
6  million, $2 million. Isn't that all laid out right
7  there on that piece of paper?
8  A. I'm seeing it here. I'm seeing also you may
9  reject either or both of these.
10 Q. Yes.
11 A. Where is the other one?
12 Q. That you can -- I mean you have both.
13 A. Where is the other both?
14 Q. There is bodily injury and then there is property
15 damage. They do make a distinction, which they explain
16 up above.
17     In other words, you can have just coverage
18 against the risk of bodily injury to you or a loved one
19 in your vehicle or you can not have any of that coverage
20 and instead make sure you have coverage for your vehicle
21 only, so if somebody that's uninsured whacks your
22 vehicle, you get coverage for your vehicle.
23 A. I'm not sure what I'm reading here, I guess.
24 Q. That's fair enough. But it does say, doesn't it,
25 that you may purchase these coverages all the way up to

Page 39

1  $1 million, $2 million? Isn't that what this page is
2  saying to you?
3  A. You may purchase, it says, UM then slash UIM, BI
4  and/or UM, slash UIM, PD. I don't understand it.
5  Q. Look. That's fair.
6  A. I don't understand what is here in front of me is
7  what I'm saying.
8  Q. We have to start at the beginning of the
9  paragraph. The beginning of the paragraph says, "We
10 have offered you," and it spells it all out,
11 "uninsured/underinsured motorist bodily injury
12 coverage."
13    Then it puts that into initials, paren UM/UIM/BI,
14 so it explains to you what those letters mean.
15 A. I see it. You are telling me it explains to me,
16 but I'm telling you I don't understand it.
17 Q. Even reading it now?
18 A. I don't understand it.
19 Q. Okay. Have you ever consulted with anyone to
20 help them explain to you what words mean either in a
21 letter or a policy? Have you ever asked for assistance?
22 A. No. On my insurance the only -- I can't remember
23 the gal. Julie was her name, whoever I had my main
24 policies with, she would put everything together for me.
25 Q. Would you agree --

Page 40

1  A. I had trust in her.
2  Q. Her name is Julie?
3  A. Julie something. I don't remember her last name.
4  Q. Who did she work with?
5  A. I don't remember.
6  Q. Was she with Denali Alaskan?
7  A. I would have to pull out a box from years ago to
8  find out what company it was.
9  Q. When you got this fax, which you signed and faxed
10 back, did you ever say, "Geez, you know, this is
11 confusing to me. I don't understand this part of it or
12 that part of it. I'm going to call the agent and ask
13 them questions." Did you ever do that?
14 A. No.
15 Q. You could have done that, right?
16 A. I wanted insurance.
17 Q. But if you had any questions in your mind, if
18 something was confusing, you had the ability to pick up
19 the phone and call the agent and ask them questions?
20 A. I felt the way the agent -- they want to sell you
21 something and I felt they had me covered. They were
22 taking care of me. You got to have faith when they put
23 something together for you. I had no reason to think I
24 wouldn't be covered.
25 Q. So as you look at this, did Progressive

CASENAME>                                                          WITNESS>
                                                                    DATE>

Page 41

1  Northwestern give you the opportunity to purchase
2  uninsured/underinsured motorist coverage all the way up
3  to $1 million, $2 million? Did they or did they not?
4      MR. LEGACKI: Progressive or their agent?
5      A. What I'm saying is like, you know, I don't
6  understand this here that much, but if you lay this in
7  front of me, I would think that's what I have.
8      If you are going to fax me my policy, is this my
9  policy?
10     Q. This is an application for a policy. Do you
11 understand there is a difference?
12     A. I understand there is a difference between
13 applications and policies.
14     Q. This is the application.
15     A. I was thinking it was a policy.
16     Q. This is the application for the policy. Even
17 where you signed, it's under a title that says
18 "applicant's signature".
19     So are you saying for the benefit of whoever is
20 going to look at this, the judge or the jury, that you
21 signed this thinking this was the policy and not an
22 application?
23     A. On a '95 Dodge.
24     Q. I'm sorry. So the answer is yes, in your mind,
25 this was the policy, not an application? Or do you

