CASENAME>                                                                WITNESS>
                                                                          DATE>

Page 65

1  arising out of the ownership, maintenance or use of an
2  uninsured/underinsured motor vehicle."
3      I have read a lot of words there and I understand
4  that you are not an expert on insurance. That's pretty
5  clear. And you don't have to be. It's not your job to
6  be, but I just want to see if we can cover a few points.
7      When it says "we" will pay, you understand that
8  means Progressive Northwestern? The "we" is a reference
9  to the insurance company? Does that make sense?
10     A. You are saying it's the insurance company.
11     Q. The word "we" refers to the insurance company.
12     A. It's not me?
13     Q. It doesn't mean you. It means the insurance
14  company. Does that make sense? The insurance company
15  is going to pay certain moneys?
16     A. You are saying "we" is Progressive, not me?
17     Q. "We" is Progressive. It doesn't mean R.W. Are
18  you with me so far? The words "we" --
19     A. Should be Progressive.
20     Q. It's Progressive. So just bit by bit, we're
21  going to go here. So subject to the limits of
22  liability, again, it's always subject to the limits of
23  liability, Progressive is going to pay for damages.
24     Are you with me so far? Progressive will pay for
25  damages?

Page 66

1     A. Yes.
2     Q. Then let's just skip those words "punitive,
3  exemplary" because they are not important here.
4  "Progressive will pay for damages which an insured
5  person is legally entitled to recover."
6     Let's just go bit by bit. You were insured under
7  this policy, right?
8     A. This is my policy.
9     Q. So you are an insured, right?
10    A. Pardon me.
11    Q. You have no problem with the idea that you are
12  insured under this policy? You bought the policy, so
13  you are an insured person?
14    A. This is my policy. I am insured.
15    Q. And your daughter, Heidi, if she resided with you
16  in your home, and let's get past this issue of whether
17  she should have been disclosed or not.
18    Your daughter, Heidi, she might be an insured
19  person. She was living in your home, wasn't she?
20  That's correct?
21    A. Yeah.
22    Q. Okay. Now, Progressive is going to pay damages
23  which you or Heidi, if she is a household member, are
24  legally entitled to recover, no difficulty there,
25  legally entitled to recover, what you are allowed to get

Page 67

1   in the way of damages from the owner or operator.
2      Let's just stick with operator for a moment,
3   Esper. Progressive will pay damages to you that you are
4   entitled to recover from Esper because he was operating
5   a vehicle that did not have enough insurance.
6      There wasn't enough insurance covering Esper to
7   cover all the damages that your daughter, Heidi,
8   sustained obviously, right?
9      Do you agree with that, Esper did not have enough
10  insurance to cover all of your damages?
11     A. I don't know what his insurance was.
12     Q. Okay. Let's assume for the sake of discussion
13  that he did not have enough insurance, save ourselves a
14  bunch of time.
15     A. Okay.
16     Q. This policy that Progressive issued to you says
17  that, again, subject to the limits of liability,
18  Progressive is going to pay the damages that you are
19  legally entitled to get from Esper, you or Heidi are
20  legally entitled to get from Esper because he is driving
21  a vehicle that does not have insurance.
22     Assuming, we'll just assume that he didn't have
23  enough insurance.
24     A. Now, you said Heidi and me.
25     Q. You are a named insured.

Page 68

1     A. And Heidi.
2     Q. And Heidi, if she is a member of your household,
3  skipping over this whole disclosure/non-disclosure
4  issue. Heidi was a member of your household, so she
5  might qualify as an insured person.
6     It says Progressive is going to pay the damages
7  that you and Heidi are entitled to recover from Esper
8  because of bodily injury sustained by an insured person
9  in an accident that arises out of the use of an
10  uninsured motor vehicle.
11    There is a lot of fancy words there.
12    A. What are you coming to?
13    Q. I'm coming to it right now.
14    A. What is it?
15    Q. Doesn't this language say that Progressive is
16  going to pay the damages that you or Heidi have
17  sustained because of Esper's negligence as a result of
18  the bodily injuries sustained by Heidi in this accident?
19    Does that make sense to you if we condense it
20  into that language? Progressive is going to pay the
21  damages that you and Heidi have sustained as a result of
22  Esper's negligence because of the bodily injuries which
23  led to Heidi's death in that accident?
24    Does that seem like a fair summary of what that
25  says?

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT___B___
Page__17__of__31__

17 (Pages 65 to 68)

CASENAME>                                                                 WITNESS>
                                                                          DATE>

Page 69

1   A. I'm not sure how -- I'm not sure how it's saying
2   that. I'll be honest with you.
3   Q. Fair enough. I'm just trying to get your
4   understanding.
5   A. You are going over this and you are trying to
6   come on something. This is not my expertise. This is
7   not me.
8   Q. I'm not trying to mislead you in any way, sir.
9   I'm just trying to see if that summary makes sense. If
10  it doesn't, if it's confusing, no matter what I say,
11  it's confusing.
12  A. It's confusing.
13  Q. It's confusing. I would like you then to turn to
14  page 27 of that exhibit. They are all numbered at the
15  bottom. Again, I'm not expecting you to be an insurance
16  expert.
17  A. But if you got in my boat, you would expect me to
18  be there.
19  Q. I would expect you to get me some fish. I'm sure
20  you would, too. Okay.
21      You remember how we started off on page 20 with
22  the words "subject to the limits of liability"? I must
23  have said that too many times.
24      Subject to the limits of liability, now on page
25  27 at the bottom all in caps, big bold letters, we see

Page 70

1   the words "limits of liability," right? You see them?
2   A. Yes.
3   Q. So this whole first section is subject to what
4   happens here. Would you agree with that idea that
5   whatever they said they were going to pay you, whatever
6   it is, however confusing or not confusing, whatever
7   Progressive said they were going to pay you on page 20
8   is subject to whatever they say on page 27 and 28.
9   Would you agree with that?
10  A. It's part of my policy, I guess.
11  Q. And the first words of that coverage were
12  "subject to the limits of liability," right, so whatever
13  it says on page 20 we have to look at the limits of
14  liability to see what it says. Isn't that a fair
15  thought?
16      Wouldn't you, as a reasonable insured reading
17  your policy, know that you can't just stop with what it
18  says on page 20, you also have to look at what it says
19  on 27 and 28 because of the very first words, "subject
20  to the limits of liability." Would you agree with that?
21  A. I'm not sure what to agree with you anymore.
22  Q. I have confused you?
23  A. Yeah.
24  Q. I'm telling you I'm trying not to confuse you,
25  but you are not the first person to tell me that I have

Page 71

1   confused them.
2       But you do agree with me that at the bottom of --
3   A. I agree you are telling me this is my policy.
4   Q. Have you ever seen these words before?
5   A. I believe I have gone through this here within
6   the past few months one time, but I couldn't understand
7   it then either that much. Probably not very much at
8   all.
9   Q. I'm in the section now limits of liability. What
10  it says is, and I'll quote it, "The limit of liability
11  shown on the declarations page," we can talk about that
12  for a second too, "with the coverages under this part is
13  the most we will pay regardless of the number of claims
14  made, regardless of the number of covered vehicles,
15  regardless of the number of insured persons and
16  regardless of the number of lawsuits."
17      They are putting limits. They say even
18  regardless of the number of vehicles involved or the
19  amount of the premiums paid. They are putting certain
20  limits on what they are going to pay you.
21      Whether that makes perfect sense to you or not,
22  the insurance company says there are limits to what they
23  will pay.
24      I just want to move right along to the key
25  sections, because if we don't understand each other,

