NOTICE

*Memorandum decisions of this court do not create legal precedent. See Alaska Appellate Rule 214(d). Accordingly, this memorandum decision may not be cited for any proposition of law or as an example of the proper resolution of any issue.*

# THE SUPREME COURT OF THE STATE OF ALASKA

SAMUEL PETER, SR., individually and as father and next friend of SAMUEL PETER, JR.,

Appellants/Cross-Appellees,

v.

THE PROGRESSIVE CORPORATION, PROGRESSIVE NORTHWESTERN INSURANCE COMPANY,

Appellees/Cross-Appellants.

Supreme Court Nos. S-11416/11445

Superior Court No. 3KN-97-964 Civil

MEMORANDUM OPINION AND JUDGMENT*

[No. 1240 - February 22, 2006]

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Harold M. Brown, Judge.

Appearances: Murphy L. Clark, Anchorage, for Appellants/Cross-Appellees. Gary A. Zipkin, Guess & Rudd P.C., Anchorage, for Appellee/Cross-Appellant Progressive Northwestern Insurance Company.

Before: Bryner, Chief Justice, Matthews, Eastaugh, Fabe, and Carpeneti, Justices.

---

* Entered pursuant to Appellate Rule 214.

## I. INTRODUCTION

The main issue in this case os whether an insurer acted in bad faith when it denied a first-party underinsured motorist claim. We agree with the superior court that because the insurer had two reasonable bases for denying the claim, it did not act in bad faith.

## II. FACTS & PROCEEDINGS

Aspects of this case are discussed in two prior opinions of this court: *Peter v. Progressive Corp.*[1] and *Peter v. Schumacher Enterprises, Inc.*[2]

In our second opinion we described the underlying accident as follows:

> On March 27, 1995, Donita Peter dropped off her eight-year-old son Samuel on the street opposite from his school bus stop. As he crossed the street he was struck by a car driven by Cynthia Pack. Samuel was brain-damaged in the accident.[3]

In the same opinion we sketched out the insurance coverage of the actors:

> Pack had liability coverage, but her policy limits were much less than Samuel's expected damages.[4] Samuel's parents, Donita and Samuel, Sr. (Peter), also were insured. They were covered by a policy issued by respondent Progressive Northwestern Insurance Company with limits of

---

1 986 P.2d 865 (Alaska 1999).

2 22 P.3d 481 (Alaska 2001).

3 *Id.* at 483.

4 Pack's liability coverage, with Allstate Insurance Company, was $50,000 per person and $100,000 per accident.



EXHIBIT B
Page 2 of 19

$50,000 per person and $100,000 per accident (50/100) for uninsured and underinsured motorist (UM/UIM) coverage.[5]

We set out below the facts and proceedings following the accident.

On June 24, 1996, Samuel Peter, Sr., (Peter) and Donita Peter, for themselves and as parents and next friends of Samuel, Jr., (Samuel) filed a complaint for negligence against Cynthia Pack. Pack answered and filed a counterclaim against Donita, alleging that Donita's negligence caused the accident. Pack sought equitable apportionment and a judgment against Donita allocating total or partial fault to her. On March 17, 1997, Donita tendered the defense of the counterclaim to Progressive.

There is a dispute as to when the Peters first gave Progressive notice of the accident. Peter claims that Donita first gave notice to Progressive in June of 1995, when she called Last Frontier, the Peters' insurance agent, and Progressive to alert them to the accident and Samuel's injuries. There are no records of these phone calls. Last Frontier's records indicate that it was first notified on August 13, 1996, when Allstate, Pack's insurer, called Last Frontier seeking information concerning the counterclaim. Last Frontier's records also indicate that Donita first contacted Last Frontier concerning the accident by phone on October 16, 1996, and was told to call Progressive at an 800 number. Progressive claims that it has no record of Donita making a call to the 800 number and that the first it heard of the accident was upon receipt of the March 17, 1997 tender of defense.

