IN ARBITRATION

PETER MAURO and CATHERINE MAURO,

    Claimants,

vs.

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

    Respondent.



DEPOSITION OF MARK NORTHCUTT

Pages 1 - 133, inclusive

Commencing at 10:10 a.m.

Wednesday, May 17, 2006

Anchorage, Alaska

Page 1

### Page 14

1  our contract is pretty consistent throughout the
2  different regions. It does not vary that much.
3    Q. And do the courts interpret the contract the
4  same way in the other states as they do in Alaska?
5    A. I can't speak for the courts.
6    Q. Or the cases, I guess, in how they interpret
7  different terms in the policy?
8    A. Again, it just -- it depends on the
9  jurisdiction and whose sitting on the court that time.
10 I can't really speak for them.
11   Q. But you as an adjuster, I mean, how do you try
12 to find out how courts interpret certain policy
13 language or clauses in your contracts?
14   A. We rely on our attorneys in those particular
15 states that we use and ask them for their opinions.
16   Q. And in this particular case that was
17 Mr. Regan?
18   A. Correct.
19   Q. Okay. Now, I have here a copy of the policy
20 that you sent to me. Let's mark this 1 please.
21      (Exhibit 1 was marked.)
22   Q. And this is the insurance contract that you
23 have with Ms. Mauro; is that correct?
24   A. I believe it is with her husband and she. It
25 appears to be the one that I sent.

### Page 15

1    Q. Could you tell me there where it says that she
2  can't collect for the death of her daughter as a
3  direct claim, independent claim? Is there any
4  language in there that would tell me that she cannot?
5    A. I don't believe that there is any language to
6  that degree, that I'm aware of.
7       And, again, you're asking for a coverage
8  interpretation, and I usually receive or request those
9  from our attorneys.
10   Q. So you declined to compensate Ms. Mauro for
11 the death of her daughter; is that correct? It was
12 your decision?
13   A. It was our decision at this particular point
14 that we didn't have sufficient information to provide
15 compensation at this time.
16   Q. What do you mean "at this time"?
17   A. Well, as we've gone along in the process,
18 we've been trying to, you know, obtain discovery
19 concerning the claim. And the information that we've
20 gotten to date, we've reviewed that with counsel and
21 with the laws that changed that you provided me. And
22 based on our review at this point, that we haven't
23 received that information that we need in order to
24 move forward on a claim.
25   Q. So you've declined the claim; is that correct?

### Page 16

1    A. I think that was -- our letter that came to
2  you back in August.
3    Q. Yeah. But you've now made the decision --
4  you've declined that she's entitled to any
5  compensation?
6    A. I think it's a matter of damages at this
7  particular point in time.
8    Q. What do you mean by that?
9    A. Is that -- what damages that she's entitled to
10 based on the claim that she's making.
11   Q. So you're saying that she's entitled to file a
12 claim, but you don't think she's been damaged or has
13 not suffered any injury because of the claim?
14   A. I think the claim that she's making, there's
15 certain requirements, as I understand it in
16 discussions with my attorney, that need to be
17 satisfied. And that -- I don't believe that those
18 have been satisfied yet.
19   Q. Could you explain that to me, please? What do
20 you think -- what needs to be satisfied? What has not
21 been satisfied?
22   A. I believe you have some of my correspondence
23 that I sent to you. I think that outlines my position
24 that we were looking for medical information -- was
25 one of the things we were look for -- as far as

### Page 17

1  supporting any of the medical claims that are being
2  made.
3    Q. I guess I'm confused. What kind of -- tell me
4  what you need to have to make a determination as to
5  whether or not she's entitled to compensation? What
6  is it that she's supposed to have suffered in order to
7  receive compensation?
8    A. Okay. Again, looking for a doctor's diagnosis
9  that indicates that she suffered a bodily injury or
10 personal injury as a result of this particular claim
11 that she's making.
12   Q. Is that all you need, is somebody to say that,
13 yes, she suffered some kind of -- what do you mean by
14 bodily injury or some kind of physical injury? What
15 do you mean by that?
16   A. It means that she's got some sort of physical
17 injury or bodily condition that's physical in nature.
18   Q. I mean, does she -- what do you mean by
19 physical? I guess that's the thing we've got to grasp
20 here. Do you mean that she was supposed to be in the
21 car and got hit herself or what?
22   A. No. From -- based on the resultant effect of
23 this particular loss that there would be some physical
24 injury that would have evolved.
25   Q. Like upset stomach, ulcer or something like

