Danny Withers                                    Deposition                                    July 12, 2006

Page 25

1  Q  And then he says -- and then you wrote down
2  "he says," meaning Mr. Weilbacher's attorney, "his
3  client has claim for loss of society and loss of
4  consortium. I told him these are derivative of the --
5  what does "the W.D." mean?
6  A  Wrongful death.
7  Q  "Wrongful death limit and there can be no
8  direct claim." Do you see that?
9  A  Correct.
10 Q  So you wrote down "no direct claim." What
11 did you mean by "no direct claim"?
12 A  Well, in that case, I meant that there would
13 not -- that there would be no direct -- there would
14 not be a separate bodily injury available -- bodily
15 injury limit available for these particular claims.
16 That's what I meant by that.
17 Q  And you have there "NIED." What is that,
18 negligent infliction of emotional distress?
19 A  That's correct.
20 Q  How do you define that?
21    MR. ZIPKIN: Calls for a legal conclusion.
22    THE WITNESS: How do I define it?
23    MR. LEGACKI: Yes.
24    THE WITNESS: I don't know how I define it.
25 Q  (By Mr. Legacki) What's the difference

Page 26

1  between NIED and loss of society?
2  A  Well, NIED, as we recognize in Alaska, the
3  way I understand Alaska law, could be subject to a
4  separate policy limit.
5  Q  What's the difference between somebody who's
6  suffering negligence and emotional distress and
7  somebody suffering from loss of society? Can you
8  explain the difference to me?
9     MR. ZIPKIN: Calls for a legal conclusion.
10    THE WITNESS: Well, negligent infliction of
11 emotional distress is more of a bystander-type claim,
12 somebody that sees something happen or maybe they're
13 -- they go directly to the accident scene after the
14 accident and I'm defining it the way I understand
15 Alaska law.
16 Q  (By Mr. Legacki) I'm not talking about
17 Alaska law. What's the common -- what do you think
18 of a person -- what is the difference between NIED,
19 a parent suffering emotional distress versus a
20 parent suffering loss of society?
21    Describe to me the feeling, emotions or --
22 what distinguishes the two?
23    MR. ZIPKIN: Object to form. Compound.
24 Calls for a legal conclusion.
25    THE WITNESS: The manifestation of injury.

Page 27

1  Q  (By Mr. Legacki) What does that mean?
2  A  It would be for probably NIED, negligence
3  inflicts emotional distress.
4  Q  I'm sorry, I don't understand. What do you
5  mean by manifestation of injury?
6  A  That you've got some kind of an injury and
7  because of it, be it mental or emotional, you've got
8  an injury.
9  Q  Are you saying that a person who has a loss
10 of society doesn't have the same injury?
11 A  I don't know.
12 Q  How about loss of consortium?
13    MR. ZIPKIN: Object to form.
14    THE WITNESS: A physical injury, I don't
15 think it's a physical injury, no.
16 Q  (By Mr. Legacki) So you're just saying if
17 a person has a loss of society they're not suffering
18 from any physical injury?
19 A  I'm not saying that. I said I don't think
20 they have a physical injury.
21 Q  What if a person did have a physical injury
22 from the death of a daughter?
23    MR. ZIPKIN: Object to the form, incomplete
24 question.
25    THE WITNESS: I don't know.

Page 28

1  Q  (By Mr. Legacki) So when you look at it,
2  the difference between NIED and the loss of society,
3  you look at it from a legal context, not from a
4  personal context as to what the difference is
5  between the two?
6  A  Yes.
7     MR. ZIPKIN: Mischaracterizes.
8  Q  Now?
9  Q  (By Mr. Legacki) Now further going into
10 your note here, Exhibit Number 5, was "he" -- I
11 guess this means the attorney -- "thinks Teel v.
12 Progressive gives authority for direct claim for
13 loss of consortium."
14    Did you ever analyze that statement? Did you
15 try to figure out whether or not the attorney was
16 correct in there?
17 A  Yes, I did, I conferred with someone to get
18 some other opinion on that.
19 Q  Who did you confer with?
20 A  Dan Quinn.
21 Q  Anyone else?
22 A  No.
23 Q  Dan Quinn of Richmond & Quinn?
24 A  That's correct.
25 Q  And he gave you an opinion?

