Kenneth W. Legacki, Esq.
Alaska Bar No. 8310132
425 G Street, Suite 920
Anchorage, AK 99501
Telephone: (907) 258-2422
Facsimile: (907) 278-4848
E-mail: legacki@gci.net

Attorney for Plaintiff
Ronald V. Weilbacher

**RECEIVED**

MAR 30 2007

**GUESS & RUDD**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| RONALD V. WEILBACHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| PROGRESSIVE NORTHWESTERN | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) Case No. 3:05-cv-0204-TMB |
| _____ | ) |

### PLAINTIFF'S EXPERT WITNESS DISCLOSURES

Plaintiff Ronald V. Weilbacher, by and through counsel, pursuant to this

Court's Order Granting Motion for Discovery Schedule [Docket No. 112] and Federal

Rule of Civil Procedure 26, hereby gives notice that he may call the following

individual to testify as an expert witness at the time of trial.

Stanley C. Garlington
Insurance and Insurance Regulation Expert
3705 Arctic Blvd., #2805
Anchorage, AK  99503
Telephone:  (907) 344-5867

Stanley Garlington's expert report is attached hereto.  Mr. Garlington's fee schedule

will be produced when it is received.

DATED this 28th day of March, 2007, at Anchorage, Alaska.

KENNETH W. LEGACKI, P.C.
Attorney for Plaintiff

By _____
Kenneth W. Legacki
Alaska Bar No. 8310132
425 G Street, Suite 920
Anchorage, AK  99501
Phone: (907) 258-2422
Fax: (907) 278-4848
E-mail: legacki@gci.net

I HEREBY CERTIFY that on the 28th day of
March, 2007, a copy of the foregoing
document was mailed to the offices of:

Aisha Tinker Bray
Guess & Rudd
100 Cushman Street, Suite 500
Fairbanks, AK   99701

and that on the 29th day of March, 2007,
a copy of the foregoing document was
hand delivered to the offices of:

Gary Zipkin
Guess & Rudd
510 L Street, Suite 700
Anchorage, AK  99501

_____

Kenneth W. Legacki, P.C.
425 G Street, Suite 920
Anchorage, AK  99501
Telephone: (907) 258-2422
Facsimile: (907) 278-4848

PLAINTIFF'S EXPERT WITNESS DISCLOSURES
Weilbacher v. Progressive - Case No. 3:05-cv-0204-TMB
Page 2 of 2

**DISCLOSURE OF EXPERT WITNESS TESTIMONY OF**

**STANLEY C. GARLINGTON**

**UNDER ALASKA RULES OF CIVIL PROCEDURE, RULE 26 (a) (2) (A) & (B)**

I.

Attorney Kenneth W. Legacki requested that I review materials in the case of Ronald V. Weilbacher v. Progressive Northwestern Ins. Co., Case No. 3:05-CV-0204-TMB. I have been requested to review Part III Uninsured/Underinsured Motorist Coverage of the Weilbacher Progressive policy and Progressive's claims handling of the Weilbacher claims. I have agreed to do so and provide my observations, impressions, and opinions.

II.

Attachment 1 outlines the materials received by me for review.

III.

Experience

I adjusted and supervised adjusting for national insurance companies for 18 years, 12 years in California and 6 years in Alaska.

I was an insurance regulator for the Alaska Division of Insurance for 11 years.

I have been a consultant and an expert witness in insurance and insurance regulatory cases since August 1999. I have also performed audits for an insurer and served as a contract insurance market conduct examiner.

## GENERAL QUALIFICATIONS

I grew up in California and attended the University of California, Santa Barbara, receiving a Bachelor of Arts Degree, Political Science and History, December 20, 1969. In 1965 and 1966, I also took several courses during the summer at the College of San Mateo.

I was employed for almost nine years by Liberty Mutual Insurance Group (5/70 – 1/79). After an initial six-week training program, I spent two years as a field adjuster in a liability unit handling commercial and personal lines claims and one year as a field adjuster in a workers compensation claim unit. I was promoted to a resident adjuster on 24-hour call working out of my home. My initial supervisory experience was in a first-party property claims and subrogation unit. After one year, I transferred to a multiline unit where for 4 years I was responsible for 3 field and 2 inside adjusters. I had my own claims and was responsible for my unit's claim handling from initial investigation and coverage determination through final disposition, including trials, adjudications, and appeals.

I was employed for almost 2 years by Allianz Insurance Company as a home office examiner (1/79 – 11/80). I developed a multiline claim unit in the home office handling claims nationwide for European multinational corporations' U.S. branches, technical claims such as contractor's equipment, course of construction, boiler and machinery, and bonds. I was responsible for 1 supervisor, 2 inside examiners, and 2 clerical staff. I developed processing and procedure manuals for reporting premium and loss data for a new rating organization statistical plan. I served on interdepartmental task forces with underwriting, accounting, and data processing staff involved in internal operations.

I was employed by Providence Washington Insurance Group for almost 6 years as a multiline supervisor and regional claim manager (11/80 – 9/86). As regional claim manager, I was responsible for as many as four supervisors, 9 field and inside adjusters, and 8 clerical staff. Administrative responsibilities included budget preparation, staff (recruitment, hiring, training, promotion, termination), and quality and quantity of work (reserve adequacy, investigations, dispositions, file documentation, reports, litigation management, cost containment).

I was employed by Chubb Insurance Group for almost 1½ years as a suit examiner (12/86 – 4/88). I handled complex litigation cases such as "Cumis" situations, construction defect cases, wrongful termination cases, and contractual liability disputes. My primary responsibilities were coverage analysis, litigation management, reserve adequacy, and negotiations.

I was employed by the Alaska Division of Insurance for 11 years (5/88 – 5/99). I conducted and supervised as examiner-in-charge market conduct examinations of insurance companies and

other licensees (insurance producers, independent adjusters, surplus lines brokers, and managing

general agents) and prepared written reports documenting compliance with Alaska laws and

regulations and good business practices (See attachment A).  Examinations of insurers routinely

focused on claim handling practices and compliance with Alaska's laws and regulations.  As lead

or team member, I drafted legislation and regulations, conducted regulatory hearings, testified at

legislative hearings, prepared bill analysis reports and enrolled bill recommendations (See

attachments B & C).  I reviewed and approved, questioned, or disapproved insurer form, rate,

and rule filings.  I participated in the initial accreditation of the division by the National

Association   I represented the State of Alaska at national meetings of the National Association

of Insurance Commissioners and served on committees, task forces, and working groups to

develop model laws and regulations and help resolve national or regional insurance problems.


While with the State of Alaska, I attended numerous training classes such as the Regulations

Training Class put on by the Alaska Department of Law in 1996.


I attended numerous education programs and seminars through the National Association of

Insurance Commissioners, including the Commissioners Education Program in 1989, the

Securities Law Seminar in 1992, the Unauthorized Insurers Seminar in 1993, and the Market

Conduct Examiners Handbook Training Program in 1997.


I participated in several CPCU Regulatory Roundtables sponsored by the Chartered Property

Casualty Underwriters Society.  I was a presenter at the 1997 surplus lines education program

sponsored by the National Association of Professional Surplus Lines Offices and the National Association of Insurance Commissioners.

SPECIFIC EXPERIENCE

Very late in the 1990 Legislative Session, the Director of the Alaska Division of Insurance advised me that a compromise on HB 429 had been reached between the chief sponsor, Representative Dave Donley, and the insurance industry, represented by the lobbyist for Allstate and State Farm, attorney John Frank. The Director instructed me to quickly draft revised language for HB429 that incorporated the elements of the compromise.

