IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

RONALD V. WEILBACHER, )
Plaintiff, )
vs. )
PROGRESSIVE NORTHWESTERN INSURANCE ) COMPANY, )
Defendant. )

Case No. 3:05-cv-204-TMB

VIDEOTAPED DEPOSITION OF RONALD V. WEILBACHER

Monday, August 21, 2006
9:13 a.m.

Taken by Counsel for Defendant
at
Guess & Rudd, P.C.
510 L Street, Suite 700
Anchorage, Alaska



A-P-P-E-A-R-A-N-C-E-S

For Plaintiff:
Kenneth W. Legacki, Esq.
425 G Street, Suite 920
Anchorage, Alaska 99501
(907) 258-2422

For Defendant:
Gary A. Zipkin, Esq.
Aisha Tinker Bray, Esq.
GUESS & RUDD, P.C.
510 L Street, Suite 700
Anchorage, Alaska 99501
(907) 793-2200

Videographer:
Martha Enslow, CLVS
PACIFIC RIM REPORTING

Court Reporter:
Sonja L. Reeves, RPR
PACIFIC RIM REPORTING
711 M Street, Suite 4
Anchorage, Alaska 99501



I-N-D-E-X


EXAMINATION BY PAGE
Mr. Zipkin 5

EXHIBITS
1 Letter of 2/2/04 from Legacki to Withers (5 pgs.) 18
2 Denali Alaskan Insurance Information (6 pgs.) 19
3 Plaintiff's Supplemental Responses to Progressive's First Set of Discovery Requests (15 pgs.) 45
4 Letter of 4/19/05 from Withers to Legacki (1 pg.) 51
5 Letter of 4/11/05 from Legacki to Withers (1 pg.) 58
6 Part III - Uninsured/Underinsured Motorist Coverage (13 pgs.) 63
7 Declaration Page (1 pg.) 72
8 Copy of Check (2 pgs.) 89
9 Plaintiff's Final Witness List (6 pgs.) 92
10 Letter of 3/8/05 from Legacki to Withers (1 pg.) 103
11 Letter of 11/18/03 from Liberty Mutual to Legacki (2 pgs.) 105
12 Letter of 11/18/03 from Liberty Mutual to Legacki (2 pgs.) 109




ANCHORAGE, ALASKA; AUGUST 21, 2006
9:13 a.m.
-o0o-

VIDEOGRAPHER: My name is Martha Enslow. I am the videographer for Pacific Rim Reporting. It is the 21st day of August, the year 2006. We are on record at 9:13 a.m.

We are at the offices of Guess & Rudd to take the deposition of Ronald Weilbacher in Case Number 3:05-cv-204-TMB, Ronald Weilbacher versus Progressive Northwestern Insurance Company.

This deposition is being taken on behalf of the plaintiff, Ronald Weilbacher. At this time, I would like everyone in the room to identify themselves verbally.

MR. WEILBACHER: I'm Ron Weilbacher.

MR. ZIPKIN: Gary Zipkin for Progressive Northwestern.

MS. TINKER BRAY: Aisha Tinker Bray for Progressive.

MR. LEGACKI: Ken Legacki for Mr. Weilbacher.

MR. ZIPKIN: And just to make the record clear, you said this deposition is being taken on behalf of Mr. Weilbacher. Actually, it is being taken on

behalf of Progressive Northwestern.
VIDEOGRAPHER: Are there any stipulations?
MR. ZIPKIN: None. I assume we will agree to follow the Alaska rules on depositions.

-o0o-

RONALD V. WEILBACHER,
deponent herein, being sworn on oath,
was examined and testified as follows:

EXAMINATION

BY MR. ZIPKIN:
Q. Please state your full name for the record, sir.
A. Ronald Victor Weilbacher.
Q. I noticed when we first came in, I introduced myself, Gary Zipkin, representing Progressive Northwestern, and you said, "R.W."
A. I just automatically go by R.W.
Q. Is it okay if I refer to you as R.W.? That works for you?
A. Sure.
Q. What is your residence address?
A. It's 46500 Big Eddie Road, Soldotna.
Q. And you have a separate P.O. Box?
A. P.O. Box 3824.
Q. In Soldotna?
A. Soldotna. And then also P.O. Box 1918.



Q. What are the zip codes for those?
A. 99669.
Q. And how long have you lived at the Big Eddie address?
A. 11 years.
Q. Have you, R.W., reviewed any materials, documents, specifically to prepare yourself for this deposition here today?
A. I read a little bit, not much.
Q. Can you recall what it was that you looked at?
A. I'm not too sure. I think it was a letter or just a starting paper.
I went through a couple pieces of -- yeah, you guys -- the petition, I guess, toward this, and that's about it. And then you guys did a couple of letters, but I didn't really go through them that much.
Q. I appreciate your best efforts to remember. You said the "starting papers". Sometimes people --
A. I went through some paper that told me to be here.
Q. I see. Okay. A lawsuit is often started with the filing of a complaint. In this case, there was a complaint filed on your behalf by your attorney.
Did you happen to review the complaint in preparation for today?



A. I just -- I think I just read it is all, but just quickly. I don't have much time. I am right in the middle of my season right now.
Q. Is that guiding?
A. Yes. Well, I don't go out in the boat, very little.
Q. Managerial responsibilities?
A. Yes.
Q. What's the name of the guiding service?
A. R.W.'s.
Q. Is it limited to the Kenai or do you go to the Kasilof? Where do you go?
A. Anything on the Kenai Peninsula. If I don't have a guide, I'll get you one.
Q. In preparation for today, do you know whether you reviewed or you even glanced at the Progressive Northwestern automobile insurance policy that was issued to you?
A. I glanced at just a little piece of it.
Q. The piece, would that have, if you know, related to the section of the policy that relates to uninsured/underinsured motorist coverage?
Did you look at that portion?
A. I'm not sure. If you showed it to me, I would be able to answer that better.



Q. That's something we'll definitely get to here. You said you looked at some correspondence, some letters; is that right?
A. Yes.
Q. Let me ask this sort of general question: Did you typically receive copies of letters, your own copies of letters that your lawyer would send to Progressive, Mr. Legacki would send?
A. Yes.
Q. In the normal course, you would receive in the mail copies of letters that Mr. Legacki had sent to my client? Does that sound right?
A. I'm not sure. I don't really open everything up and look at it.
Q. And did Mr. Legacki generally send you copies, your own copies of letters he would receive from the Progressive adjuster, in this case Danny Withers?
A. Yes.
Q. So you feel generally, as far as you know, you were kept fairly informed of the exchange of communications, written communications?
A. You know, this has been going on the past 90 days or more so, and I have got 70 people in camp and I'm pretty busy.
Q. I understand.

A. I kind of -- I don't understand reading the stuff that much anyway, so.
Q. What is your educational background, R.W.?
A. In which way? Schooling?
Q. Schooling, education.
A. I completed the ninth grade.
Q. Where was that?
A. In Yakima.
Q. Did you ever subsequently get a GED or any other high school equivalency?
A. No.
Q. Any additional academic classes after the ninth grade?
A. No.
Q. Do you hold any licenses, occupational licenses, issued from any portion of the state, division of occupational licenses?
A. I have a business license.
Q. How long have you had a business license roughly?
A. 28 years.
Q. Did you fill out the paperwork yourself or did you have someone do that for you?
A. I did it.
Q. Any other -- do you have to keep up a guiding license, for example? Do you have to keep that current?



Is there any paperwork associated with that?
A. Every year you go in there, but it's the same every year.
Q. Same form?
A. You just sign your name.
Q. Do you have someone who handles paperwork for your guiding business or do you pretty much run the business in terms of the paperwork yourself?
A. Which part of the paperwork?
Q. You have to generate bills, for example? You have to purchase supplies? Do you handle --
A. I use a credit card.
Q. But do you make all the purchases?
A. No, I don't make them all.
Q. Some people rely on a business partner or business manager to run paperwork, to the extent there is paperwork.
Do you have a business manager or do you basically run the business yourself?
A. What do you mean now? When you are talking the paperwork, like I use a credit card, and I have a person that has a credit card too, and if they use it, when I get the statement I can see where the money was spent.
Q. Who is this person who also --
A. There is Mary Beth.



Q. Is that her full name or does she have a last name as well?
A. Rathbun.
Q. If you can help me spell -- how does she spell that?
A. I don't know.
Q. Can I hear it again?
A. Rathbun. Then there is also -- I have a handyman more or less, a friend that stays around there and I got him a card now, you know, if he needs to pick up something.
Q. What's his name, sir?
A. Dick Anderson.
Q. How many vehicles do you currently own?
A. About seven.
Q. What insurance companies insure those vehicles currently, as of today?
A. I believe it's Allstate.
Q. Do you believe that all seven are insured through Allstate or are some of them not insured?
A. You know, I have a personal one, insurance, and I have a business insurance policy, and I'm not sure about the business.
Q. Your personal automobile insurance policy is with Allstate?



A. Yes.
Q. How long has it been with Allstate?
A. Since I left Progressive.
Q. When did you leave Progressive?
A. I'm not sure. Three, maybe four. I don't know how many years.
Q. Who is your current Allstate agent, insurance agent?
A. I go through Accord of Alaska, I believe it's called. And the gal down there, I don't know the one that handles my personal one. I just kind of had this other gal do it who does my business one, puts everything together for me.
Q. Who is that? Is that this Mary Beth?
A. No. Mary Beth is with me.
Q. You are referring to the Allstate person. My confusion.
A. I'm referring to the Accord person. It's Bonnie, and her last name I couldn't tell you. It's worse than mine.
Q. As far as you know, Bonnie at Accord of Alaska --
A. In Homer.
Q. In Homer. Thank you. -- handles or is responsible for getting your business auto policy?
A. Everything on my business. She puts everything

Page 13

together for me, boats, property, buildings.
Q. And with regard to the personal insurance that you have through Allstate --
A. It's one of the gals down there, but I couldn't tell you what her name is. I don't remember.
Q. Do you recall that you visited their office to complete an application for insurance?
A. I didn't do that. They did it for me.
Q. Did you ever sign an application? Did they, say, fax it to you or something?
A. No, they came to me. And then Bonnie, she had the other one too, but yet she doesn't do the personal, but she would take the paperwork back to them.
Q. They divide up commercial from personal within their office?
A. I wanted a personal one in case I rent a car. The business one wouldn't do car rentals.
Q. What liability limits are you carrying currently with Allstate on your personal auto policy?
A. I'm not sure.
Q. What uninsured motorist/underinsured motorist coverage limits are you carrying on your personal automobile policy currently?
A. I'm not sure what it is.
Q. Has Allstate --

Page 14

A. I know I'm paying a lot of money for it, whatever it is, but I want full coverage.
Q. What do you understand full coverage to mean, the highest possible?
A. Well, if I get hit, yeah. I mean, if I get hit, I want everything taken care of. You know, there is a deductible. I'm not sure how much that is, but there is a deductible.
Q. If we're speaking about the value of your vehicle, if we're just limiting the discussion for a moment to that, full coverage might mean that you want to make sure that you have coverage for your vehicle that pays you 100 percent of the value of your vehicle.
Do you agree with that concept? Does that make sense?
A. I also want coverage to where I don't get sued.
Q. Okay. So then on liability, that's often referred to as liability coverage, do you know whether you carry the highest possible limit of liability coverage sold in this state?
A. Well, I would imagine because I don't want to get sued.
Q. Do you know whether --
A. I have some personal property and I don't want to lose anything.

Page 15

Q. Do you know whether you carry, sir, what is sometimes referred to as an umbrella policy that provides even additional excess liability coverage above the policy you got from Allstate?
A. I'm not sure what I got. I couldn't tell you. All I can tell you is I pay a lot of money for it.
Q. Has the person you deal with at Accord of Alaska on the personal auto, I'm only talking about personal auto right now, has that person communicated to you the availability of optional higher limits for uninsured/underinsured motorist coverage up to $1 million per person, $2 million per accident?
A. No. I never really talked that much to her. I talked to Bonnie and I just told Bonnie I wanted to switch insurance and what they could do for me, and I said I wanted a good policy.
Q. Has any insurance company, to your knowledge, through their representatives, ever communicated to you your right to purchase uninsured/underinsured motorist coverage up to $1 million per person for bodily injury sustained in an accident and up to $2 million per accident?
Has any insurance company ever done that?
A. Not that I know of.
Q. Are you at all uncertain? In other words, it's

Page 16

one thing to say "no". It's another thing to say "not that I know of".
A. When I got this last policy and since the accident where I lost Heidi, I told them I didn't want to have any problems, I wanted the best I can get. And they quoted me prices.
Q. And you took what you were told was the best you could get? That's what you chose?
A. I took what I thought was going to be enough money. I think I'm paying like about $2,500, $2,600. I thought that was enough to be paying.
Q. Is that $2,500, $2,600 total for both personal and business policies or is that just on your personal?
A. I'm thinking I'm paying that on my personal. I had one truck on it and then I had a minivan on it for just four months out of the year.
Q. Is the minivan covered currently right now?
A. Yes.
Q. So at the moment, you have two vehicles on your Allstate policy?
A. Uh-huh. On the other one I got -- I think I got three. I'm not sure. I got two vehicles I don't let off my property.
Q. Are you talking about your business policy?
A. Yeah. There is two vehicles I don't even



Page 17

license. Then I have another vehicle which is just sitting in storage.
Q. As I heard your answer, and I apologize if I got it at all confused, I thought what you were saying was they offered you various options for purchasing liability and underinsured motorist coverage and you picked one of those. Does that sound right?
A. Uh-huh.
Q. Are you saying that you picked the most expensive one they offered you or something less than the most expensive one?
A. I said I picked the one I thought I was paying enough money for.
Q. I'm trying to figure out if that means the highest or somewhere below the highest.
A. It's up toward the top.
Q. But it's not the top?
A. I don't believe it was the top, but it was close to it. You know, if you don't want to have your car paid for, if it's your fault, then you are out the money.
Q. Did Progressive Northwestern, at the time you purchased the policy at issue in this case, did Progressive Northwestern give you the opportunity to purchase higher limits for uninsured/underinsured

Page 18

motorist coverage than you actually decided to purchase?
A. I don't remember. I just told her what I needed. I needed full coverage, and she faxed everything down to me. I think I have had more than one person talking to me about that with Progressive because I believe there were a couple of them left.
(Exhibit No. 1 marked.)
Q. I'm handing you Exhibit No. 1, R.W., and take all the time you need, take a look at it. I'll represent just for the record it's a letter from Mr. Legacki dated February 2, 2004 to Danny Withers at Progressive relating to this matter.
And my focus for this purpose is on the second page, but you are free to look at anything. There is a paragraph at the top of the second page. I'll just read it into the record.
"There is still a question as to whether or not Progressive offered Mr. Weilbacher underinsured coverage of up to $1 million. Mr. Weilbacher has no recollection of being offered that option. Nor does he have any recollection of declining that coverage.
In reviewing the records, there does not appear to be any indication of him declining the $1 million underinsured coverage, or for that matter that Progressive even offered him that coverage."

Page 19

Do you see that?
A. Yes.
Q. Is that a letter that, as far as you know, you did receive a copy of in the mail?
A. I might have, but I don't remember ever seeing this.
Q. Is Mr. Legacki's --
A. February 2nd?
Q. Is Mr. Legacki's representation here correct or incorrect or do you know?
A. No. It's correct.
(Exhibit No. 2 marked.)
Q. I'm handing you what's been marked as Exhibit No. 2. Did you purchase your Progressive Northwestern policy from Denali Alaskan Insurance, if you recall?
A. I believe so.
Q. You will see at the top of Exhibit No. 2 it refers to a fax coming from Denali Alaskan Insurance. You will see that on the first page there is information with your name.
It says, "Ron V. Weilbacher, P.O. Box 3824, Soldotna, policy term 12 months." Then I see there is a credit card authorization on the first page.
Does that look like your signature, sir?
A. Yes.

Page 20

Q. Below that it has driver information, just starting there for a moment. It says, "Complete for applicant spouse and all persons age 14 and over residing with applicant."
Was Heidi Weilbacher residing with you when you purchased the Progressive Northwestern policy?
A. Yes.
Q. Was she age 14 or over?
A. She was about that. In 2000?
Q. Yes. As of the end of 2000, December 21.
A. She would have been close to it.
Q. Was she 14 or over?
A. 13.
Q. She was 13?
A. 13 or 14, somewhere in there. She was born in '86.
Q. What date, if I can say, what date?
A. The end of July.
Q. In '86. So as of July 2000, she would have then turned 14?
A. Yes, she would have.
Q. So would you agree with me that by December of 2000, she was 14?
A. Uh-huh.
Q. I'm sorry. The answer is yes?

A. Yes.
Q. Shouldn't she have been listed, identified by you as a resident of your household who was 14 or over?
A. I guess if I would have read this better at the time, I would have had her listed. All I did is sign my name where she had the circles.
Q. Did the agent at Denali Alaskan go through the questions with you either in person or over the phone? In other words, the questions --
A. Who is the person on this? Who is the person that did this?
Q. Well, that was going to be one of my questions to you actually. It says --
A. I would have had -- you know, the date 12/21, I don't do insurance in December. I like to do everything in May. I like to pay for a year.
Q. Well, let me ask this --
A. That's the trouble I have with everything. I want everything done in May on everything, everything paperwork. I have even tried to get all my licenses, but the state won't do it to where they are going to send you something.
I'm not sure on this date on this even. I don't remember doing insurance in December.
Q. Okay. Well, turn, if you would, please just for



a moment to the fifth page, please. At the bottom right there are numbers sometimes called Bates numbers. It's 100095.
Do you see your signature at the bottom of the page under what's called "applicant signature"?
A. Yes, I do.
Q. Doesn't it bear the date of 12/21/00?
A. It does.
Q. Didn't you actually write that date yourself?
A. That's my handwriting.
Q. Are you now satisfied that you likely, for whatever reason, completed this application in December of the year 2000?
A. I would say I did, but I don't remember that.
Q. You have no reason to question your signature and date?
A. Why would they fax it to me on August 22nd though? That's '03. I don't know. Well, that's my signature and I wrote that date in.
Q. So as of December --
A. I can't say I recall doing this in December though. December 21st, huh. That's my date.
Q. Your signature, your date, December 21st. As of that date, Heidi Weilbacher was residing with you. She was over 14 and you agree, don't you, she should have



been identified if you were asked the question --
If you were asked the question, "Who resides with you who is 14 or older," you should have identified her, correct?
A. Yeah.
Q. If you look at the second page, sir, for a moment. Do you see that there are underwriting questions? You see that phrase in the middle of the page, and these are standard questions that insurance agents are required to ask, and it talks about prior insurance, and the answer is yes.
Let's just go through this for a moment. Did you in fact have prior personal automobile insurance before purchasing this Progressive policy?
A. I'm under the impression I had it with Progressive before this.
Q. Do you know when you first started with Progressive?
A. No. I started with -- I thought I had it for quite a few years.
Q. It talks about prior policy effective date, July 5th. It says, "Prior policy expiration date July 5, '01, so it went for a year from the year 2000 to the year 2001."
Prior carrier, it just says "other standard",



whatever that means. Then we go down to coverages. It says, first of all, "1995 Dodge".
A. On this prior insurance?
Q. Yes.
A. Was it with Progressive?
Q. I'm just here to find out what you know. That's how this works. Under coverage it says "1995 Dodge." Is that the vehicle that you had insured under the Progressive policy?
A. At that time, I believe I did have a '95 Dodge.
Q. And the next thing we see, you see the letters BI and then the dash capital PD? I'll just represent that that suggests bodily injury property damage for liability coverage and that it has the numbers 100, 300, 50. Do you know what those numbers mean?
A. No.
Q. Do you know what they mean even now, that if someone purchases a personal automobile policy for liability, just focusing on liability coverage, what you might owe to someone if you cause an accident, do you know as you sit here now what the numbers 100/300, what they mean, what their significance is?
A. I got a little bit more of an idea now today, yes.
Q. What is your understanding as you sit here today

Page 25

of what those numbers mean?
A. It's on different coverages.
Q. Well, I'm just focusing on the first one.
A. What is the first one?
Q. Where it says "BI/PD, 100/300/50." Just focusing on that coverage, as you sit here now, do you have an understanding of what those numbers refer to?
A. I feel I got a little bit more, but I'm not sure what you are trying -- what you want.
Q. I'm just trying to understand what you understand.
A. There is a $300,000 total.
Q. Is it your understanding as you sit here that the numbers refer to not $100, but $100,000, and not just $300, but $300,000? Do you understand that?
A. I'm not sure. This isn't --
Q. It's not your area?
A. Yeah.
Q. Fair enough, but I want to know even now after you have switched and now you have had Allstate for the last three years, even now when someone says you have liabilities limits of 100/300, you are not positive what that means even now?
A. I think it's full coverage, what they are going to pay.

Page 26

Q. If someone sues you for $1 million, you hurt somebody and it's your fault and they sue you for $1 million --
A. I expect to be covered.
Q. If you purchase a policy that has $100,000 per person coverage and $300,000 per accident coverage, and you get sued for $1 million, do you believe you have full coverage?
A. I feel if I got my insurance and if somebody is going to sue me, I want to be covered.
Q. Do you understand that --
A. I know I have got -- when I ask for insurance, I don't want to lose what I have. I want to be covered.
Q. Having said that --
A. I have heard other people -- people are always telling you to be incorporated or whatever to where you don't lose, but I have never done that. I have just always got insurance to cover me.
Q. You do understand, correct me if I'm wrong, that insurance companies when they issue a policy that there is a certain or finite limit to what they will pay?
There is a limit above which they won't pay. Do you understand that concept of insurance?
A. I believe so.
Q. All right. And that you can buy different

Page 27

limits. You understand that as well?
A. Yes.
Q. You can buy the minimum that the state requires or you can buy twice that or three times that, four times that, but, in any event, whatever you buy, you are buying something that has a limit? Does that all make sense?
A. Usually, like I have on my other insurance they force you to buy so much, whatever it is. I'm not sure what it is.
Q. Well, I'm speaking here about personal auto policies. You do understand that insurance companies issue policies that have limits to what they will pay? You understand that concept, right?
A. I'm not sure.
Q. In other words, the amount that you pay per year, you said you pay something like $2,500 per year?
A. I think I am now.
Q. Currently. Do you understand that the amount you are paying per year correlates, responds to the amount that the insurance company is obligating itself to pay if you get a claim?
The amount you pay relates to how much coverage you have?
A. I hope I am covered, yeah.

Page 28

Q. And you have already told us that you didn't pick the top, top, top one. You picked an amount that you were comfortable with, so you understood that you could have paid more money and gotten even more coverage, right?
A. I feel like I picked a pretty good one according to them. They told me it would be good.
Q. But you could have picked a higher one and gotten more coverage?
A. There wasn't that much difference. There was only like $100 or something.
Q. That extra $100 was going to get you something more than what you got?
A. What it would have got me, I don't know. I'm trying to get it lowered. A different vehicle, you think they would lower it.
Q. But I just want to make sure we're communicating on this point, that this $100 more you could have paid would have meant something slightly better in the way of coverage?
A. I don't know what it would have meant.
Q. Wouldn't have meant lower coverage to pay more, would it? That wouldn't make any sense, would it?
A. They told me I was pretty well covered at that $2,500 right in there.



EXHIBIT J
Page 7 of 34

Q. So you didn't purchase the additional coverage?
A. I don't know what the additional coverage was or what it would have meant.
Q. And when you see these numbers, even now after three years with Allstate, let alone the years with Progressive, when you see the numbers "100, 300" for a liability coverage, meaning the amount the insurance company is going to pay to protect you in case you hit somebody and you hurt somebody, even now you don't know what those numbers mean, 100, 300, what they relate to?
A. I know more now.
Q. Tell me what you know now.
A. That's going to be the total amount.
Q. The total amount of what?
A. What they will pay.
Q. What is the total amount they will pay?
A. $300,000.
Q. For what?
A. I guess the BI/PD, whatever it is.
Q. Do you know if that's -- so let's assume that you get in an accident with me and just for this example you are at fault. I am not at fault. I get hurt. I am hurt. I have $300,000 in damages.
Will your policy, this policy that we're talking about here, the Progressive policy, assuming you are at



fault and assuming I really have $300,000 damages, will this policy pay me $300,000 in damages?
A. What are your damages?
Q. $300,000 medical bills?
A. They should.
Q. So you don't understand that the 300 --
A. They should pay all of your medical bills.
Q. What if I have half a million in medical bills?
A. If it was my fault?
Q. Yes, it's your fault.
A. I would expect my insurance company to pay it.
Q. So it doesn't matter what these numbers say? If the person you hurt has solid, real solid damages of $500,000 just in medical, I am in the hospital for three years, you believe the company has to pay it?
A. Yes.
Q. Not you? Your company?
A. Right.
Q. Where do you -- where does that understanding come from that the insurance company can't say, "Look, R.W., you could have purchased more coverage, but really the only coverage you purchased here limited to $100,000 what Mr. Zipkin is going to get from your policy. The most we're going to pay Mr. Zipkin is $100,000."
Because that's what the "100" refers to. One



person injured, only one person hurt, Mr. Zipkin in the car with you -- in the car that you hit. If the insurance company comes back and says, "That's all we have is $100,000 for Mr. Zipkin," what is your understanding based on that they have to pay more?
A. I don't know.
Q. In other words, it would be nice -- let me see if I can phrase this right.
A. There is a lot of other numbers here too, a lot of other meanings or whatever too.
Q. Okay. But aside from what Progressive said or what you understood from Progressive, even right this minute with Allstate, the same example.
If you just hypothetically cause an accident and it was with Mr. Zipkin and Mr. Zipkin had $500,000 in medical, you would expect Allstate to pay that full $500,000?
A. True.
Q. Regardless of what the policy says?
MR. LEGACKI: You are being argumentative with him, okay, Gary. You are going around in circles. You are being argumentative with him.
He said he called a broker and said, "I want a good policy." He said if he caused $500,000 worth of damage, he expects the insurance company to pay. That's



between him and his broker.
Okay. You are getting argumentative here with him and I don't understand why.
MR. ZIPKIN: I move to strike all your comments. I ask you to limit your objections to those contemplated by the rules.
And I don't believe I'm getting at all argumentative with the witness.
Q. I'm trying to understand the basis upon which you, R.W., believe that regardless of what the policy may say you would expect the insurance company to pay whatever the damages are that you cause.
What is the basis for that, other than your hope and fondest wish?
A. I'm not sure.
Q. Going back to this Exhibit No. 2 for a moment. If you turn -- the second page we already talked about. If you turn to the third page, it has "applicant questionnaire" at the top. It says, "Please have the applicant complete this section and initial each response."
By the way, I see "R.W." by the initials there for those three questions. Are those your initials?
A. Yes.
Q. "Have all the residents of your household been

disclosed on this application including all residents age 14 and over, children away from home or in college who drive your vehicle on a regular and frequent basis."

You said, "Yes, they have all been disclosed." Right?

A. I initialed right where she told me to.

Q. Who told you to initial it?

A. Whoever was doing it at the time.

Q. Did you tell her, "I have a 14-year-old"?

A. I believe this was all faxed to me.

Q. Faxed to you. I think that's clear.

Did you tell the person who faxed it to you, "I have a 14-year-old," and they said, "That's okay. Go ahead --"

A. They knew I had my daughter.

Q. Did they know she was 14?

A. I don't know. I don't believe so.

Q. Are you saying that the agent instructed you to answer falsely the answer to number one, that you should have said no and you said yes because you were told to lie on the application?

MR. LEGACKI: Objection; argumentative. That's not an appropriate question.

Q. Were you told to answer falsely?

A. No.



Q. That answer was your answer, not somebody else's answer, right?

A. I was told to initial where the Xs were.

Q. Did they have Xs on this before they sent it to you?

A. They faxed it to me.

Q. Those are not your Xs then?

A. I don't believe so. I have had the insurance people pretty well just do the paperwork for me.

Q. Did they ask you on the phone whether you had anyone in the household who was 14 or over?

A. I don't remember talking to them on the phone, what they asked me.

Q. So they might have asked you, they might not have asked you whether you had someone in the household who was over 14? Is that a fair summary?

A. I don't know.

Q. If someone asked you to answer -- if someone checks a question for you where you are going to sign your name --

A. I don't know. I might have even put the X there, but I don't know.

Q. Let's assume --

A. I don't remember really. All I know is I can remember putting a policy when I seen something just to



hurry up and get it over with and get it faxed back because I do remember they wanted it back right away.

Q. But even if you are in a hurry, you are going to answer truthfully, right?

A. I will be truthful to you.

Q. And you were going to be truthful to the insurance company, weren't you?

A. I'm not one to lie.

Q. Okay. So let's assume that someone even checked it "yes" when the answer correctly is no. If you are going to put your initials on there, you are going to scratch out the "yes" and check the "no", aren't you, because you are truthful?

MR. LEGACKI: Assuming he did not tell. He is saying he did tell.

Q. I don't think actually Mr. Legacki said something that's at all truthful, but let's just take up on that. Did you -- Mr. Legacki says you told the people at Denali Alaskan that you had a 14-year-old daughter in the residence. Did you?

A. They knew my daughter.

Q. That wasn't the question. That wasn't the question. Did you tell the people at Denali Alaskan that you had a 14-year-old daughter, not that you had a daughter, that you had a 14-year-old daughter?



A. I don't think my daughter was ever brought up in it.

Q. So Mr. Legacki is wrong again. Okay. So did anybody tell you to answer yes when the answer should have been no on number one?

A. No, I don't believe anybody would have told me to make the answers.

Q. So it's your answer and you were trying to be truthful, but on this answer the answer is incorrect, isn't it?

A. I guess I didn't have her age right.

Q. If we turn to the next page, please, sir, the very next page. Under a section called "uninsured/underinsured motorist offer," this language here says that we have offered you uninsured/underinsured motorist bodily injury coverage and uninsured/underinsured motorist property damages.

And it says, "You may purchase these coverages with limits less than, equal to or greater than your limits of liability coverage."

Then it says, "Available limits of UM/UIM," which it has defined above, and it has all of these different limits, doesn't it, $50,000 each person, $100,000 each accident. Do you see those numbers?

A. I see the numbers.

Page 37

Q. They keep getting larger and larger, right, all the way up to $1 million each person, $2 million each accident? Do you see that?
A. Uh-huh.
Q. So this is an application you received by fax, which you signed and faxed back, so isn't it true that Progressive Northwestern told you that you may purchase uninsured/underinsured motorist coverage with limits all the way up to $1 million each person, $2 million each accident? Isn't that true?
A. I thought this is what I had everything here. When I get this paper, you know, it was faxed to me, I didn't really read it thoroughly, I would say, but I mean, I thought this was the policy and I signed it at the end, I would say.
Q. Fair enough.
A. That's where I signed it at the bottom.
Q. Do you agree as you look at it now, do you agree as you look at it now that Progressive Northwestern did give you the opportunity to purchase uninsured/underinsured motorist coverage all the way up to $1 million each person, $2 million each accident?
A. I'm not sure.
Q. What leads you to doubt or have any question about it?

Page 38

A. I'm just not sure.
Q. Isn't that what the words basically say here? "You may purchase this coverage with limits less than, equal to or greater," and it says "available limits are," and it goes all the way up. The highest one is $1 million, $2 million. Isn't that all laid out right there on that piece of paper?
A. I'm seeing it here. I'm seeing also you may reject either or both of these.
Q. Yes.
A. Where is the other one?
Q. That you can -- I mean you have both.
A. Where is the other both?
Q. There is bodily injury and then there is property damage. They do make a distinction, which they explain up above.
In other words, you can have just coverage against the risk of bodily injury to you or a loved one in your vehicle or you can not have any of that coverage and instead make sure you have coverage for your vehicle only, so if somebody that's uninsured whacks your vehicle, you get coverage for your vehicle.
A. I'm not sure what I'm reading here, I guess.
Q. That's fair enough. But it does say, doesn't it, that you may purchase these coverages all the way up to

Page 39

$1 million, $2 million? Isn't that what this page is saying to you?
A. You may purchase, it says, UM then slash UIM, BI and/or UM, slash UIM, PD. I don't understand it.
Q. Look. That's fair.
A. I don't understand what is here in front of me is what I'm saying.
Q. We have to start at the beginning of the paragraph. The beginning of the paragraph says, "We have offered you," and it spells it all out, "uninsured/underinsured motorist bodily injury coverage."
Then it puts that into initials, paren UM/UIM/BI, so it explains to you what those letters mean.
A. I see it. You are telling me it explains to me, but I'm telling you I don't understand it.
Q. Even reading it now?
A. I don't understand it.
Q. Okay. Have you ever consulted with anyone to help them explain to you what words mean either in a letter or a policy? Have you ever asked for assistance?
A. No. On my insurance the only -- I can't remember the gal. Julie was her name, whoever I had my main policies with, she would put everything together for me.
Q. Would you agree --

Page 40

A. I had trust in her.
Q. Her name is Julie?
A. Julie something. I don't remember her last name.
Q. Who did she work with?
A. I don't remember.
Q. Was she with Denali Alaskan?
A. I would have to pull out a box from years ago to find out what company it was.
Q. When you got this fax, which you signed and faxed back, did you ever say, "Geez, you know, this is confusing to me. I don't understand this part of it or that part of it. I'm going to call the agent and ask them questions." Did you ever do that?
A. No.
Q. You could have done that, right?
A. I wanted insurance.
Q. But if you had any questions in your mind, if something was confusing, you had the ability to pick up the phone and call the agent and ask them questions?
A. I felt the way the agent -- they want to sell you something and I felt they had me covered. They were taking care of me. You got to have faith when they put something together for you. I had no reason to think I wouldn't be covered.
Q. So as you look at this, did Progressive

Page 41

Northwestern give you the opportunity to purchase uninsured/underinsured motorist coverage all the way up to $1 million, $2 million? Did they or did they not?
MR. LEGACKI: Progressive or their agent?
A. What I'm saying is like, you know, I don't understand this here that much, but if you lay this in front of me, I would think that's what I have.
If you are going to fax me my policy, is this my policy?
Q. This is an application for a policy. Do you understand there is a difference?
A. I understand there is a difference between applications and policies.
Q. This is the application.
A. I was thinking it was a policy.
Q. This is the application for the policy. Even where you signed, it's under a title that says "applicant's signature".
So are you saying for the benefit of whoever is going to look at this, the judge or the jury, that you signed this thinking this was the policy and not an application?
A. On a '95 Dodge.
Q. I'm sorry. So the answer is yes, in your mind, this was the policy, not an application? Or do you

Page 42

think this was an application and not the policy?
A. I would say this is the policy number.
Q. Well, there is always a policy number, but that doesn't make this the policy.
A. I'm not sure what I would say.
MR. LEGACKI: It could be a declaration sheet, couldn't it?
MR. ZIPKIN: Move to strike counsel's comments.
Q. Do you maintain as you sit here that my client failed to give you the opportunity to purchase uninsured/underinsured motorist coverage all the way up to $1 million, $2 million? Do you maintain that?
A. I don't know what they gave me.
Q. So is it fair to say you don't maintain that because you don't know?
A. I don't know what they gave me.
Q. Aside from what they gave --
A. You got me confused, so I don't know what I got.
Q. Aside from what you got, I'm talking about what they offered aside or what they gave you the opportunity to purchase, aside from what the policy that you ultimately got says or doesn't say, this question is limited to what you were given an opportunity to buy.
Were you given the opportunity to buy

Page 43

uninsured/underinsured motorist coverage up to $1 million, $2 million?
A. I don't know.
Q. Did Allstate give you an opportunity to purchase uninsured/underinsured motorist coverage up to $1 million, $2 million with your current policy?
A. Yes, I think they did.
Q. How did they do that, verbally, orally or in a written manner?
A. I believe I bought the million.
Q. You believe that you currently have on your Allstate policy uninsured --
A. Since I lost my daughter, I have been -- people have been telling me about these policies a little bit, so I have been getting a little more education on that. I would say it only cost me my daughter. But, yeah, I got a big policy now.
Q. So it's your belief --
A. That's what I have always asked for when I get insurance is big policies. When I asked for my insurance on my other insurance policy, I asked for double.
Q. Double what?
A. Double whatever I have to have for the State of Alaska.

Page 44

Q. So if the minimum that the state requires is $50,000 protection for you against the risk of injuring some person, $50,000, you would typically say, "I want double that"?
A. No.
Q. I'm sorry. I didn't understand.
A. The state has never said $50,000.
Q. Actually the state does say $50,000. You have to have a minimum of $50,000. That is what the state says. You are not aware of that?
A. No.
Q. What did you think the state minimum was?
A. I thought it was -- which policy?
Q. Auto liability?
A. I don't know anything about auto. I'm learning about auto, but I was talking a different policy.
Q. What were you talking about?
A. Alaska State Parks, State of Alaska.
Q. Coverage for what though? I'm sorry. Coverage for a home, a boat? Coverage for what?
A. Coverage for them to run a business on the water.
Q. Is it possible that you had any conversation along the same lines with Denali that you asked that they get you double whatever the state requires?
A. No.

MR. ZIPKIN: Let's take a break for the videotape to switch over.
VIDEOGRAPHER: Off record 10:08 a.m. This is the end of tape number one.
(There was a short break.)
VIDEOGRAPHER: On record 10:16 a.m. This is the start of tape number two.
(Exhibit No. 3 marked.)
Q. R.W., I have had this marked as Exhibit No. 3 and I would like to refer that to you for a moment. It's entitled Plaintiff's Supplemental Responses to Progressive's First Set of Discovery Requests.
It's a fancy title basically saying these are your answers to some of our questions that we have posed.
Before I get into the specifics, let me ask you this: Have you received -- stop there for a second. Have you actually ever sat down and read your Progressive policy from cover to cover, ever?
A. No.
Q. Have you ever sat down and read the portion of your Progressive policy that deals with uninsured/underinsured claims, just that section in its entirety?
A. No.



Q. If you can turn in the supplemental -- this exhibit to page six, please, for a moment. In the middle of the page you will see something "Supplemental Answer to Interrogatory Number Four".
The first sentence, and I'll quote, it says, "Mr. Weilbacher believes that as he reads the insurance policy Progressive has an obligation to pay him a separate per person limit under AS09.15.010, and it has not done so."
And it goes on. That's one sentence. Do you see that sentence?
A. Yes.
Q. Do you even -- have you ever heard of or read AS09.15.010?
A. I have since the accident, yes.
Q. When was the most recent time you read that?
A. I don't remember.
Q. You have said a moment ago that you have never actually read the entire policy.
A. When I answered that, I assumed that you meant when I received it in the mail.
Q. I meant even now.
A. I have not read it from cover to cover, no.
Q. Even now, not just going back to the time of your daughter's tragic death or any time before. I'm talking



about as of now. Have you ever read the uninsured/underinsured motorist section cover to cover?
A. I have, yes.
Q. You have? When did you do that?
A. I don't remember.
Q. Within the last three months?
A. I'm not sure.
Q. Within the last year?
A. I would believe so. I'm not sure though, but I believe so.
Q. Did you read it side by side with AS09.15.010?
A. I don't know.
Q. What is AS09.15.010? What is that?
A. Numbers.
Q. Just numbers. Does it refer to some bill in the legislature or some law or some case, some case made law or some statute or any idea?
Does it refer to a bill, a statute, a case? What does it refer to?
A. I'm sure it has something to do with insurance, but that's why it's on this piece of paper. I'm sure it has something to do with insurance.
Q. Did you write out this sentence?
MR. LEGACKI: Wait a minute. We initially sent discovery requests and we put down that



Mr. Weilbacher thought he was entitled to underinsured motorist coverage.
Then your associate wrote this nasty gram and said what documents are relied upon and so forth, and she wanted more information, so we put down the statute and we put down the language.
That's what she asked for in her letter. So otherwise she said that we were not complying with Rule 26.
So you wanted the statute and you wanted the things. We put it in there after her letter.
So, Gary, you are playing games here. This is really being obnoxious, Gary. The guy has got a ninth grade education. He is dyslexia and then you are trying to ask him what the statute means. He has lost his daughter, Gary.
MR. ZIPKIN: I move to strike all those comments.
MR. LEGACKI: I know you move to strike them. Why don't you try to just stop being obnoxious about it and just ask the questions.
Your associate was the one who wanted to know under what documentation, what authority that he is entitled to underinsured motorist coverage.
That's what we put down. You know that,



EXHIBIT J
Page 12 of 34

Page 49

Gary, and she knows that. You are just playing games here.
MR. ZIPKIN: There is no game being played by me.
MR. LEGACKI: Sure, it is, Gary.
MR. ZIPKIN: I'm not going to get into this.
Q. R.W., it is not a sin for one in litigation to rely on counsel to draft answers as opposed to doing it themselves. It's not a sin.
Is that what happened here? Did you rely upon counsel to draft the answer? There is nothing wrong with that if that's true. Is that what occurred?
A. I didn't put this together, if that's what you are asking me.
Q. You relied on counsel to assist with these responses?
MR. LEGACKI: Because --
A. What do you mean by that now?
MR. LEGACKI: Because your firm did not like the honest answers he gave before, which says that he thought his insurance covered him for his policy.
You wanted the documentation and the background for it, and that's what he did.
MR. ZIPKIN: We are getting close to the point, Ken, where your obstructionist behavior is going

Page 50

to result in the stoppage of the deposition and a request for sanctions.
I am asking simple questions. I believe R.W. and I are communicating fairly well, and we're doing pretty well without your obstructionist tactics.
MR. LEGACKI: I see. When you did it at your deposition it was not obstructionist when you kept on interjecting? Okay.
Q. R.W., to the best of your knowledge, these answers that we're talking about here were prepared by your attorneys to assist you in this case, right?
A. Yes.
Q. If you look at the next page, page seven, supplemental answer to interrogatory number five. It's like two-thirds of the way down the page of page seven.
The second sentence of that, and I'll quote, it says, "Why Progressive has failed to pay Mr. Weilbacher."
A. Where are you at?
Q. I'm sorry.
A. Page seven?
Q. It's page 7 of 14. Yes, you got it.
A. I'm on page 6 of 14.
Q. I'm sorry. My fault. Page 7 of 14 under "Supplemental Answer to Interrogatory Number Five". I

Page 51

have highlighted it on my copy because of the sentence I wanted to read into the record.
It says, "Why Progressive has failed to pay Mr. Weilbacher is beyond his knowledge and all the documents for the reason for not paying Mr. Weilbacher are in the possession of Progressive."
Do you see that sentence?
A. Read that one more time for me, will you?
Q. Sure. "Why Progressive has failed to pay Mr. Weilbacher is beyond his knowledge and all the documents for the reason for not paying Mr. Weilbacher are in the possession of Progressive."
Have I read that right?
A. Yes.
(Exhibit No. 4 marked.)
Q. So I apologize, R.W., but there is more paper, but Exhibit No. 4 you said earlier that you did receive, generally speaking, copies of correspondence that your lawyer sent to Progressive, you got copies, and, generally speaking, you got copies of letters that your lawyer got from Progressive, you got those.
Do you know whether you got a copy of this one, April 19, 2005, a letter from Danny Withers at Progressive to your attorney, Ken Legacki?
A. What are you asking me?

Page 52

Q. If you remember whether you ever received a copy of this letter?
A. I might have, but I don't know.
Q. You might have. In preparing for today's deposition, do you know whether you looked at this April 19th letter?
A. I can't say that I have or haven't.
Q. Fair enough. If I don't ask, I don't find out. In the second sentence of this letter it says, "It is Progressive's position" --
A. Who wrote the letter?
Q. It says "Danny Withers" at the bottom. It doesn't have a signature unfortunately, but it has his name. Danny C. Withers on behalf of Progressive Northwestern. Do you have that?
A. Yeah. You just gave it to me.
Q. Yeah. I'm just trying to answer your question. Do you see that?
A. I didn't know who did the letter.
Q. I'm sorry. It's down there at the bottom. At the second sentence it says, "It is Progressive's position that Mr. Weilbacher does have" --
A. Where are you at now?
Q. Second sentence. First paragraph, second sentence. Second sentence of the letter. "It is

Progressive's position that Mr. Weilbacher does have UM/UIM coverage under the above-noted policy."
And it refers to policy number 65824951-0. It goes on though. It says, "However, it is my understanding that he is presenting an individual claim for loss of society/loss of consortium relating to Heidi Weilbacher's untimely death in the accident on the above-captioned date."
Next paragraph, "It is Progressive's position that any claims for loss of society and loss of companionship/loss of consortium under the above-noted policy is derivative of any claims for wrongful death and are subject to a single bodily injury limit of liability."
Have I at least read it correctly, as far as you can tell?
A. I don't understand it though.
Q. I know, but I was trying to start with does it appear that I have read it at least correctly?
A. Yeah.
Q. And I was wondering whether -- you are sort of jumping ahead, but that's fine.
A. I'm jumping ahead?
Q. Well, by jumping ahead to say you are not sure you understand it. My question was did I read it right.



The next question is did you understand what it said here?
A. I'm not sure. You want to do it one more time?
Q. No. I think the record has heard enough of me for that. But let me just ask, aside from whether it all makes sense to you, whether it's rational, reasonable, correct, incorrect, wouldn't you agree with this much, this letter sets forth Progressive Northwestern's position on your claim?
It tells you what Northwestern -- what Progressive Northwestern's position is, whether it's right, whether it's wrong, whether it's clear, whether it's confusing? They did tell you in this letter what their position is, right?
A. I'm not sure. I'm not sure what they are trying to say.
Q. Progressive in this case, I'll just tell you this much, Progressive takes the position that this letter, this April 19, 2005 letter set forth Progressive's position.
In fact, the second paragraph even says -- uses the words "Progressive's position," and I'm just asking initially whether you would agree with me that the letter at least attempts to set forth Progressive's position, not that you agree with it, not that



Progressive is right?
A. I can see where it says "position".
Q. Wouldn't it be wrong, in other words, to say in an answer to an interrogatory that Progressive has never told you what their position is because they have? Progressive has told you what their position is, right?
A. In the form of a letter?
Q. Yes, in the form of a letter. They have told you what their position is? Even if they are dead wrong, they have told you what their position is, right?
A. I don't remember getting this letter, but I mean are you asking me about this letter now?
Q. Yes, I'm talking about the letter. And let's assume you never got the letter, because you are not sure, right? You don't know if you got it or not?
A. No, I'm not sure.
Q. Let's assume for the sake of this question you never got the letter.
A. If I got this letter, I might have probably just sat it on the stack of the other stuff for this because I know if I read it, I ain't going to understand it anyway.
Q. So let's assume you never got the letter or that you got it and you never read it. Now you see it. Now you have it right in front of you.



Would you agree with me that in this letter Progressive tried to set forth their position on whether they owe you additional money under their policy?
Whether you got this letter or didn't get this letter, now that you are looking at it, isn't it true that Progressive in this letter sets forth their position?
A. Would you read the letter one more time?
Q. I don't think the record wants to hear me keep reading. I'm happy to do it for your benefit.
MR. LEGACKI: I'm confused here. This says why Progressive failed to pay it beyond his understanding, his knowledge.
Like you say, right or wrong, but why they came to that conclusion doesn't mean that he understands it.
MR. ZIPKIN: That's just argumentative. What's the objection? Is there something wrong with the form of my question?
MR. LEGACKI: I don't know why -- I think you're argumentative. I think you are trying to misconstrue the evidence. You are trying to put something in there that's not here.
MR. ZIPKIN: It's another obstructionist objection. If the form of my question was incorrect,



EXHIBIT J
Page 14 of 34

Page 57

please let me know.
If you have an objection that the law recognizes, please let me know, but that's not an objection.
MR. LEGACKI: You got things confusing here. You are trying to misconstrue what he says. It's argumentative. It misconstrues the evidence.
MR. ZIPKIN: The last question he wanted me to read it to him. I don't know how that was argumentative.
Q. "It is Progressive's position that any claims for loss of society and loss of companionship/loss of consortium under the above-noted policy is derivative of any claims for wrongful death and are subject to a single bodily injury limit of liability."
Whether Progressive is right or whether they are wrong, whether you understand it or whether you don't understand it, would you at least agree with me, R.W., that Progressive told you in this letter what their position is?
A. I'm not sure. I'm trying to get through the first paragraph there.
Q. Well, okay.
A. You read it right back. When you started reading it back to me, you started on the second paragraph. I

Page 58

thought you was going to read it.
Q. Fair enough. The first paragraph says, and we'll read the whole thing. "Progressive is in receipt of your letter of April 11, 2005 with reference to the above-mentioned claim."
A. This letter of April 2005 --
Q. That's a letter --
A. Is that the letter from --
Q. That's a letter from Mr. Legacki to Progressive.
A. Okay.
Q. In fact, we can get that out. Is that a letter you would like to see?
A. I just want to know who did the letter April 11th.
Q. That's a fair question, R.W. I'm not arguing with you.
(Exhibit No. 5 marked.)
Q. Here is a copy of what we have marked as Exhibit No. 5. As you can see, it's dated April 11, 2005. It's from Ken Legacki, your lawyer. It's to Danny Withers.
I'll read the whole thing because it's short. "I am in receipt of your April 5, 2005 letter. It is not clear whether Progressive is going to pay Mr. Weilbacher the policy limits under the policy.
Please confirm that not only is he covered by the

Page 59

policy, but you also will be paying policy limits to Mr. Weilbacher. Sincerely, Ken Legacki."
Do you see that? So would you agree that Mr. Legacki's April 11th letter asked for a straightforward statement of Progressive's position? Would you agree with that?
A. Yes.
Q. And would you agree that whether Progressive is right or wrong, Progressive --
A. Whether they are right or wrong?
Q. Yeah, because I don't want to argue the merits with you right now. I just want to know whether you agree that Progressive's April 19th letter was a letter by Progressive to set forth their position in response to Mr. Legacki's request?
A. I'm not all that sure, but I guess.
Q. Let's talk about your claim for a moment. This letter, Progressive's letter, in the first paragraph, which we were starting to read a moment ago says in the second sentence, "It is Progressive's position that Mr. Weilbacher does have UM/UIM coverage" --
A. Where at now?
Q. I'm sorry. I was back in the first paragraph. You wanted me to sort of --
A. I thought you said second sentence.

Page 60

Q. Second sentence, first paragraph. It can be confusing. The third sentence of the first paragraph starts out, and I'll read the whole thing, "However, it is my understanding that he is presenting an individual claim for loss of society/loss of consortium relating to Heidi Weilbacher's untimely death in the accident on the above-captioned date."
That sentence, let's talk about that for a moment. Okay. You have lost your daughter in this tragic accident. We all understand that. By the way, this was an accident caused by the reckless and criminal conduct of Robert Esper, E-s-p-er, right?
A. He was the driver.
Q. Right. He was ultimately the person criminally responsible for your daughter's death, right?
A. Criminally?
Q. Well, whether we say "criminally" or not -- maybe you are not prepared to say he was acting criminally. I am prepared to say it, but you're not.
He was responsible for your daughter's death?
A. Fully responsible? I don't believe so.
Q. Who else was?
A. How about the people that kept chasing him?
Q. You mean the police officers?
A. How long did they chase him?

Page 61

Q. Well, one was coming from the opposite --
A. And they knew where he lived. Don't you think they could have just went and got him later instead of putting everybody at risk on the road?
I don't think he is full responsible. Anyway, I'm sorry.
Q. Have you brought any sort of a lawsuit against the police who were in pursuit?
A. No.
Q. You understand Officer Wolham lost his life in this accident, right?
A. A lot of people did and it changed a lot of lives.
Q. Do you think Officer Wolham should not have been attempting to respond to this Mr. Esper?
A. I don't know what to think.
Q. In any event, what I was trying to get to is an understanding of your damages. Do you see a reference here to loss of society or a loss of consortium in this letter? Do you have an understanding of what those words mean?
I'm not asking you for a legal definition, but as a layperson, you have suffered the loss of your daughter. The law talks about society, consortium. You have lost the companionship that you would have had with

Page 62

your daughter, right?
A. Yeah.
Q. Sometimes that's referred to as loss of society, loss of companionship, the loss of whatever comfort she could provide to you or you could provide to her.
You have lost that comfort that you could provide to each other, right?
A. Yes, lost.
Q. It's all lost. It's gone forever. Loss of comfort, loss of society, loss of companionship. Those are all things that you have lost, correct?
A. And a lot more.
Q. Okay. What else have you lost?
A. Huh?
Q. What else?
A. I lost talking to her, playing with her, taking her places again. I lost watching her grow up, grandkids. I lost a lot. You can go on and on and on. You haven't got enough time for it.
Q. The law generally groups that all together as loss of companionship or loss of society. Does that make sense?
A. No.
Q. Okay. I want to take us to the policy and figure out what you understand or what you don't understand

Page 63

about the policy in connection with this loss.
A. Could you tell me what this word here means right here? What's this mean? Policy is what?
Q. Derivative. Derivative. We're going to get to that even more in a moment.
(Exhibit No. 6 marked.)
Q. This is Exhibit No. 6. I want to answer your question, and it's a fair question, so we'll get to it. This is a portion of your policy with Progressive.
It's the section of the policy that relates to uninsured/underinsured motorist coverage. I believe it starts at page 20 of your policy. That's why it's not page one, because we're going right to the coverages that are at issue here.
In other words, there is a liability portion of a policy. There is no liability on your part for anything. You have nothing to do with causing this accident, right?
That's clear, right? You had nothing to do with causing this accident? Fair statement?
A. Yeah.
Q. By the way, if you want to take a break for any reason --
A. Let's do. Let's take a break.
VIDEOGRAPHER: Off record 10:42 a.m.

Page 64

(There was a short break.)
VIDEOGRAPHER: On record 10:51 a.m.
Q. R.W., you have Exhibit No. 6 there in front of you. This is a portion of the Progressive policy that's at issue here.
Page 20 starts off by discussing what's called the insuring agreement for uninsured/underinsured motorists bodily injury coverage.
Do you see that it says in the opening words, the very first six words are "subject to the limits of liability"? Do you see that?
A. Yes.
Q. So subject to the limits of liability, Progressive in this paragraph says, and I'll quote starting on the third line, "We will pay for damages other than punitive or exemplary damages."
A. Where are you at?
Q. Third line.
A. Oh.
Q. "We will pay for damages other than punitive or exemplary damages, which an insured person is legally entitled to recover from the owner or operator of an uninsured/underinsured motor vehicle because of bodily injury," underneath that it says, "one, sustained by an insured person; two, caused by accident; and three,

Page 65

arising out of the ownership, maintenance or use of an uninsured/underinsured motor vehicle."
I have read a lot of words there and I understand that you are not an expert on insurance. That's pretty clear. And you don't have to be. It's not your job to be, but I just want to see if we can cover a few points.
When it says "we" will pay, you understand that means Progressive Northwestern? The "we" is a reference to the insurance company? Does that make sense?
A. You are saying it's the insurance company.
Q. The word "we" refers to the insurance company.
A. It's not me?
Q. It doesn't mean you. It means the insurance company. Does that make sense? The insurance company is going to pay certain moneys?
A. You are saying "we" is Progressive, not me?
Q. "We" is Progressive. It doesn't mean R.W. Are you with me so far? The words "we" --
A. Should be Progressive.
Q. It's Progressive. So just bit by bit, we're going to go here. So subject to the limits of liability, again, it's always subject to the limits of liability, Progressive is going to pay for damages.
Are you with me so far? Progressive will pay for damages?

Page 66

A. Yes.
Q. Then let's just skip those words "punitive, exemplary" because they are not important here. "Progressive will pay for damages which an insured person is legally entitled to recover."
Let's just go bit by bit. You were insured under this policy, right?
A. This is my policy.
Q. So you are an insured, right?
A. Pardon me.
Q. You have no problem with the idea that you are insured under this policy? You bought the policy, so you are an insured person?
A. This is my policy. I am insured.
Q. And your daughter, Heidi, if she resided with you in your home, and let's get past this issue of whether she should have been disclosed or not.
Your daughter, Heidi, she might be an insured person. She was living in your home, wasn't she? That's correct?
A. Yeah.
Q. Okay. Now, Progressive is going to pay damages which you or Heidi, if she is a household member, are legally entitled to recover, no difficulty there, legally entitled to recover, what you are allowed to get

Page 67

in the way of damages from the owner or operator.
Let's just stick with operator for a moment, Esper. Progressive will pay damages to you that you are entitled to recover from Esper because he was operating a vehicle that did not have enough insurance.
There wasn't enough insurance covering Esper to cover all the damages that your daughter, Heidi, sustained obviously, right?
Do you agree with that, Esper did not have enough insurance to cover all of your damages?
A. I don't know what his insurance was.
Q. Okay. Let's assume for the sake of discussion that he did not have enough insurance, save ourselves a bunch of time.
A. Okay.
Q. This policy that Progressive issued to you says that, again, subject to the limits of liability, Progressive is going to pay the damages that you are legally entitled to get from Esper, you or Heidi are legally entitled to get from Esper because he is driving a vehicle that does not have insurance.
Assuming, we'll just assume that he didn't have enough insurance.
A. Now, you said Heidi and me.
Q. You are a named insured.

Page 68

A. And Heidi.
Q. And Heidi, if she is a member of your household, skipping over this whole disclosure/non-disclosure issue. Heidi was a member of your household, so she might qualify as an insured person.
It says Progressive is going to pay the damages that you and Heidi are entitled to recover from Esper because of bodily injury sustained by an insured person in an accident that arises out of the use of an uninsured motor vehicle.
There is a lot of fancy words there.
A. What are you coming to?
Q. I'm coming to it right now.
A. What is it?
Q. Doesn't this language say that Progressive is going to pay the damages that you or Heidi have sustained because of Esper's negligence as a result of the bodily injuries sustained by Heidi in this accident?
Does that make sense to you if we condense it into that language? Progressive is going to pay the damages that you and Heidi have sustained as a result of Esper's negligence because of the bodily injuries which led to Heidi's death in that accident?
Does that seem like a fair summary of what that says?