Adam Lund                          Deposition                          July 13, 2006

## Page 1

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF ALASKA
3
    RONALD V. WEILBACHER,
4
            Plaintiff,
5
6      v.
7   PROGRESSIVE NORTHWESTERN
    INSURANCE COMPANY,
8
9          Defendant.
10   _____/
    Case No. 3:05-CV-0204-TMB
11
12
13
14      DEPOSITION OF ADAM LUND
15
16      Pages 1 - 60 inclusive
17      Thursday, July, 13, 9:00 a.m.
18          Anchorage, Alaska
19
20
21
22
23
24
25

## Page 2

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF ALASKA
3   RONALD V. WEILBACHER,
4          Plaintiff,
5      v.
6   PROGRESSIVE NORTHWESTERN
    INSURANCE COMPANY,
7
8          Defendant.
9   _____/
    Case No. 3:05-CV-0204-TMB
10
11      DEPOSITION OF ADAM LUND,
12   taken on behalf of the plaintiff, pursuant to notice,
13   at the offices of Alaska Stenotype Reporters, 511 West
14   Ninth Avenue, Anchorage, Alaska, before Cynthia J. Kenan,
15   Court Reporter for Alaska Stenotype Reporters and Notary
16   Public for the State of Alaska.
17
18
19
20
21
22
23
24
25

## Page 3

1          A-P-P-E-A-R-A-N-C-E-S
2
3   For Plaintiff:      Kenneth W. Legacki, P.C.
                        By Kenneth W. Legacki
4                       425 G. Street
                        Suite 920
5                       Anchorage, Alaska 99501
                        907/278-4848
6
7
8   For Defendants:     Guss & Rudd
                        By: Gary A. Zipkin
                        510 L. Street
9                       Suite 700
                        Anchorage, Alaska 99501
10                      907/793-2299
11
    Also Present:       Jay Wesolowski
12
13   Reported By:        Cynthia Kenan
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          I-N-D-E-X
2
3   EXAMINATION BY:                    PAGE
4   Mr. Legacki                          5
5
6   EXHIBITS:
7      10  Lawrence Decision             33
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT_____0_____
Page____1___of _15_

Adam Lund                                    Deposition                                    July 13, 2006

Page 5

1  Anchorage, Alaska, Thursday, July 13, 2006, 9:00 a.m.
2                    ADAM LUND,
3       called as a witness herein on behalf of the
4       Plaintiff, having been duly sworn upon oath
5       by Cynthia Kenan, Notary Public, was examined
6       and testified as follows:
7                 EXAMINATION
8    Q    (By Mr. Legacki)
9         Sir, would you please state your name for the
10  record and spell your last name?
11   A    My name is Adam Lund. Last name is L-u-n-d.
12   Q    And how would you prefer to be addressed?
13   A    Adam is fine.
14   Q    You're listed as a witness in this case. What
15  is your position with Progressive?
16   A    My title is injury process manager, basically
17  means I am a manager for claims reps in our claims
18  organization for Washington and Alaska.
19   Q    So what exactly does that mean if you're the
20  manager of claims reps for Alaska and Washington?
21   A    Well, I supervise the group of managers and
22  claims reps who handle claims in organizations. So
23  responsible for hiring and providing guidance on
24  claims from time to time.
25   Q    So I guess you're like a regional manager?

Page 6

1    A    Regional manager.
2    Q    That would be a better term?
3    A    (Witness nods affirmatively.)
4    Q    Are you the one who gives the ultimate
5  authority to settle the case or not settle a case?
6    A    The ultimate authority depends on -- we have
7  levels of authority for settlement as far as dollar
8  authority.
9    Q    And what is your level?
10   A    A hundred thousand dollars.
11   Q    Okay. So that's generally the policy limits?
12   A    Well, policy limits vary, obviously. So it
13  could be fifty. It could be a hundred. It could be
14  something different.
15   Q    Does somebody like Dan Withers have the
16  authority to settle a claim for $100,000?
17   A    Danny does not have that much authority.
18   Q    What's his authority?
19   A    I believe his authority is $40,000.
20   Q    But anything over that he has to get approval
21  from you?
22   A    Correct.
23   Q    And if it's over 100,000 do you have to go
24  above someone else?
25   A    That's correct.

Page 7

1    Q    And where is that person located?
2    A    Seattle.
3    Q    And that's there you're from, Seattle?
4    A    Correct.
5    Q    How long have you been with Progressive?
6    A    Total of 15 years.
7    Q    And what has been your position with
8  Progressive?
9    A    I started out as claims rep. I've been a
10  supervisor, immediate supervisor, we called it team
11  leader. I've been a branch manager in what we call
12  our PCS group basically that handles the initial
13  claims that come in, regional manager and now this
14  other kind of regional manager, which is responsible
15  for the injury claims in Washington and Alaska.
16  That's my current job.
17   Q    Are you licensed in Alaska, by the way?
18   A    No.
19   Q    Do you know what gain share is, by the way?
20   A    I do.
21   Q    Could you explain that to me?
22   A    It's a form of compensation that's in
23  addition to your normal salary.
24   Q    Okay. And exactly how does one get this
25  additional compensation?

Page 8

1    A    Well, everybody at Progressive is part of the
2  gain share. So it's basically compensation that is
3  provided at the end of the year to all employees.
4    Q    Is it based on individual performance or
5  group performance?
6    A    It's based on performance of the company as a
7  whole.
8    Q    Does each employee get the same percentage?
9    A    The percentage is varied by job title.
10   Q    What do you mean by job title?
11   A    Well, different levels of responsibility.
12  You might have a person who's a secretary, essentially
13  they'll have a lower gain share than a manager might,
14  for example.
15   Q    And does each manager get the same percentage
16  or it depends on their performance?
17   A    It depends on their job. It doesn't depend
18  on their performance per se. Basically a job level
19  should have a percentage that you're entitled to base
20  on the job level.
21   Q    So each -- what's the different adjuster
22  categories?
23   A    Well, there's essentially four levels for
24  claims adjusters: Claim rep one, two, three and four
25  is the simplest way to describe it. Claim rep one

EXHIBIT     D
Page     2    of   15

Adam Lund                          Deposition                          July 13, 2006

---

**Page 9**

1  would be a new trainee. Claim rep two would have
2  demonstrated some proficiency in handling claims and
3  then on up to three and four, which are your more
4  senior reps that have extended experience and
5  knowledge in handling claims.
6     Q   So each claim rep gets the same percentage at
7  the end of the year.
8     A   No. Similar to the description I gave you
9  earlier, the claims reps have different --
10    Q   I'm sorry, each -- claims rep one, do they
11 get the same percentage?
12    A   Each claims rep one will get the same
13 percentage, yes.
14    Q   Claims rep three?
15    A   It's all the same by job title.
16    Q   So it doesn't matter on your evaluations and
17 performance the percentage you get for each?
18    A   Your gain share does not vary based on
19 performance.
20    Q   So what was your affiliation with this file,
21 the Weilbacher file?
22    A   Fairly minimal. I took over the claim when I
23 moved over to this role from, like I said earlier, I
24 was a regional manager for what we call PCS branch is
25 the initial losses that come in. I moved over to this

---

**Page 10**

1  casualty manager job essentially and took over the
2  responsibility for reviewing higher exposure files for
3  claims reps for Alaska and Washington and some
4  litigated files so I happen to have this one on diary
5  and reviewed it with Danny, made sure that we were
6  moving the claim along to get it resolved and
7  ultimately Danny requested and received authority to
8  settle the claim and we paid it and that's the extent
9  of my involvement in the claim.
10    Q   Are you aware of the issue of a parent trying
11 to collect a separate per person limit on the policy?
12    A   I'm aware of that issue in this case, yes.
13    Q   Are you aware of this issue in any other
14 cases?
15    A   No.
16    Q   Did you receive any legal opinions as to
17 whether or not you should give a separate claim to Mr.
18 Weilbacher personally or separate per person limit to
19 Mr. Weilbacher?
20        MR. ZIPKIN: Object to form.
21    Q   Did you receive any legal advice on whether
22 or not to give Mr. Weilbacher a separate per person
23 limit for the death of his daughter?
24    A   I did not.
25    Q   Did you decline -- did you give an opinion as

---

**Page 11**

1  to whether or not he should receive a separate per
2  person limit?
3     A   I did not.
4     Q   Were you consulted as to whether or not to
5  give that separate per person limit to Mr. Weilbacher?
6     A   No.
7     Q   So what is -- your role in this case is
8  simply to authorize the first $100,000?
9     A   That's what my role was in the case and
10 ultimately I did not personally authorize it. At the
11 time I didn't have the authority. I passed it on to
12 my manager, who did. And we authorized it and paid the
13 claim.
14    Q   Who was your manager then?
15    A   His name was Craig Edmonds.
16    Q   And then you came subsequent to the initial
17 payment of $100,000?
18    A   No. When we paid the $100,000 or at least
19 received the authority to pay the $100,000, my
20 involvement in the claim ended. So at that point, we
21 considered the claim settled.
22    Q   So has there been any consultations in
23 Seattle regarding whether or not Mr. Weilbacher should
24 himself get a separate per person limit?
25        MR. ZIPKIN: Object to form.

---

**Page 12**

1     Q   (By Mr. Legacki) Go ahead.
2     A   No, there were no discussions in Seattle.
3     Q   So Danny Withers declined that on his own?
4  He didn't consult with anyone to see whether or not he
5  should decline that?
6        MR. ZIPKIN: Object to form. Lack of
7  foundation.
8     Q   Who made the decision not to pay
9  Mr. Weilbacher the separate policy limits, do you
10 know?
11    A   As I understand it, Danny consulted with
12 counsel here locally who are well versed in Alaska
13 law, the coverage law. He got an opinion about that
14 particular issue and made the decision.
15    Q   On his own?
16    A   With -- in consultation with counsel.
17    Q   He didn't have to go above to any managers or
18 anything like that?
19    A   He did not go to myself, no.
20    Q   Do you know if he went to any other manager?
21    A   I'm not aware of that.
22    Q   Would normally he go to you first in the
23 scheme of protocol?
24        MR. ZIPKIN: Object to form.
25        THE WITNESS: We paid the claim. We

---

Adam Lund                              Deposition                              July 13, 2006

Page 13

1 considered that resolved at that point. The limits
2 were paid.
3     Q   (By Mr. Legacki) Were you aware of the
4 issue of the statute that says the parent has an
5 independent separate claim for the death of a child?
6     A   I became aware of that recently.
7     Q   What do you mean by recently?
8     A   I wasn't involved in the discussions about
9 this particular issue until just when my deposition
10 was noticed in this case essentially. So I found out
11 about that just recently.
12     Q   Did you know you were listed as a witness in
13 this case?
14     A   I did.
15     Q   And what were you -- do you know why you were
16 listed as a witness in this case?
17     A   Not specifically, no.
18     Q   Well, you were listed as the person who's
19 going to testify about the policy and the policy
20 language in the case. Are you aware of that?
21     A   To a limited extent.
22     Q   What's the definition of bodily injury in
23 Alaska, do you know?
24        MR. ZIPKIN: Object to form if you're calling
25 for a legal conclusion, something separate from the

Page 14

1 policy.
2        THE WITNESS: I don't know what the legal
3 definition would be, but it's, you know, we would
4 consider it bodily injury, physical injury,
5 essentially, to a person.
6     Q   (By Mr. Legacki) Would mental injury be
7 the same thing?
8     A   It could be considered an injury.
9     Q   Would a mental injury be covered under the
10 policy?
11        MR. ZIPKIN: Object to form.
12        THE WITNESS: Would a mental injury be
13 covered under the policy? Possibly.
14     Q   (By Mr. Legacki) What do you mean
15 "possibly"? Explain that further.
16     A   Well, when you say "covered", there's
17 different coverage scenarios, so would an emotional
18 injury be covered? It can be covered, yes.
19     Q   Okay. If Mr. Weilbacher -- let's assume Mr.
20 Weilbacher was in an accident. He caused the
21 accident. And if someone sued Mr. Weilbacher for
22 mental anguish for loss of society, loss of
23 consortium, would his insurance cover that?
24     A   Loss of society, loss of consortium, yes.
25     Q   Would it cover an emotional distress injury

Page 15

1 if he was sued for emotional distress?
2     A   If he was sued for emotional distress?
3     Q   Yes.
4        MR. ZIPKIN: Objection. Incomplete
5 hypothetical. Is he being sued for bodily injury of
6 an emotional distress component; for no physical
7 injury, just emotional distress? If I could get
8 clarification.
9     Q   (By Mr. Legacki) Just for emotional
10 distress. Would his insurance cover it if he was
11 sued for emotional distress?
12     A   It could. I'd have to understand the
13 specific circumstances and I'd want to get a legal
14 opinion about how those circumstances and those facts
15 would fit the policy language. But I believe it
16 could, yes.
17     Q   Okay. What would happen if Mr. Weilbacher
18 killed a child in an accident? Can the parent of that
19 child sue Mr. Weilbacher under AS09.15.O1O for the
20 death of child?
21        MR. ZIPKIN: I object. The witness has
22 already said he's not familiar with that statute, I
23 think.
24        THE WITNESS: I don't know the statute by
25 number.

Page 16

1     Q   (By Mr. Legacki) That's where a parent
2 can collect for the death of a child. Are you
3 familiar with that?
4     A   Is it a wrongful death statute or is that
5 something different, I'm not sure what the number --
6     Q   It's a separate claim.
7     A   It's a separate claim? So it's their
8 independent claim for --
9     Q   For death of a child.
10     A   Death of a child, okay. And your question
11 is: Can they make a claim for that?
12     Q   Yes, would Progressive pay for that claim?
13     A   They would have a claim that would be covered
14 under the policy.
15     Q   Would it be a separate claim?
16     A   Can you define separate?
17     Q   Their own individual claim.
18     A   It is an individual claim, yes.
19     Q   Would it be a direct claim?
20     A   It's a derivative claim.
21        MR. ZIPKIN: Calls for legal conclusion.
22 Using the word "direct" requires a legal definition of
23 direct. If you can answer it, go ahead.
24        THE WITNESS: Okay. As I understand it, it's
25 a derivative claim, that it's deriving from the injury

EXHIBIT _____0_____

Page __4__ of _15_        4 (Pages 13 to 16)

Adam Lund                                    Deposition                                    July 13, 2006

---

Page 17

1    to the child.
2        Q    (By Mr. Legacki)  What do you mean by
3    derivative?
4        A    Basically, it arises out of the injury to the
5    child.  It's derivative of that bodily injury.
6        Q    Could you explain to me as if I am a
7    12-year-old kid.  What does that mean?
8        A    I'm not a lawyer.  I'm not admitted to the
9    bar in the state of Alaska, so I'm not qualified to
10   give you a legal opinion about what the statute says.
11          My understanding of our policy language is
12   that that claim, while independent, is derivative of
13   the child's bodily injury claim.
14       Q    But derivative, I don't understand that.  Can
15   you explain it to me in lay terms?
16       MR. ZIPKIN:  Asked and answered.  He has
17   explained it.
18       Q    (By Mr. Legacki)  What does derivative
19   mean?
20       A    As I mentioned earlier, it arises out of that
21   injury to the child, their claim for loss of
22   consortium and loss of society is a result of the
23   injury or death of the child.
24       Q    What's the difference between that and a
25   direct claim?

---

Page 18

1        MR. ZIPKIN:  Calls for legal conclusion.
2        THE WITNESS:  I don't know what you mean by
3    direct, necessarily.
4        Q    (By Mr. Legacki)  Well, you interpret
5    policies.  I guess you make decisions on whether or
6    not to pay.
7          Do you know the difference between a direct
8    and a derivative claim?
9        A    Well, I described what I understand to be a
10   derivative claim, and I would need a legal opinion as
11   to the definition of direct and how that's interpreted
12   in Alaska.
13       Q    Now, you've worked with Progressive for 15
14   years; is that right?
15       A    Yes.
16       Q    What is your educational background?
17       A    I graduated -- I'll give you college.  Is
18   that okay to start with or do you want something
19   further back?  I graduated from the University of
20   California, Davis, in 1987.  After that I started with
21   Progressive, and worked there for three years.  I went
22   to graduate school at the University of Washington,
23   got a master's in business administration, worked for
24   a couple more years and then came back to Progressive
25   in 1994 and I've been back with Progressive since

---

Page 19

1    then.
2        Q    And you're now regional manager for Alaska
3    and Washington, correct?
4        MR. ZIPKIN:  I thought his title was injury
5    process manager.
6        THE WITNESS:  Injury process manager is the
7    title.
8        Q    (By Mr. Legacki)  What is an injury
9    process manager?  Is it different than region
10   manager?
11       A    It's a different title.  It's a different --
12   regional manager in our claims organization typically
13   means somebody who manages a group of the PCS
14   branches, the branches of people that go out and
15   handle the initial investigations of claims, write
16   estimates on damaged cars, that sort of thing.  The
17   injury process manager is responsible for the casualty
18   units typically that handle bodily injury claims,
19   litigation.  I also have the medical claims units in
20   Washington and there's a medical claims rep in Alaska
21   as well.
22          So the difference is my role is responsible
23   primarily for injury claims whereas the others do
24   property damage and cars basically.
25       Q    So you oversee Alaska as far as processing

---

Page 20

1    injury claims; is that correct?
2        A    Correct.
3        Q    And you got a master's from the University of
4    Washington, an MBA, and a degree from UC Davis and you
5    don't know what a direct claim is?
6        MR. ZIPKIN:  Argumentative and he's also
7    answered the question.  Go ahead.
8        THE WITNESS:  I cannot explain to you
9    specifically what the Alaska Supreme Court definition
10   of what a direct claim would be.
11       Q    (By Mr. Legacki)  So how is an insured
12   supposed to understand the difference between a
13   direct and a derivative claim?
14       MR. ZIPKIN:  Object to form.  That assumes
15   the word direct is in the policy.
16       THE WITNESS:  How is an insured to understand
17   that?
18       MR. LEGACKI:  Yes.
19       THE WITNESS:  That assumes that they ask the
20   question.  I mean, it requires basically a legal
21   opinion and advice from coverage counsel.  We would
22   provide that information to the insured.
23       Q    Do you give that to them before they buy a
24   policy or after they buy the policy?
25       A    I don't -- I'm not involved in policies so I

---

EXHIBIT ___O___
Page ___5___ of ___15___

Adam Lund                                   Deposition                          July 13, 2006

Page 21

1  couldn't explain to you what is explained to them when
2  they buy the policy.
3      Q   Let's look at Exhibit No. 1. Do you see
4  that, sir?
5      A   Yes.
6      Q   It says "Uninsured/Underinsured Motorist
7  Bodily Injury Coverage."
8          Do you see that?
9      A   Right.
10     Q   And it says "Subject to the Limits of
11 Liability. If you pay a premium for
12 Uninsured/Underinsured Motorist Coverage for bodily
13 injury, we will pay for damages, other than punitive
14 or exemplary damages which an insured person is
15 legally entitled to recover from the owner or operator
16 of an uninsured/underinsured motor vehicle because of
17 bodily injury."
18     A   Uh-huh.
19     Q   And if Mr. Weilbacher can collect under
20 Alaska statute for the loss of his child, would this
21 language here say that he can also collect under the
22 uninsured motorist coverage?
23         MR. ZIPKIN: Lack of foundation. Incomplete
24 hypothetical. Go ahead.
25         THE WITNESS: Would this language say that he

Page 22

1  can collect? I don't know that it says he can collect
2  or not collect. The way I read it, say it's
3  possible that he could collect.
4      Q   (By Mr. Zipkin) How is he to know whether
5  or not he could or could not collect?
6      A   Well, there is additional language throughout
7  the policy that explains what bodily injury is, who an
8  insured person is. There is a lot of different things
9  that you have to consider.
10     Q   I guess your counsel has already admitted
11 he's an insured person?
12     A   Okay.
13     Q   And that the death of his daughter was caused
14 by an accident?
15     A   Uh-huh.
16     Q   Correct?
17     A   Right.
18     Q   And the car, Esper, was underinsured?
19     A   Uh-huh.
20     Q   That's the three elements, right?
21     A   We've got those three, yes.
22     Q   Is there anything else that we should look
23 at?
24         MR. ZIPKIN: To answer which question?
25     Q   (By Mr. Legacki) Whether or not -- to

Page 23

1  determine whether or not he would be covered by the
2  claim ASO9.15.O1O?
3          MR. ZIPKIN: Object to form. The witness has
4  already said he's not familiar with that statute.
5          THE WITNESS: Well, we provided coverage for
6  the claim, so, yes we found coverage.
7      Q   (By Mr. Legacki) How about for his own
8  injury?
9      A   For his own injury?
10     Q   For the death of his daughter?
11     A   His loss of society and loss of consortium
12 claim, yes.
13     Q   He would be entitled to that?
14     A   There is coverage for that.
15     Q   And as a separate claim, individually?
16     A   He has an individual claim.
17     Q   An independent claim?
18         MR. ZIPKIN: Asked and answered.
19         THE WITNESS: He has a claim.
20     Q   An independent claim?
21     A   Define what you mean by "independent". I
22 believe it's derivative of the child's bodily injury
23 claim.
24     Q   You don't -- the statute -- the claim under
25 ASO9.15.O1O, you don't think that it's independent and

Page 24

1  separate or you think it's derivative?
2      A   I think he has an individual claim for his
3  loss of society and loss of consortium.
4      Q   Is that separate and distinct from his
5  daughter's claim, from his daughter's death?
6          MR. ZIPKIN: Asked and answered.
7      A   It is separate and distinct. He has his own,
8  again, individual claim for his loss of society and
9  loss of consortium, so that would be his claim,
10 correct.
11     Q   That's an independent claim, his own
12 independent claim?
13     A   You know, independent, again depends on the
14 definition of independent. It's his claim, his
15 individual claim.
16     Q   Independent of his daughter's?
17         MR. ZIPKIN: This is just argumentative.
18         THE WITNESS: Again, it depends on what
19 independent means.
20     Q   (By Mr. Legacki) What do you think it
21 means?
22     A   I think it means, for example, you have two
23 parties in a car; they're both injured. They have
24 independent claims. They're not dependent on the
25 other claim to have an injury or have an injury claim,

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT _____O_____ (Pages 21 to 24)
Page _6_ of _15_

Adam Lund                           Deposition                           July 13, 2006

Page 25

1  let's say. But as I understand it, Mr. Weilbacher's
2  claim is -- arises out of his daughter's claim. It's
3  not his own individual or let's say, it's not his own
4  claim for injury as a result of the accident. It
5  comes out of her injury claim.
6      Q   Are you aware of any Alaska cases or any
7  court decision that states that a parent can have an
8  independent direct claim because of the child
9  suffering in a car accident?
10     MR. ZIPKIN:  Objection. The case law says
11 independent. It doesn't say direct. That's the key
12 point. You're confusing dependent with direct. If
13 you can answer, go ahead.
14     THE WITNESS:  I can't that say that I know of
15 any case law on that particular point.
16     MR. LEGACKI:  For the record, you know
17 Progressive in its argument to Wald interchanged its
18 use of direct and independent as well, so --
19     MR. ZIPKIN:  It is our position in this
20 case, I'll just say it loud and clear, that your
21 client has an independent claim under that statute but
22 it is not considered direct and under the definition
23 of the policy of derivative, it is a derivative claim.
24 So it is independent, but not technically direct. And
25 you're free to argue to the contrary.

Page 26

1      Q   (By Mr. Legacki) Have you ever read the
2  Gillespie decision?
3      A   No, I have not.
4      Q   Let me take a look at that then but first I
5  want to -- did you review Mr. Withers's PACMAN notes?
6      MR. ZIPKIN:  You mean in preparing for today
7  or ever?
8      Q   (By Mr. Legacki) Either/or?
9      A   I reviewed Danny's PACMAN notes when I was
10 overseeing the file, and I reviewed my notes and maybe
11 two or three of Danny's in preparation for this
12 deposition.
13     Q   I'm sorry, what did you review in preparation
14 for this?
15     A   Just a couple of Danny's notes during the
16 time that I was involved in the file and looking at my
17 entries into the file.
18     Q   Let's look at Exhibit No. 3.
19         Have you seen this before? Did you review
20 this last night or yesterday afternoon or anything
21 like that?
22     A   No.
23     Q   At the bottom there it says "The individual
24 claims of father and mother will include loss of
25 consortium, loss of society." Do you see that?

Page 27

1      A   Yes.
2      Q   What does that mean, "individual claims?"
3      MR. ZIPKIN:  Asked and answered.
4      Q   (By Mr. Legacki) Regarding to this note
5  here?
6      A   As I stated earlier, that means that the
7  father has his own claim for his loss of society and
8  loss of consortium. He can make a claim.
9      Q   He can make his own individual separate
10 claim?
11     A   He can make an individual claim. It's his
12 claim. In that sense, it's individual, belongs to
13 him.
14     Q   What does that mean "belongs to him?" Would
15 you explain it? If you had an insured come to you and
16 say, "What does that mean, my individual claim?" How
17 do you explain that to him?
18     A   Well, it's his loss of his daughter and his
19 injury, his pain or however you want to describe it.
20 His loss of consortium, his loss of the society and
21 companionship with his daughter. That's his
22 individual loss. Therefore, he has a claim for that.
23     Q   And Exhibit 4 says "parents' individual
24 claims would have value of 50- to $75,000 each."
25         How does one evaluate what the value of a

Page 28

1  case of losing a 15-year-old daughter -- how do you
2  come up with the total of 50- to $75,000?
3      MR. ZIPKIN:  It's irrelevant to the issues in
4  this case. Objection.
5      THE WITNESS:  It is very difficult to put a
6  value on anything of that nature. I would hate to
7  have to put a number on something like that. It's a
8  judgment that the claims rep has to make based on the
9  facts of the case and what they know about the
10 situation.
11     Q   (By Mr. Legacki) And it says "parents'
12 individual claims would have value of 50- to $75,000
13 each."
14         Does that mean it's 50- to $75,000 for each
15 of the parents, individually for Ms. Morrow and Mr.
16 Weilbacher?
17     MR. ZIPKIN:  I'll object to the form. He
18 didn't write the number, somebody else did. If you
19 can understand it, go ahead.
20     THE WITNESS:  I would interpret that to mean
21 that each individual -- each individual claim could
22 have a value of 50- to 75,000 in Danny's opinion.
23     Q   I would like you to look at this Gillespie
24 decision. I assume part of your job is to understand
25 case law in Alaska, interpreting policies,

EXHIBIT_____O_____

Page__7__of_15_    7 (Pages 25 to 28)

Adam Lund                              Deposition                              July 13, 2006

---

Page 29

1   understanding -- interpreting tort law in Alaska; is
2   that correct?
3       A   I don't interpret tort law necessarily, but I
4   do need to understand what it means.
5       Q   Would you like to take a minute and read that
6   case?
7       MR. ZIPKIN:  If you're going to ask him
8   questions about it, then I ask that he be allowed to
9   read the entire case.  Of course, I object to the
10  whole line of questioning because it's seeking legal
11  opinions.  I'm not instructing him not to answer, but
12  I suggest you read the whole thing.
13      THE WITNESS:  Yes, I don't feel qualified to
14  render an opinion about what this case says.
15      Q   (By Mr. Legacki) I would like to ask you
16  some questions anyway about it so if you want to
17  read it or should I just ask you questions directed
18  to the portions I want to ask you about?
19      A   Well, I don't mind reading it.  I don't know
20  that I'm going to be able to help you with -- well,
21  I'll read it.
22      MR. LEGACKI:  Go off record.
23      (A brief break was taken.)
24      Q   (By Mr. Legacki) Sir, I would like to
25  refer your attention to page 1273.

---

Page 30

1       A   Okay.
2       Q   And under where it says "2."
3       A   Yes.
4       Q   "The Gillespies, however are not without
5   recourse." Do you see that?
6       A   (Witness nods affirmatively.)
7       Q   "Another statute, ASO9.15.O1O, provides in
8   part: A parent may maintain an action as plaintiff
9   for the injury or death of a child below the age of
10  majority."
11      A   Uh-huh.
12      Q   Okay.  And we already established that Heidi
13  was 14 when she was killed, right?
14      A   Right.
15      Q   "We have not yet addressed whether
16  ASO9.15.O1O creates a separate, independent, parental
17  cause of action."
18      Do you see that?
19      A   "We have not yet addressed," yes, I see that.
20      Q   Now, what does that mean to you?
21      MR. ZIPKIN:  Objection.  It's not his job to
22  interpret what the Supreme Court means.  He's read the
23  sentence.  I don't think he's obligated to perform
24  legal services for you.
25      Q   (By Mr. Legacki) What does this mean to

---

Page 31

1   you, sir?
2       A   I think the language is clear.  It says that
3   they are able to bring a partial cause of -- or
4   parental cause of action.
5       Q   Independent?
6       A   What's that?
7       Q   Independent?
8       A   It says independent.
9       Q   So their own separate claim independent of
10  the claim of their daughter?
11      MR. ZIPKIN:  Asked and answered.  It's
12  already been established.
13      THE WITNESS:  It says independent.
14      Q   (By Mr. Legacki) What does that mean to
15  you?
16      A   Well, it means that they have -- they can
17  make a claim.
18      Q   And would -- if Mr. Weilbacher was sued,
19  under his policy in an accident and the parent of a
20  child that was killed filed this claim, a claim under
21  the Gillespie -- under this case and statute, would
22  Progressive pay it?
23      A   Well, that's not the case that we're dealing
24  with.
25      MR. ZIPKIN:  Incomplete hypothetical -- just

---

Page 32

1   give me a second and let me make the objection.  It's
2   an incomplete hypothetical.  Doesn't have enough of
3   the facts, but go ahead if you can answer.
4       THE WITNESS:  Well, I can't answer it because
5   it's not really the case that we're dealing with here.
6   And it is a hypothetical question.
7       Q   (By Mr. Legacki) Well, you also deal with
8   policies when your insured is responsible for the
9   accident, right?
10      A   Correct.
11      Q   Okay.  Now, if your insured caused the death
12  of a little girl and the parents filed a suit, would
13  you have to pay under the insurance policy for the
14  death of that girl to the parent under this statute in
15  this case?
16      A   You're asking for my opinion about whether we
17  would have to pay for that?  Yes, I believe we would.
18      Q   Let's look at page 1274 of the decision.  And
19  look at the second paragraph: "The result we reach
20  today" -- do you see that?
21      A   Yes.
22      Q   Okay.  I want to go down to the middle of
23  that "without question."
24      A   Okay.
25      Q   "Without question the death of one's own

---

EXHIBIT_____O_____

Page___8___ of ___15___     8 (Pages 29 to 32)

Adam Lund                                    Deposition                        July 13, 2006

Page 33

1     child is the greatest loss a parent may suffer."
2        Do you agree with that?
3     A   It's clearly a tremendous loss.
4     Q   And then it goes on to say: "Monetary
5  disadvantages a child's death may present to its
6  parents pales in comparison to the immense mental
7  anguish, grief and sense of loss that this even would
8  inevitably cause."
9        MR. ZIPKIN:  We'll stipulate that it says
10  that.
11     Q   (By Mr. Legacki)  Do you see that, sir?
12     A   Uh-huh.
13     Q   You have to answer audibly.
14     A   Yes.
15     Q   Are you aware of another case, State Farm
16  versus Lawrence?
17        Let me hand it to you.
18        (Exhibit Number 10 was marked.)
19     Q   Would you take a moment to read that, sir?
20        MR. ZIPKIN:  I suggest we go off record
21  because I want him to read the whole thing.
22     Q   (By Mr. Legacki)  Or else we can just go
23  to the portions.  It's up to you.
24     A   I would rather be acquainted with the case.
25     Q   Sure, off record.

Page 34

1        (A brief break was taken.)
2     Q   (By Mr. Legacki)  Let's look at page 1079
3  of the Lawrence decision.
4        Do you see that in the first full paragraph
5  up there?
6     A   On the left or the right?
7     Q   On the left.  "Other courts have rejected
8  arguments equating emotional distress and loss of
9  consortium.  We agree with those courts.  Unlike
10  claims for loss of consortium, claims for emotional
11  distress concern injuries that the claimants have
12  suffered directly, rather than derivative injuries
13  that resulted from injury to another."
14        Do you see that?
15     A   I see it.
16     Q   What does that mean to you?
17        MR. ZIPKIN:  I object, and I urge the witness
18  to exercise caution here.  You're asking for a legal
19  opinion.
20        MR. LEGACKI:  No, I'm just asking as a
21  layperson --
22        MR. ZIPKIN:  A layperson who has never looked
23  at this case before, if you put it right in front of
24  him and said what does it mean to you.  I just urge
25  the witness --

Page 35

1        MR. LEGACKI:  Make your objection and don't
2  lecture, please.  You know better than that, Gary.
3        MR. ZIPKIN:  I'm not lecturing -- well,
4  lecture you, I suppose.
5        MR. LEGACKI:  Just make the objection.
6        MR. ZIPKIN:  My objection is that this calls
7  for a legal conclusion.
8     Q   (By Mr. Legacki)  Okay.  Answer, please?
9     A   I don't feel qualified to give an opinion
10  about what this case means.
11     Q   I'm just asking, reading that as an
12  individual sitting there, please tell me what you
13  understand that to mean.
14        MR. ZIPKIN:  Asked and answered.
15     Q   (By Mr. Legacki)  Go ahead.
16     A   I don't feel -- I would want to consult with
17  an attorney who can interpret the case for me rather
18  than picking out a paragraph perhaps out of context
19  and giving you an opinion.
20     Q   So how is a reasonable insured supposed to
21  understand the difference between a direct and
22  derivative on emotional distress claim when you, who
23  has an MBA and have been working for Progressive for
24  16 years and is a senior adjuster and have -- your
25  title position is injury process manager, how is an

Page 36

1  insured supposed to understand that if you don't
2  understand it?
3        MR. ZIPKIN:  Object to form.  Assumes facts
4  not in evidence.  The language you're discussing is in
5  the policy, for example.
6        THE WITNESS:  How is an insured to understand
7  this?
8        MR. LEGACKI:  Yes.
9        THE WITNESS:  That's why we get opinions from
10  legal experts and attorneys who understand the
11  language and how the law applies in various claims
12  situations.
13     Q   (By Mr. Legacki)  Well, you used the word
14  "derivative."  You were trying to explain to me that
15  injury is derivative before?
16     A   Yes.
17     Q   So you understand what derivative means,
18  right?
19     A   Yes.
20     Q   And this says that emotional distress claim
21  is not derivative, correct?
22        MR. ZIPKIN:  Object.  Talking about pulling
23  one sentence out of a case.
24     Q   (By Mr. Legacki)  Is that right?
25     A   Is what right?

Adam Lund                          Deposition                          July 13, 2006

Page 37

1    Q    You understand what derivative means and you
2    had mentioned before that maybe emotional distress
3    would be derivative?  Is that what you said before?
4        MR. ZIPKIN:  I think that mischaracterizes
5    his testimony.
6    Q    (By Mr. Legacki)  Reading this, you said
7    you understand derivative, would you agree with me
8    that the emotional distress claim of a parent who
9    suffers because of the death of a child, the bodily
10   injury is directed to them and not derivative of the
11   child?
12       MR. ZIPKIN:  Objection.  This case is nothing
13   about that statute you cited.  This case is about
14   negligent infliction of emotional distress.  You're
15   mixing apples and oranges and confusing the witness.
16       THE WITNESS:  I don't have an opinion on that
17   particular issue, and I don't know how to interpret
18   this paragraph in that context.  I would want to have
19   time to consider it and perhaps consult with counsel
20   to decide how that applies in the case that we're
21   talking about.
22   Q    (By Mr. Legacki)  Well, we looked at the
23   Gillespie decision that said the loss of a child is
24   the greatest loss a parent may suffer, correct?
25   A    Yes, we did.

Page 38

1    Q    Isn't that what they suffered directly?
2    A    Is what they suffered directly?
3    Q    When a child dies, isn't that a loss that
4    they suffer directly?
5        MR. ZIPKIN:  Calls for a legal conclusion
6    about what direct means.
7        THE WITNESS:  Again, we're getting back to
8    interpretations of what some of these words mean and
9    what the legal definitions in the cases are which are
10   I am not entirely familiar with.
11   Q    (By Mr. Legacki)  Just give me your common
12   sense.  I don't mean that to sound flippant but you
13   do have an MBA and most insureds -- you're more
14   highly educated than most insureds if not eighty
15   percent of the insureds.  So could you explain what
16   that means?
17       MR. ZIPKIN:  Same objection.
18       THE WITNESS:  I can't explain to you without
19   having had time to consider this opinion and to get
20   some more legal advice on it potentially.
21   Q    (By Mr. Legacki)  So if a guy with a high
22   school degree said, Gee, it looks like to me my
23   insurance covers me directly when my child dies,
24   that would be a reasonable assumption, wouldn't it?
25       MR. ZIPKIN:  Same objection?

Page 39

1        THE WITNESS:  I don't know if it would be
2    reasonable or not.
3    Q    (By Mr. Legacki)  Why don't you know --
4    how do you know if it would be reasonable or not?
5    A    It's a hypothetical question.  I'm not sure
6    what the context of the question is, what his injury
7    is, what the scenario is.
8    Q    Mr. Weilbacher.  Mr. Weilbacher has a high
9    school degree.  His daughter gets killed in an
10   accident.  Progressive is his insurance carrier.
11   Wouldn't it be reasonable for him to think that, hey,
12   I'm covered as my own direct loss and my emotional
13   distress loss for the death of my daughter?
14       MR. ZIPKIN:  Calls for legal conclusion of
15   what is cognizable claim.
16   Q    (By Mr. Legacki)  Go ahead and answer the
17   question.
18   A    There is coverage for the claim and we paid
19   the policy limits for the claim.
20   Q    The derivative and not direct, correct?
21   A    We paid the policy limits.
22   Q    Because you thought it was derivative, not
23   direct, correct?
24   A    Again it would call -- the question is: What
25   is the definition of direct?  What do you mean by

Page 40

1    that?  What's the legal definition of direct by Alaska
2    courts?
3    Q    Okay.  You oversee the claims adjustment
4    here, and you don't understand what the definition of
5    direct means?
6        MR. ZIPKIN:  Well, this is argumentative.
7        MR. LEGACKI:  I'm asking him if he --
8        MR. ZIPKIN:  The witness has already said he
9    wasn't even involved in the decision about whether to
10   pay a separate, per person limit.  He was not involved
11   in it.
12   Q    (By Mr. Legacki)  I'm trying to understand
13   the standard here, if here's a man who is the head
14   adjuster here in Alaska who has the authority for
15   claims of $100,000, he does not -- if he does not
16   understand direct, then I guess the regional person
17   does not understand direct?
18       THE WITNESS:  I didn't say that I don't
19   understand direct.  I would -- I have -- request an
20   opinion from counsel to determine how that fact
21   scenario applies our policy language and the case law
22   in Alaska and make a decision based on that.
23   Q    (By Mr. Legacki)  I just want -- you're
24   sitting there.  To your knowledge, what do you
25   understand that to be, direct?

EXHIBIT_____O_____ 10 (Pages 37 to 40)
Page__1D__ of _15_

Adam Lund                          Deposition                        July 13, 2006

Page 41

1    MR. LEGACKI: Calls for a legal conclusion.
2    THE WITNESS: I don't feel qualified to
3  render an opinion on that.
4    Q  (By Mr. Legacki) Well, is Mr. Weilbacher
5  supposed to know what the insurance covers?
6    MR. ZIPKIN: Argumentative.
7    THE WITNESS: How is Mr. Weilbacher to know
8  what is covered?
9    MR. LEGACKI: Yes.
10    THE WITNESS: We provided coverage for the
11  policy limits of the claim.
12    Q  (By Mr. Legacki) But would it be
13  reasonable for him to think that he has no separate
14  per person claim?
15    A  He may think that.
16    Q  I'm sorry?
17    A  He may think that.
18    Q  Would that be a reasonable assumption on his
19  part?
20    MR. ZIPKIN: Lack of foundation.
21    THE WITNESS: I don't know that it's
22  reasonable or not reasonable.
23    Q  (By Mr. Legacki) Well, we just looked at
24  some cases and he suffered the greatest loss a
25  parent could ever suffer; he, himself. And the

Page 42

1  policy is $100,000 per person, $300,000 max, and
2  he's a person other than his daughter Heidi that
3  suffered injury because he suffered the greatest
4  loss a parent can suffer, right?
5    A  He suffered a loss.
6    Q  And that is separate from the loss of his
7  daughter? His daughter died, right?
8    A  His daughter died.
9    Q  So he has a different loss than a daughter,
10  correct?
11    A  He has a loss resulting from the death of his
12  daughter.
13    Q  And it's separate from his daughter, correct?
14    MR. ZIPKIN: This is purely argumentative
15  and it ignores other aspects of the policy.
16    THE WITNESS: I think we talked earlier about
17  "separate" and other definitions of different words.
18  He has his own individual claim arising out of the
19  death of his daughter.
20    Q  (By Mr. Legacki) Right. So he says,
21  okay, my daughter died and the insurance pays for
22  her and I've got my own individual claim, correct?
23  That's a reasonable assumption on his part?
24    A  I've stated that he has his own individual
25  claim.

Page 43

1    Q  Have you ever read the Teel case?
2    A  No.
3    Q  Are you aware that in Alaska, that a parent
4  who has a NIED claim is different and direct and
5  distinct from a derivative claim?
6    A  I'm sorry, could you repeat that?
7    Q  Are you aware that an NIED claim -- do you
8  know what an NIED claim is?
9    A  Yes.
10    Q  -- the Alaska court has held that that's a
11  separate and distinct claim from a derivative claim?
12    MR. ZIPKIN: Calls for a legal conclusion and
13  actually is incorrect. It depends on whether there is
14  a bodily injury, whether the insurer waived the issue
15  of bodily injury. It calls for a legal conclusion.
16  If you can answer, go ahead.
17    THE WITNESS: I can't answer it because I am
18  not familiar with the case and I don't feel qualified
19  to answer based on your summary of what the case is.
20    Q  (By Mr. Legacki) Exhibit No. 9 is
21  Allstate versus Teel.
22    MR. ZIPKIN: Take your time and read it.
23  We'd better go off record for about ten minutes.
24    (A brief break was taken.)
25    Q  (By Mr. Legacki) Sir, you've just read

Page 44

1  the Teel decision?
2    A  Yes.
3    Q  And you had a chance to talk to Mr. Zipkin
4  outside?
5    MR. ZIPKIN: Actually that invades
6  attorney/client privilege. But I will say we did not talk
7  about the case.
8    MR. LEGACKI: Well, he was nodding his head
9  and you were saying no.
10    MR. ZIPKIN: We had a conversation, but we
11  didn't discuss the Teel decision.
12    MR. LEGACKI: Did you discuss --
13    MR. ZIPKIN: But it's none of your business
14  anyway what we discussed.
15    MR. LEGACKI: Well, it is if it's in the
16  middle of a deposition.
17    MR. ZIPKIN: No, I can talk to my client
18  during the deposition, during breaks and there was no
19  pending question. What is your question?
20    Q  (By Mr. Legacki) Sir, reading the Teel
21  decision, the court states that an NIED claim is a
22  direct claim; is that right?
23    MR. ZIPKIN: Calls for a legal conclusion.
24    THE WITNESS: Which page, excuse me?
25    MR. LEGACKI: Page 5.

Adam Lund                              Deposition                              July 13, 2006

---

Page 45

1  And that the Teels' claim is direct, does not bar the
2  claim. Do you is see that, first column midway down?
3       MR. ZIPKIN: Can I hear the question back?
4       MR. LEGACKI: I'm trying to direct him to it,
5  where to go. Do you see where it says "The Teel claim
6  direct does not bar the claim"?
7       MR. ZIPKIN: Can I hear that back? I'm not
8  sure I understand what's being asked. Can you just
9  read that back?
10      The record was read back:
11      Q  I'm trying to direct him to it, where to go.
12 Do you see where it says "The Teel claim direct does
13 not bar the claim"?
14      MR. ZIPKIN: Object to form. I'm not sure
15 what you're saying.
16      MR. LEGACKI: Well, you kept interrupting me.
17      MR. ZIPKIN: I try not to. I'm sorry. If I
18 interrupted you, then I apologize. But I thought I
19 waited until the end of the sentence.
20      Q  (By Mr. Legacki) Sir, do you see where it
21 says that the Teels' claim is direct but does not
22 bar the claim?
23      A  No.
24      Q  All the way down on page 5.
25      A  I see that sentence. It says "That Teels'

---

Page 46

1  claim is direct does not bar the claim."
2       Q  Right. And says, "The wording of Allstate's
3  policy does not exclude direct claims. It states that
4  one would be entitled to recover so long as one's
5  damages were because of bodily injury to an occupant
6  of the insured vehicle. "
7       Do you see that?
8       A  I see it.
9       Q : You say you don't know what a direct claim
10 is?
11      MR. ZIPKIN: Calls for legal conclusion.
12      THE WITNESS: I said -- I don't recall that I
13 said I don't know what a direct claim is. I don't --
14 I would want to have a legal definition of what Alaska
15 says a direct claim is.
16      Q  (By Mr. Legacki) If you read this
17 decision, it states that NIED claim of a parent is a
18 direct claim, not a derivative claim; is that
19 correct?
20      MR. ZIPKIN: Calls for legal conclusion.
21      THE WITNESS: Where does it say that?
22      Q  (By Mr. Legacki) Let's go to page 4 where
23 it says "Discussion, Allstate's Policy Covers Teel's
24 Direct Claim"?
25      A  Uh-huh.

---

Page 47

1       Q  "Allstate correctly notes that NIED claims
2  are direct, not derivative".
3       A  I see that.
4       Q  Okay. And it cites State Farm Mutual
5  Insurance Company versus Lawrence?
6       A  Yes.
7       Q  The one we looked at earlier?
8       A  Correct.
9       Q  Does the insurance policy at Progressive
10 exclude a direct claim of Mr. Weilbacher under
11 ASO9.15.O1O?
12      MR. ZIPKIN: Assumes facts not in evidence
13 that it's considered a direct claim as opposed to an
14 independent claim. You're putting words in his mouth
15 again.
16      THE WITNESS: I don't feel qualified to
17 answer without --
18      Q  (By Mr. Legacki) You interpret the
19 policy, right? You make a decision on whether or
20 not to pay a claim? When you look at the policy,
21 the Progressive policy, does the Progressive policy
22 exclude a claim under ASO9.15.O1O?
23      A  In order to answer that I'd want to have the
24 ability to consult with an attorney to look at the
25 language and find out how it applies to that

---

Page 48

1  particular case.
2       Q  So as the senior adjuster in Alaska, the
3  person who makes decisions on claims over $100,000,
4  you don't know whether or not the policy excludes
5  claims under ASO9.15.O1O?
6       MR. ZIPKIN: Object to form. It's
7  argumentative and it mischaracterizes his position.
8       THE WITNESS: I would want to make an
9  informed decision to answer your question and I don't
10 feel qualified to do that in response to it.
11 Unfortunately, I didn't make the decision.
12      Q  (By Mr. Zipkin) I'm sorry? What was
13 that? I didn't hear what you said.
14      A  I have nothing further.
15      Q  What I'm trying to get -- see, sir, Mr.
16 Weilbacher is a man with a high school education. And
17 if you look at the policy as he would, as a reasonable
18 insured would, and you with an MBA from the University
19 of Washington and working in this field for numerous
20 years, you can't yourself tell me whether or not he
21 would have a claim under ASO9.15.O1O without that as a
22 direct claim?
23      MR. ZIPKIN: Same objection as before and
24 asked and answered.
25      THE WITNESS: I can't -- I don't know what

---

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT_____0_____

Page__12__ of__15__

12 (Pages 45 to 48)

Adam Lund                                    Deposition                                    July 13, 2006

Page 49

1    the number specifically refers to, what are you --
2        Q   (By Mr. Legacki)  Where a parent has a
3    right to collect for loss of a child, separate and
4    independent claim for loss of a child?
5        A   I think for Mr. Weilbacher to interpret the
6    policy, he needs to read the policy in its entirety
7    and in the context with his claim.  I believe Mr.
8    Weilbacher has counsel to represent him.
9        Q   Well, to your knowledge of the policy, is
10   there anything there that would tell him that his
11   claim under the statute is excluded from the policy?
12       MR. ZIPKIN:  I just have to say the
13   following:  No one has ever said that this claim for
14   loss of society has ever said
15   that.  In fact, the witness has said it was covered.
16   It was covered and paid.  So I object to you
17   repeatedly mischaracterizing what occurred in this
18   case.  The claim for loss of society was paid as part
19   of a single per person limit.  It was not excluded.
20       MR. LEGACKI:  Well, his independent claim was
21   paid?
22       MR. ZIPKIN:  His independent claim was paid
23   as part of a single per person limit.  That is the
24   position we're taking in this case.  And that is what
25   the witness I believe has been trying to tell you.

Page 50

1    His claim was covered and it was paid as part of a
2    single per person limit, yes.  That is our position.
3        Q   (By Mr. Legacki)  Do you know the
4    difference between a common law claim and a
5    statutory claim?
6        A   A common law claim and a statutory claim?
7        Q   Right.
8        A   Again, it's a legal question.  The statute
9    obviously is written law from the legislature versus
10   case law which is essentially the common law.
11       Q   And is a statutory claim separate and
12   distinct from a common law claim?
13       MR. ZIPKIN:  Calls for a legal conclusion.
14       THE WITNESS:  I'm not an attorney.  I
15   couldn't explain that to you.
16       Q   (By Mr. Legacki)  How is an insured to
17   know?
18       MR. ZIPKIN:  Object to form.
19       Q   (By Mr. Legacki)  How is an insured to
20   know the difference between a statutory claim and a
21   common law claim?
22       MR. ZIPKIN:  Same objection.
23       THE WITNESS:  How is an insured to know?  An
24   insured, again, I think should read their policy to
25   understand what's covered and what is included in the

Page 51

1    policy.
2        Q   (By Mr. Legacki)  Well, so however an
3    insured reads it and interprets it, if he has a
4    reasonable expectation that he's going to
5    be covered, that's fine, then he should get the
6    money?
7        MR. ZIPKIN:  Calls for a legal conclusion.
8        THE WITNESS:  It's a question of -- you're
9    asking me a question about whether they should know
10   what the difference is between the common law and
11   statutory law?  I wouldn't -- they would need somebody
12   with -- I would say they would probably need counsel
13   to help them understand that difference.
14       Q   (By Mr. Legacki)  So what you're saying if
15   I understand correctly, is that in order for Mr.
16   Weilbacher to understand the rights of his policy he
17   needs to hire an attorney?
18       A   No, we're not talking about the rights of his
19   policy.  You're asking me a question about what's the
20   difference between common law and how is an insured to
21   know and he's not going to get legal advice from
22   Progressive as a claims adjuster.  He would need to
23   find out the legal issues, I believe, from counsel.
24       Q   For him to know whether or not his statutory
25   claim is covered or not covered -- I'm sorry.  Isn't

Page 52

1    whether or not his statutory claim is direct or
2    derivative, he would have to hire counsel to explain
3    that to him?
4        A   No, he wouldn't.  That's, I think, a
5    different question.  It's a policy question versus
6    what the law is.  You asked me a question about common
7    law versus statutory law.  And I'm not an attorney.
8    As I said earlier, I'm not qualified to make that
9    decision or give legal advice to an insurer about
10   those differences.  If he's making a claim under his
11   policy, we'll gather the facts, interpret those facts
12   in light of what the policy language is.  If there is
13   some question about what's covered, we will consult
14   with counsel to determine how Alaska law applies in
15   concert with our contract and those facts to make an
16   accurate decision about what is covered, et cetera.
17   In this case, what we've done is we paid the policy
18   limits to Mr. Weilbacher in response to his claim for
19   damages.
20       Q   Under the theory that it's a derivative claim
21   rather than a separate direct claim?
22       A   We paid it under the single per person limit
23   for loss of society, loss of consortium as a
24   derivative claim.
25       Q   Let me check my notes for a second.  Off

Alaska Stenotype Reporters (907) 276-1680

Adam Lund                          Deposition                          July 13, 2006

Page 53

1   record.
2        (Brief break.)
3        Q   (By Mr. Legacki)  Back on record.  Under
4   Alaska law do you know the difference between a
5   direct and a derivative claim?
6        A   Under Alaska law do I know the difference
7   between a direct and a derivative claim?  If I were to
8   give you an opinion -- I don't feel qualified to give
9   you a legal opinion about what that is.
10       Q   Just as your understanding as a claims
11  adjuster.
12       A   As I said earlier, a derivative claim arises
13  out of the injury in the case to the child.  The
14  direct claim is a claim that the party can make
15  directly to the company or against the policy that's a
16  separate claim.
17       Q   The injury that they personally suffer?
18       A   Pardon?
19       Q   Is it an injury that they suffer?
20       A   That who suffers?
21       Q   The parent or the person who has the direct
22  claim.  Would that be an injury that they suffer
23  directly?
24       MR. ZIPKIN:  This is calling for a legal
25  conclusion.  Asked and answered.

Page 54

1        THE WITNESS:  It is an injury that they have
2   suffered.
3        Q   (By Mr. Legacki)  Do you know if the
4   Progressive policy excludes NIED claims?
5        A   In terms of exclusion, are you talking about
6   the actual policy exclusions?  Because there is a
7   specific policy language that is called an exclusion.
8   Is that what you're asking?
9        Q   Does the Progressive policy at issue in this
10  case, does it exclude an NIED claim?
11       A   To my knowledge it does not exclude it
12  specifically under the exclusions in the policy.
13       Q   So they would pay that as a separate per
14  person policy?
15       MR. ZIPKIN:  Those are two totally separate
16  questions.  I object to the form.
17       Q   (By Mr. Legacki)  Would they pay an NIED
18  claim under a separate per person policy?
19       A   It depends on the facts of the case and what
20  the scenario is.  It's possible.
21       Q   Do you know if an NIED claim is a statutory
22  claim or a common law claim?
23       A   That's a legal question that I'm not
24  qualified to make a judgment on.
25       Q   How many times have you been deposed before?

Page 55

1        A   I have not been deposed before.
2        Q   And what exactly did you review before you
3   came here to testify?
4        A   I reviewed my face sheet note entries in the
5   file.  I reviewed a couple of Danny's face sheet note
6   entries in the file around the time that I was
7   entering my face sheet notes and I reviewed our
8   responses to I believe your requests for production
9   and requests for admissions.
10       Q   Anything else?
11       A   No.
12       Q   Are your notes different than what we have
13  here?  Are they similar to what have been produced as
14  exhibits?
15       A   Are these the same pages that I have?  These
16  look familiar.  These appear to be the face sheets
17  notes like the ones that I have seen.
18       Q   Do they include yours as well or are they
19  just all from Danny or --
20       A   This Exhibit 3 -- go ahead.
21       MR. ZIPKIN:  I'm not sure he has them all.
22  Exhibits 4, 5, 6 and 7?  Are you talking about all
23  four of those?
24       THE WITNESS:  What I have is Exhibit 3 and I
25  have Exhibit 4.

Page 56

1        MR. LEGACKI:  Okay.
2        MR. ZIPKIN:  They were Exhibits 4, 5, 6 and 7
3   as well.
4        Q   (By Mr. Legacki)  If you want to look at
5   those.  Have you had interaction between you and
6   Danny Withers or do you do that separate than what's
7   right there?
8        A   Exhibit 3 is Danny's face sheet note in the
9   file.  Exhibit 4 is Danny's notes.  Exhibit 5
10  continues with Danny's notes, as does Exhibit 7.
11  Those are Danny's notes.
12       Q   Are yours different?
13       A   Are mine different?
14       Q   Different, yes.  You looked at your own notes
15  you said?
16       A   Well, yes, my notes are different because
17  these are Danny's.
18       Q   Okay, so it's not like it's a back and
19  forth --
20       A   No.
21       Q   -- between you and Danny?
22       A   No.
23       Q   So when you say you had face sheet notes,
24  what notes are you talking about?
25       A   I'm talking about -- I'm not sure what you're

Adam Lund                              Deposition                              July 13, 2006

Page 57

1  asking me. Are you asking about my notes?
2      Q  Yes. Are they similar to that format?
3      A  It's the same format in terms of there will
4  be a date and a time and a person writing the note.
5  So yes, it's the same format, same system.
6      Q  Well, I'm just looking at his -- I don't know
7  if I was given your notes. I guess that's the
8  question I have.
9      A  Okay.
10     Q  It's seems like I have Danny's notes. I
11 don't have yours.
12     MR. ZIPKIN: I will just say, I believe we
13 have produced all of the face sheet notes relating to
14 this claim in the course of production. I don't know
15 if they were those particular ones. Off record.
16     (Brief break.)
17     MR. LEGACKI: I have no further questions.
18     MR. ZIPKIN: No questions, we're done. No
19 questions, we're done.
20     As before, I would like to say this on the
21 record, I do ask that a separate -- if this is being
22 transcribed, I assume it is -- I ask that a separate
23 copy of the deposition be provided for the witness to
24 keep and that he, again, receive the signature page
25 and a correction sheet, that he gets his own copy of

Page 58

1  the deposition, which I will pay for. For myself, I'd
2  like an E-transcript and a four-page-to-one condensed.
3  Thank you.
4      (Proceedings concluded at 10:58 a.m.)

Page 59

1                    Witness Certificate
2  Ronald v. Weilbacher vs. Progressive Northwestern Insurance
   Company, No. 3:05-CV-0204-TMB
3
                      ADAM LUND
4
       I hereby certify that I have read the foregoing
5  deposition and accept it as true and correct, with the
   following exceptions:
6
7  Page  Line      CHANGE/CORRECTION and REASON
8  ___ ___ _____
9  ___ ___ _____
10 ___ ___ _____
11 ___ ___ _____
12 ___ ___ _____
13 ___ ___ _____
14 ___ ___ _____
15 ___ ___ _____
16 ___ ___ _____
17 ___ ___ _____
18 ___ ___ _____
19 ___ ___ _____
20 ___ ___ _____
21 ___ ___ _____
22 ___ ___ _____
23 ___ ___ _____

   Date Read          (Sign name here)
24
25 (Use additional paper to note corrections as needed, dating
   and signing each one.)      (CJK)

Page 60

1          REPORTER'S CERTIFICATE
2  I, CYNTHIA J. KENAN, hereby certify:
3      That I am a Court Reporter for Alaska Stenotype
4  Reporters and Notary Public for the State of Alaska; that
5  the foregoing proceedings were taken by me in computerized
6  machine shorthand and thereafter transcribed by me; that
7  the transcript constitutes a full, true and correct record
8  of said proceedings taken on the date and time indicated
9  therein.
10     Further, that I am a disinterested person to
11 said action.
12     IN WITNESS WHEREOF, I have hereunto
13 subscribed my hand and affixed my official seal this
14 25th day of July, 2006.
15
16
17
       _____
18             CYNTHIA J. KENAN
19             Court Reporter
               My Commission Expires 5.5.10
20
21
22
23
24
25

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT___O___15 (Pages 57 to 60)
Page__15__of__15__