Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

RONALD V. WEILBACHER,
    Plaintiff,

vs.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,
    Defendant.
_____

Case No. 3:05-cv-0204-TMB

DEPOSITION OF DANIEL QUINN
May 31, 2007
Commencing at 1:32 p.m.
Volume I - Pages 1-31, inclusive
Taken by the Plaintiff
at
THE LAW OFFICES OF KENNETH G. LEGACKI
425 G Street, Suite 925
Anchorage, AK 99501

Reported by:
Rosie S. Scott, CSR

Daniel Quinn                                Ronald Weilbacher v. Progressive                          May 31, 2007

Page 2

1  APPEARANCES
2
   For Plaintiff:  LAW OFFICES OF KENNETH W. LEGACKI
3                  By: Kenneth W. Legacki
                   425 G Street
4                  Suite 925
                   Anchorage, AK 99501
5                  (907) 258-2422
6
7  For Defendant: GUESS & RUDD
                  BY: Gary A. Zipkin
8                 510 L Street
                  Suite 700
9                 Anchorage, AK 99501
                  (907) 793-2200
10
11
12
13
14 Taken by:
15    Rosie S. Scott, CSR
16 BE IT KNOWN that the aforementioned deposition was taken
17 at the time and place duly noted on the title page,
18 before Rosie S. Scott, Certified Shorthand Reporter and
19 Notary Public within and for the State of Alaska.
20
21
22
23
24
25

Page 3

1              INDEX
2
3  EXAMINATION BY:                              PAGE
4
5  By Mr. Legacki                                4
6
7
8
9
10 EXHIBITS                                     PAGE
11 (None marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              PROCEEDINGS
2              DANIEL QUINN,
3  called as a witness herein, being first duly sworn to
4  state the truth, the whole truth and nothing but the
5  truth by the Notary, testified under oath as follows:
6              EXAMINATION
7  BY MR. LEGACKI:
8     Q. Would you please state your name for the record
9  and spell your last name.
10    A. Daniel Quinn, Q-U-I-N-N.
11    Q. And obviously, just for the record, you're an
12 attorney here in Anchorage?
13    A. That's correct.
14    Q. Do you know why you're here?
15    A. Well, I understand that I am here because I had
16 a couple of conversations with Danny Withers on an issue
17 of whether loss of consortium gives rise to another per
18 person limit. That's kind of my dim understanding.
19    Q. What did you do to prepare for today?
20    A. I did look at the notes of Danny Withers.
21 Aisha sent those to me. She sent me Danny Withers'
22 deposition. And I really just glanced at the couple of
23 pages that had to do with the conversations with me. And
24 then I just looked at a couple of cases that addressed
25 those issues.

Page 5

1     Q. What cases did you look at?
2     A. I think I looked at the Teel case because I
3  knew that was one that we had discussed. I looked at the
4  Wold case. There's the Daughty case I think, and the
5  Lawrence case. Those are the ones that come to mind.
6     Q. And when did you do that?
7     A. Just today.
8     Q. Okay. Do you have any independent recollection
9  of your conference?
10    A. I kind of have a very dim memory of those
11 conversations. In fact, I wasn't entirely clear that it
12 was two conversations, but it looks like it was according
13 to Danny's records. And I'm not surprised at that. But
14 I do remember -- I kind of remember that I had the
15 conversation. And I remember kind of the general gist
16 of at least I thought the law was in that area. And
17 that's about it. But beyond that, I don't have a memory
18 of anything very specific beyond that.
19    Q. And did you bill for your time for that?
20    A. No.
21    Q. Okay. And did you write a report?
22    A. No.
23    Q. Did you take notes when he called you?
24    A. No.
25    Q. Did you review the correspondence between

2 (Pages 2 to 5)

Southcentral Court Reporting
(907) 952-9572

EXHIBIT 22
Page 2 of 9

Daniel Quinn — Ronald Weilbacher v. Progressive — May 31, 2007

## Page 6

1  myself and Dan Withers?
2  A. No.
3  Q. Do you recall what he asked you?
4  A. Yeah. He called me and it was just -- it was
5  kind of an off-the-cuff call really just because I had
6  done work with him over the years, and I've known him for
7  a long time.
8    So, you know, I get calls like this from Danny
9  periodically, and other clients as well, just saying,
10  what do you think about this? And I think the gist of it
11  was that you had suggested to him that this Teel case
12  held or somehow suggested that loss of consortium
13  triggers another per person limit. And I said -- you
14  know, I think Teel was a fairly new case at that time.
15  And I know I had looked at it, but I didn't remember
16  specifically what it said.
17    So it seems like I looked it up, and I just
18  kind of -- you know, looking at it, I concluded that I
19  don't think it really sheds much light on that issue at
20  all. I don't think it really addressed the issue of a
21  per person limit, so that's what I told him that I didn't
22  view that case as really answering the question.
23  Q. Did you analyze the case at the time of the
24  phone conversation or before or after?
25  A. I think I may -- I have a dim memory. And I'm

## Page 7

1  just not clear on whether I called him back and looked at
2  it or not. I have a memory that I just pulled it up on
3  Westlaw because I had my computer right there. So I may
4  have just -- I know I -- I mean, didn't print it out or
5  anything. I just looked at it on Westlaw, I think, while
6  I was talking to him.
7  Q. So it was just a cursory review?
8  A. Yeah, pretty cursory I would have to say.
9  Q. And that's the last that -- and I guess you
10  talked to him again; do you recall?
11  A. I think he called me again. And I -- frankly,
12  the reason I say that is because I saw his notes that he
13  apparently had called me again.
14  Q. You don't have a recollection of that?
15  A. I kind of have a recollection of there being
16  two conversations. I can't separate them out. I mean, I
17  think I just kind -- they kind of blend together. But I
18  think I gave him the basic -- my basic conclusion that I
19  didn't think the Teel case really, you know, was
20  dispositive of that issue.
21  Q. And did he say loss of consortium or loss of
22  society?
23  A. I can't remember.
24  Q. Did he tell you about the Gillespie case?
25  A. I don't remember discussing the Gillespie case.

## Page 8

1  I mean, I'm aware of the Gillespie case myself, but I
2  don't remember that we discussed it. We may have, I
3  don't remember that.
4  Q. Did you tell him that a parent of a minor child
5  can collect under a wrongful death statute?
6  A. I don't -- I'm quite sure I didn't tell him
7  that in that conversation.
8  Q. And, of course, a parent can't collect on a
9  wrongful death statute, right?
10  A. That's correct. That's my understanding. And
11  in the Gillespie case they rely on a different statute.
12  Q. Okay. And by the way, did you read the
13  contract?
14  A. The Progressive -- I don't think I did at that
15  time. I mean, I had read it before. At least I was
16  assuming that it was the same standard Progressive
17  policy. But I didn't pull it out and specifically read
18  it. But I was kind of, you know, generally familiar with
19  it and had researched that issue before.
20  Q. What issue?
21  A. With the Progressive policy. The per person --
22  you know, what triggers a separate per person bodily
23  injury limit.
24  Q. So you have researched that before in which
25  ways?

## Page 9

1  A. Well, now the Wold case is the one that comes
2  to mind, but I have with other cases, too. I'm not sure
3  other Progressive cases, but other cases generally. It's
4  an issue that comes up periodically in my practice.
5  Q. So how long prior to this conversation had you
6  reviewed the Progressive Insurance policy?
7  A. I can't -- I don't know. I can't remember a
8  specific time. But I think I review it periodically as I
9  need to in a given case. So when I last looked at that
10  particular language, I can't tell you.
11  Q. All right. Do you still do work for
12  Progressive?
13  A. Yeah.
14  Q. How much of your work is for Progressive?
15    MR. ZIPKIN: I object. This goes beyond the
16  scope of the court's order, which is very clearly limited
17  allowing this deposition. But limiting it to Mr. Quinn's
18  conversation with Mr. Withers in connection with Mr.
19  Weilbacher's claim and the basis for any advise he might
20  have given. That's it. So I think this question is out
21  of bounds.
22    MR. LEGACKI: I don't think it is. Go ahead.
23    THE WITNESS: I would say -- I'm really
24  guessing, but I would say at least 5 percent.
25  BY MR. LEGACKI: