Daniel Quinn					Ronald Weilbacher v. Progressive					May 31, 2007

Page 22

1  correct?
2  A. Well, I suppose, or at least be familiar with
3  the policy.
4  Q. And Mr. Withers never brought this subject up
5  with you?
6  A. The mirror image?
7  Q. Yeah.
8  A. I don't recall that coming up, at least in
9  these two conversations. We may have discussed that at
10  other times and in other context, but not with regard to
11  this case.
12  Q. When you give an opinion, do you usually do a
13  written opinion?
14  A. Well, I have different levels of formality I
15  guess. I often get phone calls from Danny Withers and
16  others just saying, you know, what do you think? And I
17  think I don't charge for that. And I don't -- you know,
18  I think the recipient understands that it's not a, you
19  know, a fully researched opinion. But, you know, this is
20  the kind of work I do, so I'm kind of generally familiar
21  with, you know, the law in this area, so...
22  Q. Well, also the Supreme Court found that the
23  AS 09.15.010 simply allows a parent to pursue a claim.
24  Did you say that to him?
25  A. I dont recall if I said that to him. But I

Page 23

1  think it's -- I think that statute does allow a parent to
2  pursue a claim.
3  Q. But is it procedural, or is it actually an
4  independent claim?
5  A. I think it's -- I guess it would be the Beta
6  case. It seems to say that it's independent, whatever
7  that means. It's independent of the wrongful death
8  statute because I think what Beta said was that under the
9  wrongful death statute, a parent could not assert a loss
10  of society claim, but under this statute they can.
11  Q. And Withers says here -- so he's wrong when he
12  says, "Our argument is that although this is an active
13  claim of the parent, it is derivative of the wrongful
14  death claim per contract?"
15  A. I think he is correct about that, actually.
16  Q. I thought you can't have a wrongful death -- a
17  parent does not have a claim under a wrongful death
18  statute.
19  A. Well, it's derivative in the sense that it
20  arises out of the death of the child. I mean, the parent
21  wouldn't have the claim had it not been for the death of
22  the child. But it's independent in the sense that the
23  parent can assert it independently of the estate.
24  Q. For their own injuries?
25  A. For their own emotional loss.

Page 24

1  Q. For their own mental anguish?
2  A. I think that's correct, yeah. But again, it
3  doesn't answer the question of whether that gives rise to
4  a separate per person limit. That wasn't addressed in
5  the Gillespie case at all.
6  Q. So what did you -- since you know the
7  Progressive policy, what does give rise to a separate
8  claim?
9       MR. ZIPKIN: Excuse me. Is this part of the
10  conversation with Mr. Withers? If it is, it should be
11  phrased as such. If it isn't, I believe it's out of
12  bounds again.
13       THE WITNESS: I didn't have that discussion
14  with him.
15  BY MR. LEGACKI:
16  Q. So you're saying here today, you have no
17  independent recollection of exactly what was said?
18  A. I didn't record the conversation, and I didn't
19  memorize it, and so that's correct.
20  Q. And you don't know if Mr. Withers -- you seem
21  to think here that he wrote things down that are a little
22  bit different than what you remember in the conversation?
23       MR. ZIPKIN: Mischaracterizes his answers.
24       THE WITNESS: I'm not sure I would agree with
25  that.

Page 25

1  BY MR. LEGACKI:
2  Q. And you don't -- if I give you the policy now,
3  will you comment and let me know, and show where it says
4  that it's derivative and not an independent claim?
5       MR. ZIPKIN: It sounds like it's out of bounds
6  again.
7       THE WITNESS: I'm not sure the policy quite
8  says that anywhere. I believe it's the limits of
9  liability provision. You know, I've looked at that
10  before. I don't -- again, I don't have it memorized.
11  But that's, you know, that's the provision of the policy.
12  BY MR. LEGACKI:
13  Q. The limits of liability meaning, what?
14  A. Meaning this is -- you know, something along
15  the lines of this is the most we will pay.
16  Q. For all your claims?
17  A. Right.
18  Q. Which includes medical, loss of wages?
19  A. I'm not even sure the language that I have in
20  mine specifically says that.
21  Q. Do you recall what the language says then?
22  A. It says something along the lines of this is
23  the most we will pay for any single, bodily injury. And
24  then they --
25  Q. It's $100,000?

7 (Pages 22 to 25)

Southcentral Court Reporting
(907) 952-9572

EXHIBIT 22
Page 7 of 9

Page 26

```
 1    A.  The limits of liability language itself I don't
 2  think would include the dollar amount, but you would have
 3  to look at that.
 4    Q.  Right. But then when they say the single
 5  bodily injury limit, we mean all claims including?
 6    A.  Yeah, I think it has something along the lines
 7  of all claims including, you know, loss of consortium,
 8  loss of society. I think there's language to that
 9  effect.
10    Q.  So in your file, injury claim, the max it will
11  pay is say, $100,000 for all your claims, which includes
12  loss of consortium, loss of society, wrongful death, all
13  that stuff, right?
14    A.  I mean, you're paraphrasing it. But yeah,
15  that's kind of my understanding of generally what it
16  says.
17       MR. ZIPKIN: And you're mischaracterizing it.
18  You know you have it. Why don't you put it in front of
19  him and then see if it formed the basis of his
20  discussion?
21  BY MR. LEGACKI:
22    Q.  Do you need to see it?
23    A.  It depends on -- you know, if you're going to
24  ask me what the language says, I probably need to see it.
25  But I guess it just depends on what you're going to ask
```

Page 27

```
 1  me.
 2    Q.  I guess the question is: When Danny Withers
 3  calls you up and says, hey, does he get a separate per
 4  person policy; is that what you were thinking about?
 5    A.  Yes.
 6    Q.  And you remember reading it?
 7    A.  I did not look at the policy during the course
 8  of that conversation, but I had seen it before, and I
 9  was, as I say, I'm generally familiar with it.
10    Q.  How often has that language changed since all
11  your years working for Progressive?
12    A.  I don't know the answer to that. I know that
13  their policies have changed somewhat over time. And I
14  don't know to what extent that specific provision has
15  changed.
16       MR. ZIPKIN: That question is also out of
17  bounds. I object. Move to strike.
18       MR. LEGACKI: It's going to the basis of his
19  conversations.
20       MR. ZIPKIN: No, it doesn't. You haven't made
21  any such connection. I'll leave it for the judge to
22  decide.
23       MR. LEGACKI: Sure.
24  BY MR. LEGACKI:
25    Q.  That would be -- when you're talking to
```

Page 28

```
 1  Withers, that would be in your mind, right, because
 2  you're going back and saying, oh, gee, the policy and the
 3  case. You're putting the two together, right?
 4       MR. ZIPKIN: Objection. Vague.
 5       THE WITNESS: What would be?
 6  BY MR. LEGACKI:
 7    Q.  If he's asking you a question about, you know,
 8  the Teel decision and you're probably also, in your mind,
 9  trying to remember the insurance policy, right?
10    A.  Well, as I say, I was kind of generally
11  familiar with the insurance policy because I research
12  this issue both for Progressive and other companies, you
13  know. And the fact of the matter is, for the most part,
14  these policies have fairly comparable language.
15       And I think if there had been a significant
16  change to the Progressive policy I probably would have
17  been aware of it. So you're right. I was working on the
18  assumption that the same general provision was still --
19  the same limits of liability provision, you know, had not
20  been substantively altered since the last time I looked
21  at it. That was an assumption that I probably didn't
22  consciously make, but in giving my answer, that was my
23  assumption.
24       MR. LEGACKI: No further questions.
25       MR. ZIPKIN: No questions.
```

Page 29

```
 1       (Proceedings concluded at 2:10 p.m.)
 2       (Signature reserved.)
```

8 (Pages 26 to 29)

Page 30

```
 1          REPORTER'S CERTIFICATE
 2      I, ROSIE S. SCOTT, CSR, hereby certify:
 3      That I am a Certified Shorthand Reporter
 4  for Southcentral Court Reporting and Notary Public for
 5  the State of Alaska; that the foregoing proceedings were
 6  taken by me in computerized machine shorthand and
 7  thereafter transcribed by me; that the transcript
 8  constitutes a full, true and correct record of said
 9  proceedings taken on the date and time indicated therein.
10      Further, that I am a disinterested person to
11  said action.
12      IN WITNESS WHEREOF, I have hereunto
13  subscribed my hand and affixed my official seal this
14  ____ day of _____, 2007.
15
16
17
18
19      _____
        ROSIE S. SCOTT
        Certified Shorthand Reporter
20      My Commission Expires
        8/16/08
21
22
23
24
25
```

Page 31

```
 1          WITNESS CERTIFICATE
 2  Ronald V. Weilbacher versus Progressive Northwestern
    Insurance Company, Case No. 3:05-cv-0204-TMB
 3
 4  DANIEL QUINN         Taken May 31, 2007
 5      I hereby certify that I have read the foregoing
    deposition and accept it as true and correct, with the
 6  following exceptions:
 7  ------------------------------------------------
 8  Page  Line  Description  Reason for Change
 9  ------------------------------------------------
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22  ____  ____  _____  _____
23  ____  ____  _____  _____
    (Date read)    (Sign name here)
24
    (Use additional paper to note corrections as needed,
25  dating and signing each one.) (RS)
```