Robert Lohr — Deposition — July 26, 2006

## Page 14

1  A. It was Doug Pope, Pope & Katcher.
2  Q. And what was the issue there?
3  A. The issue was health insurance and alleged
4  discrimination in provision of health insurance coverage
5  in Northwest Alaska to a school district.
6  Q. And you had the Teel case; how about Gillispie?
7  A. No, I was not involved in Gillispie.
8  Q. Did Guess & Rudd give you that case?
9  A. My recollection is that I got Gillispie on my
10 own.
11 Q. Why did you get that?
12 A. I don't specifically recall. In some cases,
13 I will get a case, because I see it referred to in other
14 documents related to the particular case, or I see it
15 discussed in meetings. And as a result of that, I will
16 go seek that case out to try to get a firsthand sense of
17 what the core is talking about. And in other cases, it
18 could be provided to me. However, I believe I got
19 Gillispie on my own.
20 Q. And Hillman?
21 A. Hillman I had on file because it's a key
22 precedent for insurance law in Alaska.
23 Q. And Russ and Segalla, S-E-G-A-L-L-A, or I guess
24 it's Couch on Insurance?
25 A. Couch I can't quite afford. I go to the law

## Page 15

1  library and actually have to use the hard copy on that,
2  because the law library subscription to Westlaw does not
3  include access to Couch.
4  Q. Widiss, W-I-D-I-S-S?
5  MR. ZIPKIN: It's pronounced Widiss.
6  THE WITNESS: I actually felt I could afford
7  Widiss and bought a copy, so I referred to that in
8  my own library office at home.
9  BY MR. LEGACKI:
10 Q. And the Alaska Division of Insurance file was
11 given to you by Guess & Rudd?
12 A. That's correct, electronically.
13 Q. And 66th Annual Report from the Alaska Division
14 of Insurance?
15 A. I had that. And I have produced that in
16 response to your deposition notice.
17 Q. What's the relevance of that?
18 A. I -- in reading the report, the only thing that
19 I found relevant was either a quotation or a paraphrasal
20 of the role of the Alaska Division of Insurance's
21 consumer protection section. It's the only reference I
22 found of the report. And I believe that's the only use I
23 made of it in this case.
24 Q. And Government Employees Insurance Company
25 versus Graham-Gonzalez, what was -- who gave you that

## Page 16

1  case?
2  A. I had that case because I was involved in that
3  one also.
4  Q. And who were you involved with there?
5  A. I was working at the request of Mark Wilkerson
6  and GEICO.
7  Q. Do you have any other job right now other than
8  as an expert witness?
9  A. Yes.
10 Q. What's your employment?
11 A. I work part-time for the Municipality of
12 Anchorage in the Office of Management and Budget.
13 Q. What do you do for them?
14 A. I'm -- I serve as an advisor to the chief fiscal
15 officer for the Municipality on utility regulatory
16 issues.
17 Q. So if I understand correctly, you've testified,
18 or you've been retained as a consultant in 25 cases; is
19 that correct?
20 A. No. I've been retained as either a consultant
21 or an expert witness in about 25 cases beyond the four
22 that are listed under the Rule 26 disclosure.
23 Q. Does that include Teel or does not include Teel?
24 A. That list of 25 would include Teel.
25 Q. So that's approximately 29 cases?

## Page 17

1  A. Around 30, that's correct.
2  Q. Thirty, okay.
3  And only one has been for a plaintiff.
4  A. That's correct.
5  Q. And that was a -- for a health insurance issue,
6  not an automobile insurance issue?
7  A. That's correct also. And I did not testify in
8  that case, just to clarify the record. I was retained as
9  a consultant.
10 Q. Consultant?
11 A. That's correct.
12 Q. Of the other 29 cases, what was the subject
13 matter of your retention? I mean, was it for -- I guess
14 I should clarify that by saying, was it for auto
15 insurance or health insurance, or what was it for?
16 A. Many of them involved insurance bad faith
17 allegations, perhaps a majority of them dealt with
18 automobile insurance. Also included were homeowner's
19 claims, a boat insurance claim. None of the other ones,
20 besides the one that we talked about for health
21 insurance, involved health insurance. They were all
22 typically, in fact, adversely, all of them were property
23 casualty cases.
24 Q. And how many times were you retained by Guess &
25 Rudd?

Page 18

1   A. I don't know in terms of a number.
2   Q. Percentage?
3   A. I'm guessing it would be 40 percent.
4   Q. And percentage hired by others, like Mark
5   Wilkerson, what percentage were you hired by him?
6   A. Perhaps 20 percent.
7   Q. And he represents Allstate, correct?
8   A. He represents various clients.
9   Q. Okay. What other persons have -- percentage are
10  you been retained by?
11  A. I've been retained by Sonnenschein. --
12  Q. I'm sorry?
13  A. Sonnenschein, S-O-N-N-E-N-S-C-H-E-I-N, Nath &
14  Roth or Roth & Nath [as spoken]. I'm sorry, it's a
15  Chicago-based firm.
16  Q. Okay.
17  A. And I've been retained by Steptoe & Johnson in
18  Phoenix, Arizona.
19  Q. What's the percentage?
20  A. Perhaps 20 percent there also.
21  Q. So you got Guess & Rudd, 40 percent; Wilkerson,
22  20 percent. That's 60. 20 percent by the firm in
23  Phoenix or --
24  A. The outside firms, if you would.
25  Q. So that's 80 percent?

Page 19

1   A. On class actions, typically.
2       And also Mr. Al Clayton of Bliss Wilkens &
3   Clayton.
4       There are others, but I believe they're
5   incidental, that is they're not a regular occurrence.
6   Q. Okay. And you're personal friends with Mr.
7   Zipkin; is that correct?
8   A. Yes.
9   Q. You socialize together?
10  A. Yes.
11  Q. Okay. How frequently do you socialize with Mr.
12  Zipkin?
13  A. We play fierce racquetball several times a week.
14  Q. I'm not going to ask you who wins.
15      MR. ZIPKIN: I can tell you it ain't me.
16      THE WITNESS: We are both left-handed.
17  BY MR. LEGACKI:
18  Q. How long have you been playing racquetball with
19  Mr. Zipkin?
20  A. Possibly four years. Four, going on five, I
21  think.
22  Q. Was he the one that encouraged you to become an
23  expert on insurance matters?
24  A. He was one of the ones.
25  Q. Who else?

Page 20

1   A. Mr. Lou Agi and I talked about it, Mr. -- well,
2   people at the National Association of Insurance
3   Commissioners would talk about life after being a
4   commissioner. And the subject there of what do
5   ex-commissioner's do came up. And a number of them have
6   been retained by firms to express expert opinions.
7       So I was aware of the -- the possibility of
8   that, generally from my time with the National
9   Association.
10  Q. And Lou Agi, he's with the AG's office, isn't
11  he?
12  A. Not anymore. He's -- he's now with the
13  Municipality of Anchorage, working for the Municipal
14  Light and Power for one the utilities.
15  Q. That's right, Lou was with the Public Office
16  Commission, wasn't he, too, for a while?
17  A. Lou Agi was a commissioner on the Alaska Public
18  Utilities Commission sometime ago.
19      I don't know that he had involvement with the
20  Public Offices Commission.
21  Q. I'm sorry -- yeah, Public Utility Commission, I
22  misspoke.
23  A. Correct.
24      In fact, he encouraged me to consider applying
25  for the executive director position with the commission

Page 21

1   way back when. And I did so.
2   Q. Did you get that?
3   A. Yes.
4   Q. Okay. Anyone else beside Gary and Lou, any
5   commissioners?
6       MR. ZIPKIN: Object to form.
7       THE WITNESS: My wife and I certainly talked
8   about it, but I don't recall her knowing enough
9   about it to really have an opinion, pro or con.
10  BY MR. LEGACKI:
11  Q. Sure.
12  A. Other than that, I don't recall specifically.
13  Q. How long have you known Gary Zipkin?
14  A. Four to five years.
15  Q. And how did you come about meeting him?
16  A. Through racquetball, I believe. I think Mr. Agi
17  introduced us.
18  Q. Now, I'm looking at the materials reviewed. I
19  noticed you looked at a bunch more cases. You only list
20  Allstate versus Teel, Gillispie and Hillman and
21  Graham-Gonzalez; is that right? Only four cases for your
22  report?
23  A. Those are the ones listed on pages 1 and 2 of my
24  expert witness disclosure. There are other cases within
25  the body of the report that are not on that list. But

Robert Lohr                           Deposition                           July 26, 2006

### Page 22

1. obviously were sufficiently relevant that I reviewed them
2. or talked about them.
3.    Q. I guess, I don't see any other cases cited.
4.    A. For example, on page 5 of the report under a
5. discussion of Hillman versus Nationwide, which is listed
6. in the materials reviewed, there's a discussion of
7. Anderson versus Continental Insurance Company.
8.    Q. Now, did you just quote Anderson or did you
9. actually read Anderson?
10.    A. I quoted Anderson in writing this report. I
11. have subsequently gone back and reviewed Anderson
12. directly. And that's why I added it to this list.
13.    Q. So when you wrote this report, you did not read
14. Anderson?
15.    A. I did not go back and read Anderson directly,
16. that's correct.
17.    Q. Okay. So when you wrote this report, you only
18. read the four cases that I cited, Hillman, Gillispie,
19. Teel and Graham-Gonzalez?
20.    MR. ZIPKIN: Object to form.
21.    THE WITNESS: I would say it differently. I may
22. well have reviewed Anderson directly in the past,
23. but not in the near time table of when I did this
24. report. After I submitted this report, I've tried
25. to go back and look at cases to become more familiar

### Page 23

1. with the cases that were relevant here and looked at
2. a few others as well.
3. BY MR. LEGACKI:
4.    Q. Now, I noticed in the materials reviewed you
5. didn't review the Wrongful Death Statute; is that
6. correct?
7.    A. Do you have a page reference for that?
8.    Q. On your page one of your report, materials
9. reviewed.
10.    A. I don't recall the Wrongful Death Statute
11. specifically. I do recall AS 09.15.010, but I don't
12. believe that's what we're talking about when you ask
13. about wrongful death.
14.    Q. No. You did not read the Wrongful Death
15. Statute; is that correct?
16.    A. I recall seeing it discussed in one or more of
17. the cases, but I don't recall specifically going back to
18. Title 9 and looking at the Wrongful Death Statute
19. specifically. It may have been quoted as a footnote in
20. one of the cases and it's not one the volumes of Alaska
21. Statutes that I have at my beckon call at home, but I do
22. often refer to either Touch and Go (sic) or the
23. legislative site to look at additional statutes. So I
24. don't have a specific recollection of having looked at,
25. is it 09.55 something.

### Page 24

1.    Q. You're the expert.
2.    A. Well, that's why I said, I don't have a specific
3. recollection of reviewing that particular -- the Wrongful
4. Death Statute, as you call it.
5.    Q. How about the Survival Statute?
6.    A. I may not be familiar with these sections by the
7. terminology you're using, so I don't recall looking at a
8. survival statute specifically.
9.    Q. Okay. And I noticed in this report nowhere do
10. you list 09.15.010. Is there a particular reason for
11. that?
12.    A. No, there's no particular reason why I didn't
13. mention that statute.
14.    Q. You didn't review it, did you?
15.    A. I did review it.
16.    Q. And you reviewed it when you wrote this report?
17.    A. Yes, I believe I did.
18.    Q. Now, Heidi Weilbacher, she -- her cause of
19. action's the cause of wrongful death of her; is that
20. correct?
21.    A. I'm sorry. Could you repeat that.
22.    Q. The whole genesis of this litigation, the basic
23. foundation of this litigation is because of the wrongful
24. death of Heidi Weilbacher, correct?
25.    MR. ZIPKIN: Object to form.

### Page 25

1.    THE WITNESS: I have not reviewed previous
2. litigation involving Ms. Weilbacher that led up to
3. this case. The cases that involved her that
4. preceded this case, I have not reviewed, except
5. through press clippings to try to get a sense of
6. what the accident involved. But I have not gone
7. back to review pleadings or results in those cases.
8. BY MR. LEGACKI:
9.    Q. Okay. So you don't know whether or not Heidi
10. Weilbacher filed a wrongful death claim?
11.    MR. ZIPKIN: Object to form. Heidi Weilbacher
12. filed nothing.
13. BY MR. LEGACKI:
14.    Q. Or her parents on behalf of Heidi Weilbacher?
15.    A. I believe I've seen reference to that fact in
16. some of the pleadings in the case, so I'm aware of it,
17. but I have not gone back to review the documents from
18. that case or other cases related to the accident itself.
19.    Q. And I noticed that in the materials you never
20. reviewed the notes of the adjuster.
21.    A. Well, I certainly did. And if I didn't list
22. them, then I probably should have.
23.    Q. Before you filed this report, you looked at the
24. adjuster's notes?
25.    A. Absolutely.

EXHIBIT 23 PAGE 7 OF 38 PAGES                 7 (Pages 22 to 25)

Alaska Stenotype Reporter (907) 276-1680

Page 26

1  Q. Were they redacted or unredacted?
2  A. They were redacted, is my recollection, at the
3  time.
4  Q. I notice you didn't look at State Farm versus
5  Lawrence when you wrote this report; is that correct?
6  A. State Farm versus Lawrence is a case that I had
7  reviewed sometime prior to my involvement in this case.
8  I have certainly read it. I note that Teel refers to
9  State Farm versus Lawrence. I do not recall specifically
10 re-reading State Farm versus Lawrence in the context of
11 this case. I have, since the time I turned this report
12 in, however, I have done so.
13 Q. Right. In fact, let's look at Exhibit 1, your
14 notes there from -- you put down State Farm versus
15 Lawrence NIED claims are direct, not derivative, right?
16 A. That's correct.
17 Q. And then it says in parens: Too much legal
18 interpretation to expect of a lay person, close parens,
19 correct?
20 A. That's correct.
21 Q. What did you mean by that?
22 A. That is my summary of the -- just the court's
23 holding in interpreting the reasonable objective
24 interpretation of a policyholder in reviewing language.
25 It was the idea that it's not reasonable for the

Page 27

1  insurance industry or the courts to expect an insured to
2  go back and do the sifting process of interpreting court
3  cases and the nuances and language in a policy in order
4  to come up with what the policy covers.
5      The court will do that and they will take
6  account of what the reasonable expectations of the
7  policyholder concerning what the language means. And I'm
8  sort of repeating myself, that's what that note meant,
9  was that there's a considerable discussion of that by the
10 court in that case.
11 Q. So it's very difficult for a lay person to
12 understand the difference between direct claim and
13 derivative claim?
14     MR. ZIPKIN: Object to form.
15 BY MR. LEGACKI:
16 Q. Is that basically what you're saying?
17 A. No.
18 Q. So you have -- I guess you said -- when he
19 refers to too much legal interpretation to expect of a
20 lay person, are you talking about the, trying to
21 understand what a direct and derivative claim is?
22 A. My recollection is the court so talking about if
23 the claimant or first party, the policyholder has an
24 objective, reasonable reading of what the policy means,
25 that ought to be a key factor in interpreting that policy

Page 28

1  language. It's by no means the only one.
2      The court pointed out that various
3  representations are made to the policyholder,
4  advertising, the interaction with the agent or the
5  broker. All that kind of information that may influence
6  their interpretation. And the court will look to the
7  extrinsic evidence that supports the notion that the
8  policyholder had a specific impression and that this will
9  be done -- actually, that was Teel, later, but that --
10 those are important factors in interpreting policy
11 language.
12 Q. And Teel stated that a NIED claim is direct, not
13 derivative, correct?
14 A. That's correct.
15 Q. And why don't you -- can you explain to me what
16 the difference between a direct claim and a derivative
17 claim is?
18 A. My understanding is that a derivative claim
19 derives from the injury or the claim of another.
20 Q. Okay.
21 A. A direct claim would typically involve injury to
22 the claimant directly as a result of the accident, for
23 example, bodily injury.
24 Q. Okay. We were -- I was just watching the clock
25 here. You had to stop and think about that for a while

Page 29

1  to try and explain that difference. Why was it difficult
2  for you -- why did you have to take a moment, several
3  moments, actually, to formulate your answer?
4      MR. ZIPKIN: Object to form.
5      THE WITNESS: I wasn't timing it, but I believe
6  that that pause was far shorter than many of the
7  other pauses that I've used -- that I've needed
8  during the deposition to review materials and try to
9  give a careful, thoughtful answer.
10 BY MR. LEGACKI:
11 Q. Right. But, I mean, did you have to try to
12 pause and figure out what direct/derivative means and how
13 to explain that difference?
14     MR. ZIPKIN: Object to form.
15     THE WITNESS: As long back as I can recall in
16 being advised on approaching depositions, the advice
17 that I've received is to try to, number one, allow
18 counsel an opportunity to interpose an objection;
19 and number two, to give some thought, especially to
20 important questions in responding. So I don't think
21 there was anything atypical about the length of time
22 it took me to respond.
23 BY MR. LEGACKI:
24 Q. Okay. So when -- I guess, when you were pausing
25 there, you were giving Counsel time to object, you