Robert Lohr                    Deposition                    July 26, 2006

Page 30

1  weren't trying to formulate your answer, you weren't
2  trying to figure how to say your answer, I mean, try to
3  discern between direct and derivative, how to explain
4  that?
5      MR. ZIPKIN: Object to form. It's just
6  argumentative.
7  BY MR. LEGACKI:
8      Q. Is that my understanding?
9      MR. ZIPKIN: Who knows what your understanding
10 is.
11     THE WITNESS: I couldn't give an answer to that
12 question, simply because it strikes me as compound.
13 And I don't know which part I would be answering if
14 I said yes or no. I could try to go through each
15 thread that I remember, but I'll ask you to restate
16 it, if you would.
17 BY MR. LEGACKI:
18     Q. I'll restate it.
19     A. Thank you.
20     Q. The hesitation you had was not directed to
21 having trouble defining a difference between direct and
22 derivative, was it?
23     A. I don't accept the premise that it was
24 hesitation. I try to give a careful, thoughtful answer,
25 believe that I did so. And it's hard for me to do

Page 31

1  microtome slices of what my thinking was. There were
2  various factors there. I try to do a good job of giving
3  you an honest answer.
4      Q. Okay. Now, the insurance commissioner -- you
5  were appointed by, was it Tony Knowles?
6      A. Yes. In Alaska we call it the director of
7  insurance, but it's very similar to the role of insurance
8  commissioner in many other states.
9      Q. I'm sorry, director of insurance was your title?
10     A. That's correct.
11     Q. And you were appointed by Tony Knowles?
12     A. Yes.
13     Q. And what exactly are your duties as director?
14 Is it to personally review policies or is it just to
15 administer the division?
16     MR. ZIPKIN: Object to form.
17     THE WITNESS: I try to summarize in my report
18 typical duties of the director of insurance. But it
19 was to administer the division and to oversee the
20 various functions of the division, including the
21 rate and form filing section which conducted the
22 direct review of rates, proposed rates by an
23 insurer, as well as the form language and policy
24 language that was proposed and required to be
25 approved in advance of taking effect.

Page 32

1  BY MR. LEGACKI:
2      Q. Okay. So you didn't do the day-to -- again,
3  involved in the day-to-day stuff, you were mostly the
4  administrator, make sure that everything was running
5  smoothly, correct?
6      A. No. I would agree that I did not get involved
7  in the day-to-day review of policy language. However,
8  when there were policy issues related to policy language
9  or statutory interpretation, I would receive those items,
10 those would be sifted out by the people that were doing
11 the direct review and sent to me for my review and
12 involvement.
13     So I was directly involved in the more complex
14 or difficult cases involving policy language. Rates, I
15 recall Workers' Comp rates were particularly challenging.
16 But I was involved in those, not in every aspect of them,
17 but rather the ones that I considered and the staff
18 considered the most important.
19     Q. Okay. In your four years there -- was it four
20 years or less than four years or more than four years?
21     A. It was three-and-a-half years, as I recall.
22     Q. How many times did you actually review policy
23 language?
24     A. I'm guessing that it was about a dozen, maybe 12
25 to 20, in that range.

Page 33

1      Q. And what kind of policies are we talking about?
2      A. It would run the gamut. It would be -- there
3  were certainly automobile policy language. There were
4  appeals on Workers' Comp issues, life insurance. Pretty
5  much everything the division was involved in would come
6  up in some fashion.
7      I got legislatively involved in interpretation
8  of policy language in the decision legislatively to
9  reverse Bongen versus State Farm, the concurrent
10 causation case. So that's an example where the Supreme
11 Court's interpretation of that concurrent causation
12 provision led the legislature to take a second look and
13 decided ultimately, with the support and recommendation
14 of the division, to legislatively reverse what the
15 Supreme Court had done in that area.
16     Q. What area was that?
17     A. It had to do with a case involving earth
18 movement. In Kodiak the electrical cooperative had used
19 D9 Cats to plow the right-of-way for a powerline. And
20 that led to ground motion, which caused a fire and
21 damaged a house. It was a homeowner's claim.
22     That -- the court looked at that claim and
23 included that because ground motion was an excluded
24 cause, an exclusion under the policy that, therefore,
25 even though other aspects, such as the fire, would have

### Page 34

1  been covered by the policy, there was no coverage there.
2  And the legislative decision in adopting AS 21.36.212,
3  thereabouts was: No, that's not right. We want to do it
4  differently in Alaska.
5      In fact, the case itself had called on the
6  legislature to say: If they disagree, please consider
7  this.
8      Q. So specifically how many cases have you been
9  involved in interpreting the policy for auto cases?
10     MR. ZIPKIN: As director or as --
11 BY MR. LEGACKI:
12     Q. As director.
13     A. I'm estimating that it was about 6 to 10 of
14 those 12 to 20 total.
15     Q. What were the issues that you had to review to
16 approve or disapprove of?
17     A. There are various legal standards required for
18 policy language to be adopted by the division, be
19 approved by the division. And those include that it's
20 not misleading, that it's not ambiguous, that it doesn't
21 deceptively affect the nature of the risk or describe the
22 nature of the risk being undertaken.
23     There's probably others that I'm not recalling
24 at this point. It's been a few years. But if an
25 insurer.

### Page 35

1      That presented the language was turned down
2  initially by the division, then the insurer has the
3  option to appeal that adverse decision to me, to the
4  director. And I recall at least one case where it went
5  to that level of the insurer feeling that this language
6  was proper and appropriate under the statute.
7      And the division staff at that point is walled
8  off and presents their side of the case. The insurer
9  presents its side of the case. And then I render a
10 decision. I'm trying to remember what the specific issue
11 was. I know it was automotive. And I think it might
12 have involved excluding members of a family. If an
13 insured person wants to, for whatever reason, typically
14 risk, say "I don't want my son having access to this
15 vehicle," under the law, they can do that, but the way
16 they do it needs to be clear.
17     So it was something involving the insurer's
18 attempt to influence that process of the exclusion or
19 not, whether it was clearly described, that kind of
20 thing. And ultimately, I upheld the division staff in
21 their interpretation of it. I felt like what the insurer
22 wanted to do in that case did not meet the legal
23 standards of AS 21.42.120, I believe it is.
24     Q. What does that -- what's that statute say?
25     A. I'm sorry. I rambled on here, obviously.

### Page 36

1      Q. Sure.
2      A. That's the one that refers to the standards for
3  disapproval. The gist is the director shall disapprove
4  the language, only if it is misleading, ambiguous. Void
5  against public policy is another one. Those kinds of
6  things are in that statute, deceptively affects the risks
7  undertaken.
8      MR. ZIPKIN: By the way, we've been going for an
9  hour-and-a-half. If you need a break, the court
10 reporter, or you, Bob --
11     THE WITNESS: I'll take a little one.
12     (Thereupon, a brief recess was taken, after
13     which the following proceedings were had:)
14 BY MR. LEGACKI:
15     Q. Can you look at your report, please, page 4.
16 You had -- I guess, the question that you were to answer
17 was: Did Progressive Northwest Insurance Company have a
18 reasonable basis for its conclusion that loss of
19 consortium is not a separate claim.
20     Is that basically the question you were asked to
21 review?
22     A. That was one of the questions I was asked to
23 review. Also, the full paragraph above that states the
24 issue as I understood it in this case more specifically.
25     Q. Okay. "Whether or not loss of consortium

### Page 37

1  creates a separate per-person coverage for" --
2      MR. ZIPKIN: You misread it.
3  BY MR. LEGACKI:
4      Q. I'm sorry.
5      "Decide whether there was a separate per-person
6  coverage for a loss of consortium claim;" is that
7  correct?
8      A. Under the UM/UIM provisions of the Progressive
9  Alaska Motor Vehicle policy, that's correct.
10     Q. I'm sorry, I thought that was a given.
11     So you were not asked to review whether or not
12 AS 09.15.010 gives an independent claim?
13     A. I don't recall being asked that specific
14 question. However, that was one of the issues in the
15 case. And typically, when I'm retained as an expert, I'm
16 asked to deal with the full parameters of whatever issues
17 are presenting. That is, I don't normally get a
18 questionnaire or checklist.
19     Q. Okay. And I don't see any reference in the
20 report to AS 09.15.010.
21     A. Based on my earlier review during this
22 deposition, I do not either.
23     Q. And I don't see any analysis or review of the
24 Gillispie decision. Is there?
25     MR. ZIPKIN: Object to form.

Page 38

1  BY MR. LEGACKI:
2      Q. In your report is there any analysis of the
3  Gillispie decision?
4      A. I note that Gillispie is listed as one of the
5  materials reviewed on page 2 of my report. However, I do
6  not find analysis of the Gillispie case itself in my
7  report.
8      Q. And there's no analysis of whether or not
9  Mr. Weilbacher has a separate and independent claim
10 pursuant to Gillispie in your report, is there?
11     MR. ZIPKIN: Object to form.
12     THE WITNESS: No, I disagree.
13 BY MR. LEGACKI:
14     Q. Okay. Where?
15     A. On page 6 of the report, near the top it says,
16 quote, "in my opinion it is not bad faith for an insurer
17 to rely on a reasonable interpretation of Alaska Statutes
18 case law and its own policy language.
19     "This issue met the reasonable basis test of
20 Hillman. Even if the court were to find that the
21 language was broad enough to conclude that separate
22 per-accident coverage was available for a loss of
23 consortium claim, there cannot be bad faith found where
24 the insurer's interpretation was fairly debatable."
25     And it goes on there.

Page 39

1      I believe part of your question related to
2  separate.
3      MR. LEGACKI: Can we have the question read
4  back?
5      (Whereupon, the above referred to question
6      was read back by the court reporter, and the
7      following proceedings were had:)
8  BY MR. LEGACKI:
9      Q. Does Gillispie address loss of consortium?
10     A. My recollection is that it does.
11     Q. How about loss of society?
12     MR. ZIPKIN: Object to form.
13 BY MR. LEGACKI:
14     Q. Does it address loss of society?
15     MR. ZIPKIN: Same objection.
16     THE WITNESS: I have understood loss of society
17 and loss of consortium claims to be closely, almost
18 inextricably intertwined. So to the extent that it
19 addresses loss of consortium, I believe it would be
20 speaking about loss of society as well.
21 BY MR. LEGACKI:
22     Q. You don't address that in here --
23     MR. ZIPKIN: Object to form.
24 BY MR. LEGACKI:
25     Q. -- in your report.

Page 40

1      MR. ZIPKIN: Object to form.
2  BY MR. LEGACKI:
3      Q. So Gillispie -- you consider what you state in
4  page 6 as addressing the Gillispie issue in this case?
5      MR. ZIPKIN: Object to form.
6      THE WITNESS: My response concerning page 6 in
7  my report was not, in my understanding, in response
8  to a question about the Gillispie case.
9  BY MR. LEGACKI:
10     Q. Okay. So you -- does your report analyze
11 whether or not Mr. Weilbacher has a separate, independent
12 claim under Gillispie?
13     A. No, I don't believe it does.
14     Q. Okay. And why did you make reference to your
15 page 6, the first paragraph?
16     MR. ZIPKIN: Object to form.
17     THE WITNESS: If you can ask that the
18 question be read back where I responded by referring
19 to page 6, I can help you better.
20     MR. LEGACKI: Can we do that?
21     THE WITNESS: I believe it referred to separate,
22 independent cause of action in the question, but not
23 in the context of a specific case. And that's what
24 I was trying to answer.
25 BY MR. LEGACKI:

Page 41

1      Q. So does your report address whether or not --
2  any analysis of a separate, independent claim?
3      A. Yes.
4      Q. And -- okay. Tell me.
5      A. I'm sorry?
6      Q. Can you explain to me where, point it out to me?
7      A. It would start with the second paragraph on page
8  4 that states the issue in the case uses the term whether
9  there is a separate, quote, per-person, close quote,
10 coverage for a loss of consortium claim.
11     Q. Okay.
12     A. We've talked about that.
13     The top of page 6, particularly the sentence
14 that begins: Even if the court were.
15     Q. Okay.
16     A. I believe my analysis of Teel talks about
17 separate, independent. However, it's important to note
18 that that does it in the context of a negligent
19 infliction of emotional distress claim, not a loss of
20 consortium claim.
21     Q. Okay.
22     A. Those are the references that I picked out on
23 reviewing my report.
24     Q. Okay. And on page 6 you state, based on
25 relevant statutes, case law and interpretations of Alaska

### Page 42

1  and elsewhere; is that correct? That's -- you came to
2  the conclusion that Progressive's action in this matter
3  was reasonable and fairly debatable?
4      A. That's what it says, yes.
5      Q. Okay. And we know that you didn't look at the
6  Wrongful Death Statute, because it's not referenced in
7  the report, correct?
8      A. I believe my response was that I don't have a
9  specific recollection of reviewing the Wrongful Death
10 Statute, but that it may have been quoted as a footnote
11 to some of the cases that I reviewed.
12     Q. And you did not -- you only looked at four cases
13 for this report and we've already talked about those.
14 That was the Teel case, the Gillispie case, the Hillman
15 case and the Graham-Gonzalez case; is that correct?
16         MR. ZIPKIN: Object to form.
17         THE WITNESS: Those are the four cases that are
18     listed under the materials that I reviewed at the
19     beginning of my expert opinion. However, as I
20     mentioned before, there are other cases that are
21     discussed within the context of the report, so --
22 BY MR. LEGACKI:
23     Q. But you didn't read those, you just quoted them
24 from when they were quoted from Alaska cases?
25     A. I believe I indicated that I have read them in

### Page 43

1  the past. However, I did not go back to re-read them
2  before the time I did this report in the context of
3  preparing this opinion.
4      Q. Okay.
5      A. I have since reviewed them.
6      Q. So we know that you did not read the Lawrence
7  decision when you wrote this report?
8          MR. ZIPKIN: Which decision?
9          MR. LEGACKI: Lawrence.
10         MR. ZIPKIN: I thought you said Large.
11         MR. LEGACKI: Lawrence, I'm sorry. I'm
12     mumbling.
13         Did I say Large?
14         THE WITNESS: Again, it's in the category of a
15     case that I have read in the past, that I have read
16     since I did the opinion. However, I did not
17     specifically read it in preparing the opinion. I
18     relied on the references to it in other documents.
19 BY MR. LEGACKI:
20     Q. And at the time you wrote this, you didn't
21 realize -- you had not seen the appellate briefs in Wold
22 versus Progressive, have you? They gave you that
23 afterwards?
24     A. I did not see, had not seen those briefs in Wold
25 versus Progressive at the time I wrote this report,

### Page 44

1  that's correct.
2      Q. Let's look at page 7, paragraph 3 there, October
3  4th, Mr. Weilbacher, through Counsel, argued Allstate
4  versus Teel. And it has: Progressive assumes that was a
5  negligent infliction and said it was working with
6  coverage counsel and pointed out that the parents did not
7  appear to meet the NIED criteria, but asked for
8  clarification. Do you see that?
9      A. Yes, I do.
10     Q. Where do you -- have you seen the adjuster --
11 you don't have the adjuster's notes, apparently, but
12 let's look at the adjuster's notes.
13         MR. ZIPKIN: Object to form.
14         What do you mean, he doesn't have the adjuster's
15     notes? They're among the materials he produced
16     today.
17         MR. LEGACKI: I'm sorry?
18         MR. ZIPKIN: You say he doesn't have the
19     adjuster's notes. You mean directly in front of him
20     or in the file?
21 BY MR. LEGACKI:
22     Q. Do you have that?
23     A. I do.
24        (Exhibit 3 was marked.)
25         THE WITNESS: I believe there are references to

### Page 45

1  the Bates numbers for some of those notes
2  themselves.
3  BY MR. LEGACKI:
4      Q. You said that Progressive did not understand
5  that -- the negligent infliction of emotional distress.
6  Could you look at these notes and tell me whether or not
7  these adjuster notes -- whether or not the Progressive
8  adjuster, Danny Withers, understood what the claim was
9  about, whether it was NIED or an AS 09.15.010 claim?
10         MR. ZIPKIN: Object to form.
11 BY MR. LEGACKI:
12     Q. Exhibit 3 is the adjuster notes I'd like you to
13 refer to.
14     A. I've reviewed Exhibit 3. And that is not the
15 citation that I gave for my conclusion that Progressive
16 assumed that it was a negligent infliction.
17     Q. Well, where did you get that, then, that
18 Progressive assumed. Because this is Progressive's
19 notes. You're referring to my letters to Progressive?
20 You said "Legacki's letters" --
21         MR. ZIPKIN: Object to form.
22         THE WITNESS: In order to answer your question,
23     what I would do is review each of the references in
24     paragraph 3 of my report, paragraph 3 of key events
25     on page 7 to 8 of my report. I see noted here I