### Page 46

1  have a letter from Progressive dated October 29th,
2  2004 to you.
3  BY MR. LEGACKI:
4      Q. Well, let's look at Exhibit Number 3. This is a
5  note to Mr. Withers, Bates number 100329.
6      A. I have that. Thank you.
7      Q. Okay. The last page, or last paragraph on that
8  says, "the individual claims of father and mother will
9  include loss of consortium and loss of society;" is that
10 correct?
11     A. Yes, that's what it says.
12     Q. Does not say NIED, does it?
13     A. Not on that PACMAN face sheet note inquiry.
14         MR. ZIPKIN: Also object to the extent you're
15     asking the witness to assume that the face sheet
16     notes comprise the entire claim file.
17 BY MR. LEGACKI:
18     Q. Look at 100330.
19     A. I have that.
20     Q. And the second paragraph: Parents individual
21 claims. Do you see that?
22     A. Yes.
23     Q. Value 50 to 75,000 each for wrongful death of
24 their daughter. Do you see that?
25     A. Yes.

### Page 47

1      Q. Okay. Let's look at the next page, 100333. In
2  the paragraph there, in the middle there it says: Called
3  attorney, advised him that Progressive agrees that NI,
4  which I guess is insured, does have UIM coverage, but any
5  claims for NIED do not meet the elements as set out under
6  Alaska case law.
7          And then Withers quotes the attorney: He,
8  meaning Legacki, says his client has claim for loss of
9  society and loss of consortium. I told him these were a
10 derivative of the wrongful death limit and there can be
11 no direct claim. He thinks Teel versus Progressive gives
12 authority or direct claim for loss of consortium.
13         Do you see that?
14         MR. ZIPKIN: I object to this question and this
15     line. You're deliberately ignoring the preceding
16     sentences in that very page to mislead the witness.
17     I object.
18         MR. LEGACKI: What am I -- anything there?
19     "Called attorney" --
20         MR. ZIPKIN: How about the beginning?
21         MR. LEGACKI: -- should not be open for Heidi WD
22     claim has been resolved. Father's -- presenting
23     be -- I'm sorry, which is presenting NIED claim.
24     Then it goes down to the bottom, he says: I told
25     him these are derivative. The attorney says his

### Page 48

1  client's claim for loss of society and loss of
2  consortium.
3          You see that?
4          MR. ZIPKIN: I object again. The rules of
5      completeness at least should allow you --
6  BY MR. LEGACKI:
7      Q. Okay. This is Danny Withers: Feature should
8  not be open for Heidi, wrongful death claim, has been
9  resolved. Father's now presenting NIED claim which is
10 subject to separate BI limit UM since all liability
11 coverage has been exhausted.
12         Danny Withers calls: Called attorney, advised
13 him that Progressive agrees that -- does have coverage,
14 but any claims for NIED do not meet the elements of set
15 out case law. He, meaning Legacki, says his client has
16 claim for loss of society and loss of consortium. I told
17 him these are derivative of the wrongful death limit and
18 there can be no direct claim. He thinks Teel versus
19 Progressive is authority for direct loss of consortium.
20         Do you see that?
21     A. I see part of that. My copy is cut off on the
22 left margin.
23     Q. That's what I got, too.
24         Let's look at 100334, which is the next page.
25 Letter -- denied liability for NIED claims for current

### Page 49

1  case law in the Alaska. Then we go down to the next
2  entry, "letter from attorney, he continues to allege
3  direct claim under AS 09.15.010, which gives parents a
4  separate and independent cause of action for damages due
5  to the death of a child. He also cites Gillispie versus
6  Beta Construction. Our argument is although this does
7  give claim to parent, it is derivative of the wrongful
8  death claim per contract. AS 09.15.010 simply allows
9  parent to pursue claim."
10         Do you see that?
11     A. Yes, I do.
12     Q. Okay.
13     A. With your interpretation of what it means where
14 it's not visible.
15     Q. Sure.
16         Next page, this is one hundred zero three three
17 five (sic): However, we feel all claims except for NIED
18 are derivative of the limit we pay to the estate for
19 wrongful death.
20         Right?
21         "There's no evidence of NIED claims in initial
22 investigation. However, attorney is specifically making
23 claims for loss of society/consortium argues these are
24 separate claims, subject to separate limit, which we
25 dispute."

### Page 50

1   You see that?
2   A. I see part of that, yes.
3   Q. So Legacki -- or Weilbacher's are not asking for
4   NIED claim, they're asking for damages under 09.15.010,
5   correct?
6   A. In order to answer that question, I would need
7   to review the documents I referenced that I used to
8   prepare my opinion in paragraph 3 on page 7.
9   Q. What document was that? What documents are you
10  referring to?
11  A. Bates 100048 and one page before that.
12  Q. There's the box?
13  A. Okay. Do you want to stay on the record while I
14  look?
15      MR. LEGACKI: We could go off the record.
16      THE WITNESS: I would recommend that.
17      (Discussion off the record.)
18  BY MR. LEGACKI:
19  Q. I also have here your copy of the complaint.
20  And does the complaint ask for an NIED cause of action or
21  is it an action under AS 09.15.010?
22      So the complaint never mentions negligent
23  infliction, emotional distress, does it?
24  A. I was reading the complaint to determine the
25  answer to your previous question, which I believe was a

### Page 51

1   little bit different. I was looking for reference to AS
2   09.15.010 and I did find reference to that.
3   Q. And that's -- it does not reference anything
4   about negligent infliction, emotional distress claim,
5   does it?
6   A. I don't see a reference to that and that doesn't
7   surprise me, because by the date of the complaint my
8   report already indicates that the issue had been
9   clarified. My report states, quote, finally on June 8th,
10  2005 Mr. Legacki demanded payment, quote, for the direct
11  claim of a father for the death of his child and promptly
12  tender the policy limit, close quotes.
13      And the complaint was dated 21st of July, 2005,
14  so it doesn't surprise me that a document --
15  Q. Okay. So there's no NIED -- you did -- analysis
16  on NIED claim -- we were just talking about a direct
17  claim under AS 09.15.010?
18      MR. ZIPKIN: Assumes that statute provides a
19  direct claim. So you're trying to trick the
20  witness.
21      THE WITNESS: Would you repeat the question,
22  please?
23  BY MR. LEGACKI:
24  Q. So that complaint seeks compensation under
25  Mr. Weilbacher's separate and independent claim under AS

### Page 52

1   09.15.010, correct?
2   A. That complaint says, in count 7 that, quote,
3   after the third-party litigation was conducted with the
4   tort feasor, Ronald Weilbacher demanded compensation
5   pursuant to his underinsured motorists coverage with
6   Progressive for the loss of his daughter, pursuant to AS
7   09.15.010.
8   Q. Okay. Good.
9       Now, let's look at your next page here, you --
10  you quote the interpretation of policy language; is that
11  correct?
12  A. On page 8, that's one of the headings in my
13  report --
14  Q. Let's look --
15  A. -- interpretation of policy language, yes.
16  Q. Let's look at page 9. See that?
17      MR. ZIPKIN: I just ask that you let the witness
18  finish his answer before you interrupt him with the
19  next question.
20  BY MR. LEGACKI:
21  Q. I'm sorry. Do you want to say anything more?
22  A. I was done, I think we might have overlapped a
23  bit.
24  Q. You see that?
25  A. I have page 9, yes.

### Page 53

1   Q. Now, you have the declaration page shows a split
2   limit in the amount shown for each person and the most
3   people pay for all damage due to bodily injury to one
4   person; is that correct?
5   A. That is the language quoted from the policy,
6   yes.
7   Q. Now, what does that mean to you? Does that mean
8   that Mr. Weilbacher can only collect because of the death
9   of his daughter or can he collect as a separate claim, if
10  he was injured?
11      MR. ZIPKIN: Objection to the form.
12      THE WITNESS: Would you repeat the question,
13  please?
14  BY MR. LEGACKI:
15  Q. In that paragraph there, the declaration page,
16  it has one, two, three, does that mean that -- does that
17  allow Mr. Weilbacher to collect if he, himself, was
18  injured other than the death of his daughter?
19      MR. ZIPKIN: Object to form.
20  BY MR. LEGACKI:
21  Q. Let me rephrase that.
22  A. Thank you.
23  Q. We now know that Heidi Weilbacher died in the
24  crash. And that's one person, that she can collect under
25  uninsured motorists, correct?

### Page 54

1    MR. ZIPKIN: Object to form.
2    THE WITNESS: I'm not clear on from whom you
3    believe she would be collecting.
4    BY MR. LEGACKI:
5    Q. Under her underinsured motorist, she was the one
6    person that was injured, correct, and she can collect on
7    underinsured motorists coverage?
8    MR. ZIPKIN: Object to form.
9    THE WITNESS: We're assuming that the liability
10   has been paid off and that the driver of the vehicle
11   was underinsured?
12   BY MR. LEGACKI:
13   Q. Right.
14   A. All those are givens in your question?
15   Q. Right.
16   A. Then, yes, I believe she would be eligible to
17   collect as the injured, or fatally injured person.
18   Q. Okay. Now, Mr. Weilbacher, if he was injured,
19   although he was not in the accident, he could collect
20   under a separate person, as well, correct?
21   MR. ZIPKIN: Object to form.
22   THE WITNESS: In your hypothetical, did he incur
23   a bodily injury?
24   BY MR. LEGACKI:
25   Q. He was injured, yes. But he was not in the

### Page 55

1    accident, the injury is the loss, or the death of his
2    daughter.
3    MR. ZIPKIN: Object to form.
4    In aid of my objection, are you asking whether
5    he is asserting a loss of society claim, or some
6    other claim?
7    BY MR. LEGACKI:
8    Q. If he was injured, if the court finds that he
9    was injured, could he ask for a separate claim, although
10   he was not at the accident?
11   MR. ZIPKIN: Same objection.
12   THE WITNESS: I would need to see the court's
13   analysis, or some analysis of the nature of the
14   injury. I also would look at all provisions of the
15   policy as a whole in order to interpret it.
16   BY MR. LEGACKI:
17   Q. Well, you read the Lawrence decision, did you
18   not?
19   A. Yes, I did.
20   Q. Doesn't the court there say that if a party
21   suffers an injury, emotional distress injury because a
22   loved one died, that that's a separate per-person, and
23   under the policy language; is that correct?
24   MR. ZIPKIN: Mischaracterizes an NIED claim, and
25   loss of society.

### Page 56

1    MR. LEGACKI: Not an NIED claim.
2    MR. ZIPKIN: That's what it is in Lawrence.
3    BY MR. LEGACKI:
4    Q. Would you like a copy of the decision?
5    A. That would be helpful.
6    Q. Sure.
7    A. Thank you.
8    Q. Let's look at page 1078 of Lawrence. See where
9    it says number 6 there?
10   MR. ZIPKIN: I ask that the witness be allowed
11   to review as much of Lawrence as possible -- as he
12   like before being asked to respond to a particular
13   paragraph, but that's up to the witness.
14   (Discussion off the record.)
15   BY MR. LEGACKI:
16   Q. What is it that we're looking for now?
17   A. As soon as I'm done with my review, I'll be
18   happy to talk to you on the record.
19   (Discussion off the record.)
20   THE WITNESS: I'm ready.
21   BY MR. LEGACKI:
22   Q. Okay. Go ahead. What -- under --
23   MR. LEGACKI: Repeat the question, please.
24   (Whereupon, the above referred to question
25   was read back by the court reporter, and the

### Page 57

1    following proceedings were had:)
2    MR. ZIPKIN: I want to repeat, I have an
3    objection as to the form. Go ahead.
4    THE WITNESS: I believe the court says in
5    Lawrence that with a negligent infliction of
6    emotional distress, the per-accident, as opposed to
7    the per-person limit is triggered, in a case where
8    State Farm had waived that argument by not raising
9    it in superior court.
10   BY MR. LEGACKI:
11   Q. Well, but they also do an analysis, don't they?
12   Let's look at -- they say they waived it, but they still
13   addressed the issue in the decision by saying that
14   when -- the definition of what separate per-person means,
15   for example, all damage suffered by all people injured in
16   the accident, correct?
17   A. Can you tell me where you're referring to there?
18   MR. ZIPKIN: I also want to object to the
19   language of the case is specific to the State Farm
20   policy language, which is different than the
21   Progressive.
22   BY MR. LEGACKI:
23   Q. Is State Farm's different than Progressive's?
24   A. In my review, I couldn't find the term bodily
25   injured -- I'm sorry, bodily injury to one person or

### Page 58

1. bodily injury each accident in the Progressive policy.
2. Q. Let's look, it says: We find -- paragraph --
3. A. Page number?
4. Q. Page number 1078: We find the Louisiana Supreme
5. Court's reason to be persuasive, given the wording of
6. State Farm's each accident provision is objectively
7. reasonable for State Farm insureds to expect that two or
8. more persons who suffered bodily injury in the same
9. accident would be entitled to separate policy limits.
10. Since we honored the objectively reasonable expectations
11. of insureds regarding the terms of the insurance
12. contracts, we reject State Farm's interpretation of the
13. policy language at issue.
14.     MR. ZIPKIN: So what's the question?
15. BY MR. LEGACKI:
16. Q. So is the language the same there per accident?
17. A. As I said, I did not find the term bodily injury
18. per-accident or --
19. Q. How about the paragraph --
20. A. Can I finish? Or bodily injury to one person
21. defined in the Progressive policy.
22. Q. I'm sorry. What was that again now? You don't
23. find defined --
24. A. I didn't find the term bodily injury each
25. accident or the term bodily injury each person defined in

### Page 59

1. the Progressive policy.
2. Q. So you're saying --
3. A. Mr. Weilbacher's policy.
4. Q. They don't define that then?
5. A. I couldn't find those in my review.
6. Q. So what does that mean?
7. A. It speaks for itself, I believe. It means that
8. in any review of the Progressive policy, I did not find
9. those as defined terms.
10. Q. Well, you wrote this in your paragraph here, so
11. is it --
12.     MR. ZIPKIN: Which paragraph of his report,
13. please?
14. BY MR. LEGACKI:
15. Q. Page 9, the amount shown for each person is the
16. most we will pay for all damages is the subject due to a
17. bodily injury to one person; is that correct?
18. A. That's the first number paragraph.
19. Q. Subject to each-person limit, the amount shown
20. for each accident is the most we will pay for all damages
21. due to bodily injury sustained by two or more persons in
22. any one accident.
23.     What does that mean?
24.     You don't know what that means, sir?
25.     MR. ZIPKIN: First of all, the language speaks

### Page 60

1. for itself. And secondly, he gets a chance to
2. respond.
3.     MR. LEGACKI: I know, you -- but it's taking him
4. 15 minutes to respond to each question. That's the
5. problem we're having here. If he doesn't know
6. what he -- you know, he's supposed to be the expert.
7. I'm just asking what does that mean?
8.     MR. ZIPKIN: I move to strike counsel's remarks.
9. He hasn't taken 15 minutes to answer each question.
10. That's absurd.
11.     MR. LEGACKI: I've been watching the clock,
12. here.
13.     Go ahead.
14.     THE WITNESS: Would you repeat the question?
15. BY MR. LEGACKI:
16. Q. Sure. What does that mean to you, subject to
17. the each-person limit, the amount shown for each accident
18. is the most people pay for all damages due to bodily
19. injury sustained by two or more persons in any one
20. accident?
21. A. That paragraph sets a per-accident limit built
22. on the each-person limit that you quoted above.
23. Q. How much is the limits here in this case,
24. Mr. Weilbacher's policy? 100 to 300?
25. A. 100,000 each person, 300,000 each accident.

### Page 61

1. Q. So each person's injury gets a maximum of
2. 100,000; is that correct?
3.     MR. ZIPKIN: Object to form.
4. BY MR. LEGACKI:
5. Q. Up to three people for total amount of the
6. 300,000 per accident; is that correct?
7.     MR. ZIPKIN: Object to form.
8.     THE WITNESS: The declarations page has a split
9. limit of $100,000 each person, $300,000 each
10. accident for an uninsured/underinsured motorist
11. coverage in this policy.
12. BY MR. LEGACKI:
13. Q. Okay. So if Mr. Weilbacher had a loss of
14. society claim, it would be a separate per-person policy,
15. wouldn't it? Or he would have his own $100,000 limit,
16. correct?
17.     MR. ZIPKIN: Object to form. Mischaracterizes
18. the witness' testimony and the policy.
19.     THE WITNESS: No.
20. BY MR. LEGACKI:
21. Q. Why not?
22. A. First of all, the definitions in this section on
23. limit of liability talk about bodily injury. And that is
24. a defined term in the Progressive policy.
25. Q. Is bodily injury defined in Progressive's