### Page 126

```
 1    around your particular citation.
 2    BY MR. LEGACKI:
 3      Q. Page 41.
 4      A. There we go. Line 1?
 5      Q. Yeah.
 6         THE WITNESS: And the question, please?
 7         (Whereupon, the above referred to question
 8         was read back by the court reporter, and the
 9         following proceedings were had:)
10         THE WITNESS: Thank you.
11         In reviewing the context around page 44, page
12    42, line 1, I'm struck by the number of things that
13    Mr. Withers does not recall related to this.
14    There's considerable uncertainty as to the number of
15    times this issue has come up, the number of cases
16    where it's been -- he's been involved, what the
17    outcome of those cases was. And the only thing he
18    seemed certain about, based on the context of his
19    answers, is that Progressive has consistently
20    maintained its interpretation of these matters and
21    that it has paid claims under this within the single
22    per-person limit.
23    BY MR. LEGACKI:
24      Q. And, so he also says that, as far as he knows,
25    he cannot tell the difference between an NIED claim and a
```

### Page 127

```
 1    loss of -- a claim under AS 09.15.010, right?
 2      A. No.
 3         MR. ZIPKIN: No. Yeah, mischaracterizes.
 4    BY MR. LEGACKI:
 5      Q. He didn't say that.
 6         "I don't know if there is any difference."
 7         MR. ZIPKIN: Mischaracterizes the question
 8    again, you've mischaracterized it.
 9    BY MR. LEGACKI:
10      Q. Question, what's the difference between an
11    independent NIED claim and an independent loss of society
12    claim under AS 09.15.010?
13         "I don't know if there is any difference."
14      A. I think that answer speaks for itself, but I
15    think the characterizations of that answer in your
16    subsequent questioning changes the nature of what he
17    said.
18      Q. Okay. NIED claim is subject to a second
19    per-person limit, right?
20      A. There's a lot of things that go along with that,
21    establishing the validity of NIED claim, the policy
22    language involved, the case law interpretation. But
23    generally, under Teel and other cases, that is correct.
24      Q. Right. And so I'm asking what's the difference
25    between an NIED claim and an AS 09.15.010 claim, and he
```

### Page 128

```
 1    says he doesn't know if there is any difference. So why
 2    is it not an AS 09.15.010, a separate per-person policy
 3    limit?
 4      A. The clear terms of the policy language for
 5    Progressive, between Progressive and Mr. Weilbacher,
 6    provide that it is a separate per-person limit, rather,
 7    it is included within the perperson limit of the injured
 8    person or the insured.
 9      Q. Death Statute says they don't get a loss of
10    society claim, derived from the death of the daughter.
11         MR. ZIPKIN: Asked and answered.
12    BY MR. LEGACKI:
13      Q. Correct?
14      A. That's my understanding of the case that we
15    reviewed earlier, yes.
16      Q. And so isn't it fair to assume that when they
17    talk about loss of consortium and loss of society, it's
18    talking about a spousal, or a child loss of consortium,
19    loss of spouse and not a parent?
20         MR. ZIPKIN: Mischaracterizes, lack of
21    foundation.
22         THE WITNESS: By the "they" in that case, do you
23    mean the court?
24    BY MR. LEGACKI:
25      Q. The policy.
```

### Page 129

```
 1      A. The policy?
 2      Q. Policy language.
 3         MR. ZIPKIN: Mischaracterizes the policy.
 4         THE WITNESS: I don't know the answer. I would
 5    need to review that policy language to give you an
 6    intelligent answer.
 7    BY MR. LEGACKI:
 8      Q. You know, also in your report here you say, on
 9    page 11 of your report, talks about deal with the direct
10    NIED claim not with the loss of consortium. You quote
11    Judge Wood. You say Judge Wood -- or you quote the case
12    which quotes Judge Wood: Judge Wood held that because a
13    reasonable lay person would have no reason to believe
14    that the policy language would exclude Teel's NIED claim,
15    comma, Teel was an insured under the UM/UIM provisions of
16    O'Flanagan's policy. Because we conclude the policy
17    language does not clearly excluded Teel from coverage,
18    comma, we affirm the decision of the superior court.
19         Do you see that?
20      A. I do.
21      Q. Why did you put that language in your report?
22      A. I included that quotation from Teel because I
23    think it did two things; it emphasized the interpretation
24    of policy language using what is variously called a
25    reasonable lay person standard or objective understanding
```

Robert Lohr                     Deposition                     July 26, 2006

Page 130

1  of the insured, language to that effect. And because it
2  emphasized that they were dealing with a negligent
3  infliction of emotional distress claim, not with a loss
4  of consortium claim.
5      Q. Let's go back to Mr. Withers on page 33 of 35.
6  When I asked him, said what's the difference between an
7  independent NIED claim and --
8      A. I'm not to that page yet.
9      Q. 33 of 55.
10     A. Got the page. Thank you.
11     Q. Said what's the difference between an
12 independent NIED claim and independent loss of society
13 claim under AS 09.15.010, and he says I don't know if
14 there is any difference, would you agree with me that a
15 lay person would probably not know there's any difference
16 and would expect to be compensated on a separate
17 per-person limit?
18     A. No.
19     Q. Why not?
20     A. Because --
21         THE WITNESS: I'm sorry, I need the question
22     again, please.
23         (Whereupon, the above referred to question
24     was read back by the court reporter, and the
25     following proceedings were had:)

Page 131

1          THE WITNESS: The policy language is the key,
2     and the policy language with respect to how loss of
3     consortium claims are handled by Progressive is
4     clear, they are not excluded, it's not an exclusion
5     from coverage. It's really an inclusion, they're
6     included within the single per-person policy limit.
7  BY MR. LEGACKI:
8      Q. But isn't the purpose of underinsured motorist
9  coverage is to compensate someone when a tort feasor
10 cannot pay the claim, doesn't have enough money to pay
11 the underlying claim?
12     A. That is my general understanding of the purpose
13 of UIM coverage, subject to the specific language of the
14 policy.
15     Q. Doesn't the policy have to mirror the rights and
16 remedies of the underlying claim?
17         MR. ZIPKIN: Object to form.
18         THE WITNESS: No, not in my opinion.
19     What I mean by that is, I've never seen
20     mirroring the case law as a standard that policy
21     language has to meet.
22 BY MR. LEGACKI:
23     Q. What's the standard, then?
24     A. The standard in this case would be not void
25 against public policy. If policy language were void

Page 132

1  against public policy, the court or the division would so
2  find and would prohibit its use or take other appropriate
3  remedies.
4      Q. So if a policy, if it's -- the court finds that
5  Mr. Weilbacher has an independent cause -- strike that.
6         If the Progressive policy says that
7  Mr. Weilbacher cannot collect under his separate
8  independent claim under AS 09.15.010 because we
9  categorize it differently, then Progressive language
10 would be void, correct?
11     A. No. I don't believe so.
12     Q. Why?
13     A. Because if the courts find that insurance policy
14 language is void against public policy, they can -- they
15 have several remedies available. One is to reform the
16 policy language itself and to, in essence, to insert
17 their own interpretation of what the policy means and
18 make that prospectively applicable.
19        Another one they have for other issues that they
20 identify in insurance language would be to refer it to
21 the legislature to say, in essence, we've identified
22 this, if you think it should be otherwise, then please
23 consider amending Alaska Statutes Title 21.
24        And the two operate in conjunction. If there
25 are causes of action the court has interpreted, such as

Page 133

1  expanded NAID (sic) for example, under Teel and other
2  cases. The language of Title 21 needs to change also to
3  reflect those changes or -- that's basically it.
4         And when courts simply find that there's an
5  issue there in terms of causes of action, but take no
6  action with respect to the insurance code, that's not any
7  kind of mandate in and of itself to go and change the
8  policy language.
9      Q. If the policy language is void, it's not
10 inoperable, right?
11        MR. ZIPKIN: Object to form. Mischaracterizes
12    what has occurred in this case.
13        THE WITNESS: As I indicated, if the court finds
14    that policy language is void as against public
15    policy, the court may choose to reform that language
16    on its own motion, on its own initiative.
17 BY MR. LEGACKI:
18     Q. Don't the courts conform the language -- if the
19 language is contrary to the statute, don't the courts
20 conform the language to the statute?
21        MR. ZIPKIN: Object to form.
22        THE WITNESS: That's a very general
23    characterization, I think the answer is: It
24    depends.
25 BY MR. LEGACKI:

EXHIBIT 23 PAGE 34 OF 38 PAGES          34 (Pages 130 to 133)

Alaska Stenotype Reporter (907) 276-1680

Robert Lohr                                    Deposition                              July 26, 2006

### Page 134

1     Q. Have you read the Harrington case?
2     A. I have.
3     Q. Isn't that what it says?
4     A. I'm not sure. I mean, I don't know what you
5 mean by "isn't that what it says."
6     Q. Harrington says if the language does not comport
7 to statute -- make sure it comports to statute. The
8 language will comport with the statute.
9     A. Are you talking about within the context of
10 umbrella coverage for auto?
11     Q. For anything. The language of the policy has to
12 follow in the statutes.
13     MR. ZIPKIN: Objection, form. It's vague and
14 ambiguous, what it is you're talking about.
15     THE WITNESS: I guess I'd like to see that
16 quotation from Harrington, because I don't recall it
17 being nearly that broad and sweeping.
18 BY MR. LEGACKI:
19     Q. Now, Mr. Weilbacher -- want to go back -- strike
20 that.
21     Let's assume that the tort feasor in this case,
22 Mr. Esper was a multi-millionaire, billionaire, he had
23 enough insurance or money to cover all claims without
24 having to go to the underinsured -- or underinsured
25 policy. Okay? Could Mr. Weilbacher -- you'll agree with

### Page 135

1 me, Mr. Weilbacher could sue and collect directly from
2 the tort feasor for a claim under AS 09.15.010.
3     A. I believe Mr. Weilbacher would have a separate,
4 direct -- I'm sorry, not direct -- a separate,
5 independent parental cause of action against Mr. Esper in
6 that -- the limited amount of information you've given
7 about the hypothetical.
8     Q. And would he get that money -- get the
9 compensation directed to him or would it have to go
10 through his daughter and to him?
11     MR. ZIPKIN: I object to the extent that Counsel
12 is deliberately attempting to confuse the witness
13 and the record by the way you use the word
14 "directly." It's an attempt to confuse the witness.
15     THE WITNESS: I just want to make it absolutely
16 clear that in my previous answer, when I said
17 "direct," I misspoke and I corrected it, but it was
18 not my intention to say "direct" there.
19     The question here is --
20     Would you repeat the question, please.
21     (Whereupon, the above referred to question
22     was read back by the court reporter, and the
23     following proceedings were had:)
24     THE WITNESS: I believe the question, how the
25 money would flow, would be routed -- would be based

### Page 136

1 on AS 09.15.010, subsection A; there's a sentence in
2 there that indicates the amount -- quote, the amount
3 was covered, if any, shall be exclusively for the
4 benefit of the decedent's spouse and children when
5 the decedent is survived by spouse or children or
6 other dependents.
7     Then it goes on to have the limiting section on
8 pecuniary that you quoted earlier.
9 BY MR. LEGACKI:
10     Q. So you're saying, under the Wrongful Death
11 Statute, they can or cannot collect independent of -- for
12 their own damages, independent of their daughter?
13     MR. ZIPKIN: Object. Compound, lack of
14 foundation. Maybe it's the lateness of the hour and
15 the length of the deposition, but you're not
16 communicating to each other.
17     THE WITNESS: The answer is I don't know.
18 BY MR. LEGACKI:
19     Q. How about the Gillispie decision?
20     MR. ZIPKIN: Incomplete question.
21 BY MR. LEGACKI:
22     Q. Do you have that in front of you?
23     A. I do.
24     Q. Page 1273: The Gillispies, however, are not
25 without recourse. Another statute AS 09.15.010 provides,

### Page 137

1 in part, a parent may maintain an action as plaintiff for
2 the injury or death of a child below the age of majority.
3     You see that?
4     A. I do.
5     Q. Can they collect independent of the Wrongful
6 Death Statute for damages for loss of their child?
7     MR. ZIPKIN: To the extent there's any doubt, we
8 offer you the stipulation that they can.
9     MR. LEGACKI: They can.
10     MR. ZIPKIN: They can. And they've been paid
11 under a per-person limit. The claim wasn't denied.
12 It was paid under a per-person limit.
13 BY MR. LEGACKI:
14     Q. But why is it that if they sue the tort feasor
15 they had their own separate limit under AS 09.15.010, but
16 it's not covered under the underinsured policy, it's
17 derivative of the wrongful death of the daughter --
18     MR. ZIPKIN: Mischaracterizes the statute. The
19 statute doesn't say anything about they get a
20 separate limit against the tort feasor.
21     THE WITNESS: The Gillispies have contracted for
22 the coverage under the Progressive UM/UIM policy.
23 The language of that policy is clear and unambiguous
24 with respect to which claims are included in the
25 single per-person limit. And that is the policy

EXHIBIT __23__ PAGE __35__ of __38__ PAGES    35 (Pages 134 to 137)
Alaska Stenotype Reporter (907) 276-1680