Page 42

1  think this was an application and not the policy?
2      A. I would say this is the policy number.
3      Q. Well, there is always a policy number, but that
4  doesn't make this the policy.
5      A. I'm not sure what I would say.
6      MR. LEGACKI: It could be a declaration
7  sheet, couldn't it?
8      MR. ZIPKIN: Move to strike counsel's
9  comments.
10     Q. Do you maintain as you sit here that my client
11 failed to give you the opportunity to purchase
12 uninsured/underinsured motorist coverage all the way up
13 to $1 million, $2 million? Do you maintain that?
14     A. I don't know what they gave me.
15     Q. So is it fair to say you don't maintain that
16 because you don't know?
17     A. I don't know what they gave me.
18     Q. Aside from what they gave --
19     A. You got me confused, so I don't know what I got.
20     Q. Aside from what you got, I'm talking about what
21 they offered aside or what they gave you the opportunity
22 to purchase, aside from what the policy that you
23 ultimately got says or doesn't say, this question is
24 limited to what you were given an opportunity to buy.
25     Were you given the opportunity to buy

Page 43

1  uninsured/underinsured motorist coverage up to $1
2  million, $2 million?
3      A. I don't know.
4      Q. Did Allstate give you an opportunity to purchase
5  uninsured/underinsured motorist coverage up to $1
6  million, $2 million with your current policy?
7      A. Yes, I think they did.
8      Q. How did they do that, verbally, orally or in a
9  written manner?
10     A. I believe I bought the million.
11     Q. You believe that you currently have on your
12 Allstate policy uninsured --
13     A. Since I lost my daughter, I have been -- people
14 have been telling me about these policies a little bit,
15 so I have been getting a little more education on that.
16 I would say it only cost me my daughter. But, yeah, I
17 got a big policy now.
18     Q. So it's your belief --
19     A. That's what I have always asked for when I get
20 insurance is big policies. When I asked for my
21 insurance on my other insurance policy, I asked for
22 double.
23     Q. Double what?
24     A. Double whatever I have to have for the State of
25 Alaska.

Page 44

1      Q. So if the minimum that the state requires is
2  $50,000 protection for you against the risk of injuring
3  some person, $50,000, you would typically say, "I want
4  double that"?
5      A. No.
6      Q. I'm sorry. I didn't understand.
7      A. The state has never said $50,000.
8      Q. Actually the state does say $50,000. You have to
9  have a minimum of $50,000. That is what the state says.
10 You are not aware of that?
11     A. No.
12     Q. What did you think the state minimum was?
13     A. I thought it was -- which policy?
14     Q. Auto liability?
15     A. I don't know anything about auto. I'm learning
16 about auto, but I was talking a different policy.
17     Q. What were you talking about?
18     A. Alaska State Parks, State of Alaska.
19     Q. Coverage for what though? I'm sorry. Coverage
20 for a home, a boat? Coverage for what?
21     A. Coverage for them to run a business on the water.
22     Q. Is it possible that you had any conversation
23 along the same lines with Denali that you asked that
24 they get you double whatever the state requires?
25     A. No.

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT____B____
Page__11__ of_31_

11 (Pages 41 to 44)

CASENAME>                                                                                          WITNESS>
                                                                                                   DATE>

Page 45

1      MR. ZIPKIN: Let's take a break for the
2  videotape to switch over.
3      VIDEOGRAPHER: Off record 10:08 a.m. This
4  is the end of tape number one.
5      (There was a short break.)
6      VIDEOGRAPHER: On record 10:16 a.m. This is
7  the start of tape number two.
8      (Exhibit No. 3 marked.)
9      Q. R.W., I have had this marked as Exhibit No. 3 and
10 I would like to refer that to you for a moment. It's
11 entitled Plaintiff's Supplemental Responses to
12 Progressive's First Set of Discovery Requests.
13     It's a fancy title basically saying these are
14 your answers to some of our questions that we have
15 posed.
16     Before I get into the specifics, let me ask you
17 this: Have you received -- stop there for a second.
18 Have you actually ever sat down and read your
19 Progressive policy from cover to cover, ever?
20     A. No.
21     Q. Have you ever sat down and read the portion of
22 your Progressive policy that deals with
23 uninsured/underinsured claims, just that section in its
24 entirety?
25     A. No.

Page 46

1      Q. If you can turn in the supplemental -- this
2  exhibit to page six, please, for a moment. In the
3  middle of the page you will see something "Supplemental
4  Answer to Interrogatory Number Four".
5      The first sentence, and I'll quote, it says,
6  "Mr. Weilbacher believes that as he reads the insurance
7  policy Progressive has an obligation to pay him a
8  separate per person limit under AS09.15.010, and it has
9  not done so."
10     And it goes on. That's one sentence. Do you see
11 that sentence?
12     A. Yes.
13     Q. Do you even -- have you ever heard of or read
14 AS09.15.010?
15     A. I have since the accident, yes.
16     Q. When was the most recent time you read that?
17     A. I don't remember.
18     Q. You have said a moment ago that you have never
19 actually read the entire policy.
20     A. When I answered that, I assumed that you meant
21 when I received it in the mail.
22     Q. I meant even now.
23     A. I have not read it from cover to cover, no.
24     Q. Even now, not just going back to the time of your
25 daughter's tragic death or any time before. I'm talking

Page 47

1  about as of now. Have you ever read the
2  uninsured/underinsured motorist section cover to cover?
3      A. I have, yes.
4      Q. You have? When did you do that?
5      A. I don't remember.
6      Q. Within the last three months?
7      A. I'm not sure.
8      Q. Within the last year?
9      A. I would believe so. I'm not sure though, but I
10 believe so.
11     Q. Did you read it side by side with AS09.15.010?
12     A. I don't know.
13     Q. What is AS09.15.010? What is that?
14     A. Numbers.
15     Q. Just numbers. Does it refer to some bill in the
16 legislature or some law or some case, some case made law
17 or some statute or any idea?
18     Does it refer to a bill, a statute, a case? What
19 does it refer to?
20     A. I'm sure it has something to do with insurance,
21 but that's why it's on this piece of paper. I'm sure it
22 has something to do with insurance.
23     Q. Did you write out this sentence?
24     MR. LEGACKI: Wait a minute. We initially
25 sent discovery requests and we put down that

Page 48

1  Mr. Weilbacher thought he was entitled to underinsured
2  motorist coverage.
3      Then your associate wrote this nasty gram
4  and said what documents are relied upon and so forth,
5  and she wanted more information, so we put down the
6  statute and we put down the language.
7      That's what she asked for in her letter. So
8  otherwise she said that we were not complying with Rule
9  26.
10     So you wanted the statute and you wanted the
11 things. We put it in there after her letter.
12     So, Gary, you are playing games here. This
13 is really being obnoxious, Gary. The guy has got a
14 ninth grade education. He is dyslexia and then you are
15 trying to ask him what the statute means. He has lost
16 his daughter, Gary.
17     MR. ZIPKIN: I move to strike all those
18 comments.
19     MR. LEGACKI: I know you move to strike
20 them. Why don't you try to just stop being obnoxious
21 about it and just ask the questions.
22     Your associate was the one who wanted to
23 know under what documentation, what authority that he is
24 entitled to underinsured motorist coverage.
25     That's what we put down. You know that,



CASENAME>                                                                                          WITNESS>
                                                                                                    DATE>

Page 49

1  Gary, and she knows that. You are just playing games
2  here.
3          MR. ZIPKIN: There is no game being played
4  by me.
5          MR. LEGACKI: Sure, it is, Gary.
6          MR. ZIPKIN: I'm not going to get into this.
7  Q. R.W., it is not a sin for one in litigation to
8  rely on counsel to draft answers as opposed to doing it
9  themselves. It's not a sin.
10     Is that what happened here? Did you rely upon
11 counsel to draft the answer? There is nothing wrong
12 with that if that's true. Is that what occurred?
13 A. I didn't put this together, if that's what you
14 are asking me.
15 Q. You relied on counsel to assist with these
16 responses?
17         MR. LEGACKI: Because --
18 A. What do you mean by that now?
19         MR. LEGACKI: Because your firm did not like
20 the honest answers he gave before, which says that he
21 thought his insurance covered him for his policy.
22         You wanted the documentation and the
23 background for it, and that's what he did.
24         MR. ZIPKIN: We are getting close to the
25 point, Ken, where your obstructionist behavior is going

Page 50

1  to result in the stoppage of the deposition and a
2  request for sanctions.
3          I am asking simple questions. I believe
4  R.W. and I are communicating fairly well, and we're
5  doing pretty well without your obstructionist tactics.
6          MR. LEGACKI: I see. When you did it at
7  your deposition it was not obstructionist when you kept
8  on interjecting? Okay.
9  Q. R.W., to the best of your knowledge, these
10 answers that we're talking about here were prepared by
11 your attorneys to assist you in this case, right?
12 A. Yes.
13 Q. If you look at the next page, page seven,
14 supplemental answer to interrogatory number five. It's
15 like two-thirds of the way down the page of page seven.
16     The second sentence of that, and I'll quote, it
17 says, "Why Progressive has failed to pay
18 Mr. Weilbacher."
19 A. Where are you at?
20 Q. I'm sorry.
21 A. Page seven?
22 Q. It's page 7 of 14. Yes, you got it.
23 A. I'm on page 6 of 14.
24 Q. I'm sorry. My fault. Page 7 of 14 under
25 "Supplemental Answer to Interrogatory Number Five". I

Page 51

1  have highlighted it on my copy because of the sentence I
2  wanted to read into the record.
3          It says, "Why Progressive has failed to pay
4  Mr. Weilbacher is beyond his knowledge and all the
5  documents for the reason for not paying Mr. Weilbacher
6  are in the possession of Progressive."
7      Do you see that sentence?
8  A. Read that one more time for me, will you?
9  Q. Sure. "Why Progressive has failed to pay
10 Mr. Weilbacher is beyond his knowledge and all the
11 documents for the reason for not paying Mr. Weilbacher
12 are in the possession of Progressive."
13     Have I read that right?
14 A. Yes.
15         (Exhibit No. 4 marked.)
16 Q. So I apologize, R.W., but there is more paper,
17 but Exhibit No. 4 you said earlier that you did receive,
18 generally speaking, copies of correspondence that your
19 lawyer sent to Progressive, you got copies, and,
20 generally speaking, you got copies of letters that your
21 lawyer got from Progressive, you got those.
22     Do you know whether you got a copy of this one,
23 April 19, 2005, a letter from Danny Withers at
24 Progressive to your attorney, Ken Legacki?
25 A. What are you asking me?

Page 52

1  Q. If you remember whether you ever received a copy
2  of this letter?
3  A. I might have, but I don't know.
4  Q. You might have. In preparing for today's
5  deposition, do you know whether you looked at this
6  April 19th letter?
7  A. I can't say that I have or haven't.
8  Q. Fair enough. If I don't ask, I don't find out.
9  In the second sentence of this letter it says, "It is
10 Progressive's position" --
11 A. Who wrote the letter?
12 Q. It says "Danny Withers" at the bottom. It
13 doesn't have a signature unfortunately, but it has his
14 name. Danny C. Withers on behalf of Progressive
15 Northwestern. Do you have that?
16 A. Yeah. You just gave it to me.
17 Q. Yeah. I'm just trying to answer your question.
18 Do you see that?
19 A. I didn't know who did the letter.
20 Q. I'm sorry. It's down there at the bottom. At
21 the second sentence it says, "It is Progressive's
22 position that Mr. Weilbacher does have" --
23 A. Where are you at now?
24 Q. Second sentence. First paragraph, second
25 sentence. Second sentence of the letter. "It is

CASENAME>                                                                                    WITNESS>
                                                                                              DATE>

Page 53

1  Progressive's position that Mr. Weilbacher does have
2  UM/UIM coverage under the above-noted policy."
3      And it refers to policy number 65824951-0. It
4  goes on though. It says, "However, it is my
5  understanding that he is presenting an individual claim
6  for loss of society/loss of consortium relating to Heidi
7  Weilbacher's untimely death in the accident on the
8  above-captioned date."
9      Next paragraph, "It is Progressive's position
10 that any claims for loss of society and loss of
11 companionship/loss of consortium under the above-noted
12 policy is derivative of any claims for wrongful death
13 and are subject to a single bodily injury limit of
14 liability."
15     Have I at least read it correctly, as far as you
16 can tell?
17     A. I don't understand it though.
18     Q. I know, but I was trying to start with does it
19 appear that I have read it at least correctly?
20     A. Yeah.
21     Q. And I was wondering whether -- you are sort of
22 jumping ahead, but that's fine.
23     A. I'm jumping ahead?
24     Q. Well, by jumping ahead to say you are not sure
25 you understand it. My question was did I read it right.

Page 54

1  The next question is did you understand what it said
2  here?
3      A. I'm not sure. You want to do it one more time?
4      Q. No. I think the record has heard enough of me
5  for that. But let me just ask, aside from whether it
6  all makes sense to you, whether it's rational,
7  reasonable, correct, incorrect, wouldn't you agree with
8  this much, this letter sets forth Progressive
9  Northwestern's position on your claim?
10     It tells you what Northwestern -- what
11 Progressive Northwestern's position is, whether it's
12 right, whether it's wrong, whether it's clear, whether
13 it's confusing? They did tell you in this letter what
14 their position is, right?
15     A. I'm not sure. I'm not sure what they are trying
16 to say.
17     Q. Progressive in this case, I'll just tell you this
18 much, Progressive takes the position that this letter,
19 this April 19, 2005 letter set forth Progressive's
20 position.
21     In fact, the second paragraph even says -- uses
22 the words "Progressive's position," and I'm just asking
23 initially whether you would agree with me that the
24 letter at least attempts to set forth Progressive's
25 position, not that you agree with it, not that

Page 55

1  Progressive is right?
2      A. I can see where it says "position".
3      Q. Wouldn't it be wrong, in other words, to say in
4  an answer to an interrogatory that Progressive has never
5  told you what their position is because they have?
6  Progressive has told you what their position is, right?
7      A. In the form of a letter?
8      Q. Yes, in the form of a letter. They have told you
9  what their position is? Even if they are dead wrong,
10 they have told you what their position is, right?
11     A. I don't remember getting this letter, but I mean
12 are you asking me about this letter now?
13     Q. Yes, I'm talking about the letter. And let's
14 assume you never got the letter, because you are not
15 sure, right? You don't know if you got it or not?
16     A. No, I'm not sure.
17     Q. Let's assume for the sake of this question you
18 never got the letter.
19     A. If I got this letter, I might have probably just
20 sat it on the stack of the other stuff for this because
21 I know if I read it, I ain't going to understand it
22 anyway.
23     Q. So let's assume you never got the letter or that
24 you got it and you never read it. Now you see it. Now
25 you have it right in front of you.

Page 56

1      Would you agree with me that in this letter
2  Progressive tried to set forth their position on whether
3  they owe you additional money under their policy?
4      Whether you got this letter or didn't get this
5  letter, now that you are looking at it, isn't it true
6  that Progressive in this letter sets forth their
7  position?
8      A. Would you read the letter one more time?
9      Q. I don't think the record wants to hear me keep
10 reading. I'm happy to do it for your benefit.
11     MR. LEGACKI: I'm confused here. This says
12 why Progressive failed to pay it beyond his
13 understanding, his knowledge.
14     Like you say, right or wrong, but why they
15 came to that conclusion doesn't mean that he understands
16 it.
17     MR. ZIPKIN: That's just argumentative.
18 What's the objection? Is there something wrong with the
19 form of my question?
20     MR. LEGACKI: I don't know why -- I think
21 you're argumentative. I think you are trying to
22 misconstrue the evidence. You are trying to put
23 something in there that's not here.
24     MR. ZIPKIN: It's another obstructionist
25 objection. If the form of my question was incorrect,

CASENAME>                                                WITNESS>
                                                         DATE>

Page 57

1  please let me know.
2        If you have an objection that the law
3  recognizes, please let me know, but that's not an
4  objection.
5        MR. LEGACKI: You got things confusing here.
6  You are trying to misconstrue what he says. It's
7  argumentative. It misconstrues the evidence.
8        MR. ZIPKIN: The last question he wanted me
9  to read it to him. I don't know how that was
10 argumentative.
11    Q. "It is Progressive's position that any claims for
12 loss of society and loss of companionship/loss of
13 consortium under the above-noted policy is derivative of
14 any claims for wrongful death and are subject to a
15 single bodily injury limit of liability."
16       Whether Progressive is right or whether they are
17 wrong, whether you understand it or whether you don't
18 understand it, would you at least agree with me, R.W.,
19 that Progressive told you in this letter what their
20 position is?
21    A. I'm not sure. I'm trying to get through the
22 first paragraph there.
23    Q. Well, okay.
24    A. You read it right back. When you started reading
25 it back to me, you started on the second paragraph. I

Page 58

1  thought you was going to read it.
2     Q. Fair enough. The first paragraph says, and we'll
3  read the whole thing. "Progressive is in receipt of
4  your letter of April 11, 2005 with reference to the
5  above-mentioned claim."
6     A. This letter of April 2005 --
7     Q. That's a letter --
8     A. Is that the letter from --
9     Q. That's a letter from Mr. Legacki to Progressive.
10    A. Okay.
11    Q. In fact, we can get that out. Is that a letter
12 you would like to see?
13    A. I just want to know who did the letter
14 April 11th.
15    Q. That's a fair question, R.W. I'm not arguing
16 with you.
17       (Exhibit No. 5 marked.)
18    Q. Here is a copy of what we have marked as Exhibit
19 No. 5. As you can see, it's dated April 11, 2005. It's
20 from Ken Legacki, your lawyer. It's to Danny Withers.
21 I'll read the whole thing because it's short. "I
22 am in receipt of your April 5, 2005 letter. It is not
23 clear whether Progressive is going to pay Mr. Weilbacher
24 the policy limits under the policy.
25       Please confirm that not only is he covered by the

Page 59

1  policy, but you also will be paying policy limits to
2  Mr. Weilbacher. Sincerely, Ken Legacki."
3        Do you see that? So would you agree that
4  Mr. Legacki's April 11th letter asked for a
5  straightforward statement of Progressive's position?
6  Would you agree with that?
7     A. Yes.
8     Q. And would you agree that whether Progressive is
9  right or wrong, Progressive --
10    A. Whether they are right or wrong?
11    Q. Yeah, because I don't want to argue the merits
12 with you right now. I just want to know whether you
13 agree that Progressive's April 19th letter was a letter
14 by Progressive to set forth their position in response
15 to Mr. Legacki's request?
16    A. I'm not all that sure, but I guess.
17    Q. Let's talk about your claim for a moment. This
18 letter, Progressive's letter, in the first paragraph,
19 which we were starting to read a moment ago says in the
20 second sentence, "It is Progressive's position that
21 Mr. Weilbacher does have UM/UIM coverage" --
22    A. Where at now?
23    Q. I'm sorry. I was back in the first paragraph.
24 You wanted me to sort of --
25    A. I thought you said second sentence.

Page 60

1     Q. Second sentence, first paragraph. It can be
2  confusing. The third sentence of the first paragraph
3  starts out, and I'll read the whole thing, "However, it
4  is my understanding that he is presenting an individual
5  claim for loss of society/loss of consortium relating to
6  Heidi Weilbacher's untimely death in the accident on the
7  above-captioned date."
8        That sentence, let's talk about that for a
9  moment. Okay. You have lost your daughter in this
10 tragic accident. We all understand that. By the way,
11 this was an accident caused by the reckless and criminal
12 conduct of Robert Esper, E-s-p-er, right?
13    A. He was the driver.
14    Q. Right. He was ultimately the person criminally
15 responsible for your daughter's death, right?
16    A. Criminally?
17    Q. Well, whether we say "criminally" or not -- maybe
18 you are not prepared to say he was acting criminally. I
19 am prepared to say it, but you're not.
20       He was responsible for your daughter's death?
21    A. Fully responsible? I don't believe so.
22    Q. Who else was?
23    A. How about the people that kept chasing him?
24    Q. You mean the police officers?
25    A. How long did they chase him?

PACIFIC RIM REPORTING, LLC         EXHIBIT  B
www.courtreportersalaska.com       Page 15 of 31

15 (Pages 57 to 60)

CASENAME>                                                                    WITNESS>
                                                                              DATE>

Page 61

1    Q. Well, one was coming from the opposite --
2    A. And they knew where he lived. Don't you think
3    they could have just went and got him later instead of
4    putting everybody at risk on the road?
5         I don't think he is full responsible. Anyway,
6    I'm sorry.
7    Q. Have you brought any sort of a lawsuit against
8    the police who were in pursuit?
9    A. No.
10   Q. You understand Officer Wolham lost his life in
11   this accident, right?
12   A. A lot of people did and it changed a lot of
13   lives.
14   Q. Do you think Officer Wolham should not have been
15   attempting to respond to this Mr. Esper?
16   A. I don't know what to think.
17   Q. In any event, what I was trying to get to is an
18   understanding of your damages. Do you see a reference
19   here to loss of society or a loss of consortium in this
20   letter? Do you have an understanding of what those
21   words mean?
22        I'm not asking you for a legal definition, but as
23   a layperson, you have suffered the loss of your
24   daughter. The law talks about society, consortium. You
25   have lost the companionship that you would have had with

Page 62

1    your daughter, right?
2    A. Yeah.
3    Q. Sometimes that's referred to as loss of society,
4    loss of companionship, the loss of whatever comfort she
5    could provide to you or you could provide to her.
6         You have lost that comfort that you could provide
7    to each other, right?
8    A. Yes, lost.
9    Q. It's all lost. It's gone forever. Loss of
10   comfort, loss of society, loss of companionship. Those
11   are all things that you have lost, correct?
12   A. And a lot more.
13   Q. Okay. What else have you lost?
14   A. Huh?
15   Q. What else?
16   A. I lost talking to her, playing with her, taking
17   her places again. I lost watching her grow up,
18   grandkids. I lost a lot. You can go on and on and on.
19   You haven't got enough time for it.
20   Q. The law generally groups that all together as
21   loss of companionship or loss of society. Does that
22   make sense?
23   A. No.
24   Q. Okay. I want to take us to the policy and figure
25   out what you understand or what you don't understand

Page 63

1    about the policy in connection with this loss.
2    A. Could you tell me what this word here means right
3    here? What's this mean? Policy is what?
4    Q. Derivative. Derivative. We're going to get to
5    that even more in a moment.
6         (Exhibit No. 6 marked.)
7    Q. This is Exhibit No. 6. I want to answer your
8    question, and it's a fair question, so we'll get to it.
9    This is a portion of your policy with Progressive.
10        It's the section of the policy that relates to
11   uninsured/underinsured motorist coverage. I believe it
12   starts at page 20 of your policy. That's why it's not
13   page one, because we're going right to the coverages
14   that are at issue here.
15        In other words, there is a liability portion of a
16   policy. There is no liability on your part for
17   anything. You have nothing to do with causing this
18   accident, right?
19        That's clear, right? You had nothing to do with
20   causing this accident? Fair statement?
21   A. Yeah.
22   Q. By the way, if you want to take a break for any
23   reason --
24   A. Let's do. Let's take a break.
25        VIDEOGRAPHER: Off record 10:42 a.m.

Page 64

1         (There was a short break.)
2         VIDEOGRAPHER: On record 10:51 a.m.
3    Q. R.W., you have Exhibit No. 6 there in front of
4    you. This is a portion of the Progressive policy that's
5    at issue here.
6         Page 20 starts off by discussing what's called
7    the insuring agreement for uninsured/underinsured
8    motorists bodily injury coverage.
9         Do you see that it says in the opening words, the
10   very first six words are "subject to the limits of
11   liability"? Do you see that?
12   A. Yes.
13   Q. So subject to the limits of liability,
14   Progressive in this paragraph says, and I'll quote
15   starting on the third line, "We will pay for damages
16   other than punitive or exemplary damages."
17   A. Where are you at?
18   Q. Third line.
19   A. Oh.
20   Q. "We will pay for damages other than punitive or
21   exemplary damages, which an insured person is legally
22   entitled to recover from the owner or operator of an
23   uninsured/underinsured motor vehicle because of bodily
24   injury," underneath that it says, "one, sustained by an
25   insured person; two, caused by accident; and three,