Page 72

1   then there is no use to spending a lot of time on it.
2       I want to turn to page 28, the very next page.
3   At about one-third of the way down the page, it has the
4   words "if your declarations page."
5       "If your declarations page shows a split limit
6   then certain things follow." So let's take a look at
7   your declarations page?
8       (Exhibit No. 7 marked.)
9   Q. Here is No. 7. I'm referring to No. 7 because at
10  this point in your policy it says, "if your declarations
11  page shows a split limit."
12      Well, does it or does it not? Let's look. If
13  you look under -- this is your declarations page. If
14  you look down. First, it talks about bodily injury.
15  That's the first thing it talks about, but we're not
16  talking about bodily injury. We're talking about
17  uninsured/underinsured.
18      So let's go down to uninsured/underinsured. You
19  will see that it says, "$100,000 each person, $300,000
20  each accident." Do you at least see that reference?
21  A. I see what it says, yeah.
22  Q. I want you to assume that that in insurance lingo
23  is a split limit. In other words, it could have said
24  you have a combined single limit, that if you are hurt
25  because of the negligence of Gary Zipkin, I run into you

CASENAME>                                                                 WITNESS>
                                                                          DATE>

Page 73

1   and I don't have any insurance and I cause you injury,
2   your policy could say you have $300,000 for every person
3   who is physically injured and you have $300,000 for
4   accidents.
5       It could say some combined single number. In
6   other words, let's assume this: Let's assume Gary
7   Zipkin, uninsured Gary Zipkin runs into you and you have
8   another person in your car and I injure both of you. I
9   injure both of you.
10      I injure you because of my negligence and I
11  injure someone else in your car because of my
12  negligence, not your fault at all. Let's assume you
13  have injuries worth $150,000 and let's assume your
14  passenger has injures worth $150,000, so the total
15  between you is $300,000.
16      If my policy -- excuse me. If your policy, your
17  Progressive policy says that you have $300,000 coverage,
18  just $300,000, not split between people, just $300,000,
19  there is enough money to cover both of you in that
20  accident.
21      There is $300,000 available to cover your total
22  of $300,000 damages. Is that too confusing already or
23  does that make sense?
24  A.  I have kind of lost it.
25  Q.  Bad example. We'll just forget that example.

Page 74

1   A.  I mean, you are not driving.
2   Q.  I just want to see if you understand this idea,
3   that instead of having one figure, pick any number you
4   want, $100,000, $300,000. Instead of having one figure
5   that covers both injuries to a person and in the
6   accident, here it is split.
7       Do you agree that you see one number?
8   A.  I see where it says $100,000. I see that and I
9   see each person.
10  Q.  Then you see a separate number?
11  A.  Then I see $300,000 per person, so what would
12  that mean?
13  Q.  That means it's a split limit.
14  A.  $300,000 for each person?
15  Q.  No, it means $300,000 per accident. If there
16  were two people injured, as I was trying to give a
17  hypothetical, and you had $150,000 injury for both of
18  them, you would have a maximum of $300,000 for the
19  accident, but you only have $100,000 per person.
20      So if you had $150,000 damage, the policy would
21  only pay you $100,000 if it's $100,000 per person. It
22  would only pay you a maximum of $100,000 and it would
23  pay your passenger a maxium of $100,000.
24      So you wouldn't get all your recovery. If Gary
25  Zipkin driving negligently caused injury to you and a

Page 75

1   passenger, and I had no insurance, and you had $100,000
2   and $300,000, and you had $150,000 in damage, you would
3   only get $100,000, because it says $100,000 per person,
4   two people $100,000 each, so if your damages were in my
5   example $150,000, you are not getting all your money
6   back. You are only getting $100,000.
7       Does that idea make any sense to you at all?
8   A.  I understand the part where $50,000 and $100,000.
9   Q.  In other words, the policy may not make you
10  whole. Insurance policies have limits. The limits,
11  depending on how badly hurt you are, the policy may not
12  make you whole. You follow that idea?
13  A.  Yeah.
14  Q.  If you had hypothetically $150,000 in damages,
15  you are hurt. We both agree, I caused it. I was at
16  fault. You were innocent. We look at your damages.
17  You and I sit down and we agree you have $150,000 in
18  damage.
19      My policy, if it was $100,000, $300,000 is only
20  going to pay you $100,000. It's only going to pay you
21  $100,000. It's not going to pay you $150,000 because
22  your policy only covers you for $100,000 per person.
23      So you might have $50,000 in damage that you
24  don't get back. Does that hypothetical make sense?
25  A.  I am understanding you are saying that there is

Page 76

1   $50,000 gone.
2   Q.  Right, gone, that you suffered the injury, but
3   you don't get the money, that that could happen. If
4   Gary Zipkin negligently caused injury to you and I have
5   no insurance, but you have this policy, you could get
6   $100,000 of your $150,000, and you lose out on the other
7   $50,000. That hypothetical, that example --
8   A.  That's what you are saying.
9   Q.  -- makes sense, hypothetically?
10  A.  $100,000 from $150,000 leaves $50,000. I
11  understand that.
12  Q.  Okay. That's what we call, and that's what the
13  policy is talking about, split limits. You have so much
14  per person, so much per accident.
15      So the only way that you would get the full
16  benefit of $300,000 is if you had three people injured
17  in your car, you and two passengers, and each one of
18  them had big enough damages. You could each get
19  $100,000, $100,000, $100,000.
20      It would take three people to get to the maximum
21  of $300,000, but if only one person is injured -- let's
22  assume your damages were $300,000, not $150,000. I
23  really injured you, $300,000.
24      This policy is only going to pay you $100,000.
25  Now there is $200,000 you didn't get paid. I'm throwing

CASENAME>                                                                  WITNESS>
                                                                           DATE>

Page 77

1  a lot of numbers at you and I apologize. I want to see
2  if you understand the concept.
3       The insurance policy is only going to cover you
4  for $100,000 of your damages. If you have more, it's
5  just not covered. Does that concept make sense?
6     A. Yes.
7     Q. Now, since we had to do that to get back to this
8  policy. The policy says, "If your declarations page
9  shows a split limit," and it does, $100,000, $300,000,
10 the amount shown for each person is the most we will pay
11 for all damage due to a bodily injury to one person."
12      We break that down. The amount shown for each
13 person, $100,000, is the most we, that's Progressive,
14 will pay for all damage due to a bodily injury to one
15 person.
16      Your daughter suffered the worst possible bodily
17 injury. She was killed as a result of Mr. Esper's
18 conduct. She suffered bodily injury.
19      Progressive says if you have a split limit, they
20 will pay up to $100,000, even if Heidi Weilbacher's
21 damages are $1 million or $10 million. They will pay
22 $100,000 for the bodily injury to Heidi Weilbacher.
23      That's what that first paragraph is trying to
24 say. Does that make sense or not so far?
25    A. If she was injured.

Page 78

1     Q. And she was, right? She was injured the worst
2  possible way. Does that make sense so far conceptually?
3     A. Somewhat, yeah.
4     Q. That's what they say they are going to pay for --
5  Progressive was going to pay for all the damages due to
6  a bodily injury to one person.
7       They are going to pay that per person limit,
8  $100,000. Now, I want to skip -- I'm happy to go
9  through two and three, but I want to go to the key
10 point, this paragraph right here. The bodily injury
11 limit of liability under this part for each person
12 includes the total of all claims made for such bodily
13 injury and all claims derived -- there is that word,
14 "derived" -- from such bodily injury.
15    A. What is that word?
16    Q. Well, let's read the whole paragraph. "Derived
17 from such bodily injury, including but not limited to,
18 loss of society, loss of companionship, loss of
19 services, loss of consortium and wrongful death."
20      All right. The word "derived" is not a word you
21 are familiar with? You are not comfortable trying to
22 figure out what that word means?
23    A. I have never heard of it. There is a lot of
24 words I have never heard of.
25    Q. Let's assume --

Page 79

1     A. What do you want on this page?
2     Q. Hang on. Whatever the word "derived" means,
3  whatever it means, doesn't this paragraph make it clear
4  that to the extent someone has a loss of society or loss
5  of companionship or loss of services or loss of
6  consortium claim they don't get any additional moneys
7  over what Progressive is going to pay for each person,
8  regardless of what the word "derivative" means.
9       Whether "derivative" means whatever you want it
10 to mean, isn't this policy telling you that we will pay
11 $100,000 for your daughter's injuries, we'll pay
12 $100,000. She was injured. We'll pay that, and that
13 $100,000 includes loss of society, loss of
14 companionship, loss of services, loss of consortium. It
15 includes that.
16      MR. LEGACKI: Objection; calls for a legal
17 conclusion.
18    Q. I'm just asking for your lay perspective.
19 Doesn't the policy tell you, reader, that Progressive is
20 going to pay $100,000 for the injuries which led to your
21 daughter's death?
22      They will pay $100,000, and that includes loss of
23 society claims, loss of companionship claims. Either
24 you understand that or you don't.
25    A. I don't.

Page 80

1     Q. Would you agree that what you have in the way of
2  a claim here, your own claim here, your own separate
3  independent claim is a claim, as you have already
4  described, for the loss of the companionship of your
5  daughter over a lifetime, the joy of being with her, the
6  ups, the downs, the happiness, the sadness, but all of
7  that, you have lost all of that.
8       You have lost all of that because of this injury
9  and death. That's what you have lost, right,
10 companionship, society, comfort with your daughter?
11    A. We know that.
12    Q. Yes. Doesn't this policy tell you that with
13 regard to that kind of a claim, loss of companionship is
14 actually right there. Those words are right there.
15      Loss of companionship. They are not going to pay
16 more than what it says here for each person. Each
17 person is $100,000.
18      If that isn't the fair understanding of what the
19 policy says, I would like you to tell me why it isn't
20 the fair understanding.
21    A. I don't know.
22    Q. Would you agree with this, if Heidi had not been
23 killed in this accident, you wouldn't have a claim for
24 loss of companionship? That's pretty obvious, isn't it?
25      MR. LEGACKI: Objection; calls for a legal

Page 81

1  conclusion.
2     A. We wouldn't be here.
3     Q. We wouldn't be here?
4     A. She would be here. What do you mean now?
5     Q. I'm talking about the word "derived". You asked
6  me what "derived" means. I am getting to it in my own
7  roundabout, lawyer-like, maybe even foolish fashion.
8        If your daughter was not killed in that accident,
9  you wouldn't be here talking about a claim for loss of
10 companionship. That's pretty obvious, right?
11       MR. LEGACKI: That assumes facts not in
12 evidence; objection.
13    Q. The answer is yes?
14    A. I'm not sure.
15    Q. Well, how can you have any doubt about that?
16 What causes you to have any doubt about that? You would
17 not be here making a claim for loss of companionship if
18 it wasn't for the fact that your daughter was injured
19 and died as a result of that terrible accident? What's
20 hard to understand about that?
21    A. If she wasn't in that accident, I guess we
22 wouldn't be here.
23    Q. Your claim -- let's back up and approach it even
24 a different way. You were not in the car, right?
25 That's obvious. You agree with that, don't you?

Page 82

1     A. Yes.
2     Q. You were not injured in the accident? You
3  weren't there at the accident, right?
4     A. No.
5     Q. You have the suffering that any parent would
6  have, the grief, the emotional distress, the anguish,
7  you have all of that flowing from her death, right? It
8  all flows from Heidi's death, doesn't it?
9     A. It's an everyday thing.
10    Q. If the word "derived" means arose from, came
11 from, developed as a result of --
12    A. Yep.
13    Q. You would agree?
14    A. If the word divide means --
15    Q. "Derived." If it means flows from, arises out
16 of, comes from, is because, your loss is because, arises
17 from, flows out of the death of your daughter?
18    A. The word devine.
19    Q. "Derived."
20    A. I don't know.
21    Q. If it means what I just told you -- we can get
22 the dictionary. The dictionary says, "coming from,
23 taken from, secondary to, owes its existence to."
24       If that's what "derived" means, isn't it true
25 that your loss, your damages derive from, are a result

Page 83

1  from Heidi's death?
2     A. I guess so.
3     Q. And this policy, which I know you are not an
4  expert on, this policy that you have right in front of
5  you which I don't have in front of me anymore.
6     A. You want mine?
7     Q. I may have to borrow it. Bear with me. One
8  second I have it, the next second I don't.
9        At page 27, which you have open in front of you,
10 you have got page 27 there, it goes on to 28. Is this
11 28? Perfect, 28.
12       That paragraph under bodily injury says, "The
13 bodily injury limit of liability under this part three
14 for each person includes the total of all claims made
15 for such bodily injury and all claims derived from such
16 bodily injury, including but not limited to, loss of
17 society, loss of companionship, loss of services, loss
18 of consortium and wrongful death."
19       Isn't it a reasonable reading of this policy
20 language --
21    A. I'm not sure.
22    Q. Hang on. Isn't it reasonable to read this policy
23 and say what this is saying to me is if I have split
24 limits, and I do, and the limits are $100,000 per person
25 and that's the injury -- the injury here is the injury

Page 84

1  to Heidi which led to her death, that there is $100,000,
2  this policy will pay $100,000 and that policy $100,000
3  will include claims for loss of companionship, just like
4  the one that R.W. is asserting. Isn't that a reasonable
5  reading of this policy?
6     A. I'm not sure. For each person. The amount shown
7  for each person -- and there is two people involved in
8  this.
9     Q. Which two? You mean you and your daughter or you
10 mean Esper and Heidi? Who do you mean?
11    A. Me and my daughter.
12    Q. But only Heidi suffered bodily injuries in the
13 accident, right?
14       MR. LEGACKI: Objection; that calls for a
15 legal conclusion, misconstrues the terms.
16    Q. Heidi suffered bodily injury in the accident,
17 right? You did not suffer bodily injury in the
18 accident.
19       MR. LEGACKI: Objection.
20       MR. ZIPKIN: He gets to answer, not you.
21       MR. LEGACKI: I can make an objection.
22       MR. ZIPKIN: What's the objection?
23       MR. LEGACKI: Calls for a legal conclusion.
24    Q. I want your understanding, lay understanding.
25    A. I don't know. I don't know legal understanding.

CASENAME>  WITNESS> DATE>

Page 85

1 Q. I didn't want a legal understanding. I wanted
2 your lay ordinary person's understanding. Who was
3 injured in the accident?
4 A. It was Heidi.
5 Q. And your loss flows from her death, right?
6 A. I guess.
7 Q. Well, what do you mean you guess? Isn't it as
8 sure as the sun rises, in some states?
9 A. Every day.
10 Q. Every day?
11 A. Every day.
12 Q. And that all flows because of her tragic wrongful
13 death. She should not have died and you should have
14 your daughter, right? Those are obvious things.
15    I'm not trying to cause pain. I'm just trying to
16 make sure that we understand each other.
17    MR. ZIPKIN: Let's take a break.
18    VIDEOGRAPHER: Off record 11:21 a.m. This
19 is the end of tape number two.
20    (There was a short break.)
21    VIDEOGRAPHER: On record 11:24 a.m. This is
22 the start of tape number three.
23 Q. R.W., do you have a fishing guiding license or
24 are you an outfitter?
25 A. I consider it everything.

Page 86

1 Q. Isn't there -- I'm told, that there is --
2 A. Who told you?
3 Q. Aisha Tinker Bray. I'm told by Aisha Tinker Bray
4 that there is actually a written and oral exam for those
5 who have licenses as fishing guides.
6 A. Yeah.
7 Q. Did you take the oral and written exam?
8 A. When I got mine, it was back in '79 or '80, and
9 the association put the test together, so everybody had
10 the answers.
11 Q. Are you saying that you basically had the answers
12 to the questions before you took the exam?
13 A. I am very thankful.
14 Q. And have you had to take the exam more than once
15 or just in '79?
16 A. Just then. But nowadays they got to where you
17 can go to a two-day course and you are pretty well
18 guaranteed it.
19 Q. Have you taken the course?
20 A. No. That's for a Coast Guard license.
21 Q. Is it fair to say that you don't fully understand
22 the reasoning Progressive gave for denying you a
23 separate $100,000 payment?
24 A. Say that one more time.
25 Q. Is it fair to say that you don't fully understand

Page 87

1 why it is that Progressive refused to pay you an extra
2 $100,000?
3 A. Yes.
4 Q. Is it fair to say that after looking at the
5 policy you don't fully understand what the words in the
6 policy mean?
7 A. Yes.
8 Q. As you sit here, would you agree that it's
9 possible that Progressive has in fact set forth its
10 position in a way that the court might understand?
11 A. I'm not sure on that.
12 Q. Are you able to explain to me if you feel this
13 way -- well, let me back up and ask. Has Progressive
14 mistreated you in this case?
15 A. I'm not sure.
16 Q. That leads to my next question because I was
17 going to say if you feel that Progressive has mistreated
18 you are you able to lay it out for me as to what they
19 did wrong and when they did it and how they did it
20 wrong?
21 A. I'm not sure.
22 Q. If the law required Progressive to give you an
23 opportunity to purchase higher limits for
24 uninsured/underinsured motorist, would you agree that,
25 as we have already discussed, it is at least possible

Page 88

1 that they did that in the application?
2 A. Say that one more time.
3 Q. If the law required Progressive to give you the
4 opportunity to purchase higher limits for
5 uninsured/underinsured motorist limits, would you agree,
6 as we discussed in the application, it is at least
7 possible that that's what this application did was give
8 you that opportunity?
9 A. Somewhat. I would think the law should have been
10 -- you know, like I say, I am learning a lot more about
11 insurance, but I think it should be explained more to
12 people.
13 Q. Are you able to say from any source, any source
14 at all --
15 A. I thought I had everything. If that was given to
16 me like it was, I was under the impression I had
17 everything I needed.
18 Q. Everything you needed meaning the highest
19 possible coverages?
20 A. That's what I always wanted.
21 Q. So you think the insurance agent at Denali fell
22 down on the job by not getting you $1 million in
23 coverage?
24 A. I'm not sure.
25 Q. If the law is that an insurance company that

CASENAME>                                                                WITNESS>
                                                                         DATE>

Page 89

1  denies a claim, and here they have agreed you have
2  coverage, but that you only have coverage under one
3  check for $100,000 --
4      Let me back up and ask that. Strike that.
5      Do you agree that you were named on the check for
6  $100,000 that was paid by Progressive? It named the
7  Estate of Heidi Weilbacher. It named --
8      A. I didn't see the check. Did I sign the check?
9  Who signed the check?
10         (Exhibit No. 8 marked.)
11     Q. I'm showing you Exhibit No. 8. This is a copy of
12  a check from Progressive Northwestern Insurance Company
13  on policy 65824951-0, and it actually is a payment for
14  $117,256, right? Do you see that?
15     A. Uh-huh.
16     Q. I'm sorry. We need a verbal.
17     A. I see it.
18     Q. And it says in terms of who the payees are,
19  Kenneth W. Legacki, PC, in trust for the Estate of Heidi
20  Weilbacher; Ron Weilbacher and Cathie Mauro. Do you see
21  that?
22     A. Yes.
23     Q. So you were in fact named on this check, right?
24     A. My name is there.
25     Q. Do you remember endorsing the check so it could

Page 90

1  be deposited?
2      A. I don't know if I did or not.
3      Q. If Progressive paid a full one per person or each
4  person limit of $100,000, plus I'm not asking you to
5  explain why they have these add-ons that total another
6  $17,000 or so, if they paid that limit, can you tell me
7  why you think Progressive owes you any additional money?
8         MR. LEGACKI: Objection; assumes facts not
9  in evidence. Objection to legal conclusion. Objection
10  to foundation.
11     Q. He is entitled to make objections. At some
12  point, the court will rule on those objections, but my
13  question stands.
14        Based on the check that you have here in front of
15  you, which includes your name, for $117,256, can you
16  tell me why Progressive owes you any additional money?
17     A. I don't know. I am not sure what you are getting
18  at.
19     Q. I just want to know why. You are the plaintiff
20  in this lawsuit. You have made a claim against my
21  client.
22        Why do you believe my client owes you one dime
23  more than what it paid in this check?
24     A. This here, how come Heidi's name is on it? It
25  goes to her estate?

Page 91

1      Q. Yes. As it says, the Estate of Heidi Weilbacher.
2  It was made payable to the Estate of Heidi Weilbacher
3  and also to you and also to Cathie Mauro.
4      A. So to the three of us?
5      Q. Yes. One check to the three of you for $117,256.
6      A. Shouldn't there be a check for everyone?
7      Q. In what amount?
8      A. I'm not sure.
9      Q. Can you tell me, if you know, the basis for any
10  claim that you have against my client for any more money
11  than is represented in that check in front of you?
12     A. This check was for Heidi's part of her suffering,
13  I guess. I'm looking for mine. There is three of us on
14  here. Should be paid to all of us the amount.
15     Q. We just went through the policy, right, where it
16  talked about claims for loss of companionship, loss of
17  society as not getting a separate per person limit, but
18  being part of a single per person limit.
19        Can you explain to me why Progressive, in view of
20  the policy --
21     A. No, I can't explain to you anything about
22  Progressive right now.
23     Q. Okay. In terms of your damages, do you claim
24  that you have suffered any damages because of what
25  Progressive has done?

Page 92

1      In other words, we know Mr. Esper in that
2  accident caused you damage because of the loss of your
3  daughter. Has anything that Progressive has done caused
4  you damage?
5      A. I can't answer that. I don't know.
6      Q. Just a second. Give me a moment.
7         (Exhibit No. 9 marked.)
8      Q. I'm showing you Exhibit No. 9, R.W. You can just
9  push all the other paper aside. It's not crucial for
10  now.
11        What Exhibit No. 9 is is Plaintiff's Final
12  Witness List in this lawsuit. It gives us a list of
13  individual 23 names, before we get to the categories, 23
14  different names.
15        And I would just like to have you quickly tell me
16  why these people are on this witness list. Bo, the
17  first one is Bo, B-o, Ansel, A-n-s-e-l. Why is Bo Ansel
18  listed?
19     A. He knows me and Heidi.
20     Q. Is he a neighbor or what?
21     A. A friend.
22     Q. A friend? What sort of business is he in?
23     A. He is in real estate and he is a fishing
24  outfitter.
25     Q. Dale Dolifka is number two. Dale, D-a-l-e,

CASENAME>                                                                                    WITNESS>
                                                                                             DATE>

Page 93

1  Dolifka, D-o-l-i-f-k-a. Who is he?
2     A. He is a friend of mine in Soldotna.
3     Q. He is an attorney as well, right?
4     A. Yes, he is.
5     Q. Has he ever done any legal work for you?
6     A. He has in the past.
7     Q. Has he done any legal work in connection with
8  this case, to your knowledge?
9     A. Not to my knowledge.
10    Q. Has he given you any -- well, let me back up. Do
11 you claim any attorney-client relationship with him
12 relating to this case?
13       In other words, is he your attorney or one of
14 your attorneys in this matter?
15    A. I don't believe so.
16    Q. Because if he was, I am not allowed to ask what
17 kind of conversations you may have had with him.
18       But you are not claiming an attorney-client
19 privilege with him?
20    A. Not that I know of.
21    Q. Not that you know of?
22    A. No.
23    Q. Has Dale Dolifka given you any information or
24 made any statements at all about whether Progressive is
25 right or wrong in this case?

Page 94

1     A. I don't know. I couldn't answer that. I don't
2  remember. I don't think I ever talked to him about it.
3     Q. Is he a friend of the family or what?
4     A. Yes. He is a close friend. He knew Heidi real
5  well too. I know his kids.
6     Q. The next name is John Ebsary, E-b-s-a-r-y. Who
7  is he?
8     A. He is a friend of mine. He has been a friend of
9  mine for a few years, 10 or 15 years. Also known Heidi
10 and does things with her.
11    Q. He lives in Washington?
12    A. Maple Valley.
13    Q. Did he used to live in Alaska or what?
14    A. No. He has spent a whole summer here before. He
15 would visit here a number of times.
16    Q. Let's jump down to number seven, Steven Moe,
17 M-o-e in Ninilchik. Who is Mr. Moe?
18    A. A good friend.
19    Q. Eight is Mary Beth Rathbun. I guess we now have
20 the spelling of her name, R-a-t-h-b-u-n. And why is she
21 here?
22    A. She has been a friend for quite a few years. I
23 don't know how many.
24    Q. Did she ever handle any of your insurance needs
25 relating to your personal auto policy?

Page 95

1     A. No.
2     Q. And she did have something to do with your
3  commercial auto policies?
4     A. No.
5     Q. Who is Mary Ring?
6     A. My mother.
7     Q. And Jerry Ring?
8     A. Her husband.
9     Q. Who is Vicki Santos, S-a-n-t-o-s.
10    A. My daughter.
11    Q. How old is she?
12    A. 37. I don't know.
13    Q. It's okay.
14    A. It's close.
15    Q. Good job. It's not crucial. I'm not trying to
16 trip you up on dates. Who is Bob Saxton, S-a-x-t-o-n?
17    A. A close friend.
18    Q. Who is Carl with a "C" Staley, S-t-a-l-e-y?
19    A. Close friend.
20    Q. It says Tempe, Arizona. Did he ever live in the
21 Soldotna area?
22    A. He has a cabin there or a small house on the
23 river, I guess.
24    Q. Then the next one is Ann, A-n-n, Stockman,
25 S-t-o-c-k-m-a-n, Dr. Ann Stockman. Who is she?

Page 96

1     A. A doctor I go see.
2     Q. Is she a psychologist or psychiatrist, do you
3  know?
4     A. Yes.
5     Q. Do you know which?
6     A. I don't know which. All of the above, I guess.
7     Q. When was the last time you saw her for any
8  reason?
9     A. A few weeks ago.
10    Q. Do you see her on a regular basis or irregular?
11    A. Whenever.
12    Q. A few weeks ago? You had an appointment with
13 her?
14    A. Yeah.
15    Q. Here in Anchorage?
16    A. Yeah.
17    Q. So you came up to Anchorage like at the beginning
18 of August?
19    A. I don't know what the date was.
20    Q. Does it basically take you away from your
21 business for a whole day to see her?
22    A. No.
23    Q. How do you arrange it so it doesn't take you away
24 from your business for a whole day?
25    A. Soldotna is not that far.

CASENAME>                                                                          WITNESS>
                                                                                   DATE>

Page 97

1   Q. So you drive up to Anchorage, you see her and
2   then you drive back?
3   A. I might have flown. I don't know. I don't
4   remember. I might have just talked to her on the phone.
5   Q. It's only a couple of weeks ago and you can't
6   remember whether it was in person or on the phone?
7   A. It was in person and then there was just a short
8   time on the phone too.
9   Q. Does she prescribe any medications for you?
10  A. No.
11  Q. Have you taken any medications directly as a
12  result of your loss of your daughter?
13  A. I won't take anything. I won't take an aspirin.
14  Q. How long have you known Ann Stockman,
15  Dr. Stockman?
16  A. I don't know. Since the accident.
17  Q. You did not know her before the accident?
18  A. No.
19  Q. Who recommended that you see her, if anyone?
20  A. A friend of mine.
21  Q. Who was the friend who gave you some names?
22  A. Karen.
23  Q. Do you know Karen's last name?
24  A. No.
25  Q. Is there any reason why Karen isn't listed as one

Page 98

1   of your witnesses?
2   A. I didn't know -- no, there is no reason.
3   Q. Is she someone who knows you pretty well?
4   A. Not that well. Karen is -- I asked Karen.
5   That's Ken Legacki's secretary.
6   Q. Was it Mr. Legacki's office that suggested you
7   see Dr. Stockman?
8   A. No.
9   Q. It was Karen at Mr. Legacki's office?
10  A. They gave me a list of names of people who could
11  help me.
12  Q. Did you ask for the names or did they just give
13  them to you on your own?
14  A. I didn't know where to go.
15  Q. That wasn't my question. Did you ask for a name
16  or did they just make some suggestions?
17  A. I don't know how it came about. I think Ken told
18  me when I talked to him one time maybe I should see
19  somebody if I was having that kind of trouble.
20  Q. I'm sorry.
21  A. I didn't want to ask Cathie.
22  Q. So the suggestion to see Dr. Stockman came from
23  Mr. Legacki?
24  A. No, it came from me. I didn't know where to go.
25  Q. I thought you said Mr. Legacki told you that if

Page 99

1   you were having that kind of trouble maybe you should go
2   see someone?
3   A. I did.
4   Q. Doesn't that sound like it came from Mr. Legacki?
5   A. Pardon me?
6   Q. Doesn't it sound like the suggestion then came
7   from Mr. Legacki?
8   A. It was my idea, but I don't know anybody.
9   Q. Well, how many visits would you say you have had
10  total with Dr. Stockman, let's say, in-person visits?
11  A. Not very many.
12  Q. Can you give me an estimate?
13  A. Half a dozen maybe at the most.
14  Q. How many would you say the least would be? Six
15  at the most.
16  A. I don't know. I don't know how many times.
17  Q. How many times have you spoken with Dr. Stockman
18  by phone?
19  A. A couple of times.
20  Q. Were those substantive or just to arrange
21  appointments?
22  A. Both. I don't know how many times I just called
23  her up and said -- I don't know how many times.
24  Q. Have you ever asked Dr. Stockman to give you
25  copies of records so that you could produce them in this

Page 100

1   case if they relate to counseling for your grief?
2       Wouldn't you say they are pretty relevant?
3   A. I asked Dr. Stockman never to tell anybody I was
4   there.
5   Q. Well, your lawyer has listed her as a witness you
6   guys intend to call to testify.
7   A. Yeah.
8   Q. Wouldn't you agree then that if you are going to
9   name her that we ought to get the records? Would you
10  agree to sign a release of authorization so we can get
11  those records?
12  A. I don't know. I couldn't answer that.
13      MR. ZIPKIN: Well, I'll ask you,
14  Mr. Legacki. Will you sign a release so we can get
15  those records?
16      MR. LEGACKI: Discovery is over.
17      MR. ZIPKIN: Well, actually, it's not over
18  in the sense that we both agreed that I can take this
19  deposition after the close of discovery.
20      MR. LEGACKI: Right.
21      MR. ZIPKIN: And this is the first
22  opportunity I have ever had to talk to your client about
23  this.
24      MR. LEGACKI: You had plenty of
25  opportunities. You scheduled it at a late date.

CASENAME>  WITNESS>
DATE>

Page 101

1  MR. ZIPKIN: That's, of course, a gross
2  misrepresentation by you, but why get into that, just
3  one of many gross representations by you.
4  MR. LEGACKI: Gary, read the letters of your
5  associate there regarding discovery and close of
6  discovery and all of that other stuff.
7  And in fact, I think that answers your own
8  questions. Generally, I am very agreeable, but
9  according to your associate there in the letters,
10  discovery is over.
11  MR. ZIPKIN: That's what you just said,
12  discovery is over.
13  MR. LEGACKI: That's what she says,
14  discovery is over.
15  MR. ZIPKIN: Obviously, this deposition is
16  taking place now and it is taking place now because we
17  repeatedly attempted to set this up during the course of
18  discovery and you --
19  MR. LEGACKI: This is a witness list that
20  was filed back in, when is it, May of 2006.
21  MR. ZIPKIN: Very true, and the first --
22  MR. LEGACKI: She was listed on the
23  preliminary witness list as well.
24  MR. ZIPKIN: Very true, and the first time I
25  get to ask any questions of your client about it is

Page 102

1  today.
2  MR. LEGACKI: She was listed. There is
3  nothing hidden here, Gary.
4  MR. ZIPKIN: Nothing is hidden. Will you
5  have your client sign a release for information from
6  Dr. Stockman?
7  MR. LEGACKI: No.
8  Q. Who is Neil, N-e-i-l, Tieszen, T-i-e-s-z-e-n?
9  A. A close friend.
10  Q. Who is Elisa, E-l-i-s-a, Vidales, V-i-d-a-l-e-s?
11  A. A friend.
12  Q. And who is Bob Weilbacher in Edgewood?
13  A. My brother.
14  Q. Who is Lisa Weilbacher in Washington?
15  A. My daughter.
16  Q. How old is Lisa, roughly?
17  A. 41.
18  Q. Who is Charlie Weimer, W-e-i-m-e-r?
19  A. A good friend of mine.
20  Q. Who is Dirk, D-i-r-k-, Whitehead, just like it
21  sounds?
22  A. A friend of mine.
23  Q. Have any of the individuals that we have just
24  gone over, have any of them given you any opinions
25  regarding Progressive's position in this case?

Page 103

1  A. No.
2  Q. Have any of them tried to give you any analysis
3  of what the policy means or doesn't mean?
4  A. No.
5  Q. Liberty Mutual, do you know whether Cathie Mauro
6  or Peter Mauro have a Liberty Mutual insurance policy?
7  A. I don't know who they are insured with.
8  Q. Are you making a claim for any insurance benefits
9  under the Liberty Mutual policy that was issued to Peter
10  and Cathie Mauro?
11  A. I don't know.
12  (Exhibit No. 10 marked.)
13  Q. I'm showing you No. 10. Exhibit No. 10, a letter
14  from Ken Legacki dated March 8, 2005 to Danny Withers at
15  Progressive.
16  At the bottom of the letter, the last paragraph
17  right before the sincerely, I'll quote, it says, "For
18  your information, Liberty Mutual has agreed with my
19  analysis of the Allstate case and are allowing the
20  mother to recover under the underinsured motorist
21  provision of the policy."
22  Do you see that?
23  A. Yes.
24  Q. Did you receive a copy of this letter at or about
25  the time it went out in the mail?

Page 104

1  A. I don't believe so. I don't know.
2  Q. Is it your understanding or is it not your
3  understanding that Liberty Mutual has agreed to pay a
4  separate per person limit under its underinsured
5  motorist coverage to Cathie Mauro?
6  A. I don't know.
7  Q. Would you agree that --
8  A. We don't talk about insurance, her and I, really.
9  Q. How about this simple point: Would you agree
10  that your attorney, when he is dealing with Progressive,
11  should be dealing with Progressive in an honest way?
12  You think your lawyer ought to be honest when he
13  is talking to Progressive?
14  A. That's his line of work, not mine.
15  Q. You wouldn't want to hire a lawyer who wasn't
16  being honest with the other side, would you?
17  A. I'm not sure what's going on there.
18  Q. Are you aware of any information other than from
19  Mr. Legacki to indicate that Liberty Mutual actually has
20  agreed to make some extra payment to Cathie Mauro
21  directly with her own per person money?
22  A. Ken has never talked to me about that.
23  Q. So as you sit here, you don't know whether
24  Liberty Mutual has refused to make a separate per person
25  payment to Cathie Mauro or to you? You don't know that,

CASENAME>                                                                WITNESS>
                                                                          DATE>

### Page 105

1  right?
2  A. No, I don't.
3  Q. Have you ever read any portion of the Liberty
4  Mutual policy?
5  A. It's not my policy, is it?
6  Q. No, it's not your policy. It's a policy issued
7  to Peter and Cathie Mauro.
8  A. I don't believe. Why would I read their policy?
9  If I can't understand mine, why would I look at theirs?
10  Q. Do you know whether you have made a claim, with
11  Mr. Legacki's assistance, for any money under the
12  Liberty Mutual policy?
13  A. I don't know.
14       (Exhibit No. 11 marked.)
15  Q. Exhibit No. 11. Exhibit No. 11 is a letter on
16  Liberty Mutual letterhead dated November 18, 2003 to Ken
17  Legacki regarding Ronald Weilbacher, and refers to a
18  claim number, date of loss, July 9, 2001.
19       That is the date of your daughter's death, right?
20  A. No.
21  Q. It's not? What was the date of your daughter's
22  death?
23  A. July 9th.
24  Q. That's what I just said.
25  A. You said July 1st.

### Page 106

1  Q. I thought I said July 9, 2001. If I misspoke, I
2  apologize.
3       Is July 9, 2001 the right date?
4  A. Yeah.
5  Q. If I misspoke, I apologize.
6  A. 3:59 in the morning, yeah.
7  Q. You have this letter here in front of you. Have
8  you ever seen this letter here before?
9  A. I can't say that I have.
10  Q. The first sentence says, "Mr. Legacki, we have
11  received and reviewed your claim for benefits for Ronald
12  Weilbacher in accordance with Peter and Cathie Mauro's
13  LibertyGuard auto policy." Do you see that?
14  A. I see it.
15  Q. This suggests that a claim was advanced on your
16  behalf by Mr. Legacki to Liberty Mutual, doesn't it?
17       MR. LEGACKI: Objection; asks him to
18  speculate what they meant when they wrote this. It
19  calls for speculation.
20  A. I don't know.
21  Q. Speculation? Doesn't this first line of this
22  letter say, whether it's right or wrong, doesn't it say
23  that Mr. Legacki was advancing a claim for benefits on
24  your behalf?
25       Isn't that what that first sentence says?

### Page 107

1  Whether it's a complete falsehood or not. That's what
2  it says, doesn't it?
3  A. It does.
4  Q. Doesn't the next sentence say, "We have
5  determined" -- take your time. I'm into the second
6  sentence.
7  A. I'm trying to get ahead of you then, I guess. I
8  don't understand the letter. I have never seen the
9  letter, what I know of.
10  Q. The second sentence says, "We have determined
11  that there is no potential coverage for Mr. Weilbacher
12  according to the following policy terms," and then it
13  sets forth a bunch of policy terms, doesn't it?
14  A. You mean -- which ones are you talking now?
15  Q. All of them actually. Doesn't it say in the
16  second sentence that Liberty Mutual, assuming that they
17  are the word "we", have determined that there is no
18  potential coverage for Mr. Weilbacher, that's you,
19  according to the following policy terms, and it quotes a
20  bunch of policy terms, right?
21  A. There are -- if they are terms, they are terms.
22  Q. At the end it's signed by, "Sincerely, Mark
23  Northcutt," N-o-r-t-h-c-u-t-t, "claims specialist
24  Liberty Mutual."
25       Whether it all makes sense or not, doesn't this

### Page 108

1  look like a letter basically turning down a claim that
2  was presented by your attorney to Liberty Mutual?
3  A. Sort of, yeah.
4  Q. So can you explain to me why your attorney has
5  represented in that letter we had marked that Liberty
6  Mutual agreed with his analysis?
7  A. You want me to say what now?
8  Q. I don't want you to say anything other than the
9  truth, the whole truth and nothing but the truth.
10  A. What are you asking me?
11  Q. Can you explain -- in view of this letter, do you
12  have any explanation for why Mr. Legacki so proudly
13  announced to Progressive that Liberty Mutual had agreed
14  with Mr. Legacki?
15       Any idea why Mr. Legacki said that?
16       MR. LEGACKI: You are taking this out of
17  context. It says the mother, not Ronald Weilbacher.
18       Just like Progressive put down Cathie Mauro
19  on the check, Liberty Mutual put Ronald Weilbacher on
20  the check. I was just trying to see whether or not he
21  was covered.
22       So what are you talking about, Gary? Does
23  Progressive mean that Cathie is covered on the policy
24  when they put her name on the check?
25       First of all, you misconstrued the evidence.

CASENAME>                                                                                      WITNESS>
                                                                                               DATE>

Page 109

1   It says the mother. This one talks about Ron. Ron is
2   the father. Ron is male. Cathie Mauro is the mother.
3   She is female.
4       Q. Are you aware of any evidence that supports the
5   suggestion made by Mr. Legacki that Liberty Mutual
6   agreed with his analysis about anything?
7       A. Would you say that one more time?
8           (Question read back by court reporter.)
9       A. I don't know anything, no.
10              (Exhibit No. 12 marked.)
11      Q. Mr. Legacki just made a big speech about Cathie
12  Mauro. What did Liberty Mutual say about Cathie Mauro's
13  own claim in this letter?
14      A. I don't know.
15      Q. Take a look at it.
16      A. You want to read it to me so I can help
17  understand it better?
18      Q. Well, I mean, I'm not trying to be condescending,
19  but you can read, right?
20      A. I don't understand a lot of it though. I read
21  very slow also.
22      Q. This is a letter dated November 18, 2003, again,
23  to Ken Legacki and this one says, "Regarding Cathie
24  Mauro," right?
25      A. I see Cathie's name here, yeah.

Page 110

1       Q. And in the third paragraph -- this should ring
2   some bells of familiarity -- Liberty calls Mr. Legacki's
3   attention to the split uninsured/underinsured motorist
4   limits in Alaska, their endorsement in their policy.
5           You see where it refers to split
6   uninsured/underinsured motorist limits in the third
7   paragraph?
8       A. Uh-huh.
9       Q. Then it quotes the limits of liability. On the
10  second page, if you don't mind jumping ahead, the second
11  page, and I'll quote it, says, "Under this endorsement
12  the policy specifically provides that the "each person"
13  limit applies to liability for all damages, including
14  damages for care, loss of services or death arising out
15  of bodily injury sustained by any one person in any one
16  accident.
17          Pursuant to this language, the total available
18  limits in this matter are $100,000 and includes Heidi
19  Weilbacher's parents' loss of society claims. Because
20  Liberty Mutual has already paid $100,000 in this matter,
21  there is no coverage for the loss of society claim being
22  advanced by Ms. Mauro."
23          Now, without getting into all the fancy insurance
24  language, isn't that basically what you have been told
25  here by Progressive, just like Liberty Mutual told

Page 111

1   Mr. Legacki with regard to Cathie Mauro and with regard
2   to you, that they believe they have already paid a
3   single each person or per person limit. They have paid
4   and that they don't owe any more?
5       A. Each person, per person?
6       Q. Sometimes insurance companies use the words "each
7   person". Sometimes they use the words "per person," but
8   whether it's each person or per person, the result is
9   the same, that they have paid out one single limit that
10  they believe under their policy that includes loss of
11  society or loss of companionship claims and they don't
12  owe any more.
13          Without getting you lost in the legalese or the
14  insurance language, isn't that what this letter is
15  basically saying?
16      A. You lost me a long time ago on that.
17      Q. I lost you. Let me just do it this way: If
18  Liberty Mutual has said "no" -- we all understand the
19  word "no".
20          If Liberty Mutual had said, "No, no more money,
21  because we have already paid a single limit," isn't that
22  pretty much what Progressive has said to you?
23          You understand "no," don't you?
24      A. Yeah.
25      Q. Right. We have all heard that expression, "What

Page 112

1   part of no don't you understand?" Progressive has said
2   no. Liberty Mutual has said no. Haven't they both said
3   no?
4       A. Yeah.
5       Q. Okay. Are you aware of anything that suggests
6   that Liberty Mutual bought into Ken Legacki's theories
7   in this case and changed their mind to say yes?
8       A. I don't know anything.
9       Q. Do you know that Mr. Legacki is currently engaged
10  in some proceeding with Liberty Mutual over Cathie
11  Mauro's claim?
12      A. I don't know what it's about. I have no idea.
13      Q. As you sit here, do you know whether Mr. Legacki
14  is even pursuing a claim for you under Liberty Mutual's
15  policy or whether he has given it up?
16      A. I don't know.
17      Q. If he has given it up, don't you think he should
18  have told you?
19      A. I don't know.
20      Q. Cathie Mauro, she is the mother of Heidi
21  Weilbacher, right?
22      A. Yeah.
23      Q. And she is female, right? And you are male? We
24  got that all straight?
25          MR. ZIPKIN: Any confusion, Mr. Legacki?



CASENAME>  WITNESS>
DATE>

Page 113

1  MR. LEGACKI: Not with me.
2  MR. ZIPKIN: Okay. Good.
3  Q. You have listed a number of lawsuits that you
4  have been involved with over the years. I am not really
5  interested in going into them except to ask in a very
6  general way whether any of them involved claims for
7  bodily injury, an actual claim involving bodily injury,
8  any of these.
9  William Davis versus Ron Weilbacher; Weilbacher
10 versus Old Country Log Homes; Weilbacher versus Brush.
11 I'll give the court reporter the names so she can get
12 the spelling. Weilbacher versus State; Ron Weilbacher
13 versus Toyama; Leo versus Weilbacher.
14 A. Toyama? Okay.
15 Q. Leo versus Weilbacher; Larson versus Weilbacher;
16 Weilbacher versus Rogers/Wilderness Adventure;
17 Weilbacher versus Keating/Poachers Cove; Ansel versus
18 Weilbacher; and Tuter/Nazarene Church versus Weilbacher.
19 Any of those involve claims for personal injury
20 or bodily injury?
21 A. No.
22 Q. None of them?
23 A. No.
24 Q. Any of those involve insurance matters of any
25 kind, that you know of? I gave you a quick list.

Page 114

1  A. I think there was one.
2  Q. Take your time. Just tell me which one deals
3  with insurance matters.
4  A. The Brush.
5  Q. Your best recollection of the Brush case, what
6  did it involve, if you remember?
7  A. He ran into my van or ripped the door off.
8  Q. No personal injuries though?
9  A. No.
10 Q. Just property damage?
11 A. Yes.
12 Q. That's Weilbacher versus Brush. Okay. That one
13 involved insurance in what way, his insurance company
14 paid some money?
15 A. To pay to repair my van. So is it fair to say
16 that this is the only case in your life that you are
17 aware of, this case right here that involves any
18 insurance matters relating to bodily injury, this case
19 right here?
20 A. Yes.
21 Q. Have you ever had an insurance policy canceled by
22 an insurance company because of either nonpayment of
23 premium or for any other reason you can think of?
24 I'm speaking of auto insurance right now, not
25 homeowners, not boat insurance, not business insurance,

Page 115

1  any auto policy ever canceled for any reason?
2  A. I can't think of any at this time.
3  Q. Have you ever testified in court in front of a
4  judge or in front of a jury about anything?
5  A. Yes.
6  Q. Can you think of which case or what reason it
7  was? Was it a divorce or what caused you to have to
8  testify?
9  A. In the Brush.
10 Q. In the Brush case, that actually went to some
11 sort of a proceeding in front of a judge?
12 A. Yes.
13 Q. Was it a trial or just a hearing?
14 A. A decision by the judge, whatever that is.
15 Q. And you testified in that proceeding under oath?
16 A. Yes.
17 Q. Any other time you have ever had to testify under
18 oath other than today? You are under oath today. And
19 that Brush case.
20 A. I have had depositions, if you are talking under
21 oath.
22 Q. Like this, a setting like this at a law office or
23 a court reporter?
24 A. Uh-huh.
25 Q. Which cases did you have to give depositions in?

Page 116

1  A. The Davis.
2  Q. William H. Davis versus Weilbacher?
3  A. Uh-huh.
4  Q. Was he one of your employees, Mr. Davis?
5  A. No. He said he was, but he wasn't.
6  Q. He said he was, but he wasn't?
7  A. Yeah.
8  Q. And you testified in a deposition in that case?
9  A. Yes, I did. I believe I did. Yes, I did. And
10 then I did a deposition one other time because of
11 something that happened on the pipeline years ago.
12 Q. What happened on the pipeline years ago?
13 A. A guy had trouble landing his plane and it kind
14 of went into a snow drift, and he asked me to help pull
15 it out.
16 And when I pulled it out for him, it damaged it
17 some, and then he wanted to sue the company I was
18 working for.
19 Q. Do you know if he did sue?
20 A. I did a deposition. I don't know what happened.
21 I mean, there was me and a couple of other people there
22 working. He asked us all to help him pull it out.
23 Q. So you're basically Good Samaritans?
24 A. Try to help a guy out.
25 Q. Sued the Good Samaritans? But you weren't sued

CASENAME>                                                                    WITNESS>
                                                                             DATE>

Page 117

1  personally, just the company?
2     A. Yeah.
3     Q. Any other cases jump to your mind that you
4  actually testified in?
5     A. Yeah. There is one way, way back, as a matter of
6  fact, that's not in here. I was in an automobile wreck
7  back in '76, I think it was, and I was in court on it.
8     Q. Were you injured in the accident?
9     A. Yes, I was.
10    Q. Did you make a claim for bodily injury damages?
11    A. I did.
12    Q. Were you represented by an attorney?
13    A. I was.
14    Q. Who was the attorney, if you remember?
15    A. Dave Crossman, I think.
16    Q. Did the case -- I'm sorry.
17    A. I'm pretty sure that's the name.
18    Q. Did the case go to a trial or was it settled
19 short of trial?
20    A. It was in trial.
21    Q. It did go to a trial?
22    A. Uh-huh.
23    Q. The answer is yes? And you testified at the
24 trial, I assume?
25    A. Yes.

Page 118

1     Q. What was the result of the trial?
2     A. I don't remember. It wasn't -- you know, they
3  covered all the expenses.
4     Q. "They" being whom?
5     A. The other insurance company.
6     Q. All your damages were paid for by the insurance
7  company for the person who hit you?
8     A. Uh-huh.
9     Q. I'm sorry. The answer is yes?
10    A. Yes.
11    Q. I'm not trying to be technical.
12    A. I'm trying to remember. It's been 30 years or
13 something.
14    Q. Sure. It goes back a long time. Do you have any
15 recollection of whether you had to make or did make a
16 claim against your own insurance policy for underinsured
17 motorist coverage?
18    A. No, I never.
19    Q. Do you know the name of the insurance company for
20 the person who hit you?
21    A. No.
22    Q. Do you remember how much money was involved at
23 the very end of the day, how much you were paid?
24    A. $3,000 or $4,000, I think.
25    Q. So you have actually testified almost half a

Page 119

1  dozen times or so over the years?
2     A. I would say that was about the only time. The
3  other time all I did was say, "Yes, I own the van."
4     Q. Okay. Just give me a second.
5        MR. ZIPKIN: Let's go off record.
6        VIDEOGRAPHER: Off record 12:14 p.m.
7          (There was a short break.)
8        VIDEOGRAPHER: On record 12:18 p.m.
9     Q. Thank you, R.W., and I appreciate your patience
10 with my questions today. I'm just about done.
11       We asked in these discovery requests -- looks
12 like it's page 11. Can you turn to page 11, and then it
13 goes on to page 12.
14       At the bottom of page 11, we were talking about
15 the witnesses you have identified in this case, all the
16 witnesses, and I read all of those names starting with
17 Bo Ansel. Page 11 here, you said at the last line on
18 the page, the very last line, "The listed individuals
19 will testify concerning the depth of the sorrow, anguish
20 and hurt that Mr. Weilbacher suffered because of the
21 loss of his daughter and how he is a changed man."
22    A. Where are you at now?
23    Q. I'm on 11. I think we're okay. I'm on this last
24 line. It's the last line on 11, which I just read, the
25 last line on 11, the very last line, "The listed

Page 120

1  individuals will testify concerning the depth of the
2  sorrow, anguish and hurt that Mr. Weilbacher suffered
3  because of the loss of his daughter and how he is a
4  changed man since his daughter died. He has known each
5  of these individuals for well over 15 years."
6        Do you see where it says that?
7     A. Yeah.
8     Q. But when we were going through these names, and
9  you were very kind to go through and tell me who was a
10 friend, but when it came to Dr. Stockman, you haven't
11 known her for over 15 years, right?
12    A. No.
13    Q. And she isn't a friend of yours, right? She has
14 actually been treating you, right, or counseling you,
15 however the phrase?
16    A. Or whatever.
17    Q. In other words, when you gave us these initial
18 discovery responses, which we can have marked. I guess
19 we don't have a separate copy. I'll just show you.
20       When you first gave us a list of witnesses, you
21 said they will testify concerning the depth of the
22 sorrow, same things we just read. You have listed
23 numerous friends and business associates who can testify
24 about how the death of his daughter affected him, and
25 you gave us this list.

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT ___B___
Page __30__ of __31__
30 (Pages 117 to 120)

CASENAME>  WITNESS>
DATE>

Page 121

1   When we got to Ann Stockman, I mean, there is
2   nothing that tells us, is there, that she is just not a
3   friend who can testify about the loss? Was there
4   anything about your response that sort of told us she
5   was treating you?
6     A. Yeah.
7     Q. What?
8     A. What do you mean by what? What part didn't you
9   understand?
10    Q. I mean, we have this list of people.
11    A. I got a list of friends here who I have known a
12  very long time, yeah.
13    Q. But instead of saying you have known each of
14  these individuals for well over 15 years, when it comes
15  to Dr. Stockman, you don't know her for over 15 years
16  and you have seen her for treatment, right?
17    A. That's true.
18    Q. So the general statement that every one of them
19  is a friend that you have known for 15 years doesn't
20  quite apply to Dr. Stockman, right? She is in a
21  separate category? Isn't that a fair statement?
22    A. From what is here? I don't know. I don't know
23  what you are trying to say. Did I answer your question
24  yes or no?
25    Q. I think you have.

Page 122

1     A. I haven't known her 15 years. I answered that,
2   didn't I?
3     Q. Yes, you did.
4     A. So what else do you want to know about something
5   I really don't like talking about, Counsel?
6     Q. I wasn't trying to get into what the therapy was
7   about or what the sessions were about. It's a separate
8   point really between me and Mr. Legacki that I was
9   pointing out.
10    A. I was kind of getting that idea.
11    Q. We think it would have been helpful if she had
12  been identified as someone who was treating you as a
13  result of this accident as opposed to someone you have
14  known for 15 years.
15        But that's between me and Mr. Legacki.
16        MR. ZIPKIN: With that, I have no further
17  questions, sir. Any cross? We're done.
18        VIDEOGRAPHER: Off record 12:23 p.m. This
19  is the end of the deposition.
20        (Proceedings concluded at 12:23 p.m.)
21        (Signature reserved.)
22              -oOo-
23
24
25

Page 123

1             CERTIFICATE
2
3     I, SONJA L. REEVES, Registered Professional Reporter
4   and Notary Public in and for the State of Alaska, do
5   hereby certify that the witness in the foregoing
6   proceedings was duly sworn; that the proceedings were
7   then taken before me at the time and place herein set
8   forth; that the testimony and proceedings were reported
9   stenographically by me and later transcribed by computer
10  transcription; that the foregoing is a true record of
11  the testimony and proceedings taken at that time; and
12  that I am not a party to nor have I any interest in the
13  outcome of the action herein contained.
14    IN WITNESS WHEREOF, I have hereunto set my hand and
15  affixed my seal this 23rd day of August 2006.
16
17
18    _____
19    SONJA L. REEVES, RPR
20    My Commission Expires 8/7/07
21
22
23
24
25

Page 124

1           WITNESS CERTIFICATE
2   RE: WEILBACHER V. PROGRESSIVE
    CASE NO. 3:05-cv-204-TMB
3   DEPOSITION OF: RONALD V. WEILBACHER
    DATE TAKEN: AUGUST 21, 2006
4
5   I hereby certify that I have read the foregoing
    deposition and accept it as true and correct, with the
6   following exceptions:
    ================================================
7   Page  Line   Description/Reason for Change
    ================================================
8   ___   ___   _____
9   ___   ___   _____
10  ___   ___   _____
11  ___   ___   _____
12  ___   ___   _____
13  ___   ___   _____
14  ___   ___   _____
15  ___   ___   _____
16  ___   ___   _____
17  ___   ___   _____
18  ___   ___   _____
19  ___   ___   _____
20  ___   ___   _____
21
22  _____
    SIGNATURE       DATE
23
    Please sign your name and date it on the above line. As
24  needed, use additional paper to note corrections, dating
    and signing each page.
25              (SLR)