When Progressive received the March 17, 1997 letter, the Peters' policy had expired and references to the policy had been archived on Progressive's computer

---

5 *Peter*, 22 P.3d at 483.

system.[6] Upon receipt of the letter, Dan Woodruff – Progressive's Anchorage branch manager – conducted a name search of the database for Donita Peter and did not find any reference to a claim, indicating that no claim had been reported on behalf of or against the Peters prior to this letter. Woodruff then called the office of the attorney representing the Peters, Joe Josephson, and left a message inquiring into Donita's policy number. When no one from Josephson's office called him back, Woodruff sent a letter requesting the policy number or any other information that would assist in locating the policy. On March 31, 1997, Woodruff spoke with Josephson, who confirmed receipt of the letter and stated that he was unable to get any additional information regarding the policy at that time but that he would get back to Woodruff as soon as possible.

Woodruff heard nothing more until December 9, 1997, when he received a letter dated December 5, 1997, from Peter's new attorney, Murphy Clark. This letter included a policy number, but it turned out to be incorrect. Clark's letter of December 5 also explained the severity of Samuel's injury, noting that the total medical expenses to date approximated $500,000. Clark stated: "We would be willing to consider a policy limits offer by Progressive upon the representation that the Progressive policy limits are the only limits available to protect Mrs. Peter and our review of a certified copy of the Progressive policy." Clark also stated in his letter of December 5 that trial of the case against Pack was scheduled to begin on January 12, 1998. He noted that Josephson was still representing Donita, and that Clark on behalf of Peter had moved to continue the

---

6 Progressive uses a computer program called Proteus to obtain general policy information. This information can be retrieved via a name search unless the policy has been archived – archived information can only be accessed through policy numbers, not by name. Progressive uses a different computer program to obtain claims information. This information can be retrieved via the insured name or claim number if a claim has been opened.

trial. Clark suggested that Progressive would want to assign an attorney to represent Donita and join in support of Peter's motion for continuance.

After Woodruff received Clark's letter of December 5, 1997, things happened rapidly. Woodruff immediately contacted Progressive's California office and was advised that the policy number supplied by Clark did not match any policy issued by Progressive. Upon learning this, Woodruff wrote back to Clark explaining the problem and asking for the name of the insurance agent with whom the Peters dealt and for a copy of the police report regarding the accident. Clark responded in a letter of December 11, 1997, with the name of the agent, Last Frontier. Clark also enclosed a copy of the police report, noted that the trial was still set for January 12, 1998, and that the motion to continue was still pending, and suggested that Progressive "immediately join in the fray and support the motion to continue the trial date."

On December 12, 1997, Clark wrote Woodruff suggesting that Progressive had wrongfully avoided its duty to defend Donita and again urged it to enter the litigation and provide Donita with an unconditional defense.

When Woodruff learned that Last Frontier was the Peters' insurance agent, he was able to obtain a copy of the declarations page of the Progressive policy. On December 16, 1997, he wrote Clark that a policy number had been found and that he was in the process of establishing whether the policy was in force at the time of loss.

Meanwhile, on December 16, 1997, Clark again wrote to Woodruff, urging Progressive to enter an appearance on behalf of Donita and join in the motion to continue. Clark stated:

> Because Progressive hasn't affirmatively accepted the defense tendered to it by attorney Josephson, in his letter dated March 17, 1997, attorney Josephson is entitled to assume that Progressive has denied coverage. If Progressive wishes to memorialize for the record that the "denial" of

> coverage is incorrect, kindly do so on or before the close of business on December 18, 1997.

The next day, December 17, 1997, Clark wrote again, offering to settle with Progressive for the sum of $3 million. Clark stated that the offer would remain open only until the close of business December 23, 1997. The letter of December 17 is lengthy and accuses Progressive of fraudulent action in refusing to acknowledge the first-party medical payments and underinsured motorist (UIM) coverages protecting Samuel. Although the offer to settle was for $3 million, Clark also stated that Progressive should pay the limits of the UIM coverage plus prejudgment interest, costs, and attorney's fees that are applicable "without prejudice to the right of Samuel to pursue his claim for all damages without regard to the policy limits."

On December 24, 1997, Clark wrote Woodruff offering to settle Samuel's liability claims against Donita for the policy limits of her liability policy plus costs, prejudgment interest, and attorney's fees. The offer specified that claims under the medical payments and UIM coverages would be reserved.

On December 25, 1997, Woodruff wrote Clark concerning the UIM claim. Woodruff stated that UIM benefits would not be available to Samuel. Woodruff based this position on policy language defining "underinsured motor vehicle" as a vehicle for which liability insurance limits are less than UIM limits under the Progressive policy. Woodruff also relied on AS 28.20.445(h)(1) which defined "underinsured motor vehicle" as a motor vehicle for which there is liability insurance that "is less than the limit for uninsured and underinsured motorist coverage under the insured's policy." Since the liability limits in both Pack's and Donita's policies were 50/100, neither vehicle would be underinsured under either the policy or the statutory definition. Woodruff concluded by stating that

> the UIM trigger issue is currently in front of the Alaska Supreme Court. We are anxiously awaiting their ruling in this matter. If that ruling favors your client's position and rules that UIM benefits shall stack without offset, then we of course will be more than willing to reconsider our coverage position here.

On December 30, 1997, Peter, as father and next friend of Samuel, filed a complaint against Progressive, Woodruff, and Last Frontier. The complaint alleges that Progressive wrongfully and in bad faith refused to pay the policy limits of the UIM coverage and the medical payments coverage and that as a result Progressive should be liable for all damages without regard to policy limits. The complaint also alleges bad faith and fraudulent conduct in the handling of the claim, false advertising, racial discrimination, and destruction of evidence, and seeks compensatory and punitive damages.

On January 2, 1998, Clark sent Samuel's medical billing records to Progressive. Upon receiving these, Progressive transmitted a check to Clark for $10,000, representing policy limits under the medical payments coverage.

On January 8, 1998, Progressive assumed the defense of Donita on Pack's counterclaim.

On January 9, 1998, Progressive agreed to pay Samuel policy limits under Donita's liability coverage.[7] Progressive thereby accepted Clark's offer of December 24, 1997, and Donita was released from liability for Samuel's injuries.

On January 21, 1998, Clark offered to settle Samuel's underinsured motorist claim against Progressive for $50,000 plus prejudgment interest, costs, and attorney's

---

[7] The limits as calculated were the face amount of $50,000 plus prejudgment interest of $14,728.77 and attorney's fees of $8,972.88.

fees. Clark set a deadline for the acceptance of this offer of January 28, 1998. The offer proposed that prejudgment interest should be based on a total recovery of $3,500,000.

Progressive answered the complaint on January 23, 1998, denying the allegations of wrongful conduct. On that same date Progressive also wrote Peter in care of Clark reiterating the reasons expressed by Woodruff for denying Peter's UIM claim and expressing additional reasons. One of these was that the "liability of Ms. Peter for Samuel Peter Jr.'s injuries may not arise out of the use of a vehicle." This was a reference to a policy provision quoted in the letter conditioning UIM liability on actions that "arise out of the ownership, maintenance or use of an . . . underinsured motor vehicle." Another expressed reason was that it was unclear whether the motorists (Donita and Pack) were actually liable.

On January 27, 1998, Progressive rejected the offer of January 21, 1998, to settle the UIM claims for the reasons expressed in the January 23, 1998 letter.

Extensive motion practice, discovery, and discovery disputes followed.

On February 20, 1998, this court resolved the so-called UIM trigger issue that Woodruff had referred to in his letter of December 25, 1997. We ruled in *Progressive Insurance Co. v. Simmons* that the definition of "underinsured motor vehicle" in AS 28.20.445(h)(1) had been repealed by implication by 1990 legislation that broadened UIM coverage.[8]

On October 2, 1998, Samuel's case against Pack was dismissed with prejudice by agreement of all parties, without any payment by Pack to Samuel.

On December 22, 1998, Progressive moved for summary judgment "on all of plaintiff's claims alleging insurance 'bad faith' and extra-contractual liability." In this motion Progressive contended that it had a reasonable basis for denying Samuel's UIM

---

8 953 P.2d 510 (Alaska 1998).

claim on a number of grounds. These included the policy definition of "underinsured motor vehicle" and the language of AS 28.20.445(h)(1), whether the accident arose out of the ownership, maintenance or use of an underinsured motor vehicle, and whether either Pack or Donita were negligent. After obtaining an extension of time from the court under Civil Rule 56(f) for additional discovery, Peter filed an opposition to this motion on April 15, 2002. After another round of memoranda, oral argument was held on August 7, 2003.

On August 22, 2003, the superior court granted summary judgment on the issue of bad faith in favor of Progressive. The superior court issued a written opinion. The "DISCUSSION" portion of the opinion stated:

> Summary judgment is appropriate where there are no genuine issues of material fact in the record and the moving party is entitled to judgment as a matter of law.[1] The court draws all reasonable inferences in favor of the non-moving party.[2]
>
> An essential element of the tort of bad faith in a first-party context is that the insurance company [has] no reasonable basis for denying its insured's claim.[3] The court finds that Progressive had two reasonable bases for denying Peter's UIM claim:
>
> First, Progressive's interpretation of AS 28.20.445 provided it a reasonable basis for denying Peter's claim to UIM benefits. At the time of Progressive's denial the text of AS 28.20.445 was ambiguous as to whether UIM coverage should be available when an equal or greater amount of liability coverage was available to the insured from the party at fault in the insured's accident.[4] Under the interpretation favored by Progressive at the time Peter would have been ineligible for UIM benefits. Progressive's position on this issue constituted a good faith argument as to the state of the law. Progressive's interpretation was moreover supported by



EXHIBIT B
Page 9 of 19

one Federal District Court decision.[5] Progressive cannot as a matter of law be liable for bad faith in such circumstances.

The record also indicates that the degree to which the participants in Peter's accident were at fault was unclear to Progressive when it considered Peter's application.[6] There existed at the time of Progressive's denial a genuine dispute as to whether and to what extent Donita Peter or Cynthia Pack were to blame for Peter's injuries. The evidence available to Progressive could have supported the conclusion that Peter had not shown that he was legally entitled to recover against either driver, a showing necessary to support a UIM claim. No reasonable jury could find Progressive's denial unreasonable under these circumstances.

---

[1] *Briggs v. Newton*, 984 P.2d 1113, 1117 (Alaska 1999).

[2] *Id.*

[3] *Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1324 (Alaska 1993).

[4] The issue was not decisively settled until 1998. *See Progressive Ins. Co. v. Simmons*, 953 P.2d 510 (Alaska 1998).

[5] *See Colonial Ins. Co. of California v. Tumbleson*, 873 F. Supp. 310 (D. Alaska 1995) *reconsideration denied* 889 F. Supp. 1136 (D. Alaska 1995).

[6] Plaintiff argues that Progressive has waived this argument because it did not cite it as a basis for denying Peter's claim in its first rejection letter dated December 25, 1997. However, Progressive gave notice of this second ground in a letter dated January 23, 1998. Alaska law does not require an insurer to identify every basis for denial when it first informs its insured that it is denying a claim.

While Progressive's motion for summary judgment on the issue of bad faith was pending, a number of other summary judgment motions were made.

On March 18, 2002, Progressive moved for summary judgment, seeking an order that Samuel is not entitled to UIM benefits because his injuries did not arise out of "ownership, maintenance or use" of his mother's vehicle. Peter opposed this motion and the superior court denied the motion on August 27, 2002. Subsequent to this ruling, on January 3, 2003, Progressive tendered into the court registry $75,681.27 representing the facial limits of Donita's UIM coverage plus prejudgment interest and attorney's fees. The court found that the amount paid by Progressive into the court registry "accurately represents the total amount payable to Samuel Peter Jr. under Progressive's Underinsured Motorist Policy, plus prejudgment interest and attorney's fees."

On July 14, 2003, Progressive moved "to determine the law of the case" with respect to Peter's argument that Progressive was estopped to deny UIM coverage based on its payment of medical payment benefits and bodily injury coverage. This motion was opposed by Peter. The court granted the motion on August 28, 2003, concluding that "[a]s a matter of law, Progressive was not estopped from denying UIM coverage based on its payment of medical payments benefits or its settlement of plaintiffs' bodily injury liability claim against Donita Peter." In relatively short order the court granted summary judgment motions dismissing all the rest of Peter's claims, save one, as reflected in the partial judgment entered pursuant to Civil Rule 54(b) on February 29, 2004. The judgment provides in relevant part:

> This court, having granted Progressive's Motions for Summary Judgment dismissing plaintiffs' claims for breach of contract (1st and 3rd claims for relief), bad faith (2nd, 4th, 5th, 7th and 12th claims for relief), deceptive advertising (6th claim for relief), discrimination (8th claim for relief), estoppel (9th claim for relief), punitive damages (10th and 15th claims for relief), disgorgement (16th claim for relief), the individual claim against Dan Woodruff (14th claim for relief), spoliation (11th claim for relief), and plaintiffs having admitted that the

> only remaining claim is plaintiffs' "failure to offer" claim (13th claim for relief) which was stayed until the Alaska Supreme Court renders a decision in *GEICO v. Graham-Gonzalez*, S-10666/10755/10691 and *Manolakakis v. INSCORP*, S-10876, the court hereby makes the express determination pursuant to Civil Rule 54(b) that there is no just reason for delay and that entry of judgment on behalf of Progressive Northwestern Insurance Company and The Progressive Corporation and against plaintiffs, is hereby expressly directed[.]

The remaining claim referred to in the partial judgment was resolved favorably to Progressive's position by this court in *Government Employees Insurance Co. v. Graham-Gonzalez.*[9] The parties agree that the partial final judgment of February 29, 2004, is now, in effect, a full final judgment.

## III. DISCUSSION

### A. Bad Faith

Although many points are raised on appeal, the main issue is whether the court erred in granting summary judgment in favor of Progressive on the issue of whether Progressive acted in bad faith when it denied Samuel's UIM claim. We agree that Progressive was entitled to summary judgment on this claim for the reasons stated in the superior court's opinion.[10]

Progressive had two reasonable bases for denying the claim. Under the policy and a literal interpretation of the applicable statute, the vehicles involved were not "underinsured motor vehicle[s]." Further, whether either driver was at fault, and if so the

---

9 107 P.3d 279 (Alaska 2005).

10 *See supra* pages 9 & 10.

extent of her fault, had not been determined.[11] Peter makes a number of contentions challenging the court's grant of summary judgment on this claim.

Peter argues that the court erred in relying on the uncertainty as to whether Donita was at fault as a basis for denying his UIM claim. He argues that Progressive's remedy was to demand arbitration, and having failed to do so "Progressive conceded that liability was not disputable." No authority is cited in support of this argument nor is the argument further developed. Under these circumstances we consider the argument to be waived.[12]

Peter also argues that the court should have considered whether Progressive had notice of the accident before receiving the tender of defense on March 17, 1997, and whether Progressive deliberately ignored earlier notices. Relatedly, Peter also contends that the court should have decided that Progressive's use of a computer system that archives cancelled policies and permits retrieval of them only by policy number rather than a name search is evidence of bad faith. Further, Peter argues that Progressive's incentive payment system to its claim employees is evidence of bad faith. We find no error in these respects.

The question in this case, as in *Hillman v. Nationwide Mutual Fire Insurance Co.*,[13] is whether the insurer committed the tort of bad faith by declining to pay a first-party claim asserted by an insured. In this case the claim was first asserted on

---

11 Samuel's suit against Pack was eventually dismissed without payment of funds to Samuel. Donita was never sued, but Samuel's claim against her was settled on January 9, 1998, for policy limits. *See supra* pages 7 & 8.

12 *Adamson v. University of Alaska*, 819 P.2d 886, 887 n.3 (Alaska 1991) (points given only cursory treatment are waived).

13 855 P.2d 1321 (Alaska 1993).

December 17, 1997. Notwithstanding Peter's claim concerning Progressive's alleged claim-avoidance practices, Progressive's response to the claim was prompt and germane. The first requirement for a bad faith tort against a first-party insurer is that "the insurance company's refusal to honor a claim be made without a reasonable basis."[14] That issue was correctly determined by the superior court in Progressive's favor. Here, as in *Hillman*, questions raised as to particular practices of the insurance company "have little or no relevance on that point."[15]

Peter also argues that Progressive knew that Donita was an underinsured motorist. But the reasons Peter advances in support of this argument (rate filings and terminology changes in its policies) at most show that Progressive recognized that despite the language of AS 28.20.445(h)(1), this court might rule that persons in Donita's position were underinsured motorists. This was an open question to which an answer could not have been known until this court actually so ruled on February 28, 1998. Until then, Progressive could reasonable rely on its policy language and on the literal language of the statute.

Peter makes a number of additional arguments that we address in the paragraphs that follow.

**B. Ownership, Maintenance or Use**

Peter argues at some length (including arguments that he was improperly denied discovery on this point) that Progressive cannot use as a defense its argument that the accident did not arise out of the ownership, maintenance or use of Donita's vehicle. But as this case stands, Peter's argument is irrelevant. The superior court found that

---

14 *Id.* at 1324.

15 *Id.* at 1326.

Progressive's decision to deny the UIM claim was reasonable on other grounds, and we have determined that the court's decision was correct.

**C. Disgorgement**

Peter included a claim for "disgorgement" in his complaint. He contends that this claim was improperly dismissed because there was a factual dispute regarding whether Progressive obtained money through improper acts.

Progressive correctly argues that disgorgement is not a cause of action but an equitable remedy which requires a defendant to give up an amount of money equal to the defendant's unjust enrichment.[16] We have held that equitable relief is available only when there is no adequate remedy at law.[17] This court has indicated four types of cases in which damages may be inadequate, justifying equitable relief: "(1) when the thing that plaintiff has been deprived of is unique and irreplaceable, (2) when a legal remedy would require that the plaintiff bring more than one lawsuit, (3) when the defendant is insolvent, and (4) when the amount of damages is highly speculative."[18]

Peter has failed to assert that remedies at law are inadequate in this case. And, as Progressive points out, if the allegations in the complaint were true, Peter would

---

16 *See, e.g., Harris v. Physicians Mut. Ins. Co.*, 240 F. Supp. 2d 715, 723 (N.D. Ohio 2003) ("Disgorgement is an equitable remedy designed to force a defendant to give up the amount equal to the defendant's unjust enrichment."); *see also United States v. Lane Labs-USA, Inc.*, 324 F. Supp. 2d 547, 575-76 (D.N.J. 2004); *Frank Shop, Inc. v. Crown Cent. Petroleum Corp.*, 564 S.E.2d 134, 140 (Va. 2002).

17 *See Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983) ("One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate.").

18 *Id.* This court did not intend for this list to be exclusive, but instead to present examples of circumstances in which damages are inadequate. *See id.* at n.1.

be entitled to monetary damages. Because Peter had an adequate remedy at law, if he was entitled to any remedy, equitable relief is not available.

**D. UIM Coverage Limits**

Peter argues that UIM benefits under the policy have no limits because the policy provides that the limits for UIM benefits are equal to the damages the insured could recover from a liable party. But this argument lacks merit because the declarations page of the policy[19] expressly states that the Peters' UIM limits were $50,000 per person and $100,000 per accident.

Peter contends that Progressive should be liable without limit under the UIM coverage because it denied a policy limits offer to settle made on January 21, 1998. Peter's argument here is that the denial of a limits offer for first-party coverage should be treated like the denial of a limits offer in a liability insurance context. In the latter, an insurer has a duty to its insured to act reasonably when considering an offer to settle within policy limits, and if it fails in this duty it may ultimately be liable without regard to policy limits.[20] The reason for this is that when the liability insurer acts unreasonably in refusing a limits offer, the insurer exposes the insured to personal liability on the underlying claim.[21] The same risk is not inherent in first-party insurance. Thus Peter's analogy breaks down. Further, even in a liability insurance context, fault on the part of

---

19 The insurance policy states that the "[UIM] coverage is noted on the Declarations Page." The Peters' declarations page states that the UIM coverage is $50,000 per person and $100,000 per accident.

20 *Jackson v. American Equity Ins. Co.*, 90 P.3d 136, 142 (Alaska 2004).

21 *Id.*



EXHIBIT B
Page 16 of 19

the insurer is required.[22] Here, the superior court's determination that Progressive reasonably denied the claim would foreclose additional liability even if the analogy to liability insurance were valid.

**E. Discovery Master Appointment and Expenses**

Peter asserts that the superior court erred when it refused to discharge the discovery master and when it ordered all money paid by Progressive under the UIM coverage to go to discovery master expenses.

In *Peter v. Progressive Corp.*, we set forth guidelines for determining when appointment of a discovery master may be appropriate:

> (1) where the issues are unusually complex or specialized; (2) where discovery is particularly document intensive; (3) where resolving discovery disputes will be especially time consuming; (4) where the parties are particularly contentious or obstructionist; or (5) where a master will facilitate a more speedy and economical determination of the case.[23]

Appointment of a discovery master may infringe on the constitutional right of access to the justice system if the cost is so great as to impose an intolerable burden on a losing litigant, effectively denying the litigant's access to the justice system.[24]

Here, the superior court did not abuse its discretion in reappointing the discovery master. The court properly addressed the above factors[25] and evaluated the

---

22 *Id.* at 143 (Excess liability "arise[s] only if an insurer's failure to settle [for policy limits was] unreasonable . . . .").

23 986 P.2d at 870.

24 *Id.* at 873.

25 The order stated, in part:

> While the claims advanced against defendant are not

(continued...)



EXHIBIT B
Page 17 of 19

financial situation of the Peters. The court noted that "the Peters are a family of more than modest means," based on their joint annual gross income of about $85,000. The court also based its decision on the fact that $20,000 from the settlement of the liability claim against Donita was retained by counsel for "funding expenses incurred . . . in furtherance of [Peter's] pending claims."[26]

---

25 (...continued)
unusually complex or specialized the discovery issues are. Plaintiff is aggressively pursuing discovery and Defendant is just as aggressively resisting that discovery for the reasons stated in the pleadings. While the court would not label either counsel as "particularly contentious or obstructionist" it is true that neither party is willing to give an inch. The court cannot specifically state with any precision the number and nature of discovery disputes except by reference to those noted in Supreme Court's Opinion, as the entire record remains before that court on an unrelated issue. But, the pleadings related to discovery most especially Plaintiff's, are voluminous to the extreme. Resolution of the on-going and continual discovery disputes by this court is enormously time-consuming. Speedier and more economical determination of the issues would occur if a master were appointed.

(Footnote omitted.)

26 Peter also argues that Progressive's policy requires Progressive to pay all expenses that it requests be incurred by Peter and because Progressive requested the appointment of a discovery master, Progressive should have to pay for the discovery master. Peter mistakenly relies on the additional payments section of the policy, which states: "When we defend an insured person, we will pay, in addition to our Limit of Liability: . . . 6. Reasonable expenses, incurred at our request, including up to $50 per day for loss of wages or salary, if we ask the insured person to attend hearings or trial . . . ." This clause does not apply to the present case because Progressive is not defending an insured person, and the expenses at issue – discovery master expenses – are not a result of Progressive requesting the Peters to attend a hearing or trial.

## IV. CONCLUSION

For the reasons stated, we AFFIRM the judgment of the superior court. The remainder of Peter's arguments are moot and are addressed in the margin.[27]

---

[27] Peter argues that, as a matter of judicial economy, this court should address the issue of why all claims against The Progressive Corporation (TPC) were dropped. Peter argues that because Progressive Northwestern has no assets beyond statutory surplus requirements, TPC's presence is necessary if bad faith, punitive damages, and disgorgement are going to be assessed and recovered. Because these claims have been dismissed and no damages were awarded there is no need to address this issue. *E.g., Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1195 (Alaska 1995) ("Under certain circumstances, we will refrain from deciding questions where events have rendered the legal issue moot.").

Peter also argues that Progressive cannot use comparative fault as a defense to reduce the amount of damages Progressive owes because the duty owed by an insured is solely a contractual duty, and fault – a tort concept – cannot be attributed to the insured. We do not reach this issue due to mootness. *See Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1168 (Alaska 2002) (explaining that an issue is moot if the party raising the issue on appeal cannot be given or has already obtained the relief it is seeking).



EXHIBIT B
Page 19 of 19