### Page 98

1  THE WITNESS: Again, assuming that she meets
2  certain standards of proof.
3  BY MR. LEGACKI:
4  Q. What is the proof for loss of society, loss of
5  consortium, do you know?
6  A. It's a matter of opinion based on testimony
7  provided by the parties affected and evaluated by
8  arbiters or jury.
9  Q. Well, I guess we want to go to the case law
10 for that, don't we. Let's look at the case law.
11        (Exhibit 11 was marked.)
12 BY MR. LEGACKI:
13 Q. I want to hand you this case. It's State Farm
14 Auto Insurance Company v. Dowdy, a 2005 Alaska case.
15 And I'd like you to refer to page 343.
16        And the first part on that top of the page
17 -- beginning of the page there talks about what you
18 need to prove NIED, correct?
19        "(1), the defendant negligently caused
20 injury to a close relative, (2) the plaintiffs
21 experienced shock at the sudden sensory observation of
22 the relative's injuries more or less contemporaneously
23 with learning of the nature of the victim's injury,
24 and (3) the harm suffered was severe, but need not
25 have resulted in physical illness or injury." Okay?

### Page 99

1        And, then, the court goes, "To prevail on
2  their parental loss of society claim, the Dowdys," or
3  the plaintiff, "must show that the defendant
4  negligently caused the injury or death of their child
5  and that they suffered mental distress as a result."
6  A. Okay. Would you restate your question again?
7        MR. LEGACKI: Can I have the question read
8  back, please?
9        Oh, nevermind. I'll just ask the --
10 BY MR. LEGACKI:
11 Q. From looking at this language -- I just read
12 to you the language, what the Alaska Supreme Court
13 said for what a parent needs -- what a claimant needs
14 to prove to collect under loss of society.
15       It states, "To prevail on their parental
16 loss of society claim, the Dowdys," i.e. the parents,
17 "must show that the defendant negligently caused the
18 injury or death of their child and that they suffered
19 mental distress as a result."
20       Do you see that, sir?
21       MR. REGAN: Where is that?
22       THE WITNESS: No, I don't see that.
23       MR. REGAN: I don't see that. Can you refer
24 us to where that begins?
25       MR. LEGACKI: Page 343.

### Page 100

1        THE WITNESS: Does it start over on 242 [sic]
2  and carries over? Because it's right in the
3  midsts of that paragraph.
4  BY MR. LEGACKI:
5  Q. Right.
6  A. Where it starts out "Dowdys' NIED an loss of
7  society claims are not inter-" -- I can't even
8  pronounce that word -- "intertwined with the policy
9  coverage issues."
10 Q. Right.
11 A. And it says, "To prevail before the arbitrator
12 that" --
13 Q. Right.
14 A. Okay.
15 Q. What the parent must show in order to collect,
16 right? To win?
17       MR. REGAN: Again, Ken, is this under -- we
18 need to keep the questioning, I think, focused
19 on the context of the insurance -- the
20 applicable insurance policy.
21       I mean, these -- this makes a reference
22 in the footnote, then, to the Gillispie
23 decision. Well, that's fine. But insurance
24 policies differ. Terms are defined differently
25 in insurance policies.

### Page 101

1        I mean, I think you can't blend the
2  contract and tort together and have some rule
3  established that applies to every single
4  insurance policy.
5  BY MR. LEGACKI:
6  Q. Sir, this case, what does it say that a parent
7  has to prove to succeed for loss of society claim?
8  A. Okay. Exactly what is says is, "The Dowdys'
9  NIED and loss of society claims are not inextricably
10 intertwined with the policy coverage issues. To
11 prevail before the arbitrator on their NIED sensory
12 observation claims, the Dowdys must show that (1) the
13 defendant negligently caused injury to a close
14 relative, (2) the plaintiffs experienced shock at the
15 sudden sensory observation of the relative's injuries
16 more or less contemporaneously with learning of the
17 nature of the victim's injury, and (3) the harm
18 suffered was severe, but need not have resulted in
19 physical injury" -- or excuse me, "illness or injury."
20       "To prevail on their parental loss of
21 society claim, the Dowdys must show that the defendant
22 negligently caused the injury or death of their child
23 and that they suffered mental distress as a result.
24 The coverage issues raised by both the NIED and loss
25 of society claims center on whether they Dowdys

## Page 102

1  suffered 'bodily injury' and whether they were injured
2  'in the same accident' as their daughter under the
3  terms of the policy."
4       Okay. Does that pretty much include that
5  section that you're referring to?
6       Q. **What do they have to prove to prevail under**
7  **parental loss of society claim?**
8       A. And I think I just read that. So it's,
9  basically, what they're concluding in this particular
10 decision.
11      Q. **And they cite the Gillispie case, right? They**
12 **just have to prove that the death of their child was**
13 **negligently caused by the tortfeasor, correct?**
14      MR. REGAN: Objection, form.
15      THE WITNESS: I think there are other issues.
16 Because there's three issues that are raised.
17 BY MR. LEGACKI:
18      Q. **I'm just talking about --**
19      A. It's just not -- it's more than just
20 negligence, according to the way I read it.
21      Q. **How -- what do you mean by that?**
22      A. It says here -- it says, "The Dowdys must show
23 that the defendant negligently caused the injury or
24 death of their child and that they suffered mental
25 distress as a result." So there's more conditions.

## Page 103

1       Q. **But we all know what Gillispie says, right?**
2  **Gillispie says, "Without question, the death of one's**
3  **own child is the greatest loss a parent may suffer."**
4       A. Uh-huh.
5       Q. **Do you agree that?**
6       MR. REGAN: Objection, form.
7       THE WITNESS: I would agree with the concept,
8  yes.
9  BY MR. LEGACKI:
10      Q. **Okay. And the parent suffers -- well, it goes**
11 **on. "It is far more than pecuniary; whatever monetary**
12 **disadvantage a child's death may present to its**
13 **parents pales in comparison to the immense mental**
14 **anguish, grief and sense of loss that this event would**
15 **inevitably cause." Correct? Do you agree that**
16 **statement?**
17      A. Conceptually, yes.
18      Q. **Right. So would you agree with me, then, that**
19 **-- do you disagree that Ms. Mauro suffered mental**
20 **distress at the death of her daughter?**
21      MR. REGAN: Objection, form.
22      THE WITNESS: I think that's, again, a
23 question that can be handled by the arbitration
24 to determine if that's their conclusion or
25 finding.

## Page 104

1  BY MR. LEGACKI:
2       Q. **Are you trying to tell me that a parent like**
3  **Ms. Mauro did not suffer mental distress when she --**
4  **her daughter died?**
5       A. No. I don't think that's what I'm saying.
6  Because I'm saying, conceptually, every parent would
7  feel a loss.
8       Q. **In fact, that's what the court says, right?**
9  **There's no greater loss than the loss of a child.**
10      A. And I would, conceptually, agree.
11      Q. **All right. And so all she has to prove under**
12 **her claim to prevail under loss of society is that**
13 **Mr. Esper was negligent when he caused the death of**
14 **her daughter, correct?**
15      MR. REGAN: Objection, form.
16      THE WITNESS: As far as Mr. Espy's [sic]
17 claim is concerned, that she would have to
18 present that as a cause of action. And that her
19 subsequent claim to us would be a similar cause
20 of action that falls within the coverage that we
21 would provide.
22 BY MR. LEGACKI:
23      Q. **Well, aren't the -- isn't the uninsured**
24 **motorist coverage supposed to cover any claim that can**
25 **be made against a tortfeasor, that the tortfeasor did**

## Page 105

1  not have enough money to compensate for?
2       A. A claim that is derived from that first or
3  initial injury, yes.
4       Q. **So if Mr. Esper is responsible for the loss of**
5  **society to Ms. Mauro and he does not have enough money**
6  **to compensate Ms. Mauro for that death, isn't Liberty**
7  **Mutual, under its uninsured policy, responsible to**
8  **make up that difference?**
9       MR. REGAN: Objection, form.
10      THE WITNESS: Again, we step into the role of
11 Mr. Esper and address that lack of coverage on
12 his part. And providing the derivative claim
13 that she had made --
14 BY MR. LEGACKI:
15      Q. **Derivative or direct, sir?**
16      A. Derivative.
17      Q. **Isn't this a direct claim? Doesn't the case**
18 **law say this is a direct claim?**
19      A. And, again -- today it is a direct claim.
20      Q. **What do you mean "today"?**
21      A. Based on the Teel decision, as I understand
22 it, and the claim that we're here today about -- that
23 back when this was being looked at, it was a claim
24 that derived from that initial injury that she
25 suffered through the loss of her daughter.