Danny Withers                     Deposition                     July 12, 2006

**Page 57**

1  Q  Did you talk to counsel?
2  A  Yes, I did yesterday.
3  Q  And what was discussed?
4     MR. ZIPKIN: Well, that's attorney-client. I
5  instruct him not to answer, conversations between
6  counsel and the witness.
7     MR. LEGACKI: That's fine. So you're
8  asserting attorney-client privilege for him?
9     MR. ZIPKIN: Yes.
10    MR. LEGACKI: Okay.
11    MR. ZIPKIN: If I may just say, although we
12 did have a break for reading purposes, the witness has
13 not had a break and it's been an hour and a half. If
14 you would like a break or if the court reporter would
15 like a break --
16    MR. LEGACKI: I apologize, so he can take a
17 break.
18    MR. ZIPKIN: -- and let them have five
19 minutes.
20    (A brief break taken.)
21    MR. ZIPKIN: I just want the record to
22 reflect that I have handed Mr. Legacki unredacted
23 copies of face sheet notes pertaining to the witness's
24 phone conversation with Dan Quinn. Progressive has
25 decided we are, in fact, going to waive any

**Page 58**

1  attorney-client privilege with respect to that conversation
2  which has already been discussed in general, but I did
3  instruct the witness during those questions not to answer
4  and we have decided to waive that privilege and so I have
5  given Mr. Legacki unredacted copies of Bates 100333 and
6  100334. I have added the designation capital "A" after
7  both of those numbers just so it's clear to everybody how
8  to distinguish the redacted from the unredacted. If you
9  wish to inquire about the areas I told him not to answer,
10 you are free to do so.
11    Q  (By Mr. Legacki) Tell me about your
12 conversations with Mr. Quinn, how they came about
13 and how many conversations were there?
14    A  What part do you want to know?
15    Q  Everything.
16    A  Well, I don't know if I can recall
17 everything. I remember calling him about -- when you
18 brought up the Teel case and Dan told me that that was
19 more about a contract of an insured person and really
20 it wasn't all on point as far as the issue about loss
21 of society or loss of consortium being derivative or
22 non-derivative.
23    Q  Did he put anything in writing?
24    A  No, I don't think -- no, he didn't. I don't
25 believe so.

**Page 59**

1  Q  Did you put anything in writing to him?
2  A  No, I don't believe so. It was all verbal,
3  telephone conversations.
4  Q  So you called him and asked him -- tell me
5  about that. How did that start?
6  A  If I recall, when you brought up the Teel
7  case, I just called him and asked him about the Teel
8  case and if this changed anything as far as the policy
9  contract and how we address loss of consortium and
10 loss of society claims as derivative or
11 non-derivative and from what I recall he said no. It has
12 nothing to do with that.
13    Q  Did you ask him whether or not Gillespie
14 versus Brta Construction allows for an independent
15 direct cause of action for the parent?
16    MR. ZIPKIN: Object to form when you confuse
17 independent with direct. But go ahead.
18    THE WITNESS: I don't recall. It's been a
19 while ago.
20    Q  (By Mr. Legacki) Did you ask him whether
21 or nor AS 09.15.010 allows for an independent claim
22 for the parent?
23    A  You know, I don't recall specifically if I
24 did. But if that came up, I think he mentioned that
25 it was an independent claim but is still subject to

**Page 60**

1  the contract as to derivative or non-derivative and in
2  this case it's a derivative claim.
3     Q  Well, you agree with me then, if the contract
4  does not conform to the statute that the contract --
5  the statute prevails over the contract?
6        MR. ZIPKIN: Object to form. He hasn't said
7  that.
8     Q  (By Mr. Legacki) Well, let me ask, would
9  you agree with me that if there is a conflict
10 between the contract and the statute, the statute
11 prevails?
12    A  If there is a conflict, but there's not a
13 conflict here I don't believe.
14    Q  You don't believe. But did you ask Dan
15 whether or not there's a conflict between the statute,
16 an independent claim for a parent versus what you
17 consider to be derivative?
18    A  You know, I don't recall.
19    Q  Let's go back to Exhibit No. 1, please.
20       Do you see that, sir?
21    A  I see it.
22    Q  This language here: "We will pay damages
23 other than punitive or exemplary damages which the
24 insured person is legally entitled to recover from the
25 owner or operator of an uninsured/underinsured motor

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT  B
Page  2  of  2

15 (Pages 57 to 60)