My review of the division's legislative file and the explanation by the director indicated that the bill's sponsors were concerned that under existing Uninsured and Underinsured Motorist law, a badly injured insured would receive no benefit of Uninsured and Underinsured Motorist coverage if an automobile policy had a high Medical Payments limit because payments under the Medical Payments coverage reduced the coverage available under the Uninsured and Underinsured Motorist coverage. For example, some insureds with $100,000 Medical Payments limits and $100,000 Uninsured and Underinsured Motorist limits would receive no payments under the Uninsured and Underinsured Motorist coverage when medical bills of $100,000 were paid under the Medical Payments coverage, even though separate premiums had been charged and collected by insurers for each coverage. In addition, the bill's sponsors were concerned that because the option to offer liability limits in excess of the statutory minimum limits was at the discretion of the insurer, under current law consumers who were safe drivers were denied the choice to purchase higher limits of Underinsured and Uninsured Motorist coverage to protect



themselves from reckless drivers who were either uninsured or who had purchased only the minimum limits of $50,000/$100,000.

To remedy these problems, I was instructed to draft legislative language that would allow a badly injured insured to recover the full amount of his or her actual bodily injury damages yet avoid duplicate payments under different coverages (a medical bill would be paid once under one of the available coverages but not twice under two coverages, and the payment under one coverage would not reduce the coverage limits under another coverage). The remedy was to make Uninsured and Underinsured Motorist coverage excess over all other payments made by or on behalf of the uninsured or underinsured motorist, excess over other coverages in the same policy, and to stack Uninsured and Underinsured Motorist coverages of separate policies. In addition, I was instructed to draft legislative language that would require offers of Uninsured and Underinsured Motorist limits higher than an insured's liability limits, at specified levels up to a maximum of $1,000,000/$2,000,000.

I submitted draft language to the Director. During the subsequent legislative process, consultations between the division and the bill's sponsors and industry resulted in clarifying revisions. For example, as requested by John Frank in his May 3, 1990 letter to the Director, language was revised to provide a January 1, 1991 effective date and to treat insurers that issue separate insurance policies to the same named insured for each motor vehicle in the same manner as insurers who issue a single insurance policy to a named insured that covers more than one motor vehicle.

In 1995 or 1996 I became aware of the Colonial Ins. Co. of California v. Tumbleson case and supported the decision of the Division of Insurance to file an amicus brief in the appeal of the trial court decision. Although the issue of the definition of "underinsured motor vehicle" was ultimately favorably resolved by the Alaska Supreme Court in <u>Progressive Insurance Co. v. Simmons</u> in early 1998, the Division of Insurance requested that the Alaska legislature remove any doubt about its original 1991 intention by clarifying the statutory definition of "underinsured motor vehicle." The Alaska legislature did so in SB104 effective July 1, 1997.

## OPINIONS

## V.

Has Progressive disclosed and produced its records documenting Progressive's development of Part III Uninsured/Underinsured Motorist Coverage policy language?

It is my opinion that Progressive has not produced its records documenting its development of the policy language contained in its Form No. 9607 AK (08/99).

The December 15, 2006 affidavit of Michael A. Sablack, Assistant General Counsel in the Corporate Law Department for The Progressive Group of Insurance Companies, states that the 9607 model was finalized April 28, 1997. Sablack affirms that "Other than the model 9607 policy itself, Progressive has no documents, in either hard copy or electronic versions, related to

the development of this provision in the 9607 model policy.  We have no documents, in either

hard  copy or electronic versions, regarding the intent of this provision of the 9607 model policy."


Mr. Sablack's affidavit does not specify what the "this provision" is.  If it relates only to the

sentence "The **bodily injury** Limit of Liability under this Part III for 'each person' includes the

total  claims made for such **bodily injury** and all claims derived from such **bodily injury**,

including, but not limited to, loss of society, loss of companionship, loss of services, loss of

consortium, and wrongful death," the affidavit is not dispositive regarding records of the

development and intent of Part III Additional Definition's insured person and insured persons or

the development and intent of Part III's Limits of Liability.  Mr. Sablack's affidavit does not

address if Progressive has any documents relating to revisions considered for model 9607

subsequent to its finalization on April 28, 1997.  Mr. Sablack's affidavit does not address records

related to the preparation of the form submission to the Alaska Division of Insurance or records

of the subsequent two year plus process of review and revision by Progressive.  Mr. Sablack's

affidavit does not address Progressive's records retention policy, especially the records retention

policy of the Corporate Law Department.  Mr. Sablack's affidavit does not address Progressive's

data backup program, or any data recovery efforts from computer hard drives or back-up

processes.


The January 12, 2007 affidavit of Kellie M. Rubesne, an attorney in the Corporate Law

Department for The Progressive Group of Insurance Companies whose primary responsibility is

the policy contracts database for Alaska, states "I have personally reviewed all my files

personally, and I do not have any records/documents related to the drafting of the model 9607

policy of the Alaska 9607 policy." This affidavit is not dispositive regarding records not in her

personal files. This affidavit is not dispositive regarding records of the development and intent

of Part III Additional Definition's insured person and insured persons or the development and

intent of Part III's Limits of Liability. This affidavit does not address Progressive's records

retention policy, especially the records retention policy of the Corporate Law Department. This

affidavit does not address Progressive's records retention policy, especially the records retention

policy of the Corporate Law Department. This affidavit does not address Progressive's data

backup program, or any data recovery efforts from computer hard drives or back-up processes.


Important to every organization is institutional memory. The custom and practice of the

insurance industry, supplemented by each state's record retention requirements for its domestic,

and, in some instances, foreign insurers, is to retain records, including policy production records

that document the evolution of an insurer's policy language. I have observed in an Allstate case

and in a Nationwide case that insurer's routinely retain and have produced product development

records going back more than 10 years, including product development records relating to new

and replaced policy forms.


Progressive produced a copy of the Alaska Division of Insurance's documents for the period

9/8/97 through 11/12/99.[1] These documents do not record the internal actions of Progressive in

developing the initial proposed form prior to 9/8/97. These documents do not record the

development of policy language for the initial submission, nor do the documents record the

Progressive's review and analysis of issues raised by the Alaska Division of Insurance. These

---

[1] Note that the initial 9/8/97 filing referenced "Form No. 9607 (08/97). During the over two years of review, the form number remained the same but the edition date changed at the very end of the process.

Stanley C. Garlington             Page 9             March 27, 2007

documents merely reflect materials filed with the Alaska Division of Insurance and subsequent communications with the Alaska Division of Insurance including form revisions submitted by Progressive.

Progressive's initial 9/8/97 cover letter notes "**Form 9607 (08/97) AK** . . . is an Alaska-specific adaptation of a model personal auto policy developed by the Progressive companies for use in every state." I know from the Alaska Department of Insurance Market Conduct Examination 97-08 that Progressive had centralized personal lines policy development in the legal department at the Progressive Home Office in the mid-90s and had developed a model personal auto policy. Progressive has produced no records documenting the development of its model personal auto policy. Progressive has not produced records documenting its adaptation of the model personal auto policy to an Alaska-specific personal auto policy.

Progressive's initial 9/8/97 cover letter advises that Progressive "revised the contract to comply with new statutes, regulations, and case law; to add a new optional coverage; and to adopt some minor changes to clarify our contract and correct grammar." Progressive has not produced records documenting the review and analysis of Alaska statutes, regulations, and case law that it told the Alaska Division of Insurance it had done.

Progressive's initial 9/8/97 cover letter advises that Progressive "enclosed a comparison of the two policies indicating additions by blue underlined text and deletions with red strike-through marks." The attached pages regarding Part III Uninsured/Underinsured Motorist Coverage contain neither underlined text nor strike-through text.

If Progressive had made changes to Part III Uninsured/Underinsured Motorist Coverage, Progressive did not disclose them.  If Progressive had made no changes to Part III Uninsured/Underinsured Motorist Coverage, Progressive has not provided its records regarding its review and analysis of Alaska statutes, regulations, and case law that resulted in a conclusion that no revisions were necessary.

Progressive's initial 9/8/97 cover letter advises that Progressive's filing was a revision of Form 9604 (04/95) AK.  If Progressive had made no changes to Part III Uninsured/Underinsured Motorist Coverage since the prior filing, Progressive has produced no records documenting the development of Part III Uninsured/Underinsured Motorist Coverage for its prior policy form.

Progressive's definition of "underinsured motorist" reflects SB104, effective July 1, 1997, which affirmed the Alaska legislature's original 1990 legislative intent.  Progressive's initial filing was prior to the Alaska Supreme Court early 1998 decision in Progressive Insurance Co. v. Simmons on the same issue.  Progressive has produced no records documenting the change to its definition of "underinsured motorist" and any other changes that it may have made to Part III Uninsured/Underinsured Motorist Coverage.

In the October 2, 1997 Alaska Division of Insurance letter disapproving Progressive' filing, 38 observations and questions arising from a preliminary review were made.  Items 13 through 18 related to Part III Uninsured/Underinsured Motorist Coverage.  Progressive responded by letter on November 12, 1997, noting in regard to Item 14 "For Part III, you have asked us to provide

statutory support, provided below, for all of the following provisions within our policy . . ." In

this and other responses, Progressive references various provisions of AS 28.20 and AS 28.22.

Progressive also references customary exclusions, citing other insurers (Safeco, GEICO, and

State Farm) policies. The November 12, 1997 letter unequivocally demonstrates that Progressive

has extensively reviewed AS 28.20 and AS 28.22. The November 12, 1997 letter unequivocally

demonstrates that Progressive reviews and analyzes its policy language along with the policy

language of other insurers. Progressive has not produced its records documenting these reviews

and analyses.


In the December 5, 1997 letter to Progressive, the Alaska Division of Insurance notes:


> Progressive's contract is well a written UM/UIM contract appropriate for a limits
>
> trigger and UM driven exposure. It is similar in format and nature to the
>
> UM/UIM coverage parts that have been nationwide industry standards for many
>
> years. However, as ISO's recently published analysis of UM/UIM laws pointed
>
> out, due to their variability, that standard model form can only be used in two
>
> jurisdictions. Alaska is not one of them.


> If you will review our statutes with a fresh eye, we think you'll find that with the
>
> passage of SB104 earlier this year, our UM/UIM laws have completed the
>
> transition to what should be a simple, seamless excess contract with very few
>
> permissible restrictions and virtually no distinction between UM and UIM

components.  State Farm, ISO, and most other organizations are in the process of

redrafting their UM/UIM coverage parts to track with our statutory requirements.

Coverage obligations are, by statute, based upon the damages legally owed to the

insured by the adverse party. . .

We recognize the difficulty dealing with UM/UIM coverage due to the

Progressive's desire to limit and define its exposure in the face of a very broad

statutory mandate. . .

However, it must be recognized that the ultimate determining factor or (sic) the

carrier's obligation is the otherwise unsatisfied liability for damages owed to the

insured.

We believe that you will find a full redrafting of Progressive's UM/UIM coverage

to be simpler and ultimately more satisfactory than tweaking the existing

language and format to conform to our statutes.

Progressive has not produced its records documenting its review of Alaska statutes and

Progressive's review and analysis of Progressive's UM/UIM coverage's conformity with Alaska

statutes.

Over 11 months later, November 11, 1998, Progressive responded to the Alaska Division of Insurance's letter from the previous December with an amended policy, noting that "We are still working on our policy revisions regarding UM/UIM coverages . . ." along with some other issues. Progressive affirms that "The Alaska policy is based on our national model contract." In regard to uninsured/underinsured motorist coverage, Progressive advised the Alaska Division of Insurance that "The coverages we provide to the insured are intended to make the insured whole. Consistent with Alaska law, we include the customary safeguards to prevent our policy from providing the type of financial windfall that encourages fraud and drives up insurance rates." Progressive has not produced its records documenting its review of Alaska statutes and Progressive's review and analysis of Progressive's UM/UIM coverage's conformity with Alaska statutes.

Progressive's March 29, 1999 e-mail to the Alaska Division of Insurance advises that "Jeff Nash (my senior counsel) and I have finished our review of your issues . . . and the pending Alaska Motor Vehicle Policy – Form No. 9607 (08/97) AK. I am currently finishing-up our response letter and making revisions to the policy." Progressive has not produced its records documenting the review by Nash and Shaw or the analysis and drafting of revisions to the policy.

Progressive's April 1, 1999 letter to the Alaska Division of Insurance states that "We have completed a comprehensive review of Alaska's uninsured/underinsured motorists coverage statutes." Progressive has not produced its records of that comprehensive review. Although the letter indicates that a revised Part III is enclosed, it does not directly follow the letter in the documents produced by Progressive from the Alaska Division of Insurance. Progressive has not

produced its records documenting the review by Nash and Shaw or the analysis and drafting of revisions to the policy.

Progressive's April 1, 1999 letter to the Alaska Division of Insurance also advised that "Since our original submission of this filing, we have made several changes to our model policy which we would like to incorporate into this Alaska policy as well."   Progressive has not produced its records documenting the ongoing revision process to its model policy, including both revisions adopted and proposed revisions rejected.

Progressive's May 10, 1999 e-mail to the Alaska Division of Insurance states in regard to Part III's Limits of Liability provision that "The proposed revisions above comply with Alaska case law."  Progressive has not produced its records documenting its research, review, and analysis of Alaska case law.

In the Alaska Division of Insurance's May 14, 1999 letter, the division stated:

> . . . we direct your attention to, Cramer v. Cramer (1963), Hebel v. Hebel (1967), Hillman v. Nationwide Mutual Fire Insurance Company (1988), State Farm Auto Insurance Company v. Marqua (1989), Burton v. State Farm Fire and Casualty Company (1990), State Farm Mutual Auto Insurance v. Lyons (1990), Hughes v. Harrelson (1993), and Myers v. Robertson (1995).  The citations represent decisions by the Alaska Supreme Court, Federal District and the 9th Federal Circuit Court of Appeals.  They deal with two subjects and indicate a clear,

consistent treatment of each.  The first is the affirmation of rights of action arising

from intra-family torts.  The second is the refusal to enforce exclusions relating to

exclusions that are inconsistent with the coverage mandates of AS 28.22, Alaska's

Mandatory Insurance Act.

Progressive has not produced its records regarding its research, review, and analysis of Alaska

these cases or AS 28.22.

Progressive's June 4, 1999 letter to the Alaska Division of Insurance contains extensive evidence

of Progressive's analysis of case law.  Progressive has not produced its records regarding its

research, review, and analysis of these cases.

Progressive has produced from its Alaska policy contracts database for AK 9607 personal lines

automobile policy only one sentence - "The **bodily injury** Limit of Liability under this Part III

for 'each person' includes the total claims made for such **bodily injury** and all claims derived

from such **bodily injury**, including, but not limited to, loss of society, loss of companionship,

loss of services, loss of consortium, and wrongful death."  This one sentence does not provide

any dates or product development history related to the sentence.

VI.

What did Progressive disclose to the Alaska Division of Insurance about Progress's understanding of the purpose and scope of Alaska uninsured and underinsured motorist coverage?

It is my opinion that Progressive told the Alaska Division of Insurance that Progressive's Part III Uninsured/Underinsured Motorist Coverage was intended make its insureds whole by providing benefits to insured persons when the legally liable owner or operator of an underinsured motor vehicle did not have enough coverage to pay for the insured person's damages that resulted from an accident.

Progressive's April 1, 1999 letter to the Alaska Division of Insurance states that "Our UM/UIM coverage is a single, combined coverage from which benefits are provided to insured persons when the legally liable owner or operator of the uninsured/underinsured motor vehicle has no coverage or not enough coverage to pay for the insured person's damages that have resulted from the accident."

The Alaska Division of Insurance's December 5, 1997 letter affirmed that broad coverage:

> Coverage obligations are, by statute, based upon the damages legally owed to the insured by the adverse party. . .

We recognize the difficulty dealing with UM/UIM coverage due to the Progressive's desire to limit and define its exposure in the face of a very broad statutory mandate. . .

However, it must be recognized that the ultimate determining factor or (sic) the carrier's obligation is the otherwise unsatisfied liability for damages owed to the insured.

As noted above, Progressive's November 11, 1998 letter to the Alaska Division of Insurance, Progressive advised the Alaska Division of Insurance that in regard to UM/UIM, **"The coverages we provide to the insured are intended to make the insured whole."** Emphasis added.

It is my opinion that, because Progressive's post-claim "position"[2] on UM/UIM limits of liability is inconsistent with Progressive's expressed coverage intentions, Progressive must be bound to its promise to the Alaska Division of Insurance that "The coverages we provide to the insured are intended to make the insured whole."

---

[2] Although Withers in the claim records and depositions referred to a "position" on coverage, Progressive has not produced documentation evidencing the development of a formal position on the coverage issue.

VII.

What did Progressive disclose to the Alaska Division of Insurance specifically about how Progress intended to interpret and apply its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured and Limits of Liability provisions?

In my opinion, the documents produced by Progressive did not provide the Alaska Division of Insurance with a specific interpretation for either Part III Uninsured/Underinsured Motorist Coverage's Persons Insured provision or Limits of Liability provision.

I was unable to find a specific discussion of Progressive's intended interpretation of its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured provision and Limits of Liability provisions in the 374 page copy of the Alaska Division of Insurance file produced by Progressive.

VIII.

Did Progressive disclose to the Alaska Division of Insurance at the time the division was reviewing Form No. 9607 AK (08/99) the interpretation Part III Uninsured/Underinsured Motorist Coverage's Persons Insured and Limits of Liability provisions contained in Progressive's Motion for Summary Judgment?

It is my opinion that Progressive did not disclose to the Alaska Division of Insurance the interpretation of Part III Uninsured/Underinsured Motorist Coverage's Persons Insured and Limits of Liability provisions contained in Progressive's Motion for Summary Judgment.

I was unable to find any evidence in the Alaska Division of Insurance file produced by Progressive of Progressive's interpretation in its Motion for Summary Judgment for its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured provision and Limits of Liability.

IX.

Did Progressive disclose to the Alaska Division of Insurance that it intended to rely on the court cases cited and discussed in Progressive's Motion for Summary Judgment to interpret its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured and Limits of Liability provisions?

It is my opinion that Progressive did not disclose to the Alaska Division of Insurance that Progressive intended to rely on the court cases cited and discussed in Progressive's Motion for Summary Judgment to interpretation its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured and Limits of Liability provisions.

I was unable to find any evidence that Progressive disclosed to the Alaska Division of Insurance that Progressive intended to rely on court cases as cited and discussed in Progressive's Motion for Summary Judgment for the meaning of its Part III Uninsured/Underinsured Motorist

Coverage's Persons Insured provision and Limits of Liability provisions in the Alaska Division

of Insurance file produced by Progressive. [3]

## X.

Can Progressive construe approval by the Alaska Division of Insurance of a policy form

containing its Part III Uninsured/Underinsured Motorist Coverage's Persons Insured provision

and Limits of Liability provisions as a determination by the Alaska Division of Insurance that all

policy language in the form complies with Alaska laws, regulations, and case law?

It is my opinion that Progressive knew that form approval does not mean that the Alaska

Division of Insurance believes that all policy language and each policy provision complies with

Alaska law.  It is my opinion that Progressive knew that the Alaska Division of Insurance relied

upon AS 21.42.220 to ensure that the public was protected from approved policy provisions that

were inconsistent with statutory provisions.  It is my opinion that Progressive knew that courts

routinely refuse to enforce approved insurance policy provisions that are inconsistent with

AS 28.20, AS 28.22, and AS 21.

Progressive's March 29, 1999 e-mail the Alaska Division of Insurance suggests that Progressive

believes it is permissible to "(1) allow us to keep these exclusions in our policy until a court

holds those exclusions improper or unenforceable . . ."

---

[3] I also did find evidence that Progressive's claims department reviewed those cases when making its coverage decisions on Weilbacher's claims.

In the May 8, 1999 e-mail to Progressive, Alaska Division of Insurance stated that

> We have affirmed our previous finding. We believe that earlier approval of
> relatively broad business exclusions for Progressive and its competitors is likely
> to have been inconsistent with the minimum coverage requirements of
> AS 28.22.101 and, as a result, AS 21.89.020. Our analysis appears consistent
> with the finding of the 9th Circuit Court of Appeals. As such, business use
> exclusions would deceptively restrict coverage relative to policyholders'
> reasonable expectations or the minimum breadth for Automobile Liability
> Insurance sold in Alaska and their approval would be prohibited under
> AS 21.42.130.
>
> The matter, including the competitive advantage issues you raised, is undergoing
> further review.
>
> In consideration of the issues you raised and pending final completion of our
> analysis, including the effect of AS 21.42.220[4], and determination of a course of
> action relative to other approved forms which may be in use in the market, we
> will temporarily continue to approve business use exclusions subject to the
> following limitations . . .

---

[4] AS 21.42.220. Validity of noncomplying forms. An insurance policy, rider, or endorsement issued and otherwise
valid that contains a condition or provision not in compliance with the requirements of this title, is not thereby
rendered invalid but shall be construed and applied in accordance with the conditions and provisions as would have
applied had the policy, rider, or endorsement been in full compliance with this title.

In the Alaska Division of Insurance's May 14, 1999 letter to Progressive, the division stated

we direct your attention to, Cramer v. Cramer (1963), Hebel v. Hebel (1967),

Hillman v. Nationwide Mutual Fire Insurance Company (1988), State Farm Auto

Insurance Company v. Marqua (1989), Burton v. State Farm Fire and Casualty

Company (1990), State Farm Mutual Auto Insurance v. Lyons (1990), Hughes v.

Harrelson (1993), and Myers v. Robertson (1995). The citations represent

decisions by the Alaska Supreme Court, Federal District and the 9th Federal

Circuit Court of Appeals. They deal with two subjects and indicate a clear,

consistent treatment of each. The first is the affirmation of rights of action arising

from intra-family torts. The second is the refusal to enforce exclusions relating to

exclusions that are inconsistent with the coverage mandates of AS 28.22, Alaska's

Mandatory Insurance Act.

In the same May 14, 1999 letter to Progressive, the Alaska Division of Insurance stated

Whether it was missed in prior reviews or crept back into the policy during its

several drafts, retaining exclusion 11 of Part I is not acceptable.

The Alaska Division of Insurance knew that it would not be unusual for regulators to fail

to recognize an issue during a form review, even after multiple reviews of the same

language in the same or revised submissions.

During my 11 years with the Alaska Division of Insurance, I observed and experienced the limited resources that the Alaska legislature had been able to make available to the Alaska Division of Insurance. Budget constraints and recurring budget crises, both in Alaska and in other states, have severely limited the ability of state insurance departments to recruit and retain quality employees, to hire such employees in adequate numbers, to retain outside professional services, to undertake the necessary travel to investigate or examine entities that are located out of state, and to pursue administrative action when violations were identified. In addition, activities that constitute criminal violations are prosecuted only at the discretion of municipal, state, or federal prosecutors, over whom insurance departments have no control and who are themselves subject to severe resource constraints. Because the calls for services on the Alaska Division of Insurance were and continue to be enormous, and the resources minimal and finite, it has been recognized that even the most diligent and good faith efforts by Alaska insurance regulators do not, and cannot be expected to, ensure that consumers are always protected and that Progressive and other insurers policy forms are always in compliance with state laws, regulations, and case law.

X1.

Do AS 28.20 and AS 28.22 require that the minimum per person and per accident underinsured and underinsured motorist bodily injury limits of liability triggered by each covered person's damages arising from bodily injury?

It is my opinion that AS 28.20 and AS 28.22 require that the minimum per person and per accident underinsured and underinsured motorist bodily injury limits of liability be triggered by each insured person's damages.

Under Alaska's Motor Vehicle Safety Responsibility Act, AS 28.20, the Alaska Legislature expressed its concern "over the rising toll of motor vehicle accidents and the suffering and loss inflicted by them. The legislature determines that it is a matter of grave concern that motorists be financially responsible for their negligent acts so that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them."

This legislative intent that innocent victims of motor vehicle accidents were compensated for the injury and financial loss inflicted upon them was affirmed by the expansion of coverage in 1990 with HB 429 to both AS 28.20, AS 28.22, and AS 21.89.020.

In my opinion, the provisions of AS 28.20, AS 28.22, and AS 21.89.020 should be applied in accord with express legislative intent – each insured person and each covered person who is the innocent victim should be recover for the injury and financial loss inflicted upon them.

AS 28.20.440(b) provides that:

> The owner's policy of liability insurance must . . .
>
> > (2)    insure the person named and every other person using the vehicle with the express or implied permission of the named insured, against loss

from the liability imposed by law for damages arising out of the ownership,

maintenance, or use of the vehicle within the United States or Canada, subject to

limits exclusive of interest and costs, with respect to each vehicle, as follows:

$50,000 because of bodily injury to or death of one person in any one accident,

and, subject to the same limit for one person, $100,000 because of bodily injury to

or death of two or more persons in any one accident, and $25,000 because of

injury to or destruction of property of others in any one accident;

          (3)     contain coverage in not less than the amounts set out in (2)

of this subsection for the protection of the persons insured under the policy who

are legally entitled to recover damages from owners or operators of uninsured or

underinsured motor vehicles because of bodily injury or death, or damage to or

destruction of property arising out of the ownership, maintenance or use of the

uninsured or underinsured motor vehicle; this coverage must comply with the

provisions of AS 28.20.445.

For third-party liability to others coverage, the minimum statutory bodily injury liability limits

are $50,000 based upon bodily injury to or death of one person in any one accident and $100,000

based upon bodily injury or death of two or more persons in any one accident. The insurer is

paying the legal liabilities on behalf of its insured to for the bodily injury or death of one person

under the per person limit of liability and for the bodily or death of two or more persons under

the per accident limit of liability.

For first-party uninsured and underinsured motorist coverage, the minimum statutory uninsured and underinsured motorist bodily injury limits are $50,000/$100,000 (the amounts set out in (2)) "for the protection of the persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury or death." The insurer is paying to each of its insured persons the legal liabilities of the uninsured or underinsured motorist to each of its insured persons because of bodily injury and death.

Whereas the bodily injury liability limits are triggered by the injury or death of a person, uninsured and underinsured bodily injury coverage limits are triggered by each insured person's damages because of bodily injury and death. The distinction is consistent with the different focuses of third-party liability coverage (bodily injury or death to others) and first-party uninsured and underinsured motorist coverage (damages to insured persons because of bodily injury or death).

Effective January 1, 1991, HB 429 repealed and reenacted AS 21.28.445(a) to state:

> (a)    The maximum liability of the insurance carrier under the uninsured and underinsured motorists coverage required to be offered under AS 28.20.440 shall be the lesser of
>
> (1)    the difference between the amount of the covered person's damages for bodily injury and property damage and the amount paid to the

covered person by or for a person who is or may be held legally liable for the

damages; and

        (2)     the applicable limit of liability of the uninsured and

underinsured motorist coverage.

The express trigger for calculating the uninsured and underinsured motorist coverage limits of

liability is each covered person's damages because of bodily injury or death.

Alaska's Mandatory Motor Vehicle Insurance statute, AS 28.22.101(e) states :

        (e)     A motor vehicle liability policy must provide coverage under

AS 28.22.201 - 28.22.231 in the amounts set out in (d) of this section for the

protection of the persons insured under the policy who are legally entitled to

recover damages from the owner or operator of an uninsured or underinsured

motor vehicle because of bodily injury or death, or damage to or destruction of

property arising out of the ownership, maintenance, or use of the uninsured or

underinsured motor vehicle.

The trigger for calculating the uninsured and underinsured motorist coverage limits of liability is

each insured person's damages because of bodily injury or death.

As used in these statutes, for uninsured and underinsured motorist coverage, insured person and

covered person are synonymous.

XII.

Does Progressive's policy's Part III insuring agreement language impermissibly limit the bodily injury AS 28.20 and AS28.22 require?

It is my opinion that Progressive's added limitation "**bodily injury** sustained by an **insured person**" is not permitted by the clear language and meaning of AS 28.20 and AS 28.22.

Progressive's uninsured and underinsured motor vehicle bodily injury coverage insuring agreement states:

> "**we** will pay damages, other than punitive or exemplary damages, which an **insured person** is entitled to recover from the **owner** or operator of an **uninsured motor vehicle** or **underinsured motor vehicle** because of **bodily injury** sustained by an **insured person** . . ."

AS 28.20 and AS 28.22 provide coverage for a covered person's damages caused by bodily injury or death – the statutes do not include a limitation that the bodily injury or death be sustained by a covered person.

XIII

Does Progressive's Part III Limits of Liability provision provide the minimum per person and per accident underinsured and underinsured motorist bodily injury limits of liability required by AS 28.20 and AS 28.22?

It is my opinion that Progressive's Part III Limits of Liability provision does not provide the minimum per person and per accident underinsured and underinsured motorist bodily injury limits of liability required by AS 28.20 and AS 28.22.

Progressive's policy's Part III Limits of Liability states:

If your **Declarations Page** shows a split limit:

1.    the amount shown for "each person" is the most we will pay for all damages due to a **bodily injury** to one (1) person;

2.    subject to the "each person" limit, the most we will pay for all damages due to **bodily injury** sustained by two (2) or more persons in any one (1) **accident** . . .

As discussed above, uninsured and underinsured bodily injury coverage limits are triggered by each covered person's or each insured person's damages caused by bodily injury or death. Progressive's policy's Part III Limits of Liability provisions impermissibly apply statutory

bodily injury liability limits where Progressive must apply statutory uninsured and underinsured motorist bodily injury limits.

Progressive's policy's Part III Limits of Liability also states:

> "The **bodily injury** Limit of Liability under this Part III for 'each person' includes the total claims made for such **bodily injury** and all claims derived from such **bodily injury**, including, but not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death."

AS 28.20 and AS 28.22 do not permit a derivative claims reduction in coverage. Progressive in its Motion for Summary Judgment applies the provision as a further impermissible limitation on the broad limits of liability provided by AS 28.20 and AS 28.22. In that context, the provision does not provide the minimum per person and per accident underinsured and underinsured motorist bodily injury limits of liability required by AS 28.20 and AS 28.22.

XIV

Must Progressive construe and apply its Part III Limits of Liability provisions in full compliance with AS 21, AS 28.20 and AS 28.22?

It is my opinion that Progressive must construe and apply its Part III Limits of Liability provisions in full compliance with AS 21, AS 28.20 and AS 28.22.

Stanley C. Garlington                    Page 31                    March 27, 2007

Under AS 21.89.020(c),[5] Progressive's policy must provide uninsured and underinsured limits "not less that the limit in AS 28.20.440 or AS 28.22.101."

Under AS 21.42.220,[6] Progressive's Part III Limits of Liability must be construed and applied in accordance with the conditions and provisions as would have applied had the policy, rider, or endorsement been in full compliance with this AS 28.20 and AS 28.22.

In addition, Progressive's policy's General Provisions provides:

### TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform with the legal requirements of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform with such legal requirements.

Under the terms of Progressive's policy as well as Alaska statutes, Progressive must conform its policy to AS 28.20 and AS 28.22 and construe and apply its policy in full compliance with AS 21 and AS 28.20 and AS 28.22.

---

[5] AS 21.89.020(c) An insurance company offering automobile liability insurance in this state for bodily injury or death shall, initially and at each renewal, offer coverage prescribed in AS 28.20.440 and 28.20.445 or AS 28.22 for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles. The limit written may not be less than the limit in AS 28.20.440 or AS 28.22.101.

[6] AS 21.42.220. Validity of noncomplying forms. An insurance policy, rider, or endorsement issued and otherwise valid that contains a condition or provision not in compliance with the requirements of this title, is not thereby rendered invalid but shall be construed and applied in accordance with the conditions and provisions as would have applied had the policy, rider, or endorsement been in full compliance with this title.

XV

Under Alaska law, is Ronald V. Weilbacher a person who is entitled to recover his loss of society/loss of consortium damages because of the death of Heidi Weilbacher as a separate claim with a separate limit of liability from damages the Estate of Heidi Weilbacher was entitled to recover as damages for her injury and death?

It is my opinion that Ronald V. Weilbacher is a person who entitled to recover his loss of society/loss of consortium damages because of the death of Heidi Weilbacher as a separate claim with a separate limit of liability from damages the Estate of Heidi Weilbacher was entitled to recover as damages for her injury and death.

Progressive's policy states:

**"ADDITIONAL DEFINITIONS**

When used in this Part III:

1.    **"Insured person"** and **"insured persons"** mean

a.    **you**[7] or a **relative**;

b.    any person **occupying** a **covered vehicle**; and

c.    any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a or b above."

---

[7] **"You"** and **"Your"** mean a person shown on the **Declaration Page**, and that person's spouse if residing in the same household.

The Estate of Heidi Weilbacher was a relative as determined by Progressive. The Estate of Heidi Weilbacher was an insured person under the policy and entitled to recover damages caused by her death. Ronald V. Weilbacher is also an insured person both as the person shown in the declarations and as an insured person who is a person entitled to recover his damages because of resident Heidi Weilbacher death. Each covered person is entitled to recover its damages as a separate claim with a separate limit of liability.

XVI.

It is my opinion that it has always been essential for Progressive's coverage investigation to affirm that the policy language conforms to statute. If the coverage investigation determines the policy language does not conform to statute, Progressive has always had to construe and apply its policy consistent with statute.

For the coverage conformity to statute investigation, the key elements from AS 28.20.440(b) are highlighted below:

> **amounts** set out in (2) of this subsection for the protection of the **persons insured** under the policy who are **legally entitled to recover damages** from owners or operators of uninsured or underinsured motor vehicles **because of bodily injury or death**

The key elements from AS 28.22.101(e) are highlighted below:

**amounts** set out in (d) of this section for the protection of the **persons insured**

under the policy who are **legally entitled to recover damages** from the owner or

operator of an uninsured or underinsured motor vehicle **because of bodily injury**

**or death**

Heidi Weilbacher, as a person insured under the policy, is entitled to recover damages because

her bodily injury and death for which the underinsured motorist was liable. As noted above, the

limit of liability amount for Heidi Weilbacher would be a minimum of $50,000 (plus Civil Rule

of Procedure 82 and interest).

Ronald Weilbacher, as a person insured under the policy, is entitled to recover damages because

of Heidi Weilbacher's death for which the underinsured motorist was liable. As noted above, the

limit of liability amount for Ronald Weilbacher would be a minimum of $50,000 (plus Civil Rule

of Procedure 82 and interest).

Progressive's liability investigation must therefore must address what each person insured was

legally entitled to recover from the underinsured motorist. The legal liability of the underinsured

motorist to Heidi Weilbacher involved the claims of the Estate of Heidi Weilbacher to recover

the estate's damages. The legal liability of the underinsured motorist to Ronald Weilbacher

involved the claims of Ronald Weilbacher to recover his individual damages.

A diligent legal liability investigation Ronald Weilbacher's claim must include a determination if the underinsured motorist were liable to Ronald Weilbacher for NIED damages because of bodily injury or death, loss of society and loss of consortium, and all other potential damages.

Once the various damages for which the underinsured motorist was liable to Ronald Weilbacher had been determined, the damages investigation would identify and evaluate the value of each type of damage.

Having completed the conformity to statute investigation, the adjuster would, of course, have to carefully review the policy coverages to determine if the insurer had granted greater coverage than the minimum coverages and limits required by statute.

XVII.

Although since 1976 Alaska Statute 21.36.350 had required the division to adopt regulations to implement, define, and enforce the unfair claim settlement practices statute, through 1998 attempts by Directors of the Alaska Division of Insurance had not succeeded in promulgating regulations.  Shortly after joining the Alaska Division of Insurance in May 1988, the Director assigned me to review the division's past efforts to draft regulations and to make suggestions for improvement for the Director's review.  Using my 18 years experience and training as a property casualty claims adjuster, supervisor, home office examiner, and regional claim manager, I proposed improvements and drafted suggested language.  Market Conduct examinations

conducted by the division in 1988 also provided valuable experience used in drafting the regulations.

One area of emphasis was to make sure that the Division of Insurance could meet its statutory duty to enforce the Unfair Claim Settlements statute.  Insurance regulators, charged with protecting the public, must be able to determine if an insurer is complying with its statutory obligations.  Just as the oversight of financial solvency requires detailed books and records of financial transactions and supporting documentation, oversight of the way an insurer conducts itself with its policyholders, claimants, and the public requires detailed books and records of such transactions, especially claims handling.  State Insurance Regulators and Congressional committees who investigated the causes of a number of large insurer insolvencies that occurred in the 1980's found that financial books and records and underwriting and claims records and documentation were either inadequate or all too frequently non-existent.  Insurance regulators trying to rehabilitate or liquidate insurers often faced daunting tasks trying to identify risks underwritten and to identify potential claims and loss exposure due to the lack of records and documentation.  In claim files, records and documentation are important both to insurance regulators both for financial solvency and trade practices oversight.

To draw attention to the importance of the claim file documentation requirements contained in the regulations, Director Roller included in his order adopting the Unfair Claims Settlement Acts or Practices regulation the following paragraph:

File documentation standards are clear.  Examinations undertaken
by the Division of Insurance in 1988 confirm the impossibility of
evaluating that which is not in the file to determine if it would have
been relevant.  These regulations require file documentation to
contain all notes, work papers, documents and similar materials.
Rough drafts or scratch notes need not be retained *only* if the file
contains the final draft or memorandum which fully incorporates
the substance of the scratch notes.  Files must be sufficiently
documented to provide a detailed history of the claim handling –
who participated, when they participated, and what they said or
did.  If more than one file is maintained (such as branch, regional,
zone, and home office files), each must meet both the all
documentation and the relevant events standards.[8]

As noted in the authoritative three volume Casualty Insurance Claims 4th Edition, "whether or
not an insured or third party may bring an claim against an insurer for alleged violations of a
state's [Unfair Claims Settlement Practices] Act is perhaps less important in this discussion
[Ethics] than our consideration of the Act to be a **minimum standard of behavior . . .**"
Emphasis added.

---

[8] Alaska Division of Insurance Order 89-1.

XVIII.

Insurers that I have been employed by and insurers that I have examined as an employee of the Alaska Division of Insurance routinely maintained copies of states insurance laws, regulations, and related laws available for reference and review by their staff. These insurers had internal information systems such as bulletins, claim manuals, and printed materials to inform their staff about statutory and regulatory requirements. These insurers had internal audit systems to monitor claim handling and the insurer's compliance with laws and regulations, especially unfair claims practices laws and regulations.

XIX.

Heidi Weilbacher sustained catastrophic injuries as a passenger in a motor vehicle accident on July 9, 1991. Progressive appears to have had notice of the accident prior to December 13, 1991 report on behalf of Ronald Weilbacher[9]. Progressive immediately recognized the Underinsured Motorist Coverage exposure and assigned Withers to investigate coverage and liability. A separate adjuster was assigned to investigate the Medical Payments Coverage exposure.

XX.

I have reviewed the documentation contained in Weilbacher's Progressive claim files that has been produced to date (some materials have been redacted and withheld by Progressive) along

---

[9] "DANNY, THIS APPEARS TO BE ANOTHER LOSS FOR ANOTHER GUEST PASSENGER IN THIS LOSS" (100285)

with the depositions of Withers and Lund for compliance with the minimum standards of

Alaska's Unfair Claims Settlement practices law and Alaska's Unfair Claim Settlement Acts or

Practices regulation.. This type of review was a routine part of the market conduct examinations

that I conducted for the Alaska Division of Insurance. I noted that to date virtually no discovery

has been produced regarding Progressive's claim handling policies, practices, procedures, and

internal controls.

I made the following observations:

1.    Progressive's documentation of Weilbacher's Underinsured Motorist claim is not

in sufficient detail that relevant events, the dates of those events, and all persons

participating in those events can be identified.[10]

Progressive's claim staff was unable in deposition to use the documentation in the

Weilbacher claims files to provide details regarding the April 14, 2005 telephone

conversation with Attorney Dan Quinn.

The only claim documentation of that conversation is Wither's PACMAN note –

"I DISCUSSED ISSUE W /DAN QUINN, AND HE FEELS ATTY LAGACKI

---

[10] 3 AAC 26.030. FILE AND RECORD DOCUMENTATION. "Any person transacting a business of insurance who participates in the investigation, adjustment, negotiation, or settlement of a claim under any type of insurance must document each action taken on a claim. The documentation must contain all notes, work papers, documents and similar material. The documentation must be in sufficient detail that relevant events, the dates of those events, and all persons participating in those events can be identified. The documentation may include legible copies of originals and may be stored in the form of microfilm or electronic media. The documentation is subject to examination and copying by the director or persons acting on the director's behalf."

IS NOT INTERPRETING CASE[11] CORRECTLY, AND IT WOULD ONLY REFER TO DIRECT CLAIMS FOR NIED." In deposition, Withers had only a vague memory of the substance of the conversation.[12]

As noted in Casualty Insurance Claims, "almost every claim, unless resolved very early in its life, must be investigated in such a way that the information produced can be preserved in the event it is needed in litigation."

It is my opinion that Progressive's file and record documentation are not in sufficient detail regarding relevant events.

It is my opinion that the Progressive claim file does not document a request for a coverage opinion regarding the Weilbacher Underinsured Motorist claim. Neither the policy nor claim file was provided for Quinn's review. No letter of engagement requesting a review and opinion was issued. No written opinion was requested or provided. There was no bill for professional services.

---

[11] Teel v. Progressive per PACMAN note.

[12] "Well, I don't know if I can recall everything. I remember calling him about—when you brought up the Teel case and Dan told me that that was more about a contract of an insured person and really wasn't all on point as far as the issue about loss of society or loss of consortium being derivative or non-derivative."

"No, I don't think—no, he didn't. I don't believe so." [Anything in writing from Quinn?]

"No, I don't believe so. It was all verbal, telephone conversations."

"If I recall, when you brought up the Teel case, I just called him and asked him about the Teel case and if this changed anything as far as the policy contract and how we address loss of consortium and loss of society claims as derivative or non-derivative and from what I recall he said no. It has nothing to do with that."

"I don't recall. It's been a while ago." [About Gillespie case]

"You know, I don't recall specifically if I did. But if that came up, I think he mentioned that it was an independent claim but is still subject to the contract as to derivative or non-derivative and in this case it's a derivative claim." [About AS09.15.010]

Another example involves an SIR report. On September 13, 2002, Withers was requested to "MAKE SURE **UPDATED** SIR IS IN PLACE." Emphasis added. On October 21, 2002 Withers "UPDATED 2729/SIR." The only copy of a 2729 Report produced is dated 10/25/02. Other non-updated 2729 Reports have not been produced. Although the report itself does not indicate to whom the report goes, one would infer that the report was distributed and was acted upon by others whose records would be part of Progressive's claim records and should have been produced.

2.    Progressive failed to conduct a prompt and thorough investigation of the Weilbacher's claims and failed to promptly complete the investigation using due diligence.[13]

Progressive's documentation of Weilbacher's Medical Payments and Underinsured Motorist claims does not include detailed or comprehensive analyses by Progressive's claim staff of the Medical Payments coverages and Underinsured Motorists coverages provided by the Allstate, Liberty Mutual, and Progressive policies.

The December 14, 2001 PACMAN entry notes "ALLSTATE PART OF WERELY, PROG MP WOULD BE SECONDARY...ALLSTATE MP IS

---

[13] 3 AAC 26.050 (a). STANDARDS FOR PROMPT INVESTIGATION OF CLAIMS "Any person transacting a business of insurance who participates in the investigation, adjustment, negotiation, or settlement of a claim shall promptly undertake the investigation of a claim after notification of the claim is received, and shall complete the investigation within 30 working days, unless the investigation cannot reasonably be completed using due diligence."

$25,000." Progressive appears to be applying an extra-contractual arrangement among insurers to avoid its contractual obligations under USAA v. Werley to pay its insureds on a pro-rata basis.

Cleary's coverage investigation is incomplete and her later denial of benefits for the monument and storage is unsupported by facts. The claim records do not document that Cleary reviewed the Allstate or Liberty Mutual medical payments coverages to determine if the coverage afforded is exactly the same as Progressive's medical payments coverage. Cleary did request a copy of the Liberty Mutual declarations page to "LEARN IF MP." If the coverages (or interpretations of the coverages) differed among insurers, the policies may have covered different elements of funeral benefits. If the monument and storage charges were covered by one or more of the other policies, subject to the other policy(ies) limits, Progressive would owe more of the undisputed elements of funeral benefits even if its denial for the monument and storage had merit.

It is my opinion that Progressive's coverage investigation needed to do more than consider the limits of Medical Payments coverages; Progressive needed to review the scope of each coverage to determine Progressive's Medical Payment's coverage were primary, excess, and/or pro-rata.

On January 29, 2002 Withers learned that Heidi Weilbacher's mother had an automobile policy with Liberty Mutual. His action plan was "to get interview, all

policies, consider econ. Expert for value of estate, eval UMBI, complete by 3/1/02." On January 30, 2002, Withers requested "to interview Mr. Weilbacher in order to **complete our coverage investigation** relative to this claim." Emphasis added.

It is my opinion that Withers' request could and should have been made promptly upon receipt of the assignment; that Withers did not pursue the investigation with due diligence to complete it within 30 working days of the report of loss.

Withers also requested copies of other policies from Weilbacher. According to the claim records, Withers did not attempt to secure copies of other policies directly from either Allstate or Liberty Mutual. The Allstate policy was sent to Withers on February 4, 2002 and the recorded interview was conducted February 20, 2002. Withers asked Weilbacher for a copy of the Liberty Mutual policy on April 17, 2002. The Liberty Policy was sent to Withers on May 29, 2002. Instead of diligently completing the investigation of coverage by reviewing the policies and advising its insured persons of Progressive's coverage position, Withers on June 18, 2002 decides "TO WORK THRU COVE. ONCE UNDERLYING BI/UIM CLAIMS W/ALLSTATE HAVE BEEN RESOLVED."

On August 27, 2002, Withers notes that the Progressive and Liberty Mutual Underinsured Motorist limits are the same and concludes "THIS WOULD BE PRO-RATA OF 50/50." The claim records do not document Withers' review of

the Progressive and Liberty Mutual Underinsured Motorist coverages beyond his

observation regarding the limits of liability.  Withers did not determine if

coverage afforded the Liberty Mutual is exactly the same as Progressive's

Underinsured Motorist coverage.  Withers did not document his review of the

coverages (or the other insurer's interpretations of the coverages) to determine if

the policies may have provided different coverage for Underinsured Motorist

damages.

It is my opinion that Progressive's Underinsured Motorist coverage investigation

needed to do more than merely consider the limits, Progressive needed to review

the scope of each coverage to determine if Progressive's Underinsured Motorist

coverage were primary, excess, and/or pro-rata.

More than a year later, on September 28, 2003, Withers' action plan noted that he

had not resolved Underinsured Motorist coverage issues:  "*  LIBERTY

MUTUAL/ HAS CONCURRENT POLICY/ OF UIM UNDER DECEASED,

MOTHER'S POLICY.  *  ISSUE OF PRO-RATA COVERAGE."  Two months

later, on December 9, 2003, almost 2 years after the claim was reported to

Progressive, Withers is "WAITING TO DETERMINE LIBERTY MUTUALS

POSITION ON UIM COV.–THEY HAVE CONCURRENT POLICY FOR

UIM."  For three years the claim records do not document diligent efforts to

contact Liberty Mutual to resolve whatever coverage issues Progressive may have

thought there were.  Only in response to management direction on

January 6, 2004 did Withers, on January 9, 2004, leave a "phone message for Liberty adjuster for status on coverage."

It is my opinion that the claim records do not document that Progressive ever expressed a written position regarding its coverage in relation to Liberty Mutual's coverage.

Had Withers reviewed the Liberty Mutual policy, he would have noted that its Limits of Liability provision reads as follows:

### "LIMIT OF LIABILITY

A.  The applicable limit of liability shown in the Schedule or in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

   1.  'Insureds';

   2.  2. Claims made . . .

B.  Subject to Paragraph A. out limit of liability will be as follows . . .

   a.  The difference between the amount of an 'insured's' damages for 'bodily injury' and 'property damage', and the amount paid to that 'insured' for such damages, by or for a

person who is or may be held legally  liable

for damages, including all sums paid under

Part A.; and

b.    The applicable limit of liability for this

coverage."

Withers would have recognized that Liberty Mutual used an ISO policy form, and

that the ISO policy form did not contain the "total of all claims made for **such**

**bodily injury** and all claims derived from such **bodily injury**, including but not

limited to, loss of society, loss of consortium, and wrongful death" language.



Withers, as an experienced claims adjuster of 25 years, would know that ISO

designs and reviews its standardized policy language, rules, cost information, and

other products to make sure they comply with all statutory, judicial, and

regulatory requirements.  Withers would know that ISO's legal and government

relations staffs are current with developments in statehouses and courthouses

around the country, and that each year ISO reviews thousands of regulations and

laws, both proposed and actual, as well as court decisions, for their effect on the

risk-decision business.  Withers would know that many insurers rely on ISO to be

sure that their policy language, rules, and rates comply with all applicable legal

and regulatory requirements, especially when responding to changes in statutes or

case law.  Withers would know that Progressive itself has used ISO motor vehicle

policy forms for its commercial automobile programs.

In my opinion, the difference in the scope of the Progressive and Liberty Mutual Limits of Liability provisions should have raised a red flag for Withers. At a minimum, Withers' coverage investigation should have included a determination if Progressive's restrictive language conformed with statute and/or if the restrictive language had been included in error. Withers would also have to address the reasonable expectations of its insureds in view of the role of ISO's standardized policies and Progressive's more restrictive language.

It is my opinion that, although it was self-evident from the initial report of loss that potential claims arising out of the death of Heidi Weilbacher would include claims of the Estate of Heidi Weilbacher and the individual claims of Ronald Weilbacher, Progress did not promptly and with due diligence investigate those claims in order to advise Weilbacher of the coverage available under his Progressive policy. Progressive had express notice of the claims by October 16, 2002 when Progressive received a copy of the complaint filed against Kell. Maura and Weilbacher sued individually and as personal representatives of the Estate of Heidi Weilbacher seeking to recovery under AS 09.55.580 and AS 09.15.010 "Pain and suffering; loss of enjoyment of life; deprivation of the expectation of pecuniary benefits; loss of society; and funeral benefits."

It is my opinion that Withers and Progressive failed to diligently complete a coverage investigation and failed to advise Weilbacher of Progressive's coverage

Stanley C. Garlington                     Page 48                     March 27, 2007

determinations.  It is Progressive's sole duty to diligently analysis its coverage and to disclose to its insured Progressive's coverage determinations.

On August 26, 2003 Withers noted that he "RESPONDED TO ATTY W/ COPY OF APPLICATION, THAT CLEARLY SHOWS NI WAS OFFERED UM/UIM COV. IN ACCORDANCE W/ AK LAW."  The application states "We **have offered** you . . ."  Emphasis added.  The language of the application is in the past tense.  Neither the application nor Progressive's claim records document what was offered, when it was offered, or by whom, if any one, the offer was actually made.  If Progressive's insurance producer acting as its agent had made the offer, the insurance producer's file should have documented the details of what exactly was offered, when, and by whom.[14]  There is no documentation in the claims records Weilbacher was offered optional higher Uninsured and Underinsured Motorist limits as required by AS 21.89.020(c).

It is my opinion that Withers and Progressive failed to conduct with due diligence an investigation of an offer, if any, of higher Uninsured and Underinsured Motorist coverage limits to Weilbacher.

---

[14] AS. 21.27.350.  Records of licensees.  (a) A licensee shall document each action taken in regard to an insurance transaction. The documentation must contain all notes, work papers, documents, and similar material, and be in sufficient detail that relevant events, the dates of those events, and all persons participating in those events can be identified. The documentation must include a record of each insurance contract procured, issued, or countersigned, together with the names of the insurers and insureds, the amount of premium paid or to be paid, and a statement of the subject of the insurance; the names of other licensees from whom business is accepted, and of persons to whom commissions or allowances are promised or paid; and a record of each investigation or adjustment undertaken or consummated, and a statement of the fee, commission, or other compensation received or to be received on account of the investigation or adjustment.

3.    Progressive failed to give written notification to Weilbacher if additional time were required beyond 30 working days to complete its investigation. [15]

Withers' January 30, 2001 letter is more than 30 working days after Progressive received notice of the loss.  The letter failed to specify the additional time required to complete his investigation.

The letter's sole focus on coverage means that Progressive did not require additional time to investigate other aspects of the claim, such as liability or damages.

4.    Progressive failed to fully disclose to Weilbacher all relevant benefits and other provisions of coverage under which Weilbacher's claims may have been covered.[16]

As noted above, Progressive failed to promptly determine and fully disclose to Weilbacher whether Progressive's Medical Payments and Underinsured Motorist coverages were primary, excess, and/or pro-rata.

---

[15] 3 AAC 26.050(b). STANDARDS FOR PROMPT INVESTIGATION OF CLAIMS "Unless the notification of a claim is in the form of a suit, demand for arbitration, application for adjudication, or other pleading, or the claim becomes the subject of such litigation within 30 working days, the person transacting the business of insurance shall give written notification to the claimant that specifically states the need and reasons for additional investigative time and also specifies the additional time required to complete the investigation.  That notification shall be given no later than the 30th working day after notification of the claim is first received."

[16] 3 AAC 26.060(1).  "Any person transacting a business of insurance who participates in the investigation, adjustment, negotiation, or settlement of a claim:
        (1) shall fully disclose to a first-party claimant all relevant benefits and other provisions of coverage under which a claim may be covered."

Progressive failed to promptly determine and fully disclose to Weilbacher

the coverage available for the claims of the Estate of Heidi Weilbacher the

coverage available for the individual claims of Ronald Weilbacher.

5.      Progressive, upon notification of the loss, provided no claim forms, instructions,

and assistance so that Weilbacher could comply with legal, policy, or contract

provisions and other reasonable requirements requirement of the Underinsured

Motorists Insurance Coverages.[17]

Progressive's Uninsured and Underinsured Motorist coverage does not

require a Proof of Loss.  The claims records do not document other

requirements for Underinsured Motorist coverage.

6.      Progressive failed to affirm or deny coverage of Weilbacher's Underinsured

Motorist claims within a reasonable time of the completion of proof-of-loss

statements.[18]  Progressive failed to promptly provide a reasonable explanation of

the basis in the Weilbacher insurance policy in relation to the facts or applicable

law for denial of Weilbacher's Underinsured Motorist claims.[19]  Progressive

---

[17] 3 AAC 26.040(a)(3) REQUIRED CLAIM COMMUNICATION. "Any person transacting a business of insurance who participates in the investigation, adjustment, negotiation, or settlement of a claim must:
      (3) upon receipt of notification of a claim, promptly provide necessary claims forms, instructions, and assistance so that the first-party claimant is able to comply with legal, policy, or contract provisions and other reasonable requirements."
[18] AS 21.36.125.  Unfair claim settlement practices. "A person may not commit or engage in with such a frequency as to indicate a practice any of the following acts or practices:
      (5) fail to affirm or deny coverage of claims within a reasonable time of the completion of proof-of-claim statements."
[19] AS 21.36.125.  Unfair claim settlement practices. "A person may not commit or engage in with such a frequency as to indicate a practice any of the following acts or practices: