

WITNESS>                    CASENAME>                    DATETEXT>

---

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF ALASKA
 2
 3   RONALD V. WEILBACHER,
         Plaintiff,
 4
     vs.
 5
     PROGRESSIVE NORTHWESTERN
 6   INSURANCE COMPANY,
         Defendant.
 7   _____
     Case No. 3:05-cv-0204-TMB
 8
 9        DEPOSITION OF DANIEL QUINN
10              May 31, 2007
            Commencing at 1:32 p.m.
11       Volume 1 - Pages 1-31, inclusive
             Taken by the Plaintiff
12                     at
13   THE LAW OFFICES OF KENNETH G. LEGACKI
              425 G Street, Suite 925
14              Anchorage, AK 99501
15
16
17   Reported by:
18   Rosie S. Scott, CSR
19
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES
 2
     For Plaintiff:   LAW OFFICES OF KENNETH W. LEGACKI
 3                    By: Kenneth W. Legacki
                      425 G Street
 4                    Suite 925
                      Anchorage, AK 99501
 5                    (907) 258-2422
 6
 7   For Defendant:   GUESS & RUDD
                      BY: Gary A. Zipkin
 8                    510 L Street
                      Suite 700
 9                    Anchorage, AK 99501
                      (907) 793-2200
10
11
12
13
14   Taken by:
15       Rosie S. Scott, CSR
16   BE IT KNOWN that the aforementioned deposition was taken
17   at the time and place duly noted on the title page,
18   before Rosie S. Scott, Certified Shorthand Reporter and
19   Notary Public within and for the State of Alaska.
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2
 3   EXAMINATION BY:                    PAGE
 4
 5   By Mr. Legacki                      4
 6
 7
 8
 9
10   EXHIBITS                            PAGE
11   (None marked.)
```

Page 4

```
 1              PROCEEDINGS
 2              DANIEL QUINN,
 3   called as a witness herein, being first duly sworn to
 4   state the truth, the whole truth and nothing but the
 5   truth by the Notary, testified under oath as follows:
 6              EXAMINATION
 7   BY MR. LEGACKI:
 8       Q.  Would you please state your name for the record
 9   and spell your last name.
10       A.  Daniel Quinn, Q-U-I-N-N.
11       Q.  And obviously, just for the record, you're an
12   attorney here in Anchorage?
13       A.  That's correct.
14       Q.  Do you know why you're here?
15       A.  Well, I understand that I am here because I had
16   a couple of conversations with Danny Withers on an issue
17   of whether loss of consortium gives rise to another per
18   person limit. That's kind of my dim understanding.
19       Q.  What did you do to prepare for today?
20       A.  I did look at the notes of Danny Withers.
21   Aisha sent those to me. She sent me Danny Withers'
22   deposition. And I really just glanced at the couple of
23   pages that had to do with the conversations with me. And
24   then I just looked at a couple of cases that addressed
25   those issues.
```



EXHIBIT ___S___
Page __1__ of __8__

WITNESS>   CASENAME>   DATETEXT>

Page 5

1  Q. What cases did you look at?
2  A. I think I looked at the Teel case because I
3  knew that was one that we had discussed. I looked at the
4  Wold case. There's the Daughty case I think, and the
5  Lawrence case. Those are the ones that come to mind.
6  Q. And when did you do that?
7  A. Just today.
8  Q. Okay. Do you have any independent recollection
9  of your conference?
10 A. I kind of have a very dim memory of those
11 conversations. In fact, I wasn't entirely clear that it
12 was two conversations, but it looks like it was according
13 to Danny's records. And I'm not surprised at that. But
14 I do remember -- I kind of remember that I had the
15 conversation. And I remember kind of the general gist
16 of at least I thought the law was in that area. And
17 that's about it. But beyond that, I don't have a memory
18 of anything very specific beyond that.
19 Q. And did you bill for your time for that?
20 A. No.
21 Q. Okay. And did you write a report?
22 A. No.
23 Q. Did you take notes when he called you?
24 A. No.
25 Q. Did you review the correspondence between

Page 6

1  myself and Dan Withers?
2  A. No.
3  Q. Do you recall what he asked you?
4  A. Yeah. He called me and it was just -- it was
5  kind of an off-the-cuff call really just because I had
6  done work with him over the years, and I've known him for
7  a long time.
8      So, you know, I get calls like this from Danny
9  periodically, and other clients as well, just saying,
10 what do you think about this? And I think the gist of it
11 was that you had suggested to him that this Teel case
12 held or somehow suggested that loss of consortium
13 triggers another per person limit. And I said -- you
14 know, I think Teel was a fairly new case at that time.
15 And I know I had looked at it, but I didn't remember
16 specifically what it said.
17     So it seems like I looked it up, and I just
18 kind of -- you know, looking at it, I concluded that I
19 don't think it really sheds much light on that issue at
20 all. I don't think it really addressed the issue of a
21 per person limit, so that's what I told him that I didn't
22 view that case as really answering the question.
23 Q. Did you analyze the case at the time of the
24 phone conversation or before or after?
25 A. I think I may -- I have a dim memory. And I'm

Page 7

1  just not clear on whether I called him back and looked at
2  it or not. I have a memory that I just pulled it up on
3  Westlaw because I had my computer right there. So I may
4  have just -- I know I -- I mean, didn't print it out or
5  anything. I just looked at it on Westlaw, I think, while
6  I was talking to him.
7  Q. So it was just a cursory review?
8  A. Yeah, pretty cursory I would have to say.
9  Q. And that's the last that -- and I guess you
10 talked to him again; do you recall?
11 A. I think he called me again. And I -- frankly,
12 the reason I say that is because I saw his notes that he
13 apparently had called me again.
14 Q. You don't have a recollection of that?
15 A. I kind of have a recollection of there being
16 two conversations. I can't separate them out. I mean, I
17 think I just kind -- they kind of blend together. But I
18 think I gave him the basic -- my basic conclusion that I
19 didn't think the Teel case really, you know, was
20 dispositive of that issue.
21 Q. And did he say loss of consortium or loss of
22 society?
23 A. I can't remember.
24 Q. Did he tell you about the Gillespie case?
25 A. I don't remember discussing the Gillespie case.

Page 8

1  I mean, I'm aware of the Gillespie case myself, but I
2  don't remember that we discussed it. We may have, I
3  don't remember that.
4  Q. Did you tell him that a parent of a minor child
5  can collect under a wrongful death statute?
6  A. I don't -- I'm quite sure I didn't tell him
7  that in that conversation.
8  Q. And, of course, a parent can't collect on a
9  wrongful death statute, right?
10 A. That's correct. That's my understanding. And
11 in the Gillespie case they rely on a different statute.
12 Q. Okay. And by the way, did you read the
13 contract?
14 A. The Progressive -- I don't think I did at that
15 time. I mean, I had read it before. At least I was
16 assuming that it was the same standard Progressive
17 policy. But I didn't pull it out and specifically read
18 it. But I was kind of, you know, generally familiar with
19 it and had researched that issue before.
20 Q. What issue?
21 A. With the Progressive policy. The per person --
22 you know, what triggers a separate per person bodily
23 injury limit.
24 Q. So you have researched that before in which
25 ways?

COMPANY>
COMPANYPHONE>

EXHIBIT 5
Page 2 of 8

2 (Pages 5 to 8)

WITNESS>                CASENAME>                DATETEXT>

Page 9

1   A.  Well, now the Wold case is the one that comes
2   to mind, but I have with other cases, too. I'm not sure
3   other Progressive cases, but other cases generally. It's
4   an issue that comes up periodically in my practice.
5   Q.  So how long prior to this conversation had you
6   reviewed the Progressive Insurance policy?
7   A.  I can't -- I don't know. I can't remember a
8   specific time. But I think I review it periodically as I
9   need to in a given case. So when I last looked at that
10  particular language, I can't tell you.
11  Q.  All right. Do you still do work for
12  Progressive?
13  A.  Yeah.
14  Q.  How much of your work is for Progressive?
15      MR. ZIPKIN: I object. This goes beyond the
16  scope of the court's order, which is very clearly limited
17  allowing this deposition. But limiting it to Mr. Quinn's
18  conversation with Mr. Withers in connection with Mr.
19  Weilbacher's claim and the basis for any advise he might
20  have given. That's it. So I think this question is out
21  of bounds.
22      MR. LEGACKI: I don't think it is. Go ahead.
23      THE WITNESS: I would say -- I'm really
24  guessing, but I would say at least 5 percent.
25  BY MR. LEGACKI:

Page 10

1   Q.  And is that per year or -- you know, I guess is
2   that per year?
3   A.  I guess so, yeah.
4   Q.  How many times have you -- before this phone
5   conversation with Withers, how many times have you
6   reviewed the policy for this particular issue?
7   A.  I can't tell you how many times. I think the
8   main focus would be the Wold case because that was --
9   that probably was an issue in that case that I recall.
10  Q.  And looking -- is there a difference between a
11  derivative claim and an independent claim?
12      MR. ZIPKIN: Again, this goes beyond the scope
13  necessary to form the basis for the statements made
14  during the phone conversation.
15      THE WITNESS: A derivative versus a -- what is
16  it?
17  BY MR. LEGACKI:
18  Q.  Independent claim?
19  A.  I'm not really sure. I think I would have to
20  see the language and the context. And I think that
21  sometimes that terminology gets used kind of loosely,
22  actually.
23  Q.  Didn't you argue in Wold that the question, of
24  course, was to decide whether or not a claim is
25  independent or a derivative?

Page 11

1       MR. ZIPKIN: This is totally beyond the scope
2   of the court's order. And I personally don't think we
3   have to put up with it.
4       You're allowed to talk about the conversation
5   and the basis for opinions stated during the
6   conversation. If it isn't tied to that it's out of
7   bounds. And I intend to leave if --
8       MR. LEGACKI: If you want to leave, leave. I'm
9   going to ask some questions now. Go ahead, Dan.
10      MR. ZIPKIN: At some point very soon -- and I
11  think you're actually right on the border. You're
12  flouting the court's order.
13      MR. LEGACKI: Go ahead.
14      THE WITNESS: I guess I need to have more
15  information. The difficulty with even using this
16  terminology is that it's not entirely clear what it
17  means. And I'm not sure that it's dispositive of this
18  per person issue anyway.
19  BY MR. LEGACKI:
20  Q.  Well, didn't you and the Supreme Court say that
21  there's independent versus derivative are two
22  different --
23  A.  I may have said that. I tell you, I can't
24  remember my entire brief.
25      MR. ZIPKIN: Mr. Quinn, I'm going to advise you

Page 12

1   that -- of course, it's your decision, you're the
2   witness. You have been apprised of the court's order.
3   If this relates to your conversation with Mr. Withers, or
4   the basis for your opinion, then it's fair game. If it's
5   not, it's out of bounds.
6       THE WITNESS: Yeah.
7       MR. ZIPKIN: And I don't intend to let
8   Mr. Legacki ignore or violate the court's order.
9       THE WITNESS: I would say that, you know, what
10  I said in a brief was not the basis of my, you know,
11  brief conversation with Danny Withers. So I think this
12  probably is out of bounds based on that court order.
13  BY MR. LEGACKI:
14  Q.  But you know the difference between a
15  derivative and independent claim?
16      MR. ZIPKIN: Same objection. This is a
17  strictly limited deposition, Mr. Legacki. If you can
18  relate it to the scope allowed by the court, fine.
19      MR. LEGACKI: Well, it was discussed in the
20  conversation.
21      MR. ZIPKIN: Well, actually it wasn't. What he
22  said in the Wold appeal was not discussed in the
23  conversation.
24  BY MR. LEGACKI:
25  Q.  In the discussion with Mr. Withers you --

COMPANY>
COMPANYPHONE>


EXHIBIT 5
Page 3 of 6

3 (Pages 9 to 12)

WITNESS> CASENAME> DATETEXT>

Page 13

1  Mr. Withers stated you talked about derivative claims and
2  independent claims. And I want to ask you, is there a
3  difference between an independent claim and a derivative
4  claim?
5      A.  Well, I don't remember saying that to
6  Mr. Withers, which isn't to say that I didn't say it, but
7  I don't recall that. What I do recall saying is that
8  generally, consortium claims, in my view, do not give
9  rise to a separate per person limit. And that NIED
10 claims, at least under the Lawrence case, the Supreme
11 Court with some reservations said that in that case that
12 it did. And that's really about the extent of my
13 conversation with him.
14     I didn't talk about -- at least to my memory,
15 use the terms derivative or independent.
16     Q.  Well, I guess you wrote the Wold brief before
17 you talked to Withers. And I just saw here -- would you
18 like to see what you wrote?
19     MR. ZIPKIN: I have the same objection. And I
20 think the witness has told you that it's out of bounds.
21 So it's up to you, Mr. Quinn. I'm not your lawyer.
22 BY MR. LEGACKI:
23     Q.  Is there a difference between an independent
24 claim and a derivative claim?
25     MR. ZIPKIN: Same objection.

Page 14

1      THE WITNESS: I think I'm going to follow
2  Mr. Zipkin's advice. It just seems we're getting
3  beyond -- well beyond anything I discussed with
4  Mr. Withers.
5  BY MR. LEGACKI:
6      Q.  Well, I'm trying to find out the basis for your
7  conversation. And you said it was -- I'm trying to show
8  that it all goes to the basis of your advice to
9  Mr. Withers not to pay this claim. And so one of the
10 things I want to know is, based on your previous
11 experience, and you wrote this to the Supreme Court
12 representing Progressive, and you made a representation
13 to the Alaska Supreme Court, as I read that, that an
14 independent claim is different than a derivative claim?
15     MR. ZIPKIN: Okay. You've made a number of
16 misrepresentations. And I believe they're all
17 deliberate. One, there was no decision by Progressive.
18     MR. LEGACKI: State your objection. And then
19 don't lecture, please, Gary. You're the one that is
20 violating the order here. Just make your objection.
21     MR. ZIPKIN: If you think you've got a basis
22 for seeking sanctions against me, you go for it.
23     Contrary to what you just said, there was no
24 decision by Progressive not to pay his claim. His claim
25 was paid. It was just paid under a single limit. So

Page 15

1  you're misrepresenting the facts to the witness. And I
2  know it's deliberate because you do it all the time.
3      And I didn't hear the witness say that he
4  discussed the difference between derivative and
5  independent. You assume there is a difference, by the
6  way. Your questions assume it, when there is no evidence
7  that there is a difference. You can have an independent,
8  yet derivative claim.
9      THE WITNESS: I would also say that I didn't
10 advise Danny whether to pay or not to pay a claim. I
11 didn't even know, and still don't, the details of this
12 particular claim. You know, the purpose of his call was,
13 you know, does the Teel case, you know, hold that, you
14 know, a particular claim gives rise to another per person
15 limit. And my response was, you know, I don't think it
16 does hold that. That was really the gist of our
17 conversation.
18 BY MR. LEGACKI:
19     Q.  So did you or did you not, advise him on the
20 coverage issue in this case?
21     A.  I told you -- I mean, I just told you the gist
22 of the conversation. You know, if you want to
23 characterize that as -- I guess you'd have to use your
24 own characterization as to whether I'm advising him on
25 anything. I just said I don't think that the Teel case

Page 16

1  addresses this particular issue.
2      Q.  They raised -- as you know, they said advice of
3  counsel is an affirmative defense that shows not in bad
4  faith -- okay -- they -- Withers said he called you up --
5  and they put this in the pleadings as an affirmative
6  defense, and advice of counsel, so they didn't do
7  anything wrong. So we get it -- they're alleging
8  that you advised --
9      A.  I advised him that the Teel case, in my view,
10 did not hold that -- did not hold anything about a
11 separate per person limit. It didn't even address the
12 issue. So in my view it didn't, you know, change the
13 status quo in Alaska law on that subject. That was my --
14 that was my discussion with him.
15     Q.  And do you recall the Teel case?
16     A.  Dimly. I mean, I glanced at it today, but I
17 don't -- I haven't studied it.
18     Q.  It raises the issue of direct claim, right?
19     A.  My recollection is that it raised the question
20 of whether a parent's NIED claim was covered under a
21 UM -- you know, UM coverage or UM policy that had UM
22 coverage on a vehicle that had not been issued to that
23 parent. That's my memory.
24     So the question was, can this parent assert a
25 claim? You know, are they an insured under that policy.

COMPANY>
COMPANYPHONE>

EXHIBIT _S_
Page _4_ of _6_           4 (Pages 13 to 16)

WITNESS&gt;                    CASENAME&gt;                    DATETEXT&gt;

Page 17

1  That was the issue. And it seems like there may have
2  been some discussion of direct versus independent, but I
3  don't remember that.
4      Q.  Is there a difference between direct and
5  independent?
6      A.  I'm not quite sure what the difference is with
7  regard to the per person limit question. Because as I
8  understand what the Supreme Court says is, you've got to
9  look at the language of the policy to make that
10 determination.
11     Q.  And you didn't look at the language of the
12 policy?
13     A.  The language of which policy?
14     Q.  The Progressive policy.
15     A.  I didn't during my conversation with Dan
16 Withers. What I looked at was the Teel case because the
17 question was, does the Teel case address the issue of a
18 separate per person limit. And I looked at the Teel
19 case, and I said -- I concluded that it doesn't address
20 the issue of a per person limit.
21     Q.  Didn't -- well let's look at the Teel case, if
22 you don't mind. Look at Page 5.
23     A.  Page 5. Okay.
24     Q.  In the first column on the left, "That Teel's
25 claim is direct does not bar the claim. The wording of

Page 18

1  Allstate's policy does not exclude direct claims. It
2  states that one would be entitled to recover so long as
3  one's damage were because of bodily injury to an occupant
4  of the insured vehicle." Do you see that?
5      A.  I'm not actually seeing it. Where is it on
6  the -- okay. All right. I see that paragraph.
7      Q.  And then it goes on at the bottom, "If Teel can
8  prove all the elements of a bystander NIED claim...the
9  injuries suffered by an individual entitled to recover
10 under the bystander exception to NIED claims, though not
11 derivative..."
12         MR. ZIPKIN: Hold on a second. You left out a
13 whole part of the sentence. You just acted like the
14 sentence said something totally different than what it
15 says.
16 BY MR. LEGACKI:
17     Q.  "The injuries suffered by an individual
18 entitled to recover under the bystander exception to NIED
19 claims, though not derivative, are the natural and
20 probable consequences of contemporaneously witnessing the
21 bodily injury suffered by someone with whom they have a
22 close relationship."
23     A.  Okay.
24     Q.  Do you see that?
25     A.  I see that.

Page 19

1      Q.  It's an independent, direct claim, right?
2      A.  Well, I mean, it says what it says. It
3  certainly says that it's a -- they do characterize it as
4  a direct claim. But I think you have to -- you know, the
5  question though, is whether the fact that it's a direct
6  claim means that it gives rise to another per person
7  limit.
8          And this case doesn't address that at all.
9  There is a case that does address that. And that's the
10 Lawrence case. And the Lawrence case does not say that
11 because it's a direct or independent claim it gives rise
12 to a per person limit. So I guess that's why I'm having
13 trouble with your language or your questions, which seem
14 to presuppose that characterization of a claim as direct
15 or independent, necessarily means that it gives rise to
16 another per person limit. I don't think that follows.
17     Q.  Did you refer to Lawrence when you talked to --
18     A.  I did not.
19     Q.  Okay. Lawrence came afterwards, didn't it?
20     A.  I don't think it did, but I could be wrong. I
21 think Lawrence came up before this one -- before Teel.
22     Q.  How about the Daughty case?
23     A.  The Daughty case came after. And Dowdy, I
24 believe, makes the same point that I'm making, which is
25 that whether an NIED claim gives rise to another per

Page 20

1  person limit, hinges on issues independent of whether
2  it's direct, whether it's characterized as a direct
3  claim. And that's also -- I mean, they're really just
4  reiterating what they said in Lawrence, but they
5  highlight that point.
6          In other words, whether something is direct is
7  not dispositive as to whether it gives rise to another
8  per person limit. At least that's my reading of those
9  cases.
10     Q.  We just had a decision come down to the Supreme
11 Court Friday, Ayers versus USAA.
12     A.  Yes.
13     Q.  And the court referred to a mirror image?
14     A.  Right.
15     Q.  What does that mean?
16         MR. ZIPKIN: Objection. This could not
17 possibly have formed the basis for any discussion between
18 this witness and Mr. Withers. You know it, so you're
19 deliberately ignoring the court's order.
20         Again, Mr. Quinn, it's up to you to decide
21 whether this goes beyond the court's order, which I want
22 to make sure you got, so I sent it to you. But if this
23 goes on, I intend to seek sanctions against Mr. Legacki,
24 I do. Because this is deliberately violating the court's
25 order.

COMPANY&gt;
COMPANYPHONE&gt;



EXHIBIT ____5____

Page ___5___ of ___8___

5 (Pages 17 to 20)

WITNESS>                         CASENAME>                         DATETEXT>

Page 21

1     MR. LEGACKI: Go ahead.
2     THE WITNESS: I'm quite sure I didn't talk
3  about the mirror image rule with Mr. Withers during his
4  phone conversation. But in general, my understanding of
5  the mirror image rule is, that it refers to a
6  requirement, under some circumstances, that coverage
7  provided under liability portion of an auto policy apply
8  equally and the UM coverage of the policy. That's -- at
9  least that's my understanding of the mirror image rule.
10 BY MR. LEGACKI:
11    Q.  And did Mr. Wither ask you about that? Did you
12 discuss that in seeking your advice?
13    MR. ZIPKIN: First of all, his name is Withers,
14 with an "S" at the end.
15    THE WITNESS: I certainly -- I don't recall
16 having any discussion about that during our conversation.
17 BY MR. LEGACKI:
18    Q.  And you would have to look at the policy for
19 that, right?
20    A.  Well, to have a discussion about the mirror
21 image rule, I could probably talk about the mirror image
22 rule just as I have now without looking at the policy.
23 BY MR. LEGACKI:
24    Q.  Like to advise somebody as to whether or not to
25 pay on a policy, you would have to look at the policy,

Page 22

1  correct?
2     A.  Well, I suppose, or at least be familiar with
3  the policy.
4     Q.  And Mr. Withers never brought this subject up
5  with you?
6     A.  The mirror image?
7     Q.  Yeah.
8     A.  I don't recall that coming up, at least in
9  these two conversations. We may have discussed that at
10 other times and in other context, but not with regard to
11 this case.
12    Q.  When you give an opinion, do you usually do a
13 written opinion?
14    A.  Well, I have different levels of formality I
15 guess. I often get phone calls from Danny Withers and
16 others just saying, you know, what do you think? And I
17 think I don't charge for that. And I don't -- you know,
18 I think the recipient understands that it's not a, you
19 know, a fully researched opinion. But, you know, this is
20 the kind of work I do, so I'm kind of generally familiar
21 with, you know, the law in this area, so...
22    Q.  Well, also the Supreme Court found that the
23 AS O9.15.010 simply allows a parent to pursue a claim.
24 Did you say that to him?
25    A.  I dont recall if I said that to him. But I

Page 23

1  think it's -- I think that statute does allow a parent to
2  pursue a claim.
3     Q.  But is it procedural, or is it actually an
4  independent claim?
5     A.  I think it's -- I guess it would be the Beta
6  case. It seems to say that it's independent, whatever
7  that means. It's independent of the wrongful death
8  statute because I think what Beta said was that under the
9  wrongful death statute, a parent could not assert a loss
10 of society claim, but under this statute they can.
11    Q.  And Withers says here -- so he's wrong when he
12 says, "Our argument is that although this is an active
13 claim of the parent, it is derivative of the wrongful
14 death claim per contract?"
15    A.  I think he is correct about that, actually.
16    Q.  I thought you can't have a wrongful death -- a
17 parent does not have a claim under a wrongful death
18 statute.
19    A.  Well, it's derivative in the sense that it
20 arises out of the death of the child. I mean, the parent
21 wouldn't have the claim had it not been for the death of
22 the child. But it's independent in the sense that the
23 parent can assert it independently of the estate.
24    Q.  For their own injuries?
25    A.  For their own emotional loss.

Page 24

1     Q.  For their own mental anguish?
2     A.  I think that's correct, yeah. But again, it
3  doesn't answer the question of whether that gives rise to
4  a separate per person limit. That wasn't addressed in
5  the Gillespie case at all.
6     Q.  So what did you -- since you know the
7  Progressive policy, what does give rise to a separate
8  claim?
9     MR. ZIPKIN: Excuse me. Is this part of the
10 conversation with Mr. Withers? If it is, it should be
11 phrased as such. If it isn't, I believe it's out of
12 bounds again.
13    THE WITNESS: I didn't have that discussion
14 with him.
15 BY MR. LEGACKI:
16    Q.  So you're saying here today, you have no
17 independent recollection of exactly what was said?
18    A.  I didn't record the conversation, and I didn't
19 memorize it, and so that's correct.
20    Q.  And you don't know if Mr. Withers -- you seem
21 to think here that he wrote things down that are a little
22 bit different than what you remember in the conversation?
23    MR. ZIPKIN: Mischaracterizes his answers.
24    THE WITNESS: I'm not sure I would agree with
25 that.

COMPANY>
COMPANYPHONE>

EXHIBIT  S
Page  6  of  6         6 (Pages 21 to 24)

WITNESS>                    CASENAME>                    DATETEXT>

Page 25

```
1   BY MR. LEGACKI:
2       Q.  And you don't -- if I give you the policy now,
3   will you comment and let me know, and show where it says
4   that it's derivative and not an independent claim?
5           MR. ZIPKIN:  It sounds like it's out of bounds
6   again.
7           THE WITNESS:  I'm not sure the policy quite
8   says that anywhere. I believe it's the limits of
9   liability provision. You know, I've looked at that
10  before. I don't -- again, I don't have it memorized.
11  But that's, you know, that's the provision of the policy.
12  BY MR. LEGACKI:
13      Q.  The limits of liability meaning, what?
14      A.  Meaning this is -- you know, something along
15  the lines of this is the most we will pay.
16      Q.  For all your claims?
17      A.  Right.
18      Q.  Which includes medical, loss of wages?
19      A.  I'm not even sure the language that I have in
20  mine specifically says that.
21      Q.  Do you recall what the language says then?
22      A.  It says something along the lines of this is
23  the most we will pay for any single, bodily injury. And
24  then they --
25      Q.  It's $100,000?
```

Page 26

```
1       A.  The limits of liability language itself I don't
2   think would include the dollar amount, but you would have
3   to look at that.
4       Q.  Right. But then when they say the single
5   bodily injury limit, we mean all claims including?
6       A.  Yeah, I think it has something along the lines
7   of all claims including, you know, loss of consortium,
8   loss of society. I think there's language to that
9   effect.
10      Q.  So in your file, injury claim, the max it will
11  pay is say, $100,000 for all your claims, which includes
12  loss of consortium, loss of society, wrongful death, all
13  that stuff, right?
14      A.  I mean, you're paraphrasing it. But yeah,
15  that's kind of my understanding of generally what it
16  says.
17          MR. ZIPKIN:  And you're mischaracterizing it.
18  You know you have it. Why don't you put it in front of
19  him and then see if it formed the basis of his
20  discussion?
21  BY MR. LEGACKI:
22      Q.  Do you need to see it?
23      A.  It depends on -- you know, if you're going to
24  ask me what the language says, I probably need to see it.
25  But I guess it just depends on what you're going to ask
```

Page 27

```
1   me.
2       Q.  I guess the question is:  When Danny Withers
3   calls you up and says, hey, does he get a separate per
4   person policy; is that what you were thinking about?
5       A.  Yes.
6       Q.  And you remember reading it?
7       A.  I did not look at the policy during the course
8   of that conversation, but I had seen it before, and I
9   was, as I say, I'm generally familiar with it.
10      Q.  How often has that language changed since all
11  your years working for Progressive?
12      A.  I don't know the answer to that. I know that
13  their policies have changed somewhat over time. And I
14  don't know to what extent that specific provision has
15  changed.
16          MR. ZIPKIN:  That question is also out of
17  bounds. I object. Move to strike.
18          MR. LEGACKI:  It's going to the basis of his
19  conversations.
20          MR. ZIPKIN:  No, it doesn't. You haven't made
21  any such connection. I'll leave it for the judge to
22  decide.
23          MR. LEGACKI:  Sure.
24  BY MR. LEGACKI:
25      Q.  That would be -- when you're talking to
```

Page 28

```
1   Withers, that would be in your mind, right, because
2   you're going back and saying, oh, gee, the policy and the
3   case. You're putting the two together, right?
4           MR. ZIPKIN:  Objection. Vague.
5           THE WITNESS:  What would be?
6   BY MR. LEGACKI:
7       Q.  If he's asking you a question about, you know,
8   the Teel decision and you're probably also, in your mind,
9   trying to remember the insurance policy, right?
10      A.  Well, as I say, I was kind of generally
11  familiar with the insurance policy because I research
12  this issue both for Progressive and other companies, you
13  know. And the fact of the matter is, for the most part,
14  these policies have fairly comparable language.
15          And I think if there had been a significant
16  change to the Progressive policy I probably would have
17  been aware of it. So you're right. I was working on the
18  assumption that the same general provision was still --
19  the same limits of liability provision, you know, had not
20  been substantively altered since the last time I looked
21  at it. That was an assumption that I probably didn't
22  consciously make, but in giving my answer, that was my
23  assumption.
24          MR. LEGACKI:  No further questions.
25          MR. ZIPKIN:  No questions.
```

COMPANY>
COMPANYPHONE>

EXHIBIT  S
Page  7  of  8        7 (Pages 25 to 28)

WITNESS&gt;   CASENAME&gt;   DATETEXT&gt;

Page 29

1  (Proceedings concluded at 2:10 p.m.)
2  (Signature reserved.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 30

1       REPORTER'S CERTIFICATE
2       I, ROSIE S. SCOTT, CSR, hereby certify:
3       That I am a Certified Shorthand Reporter
4  for Southcentral Court Reporting and Notary Public for
5  the State of Alaska; that the foregoing proceedings were
6  taken by me in computerized machine shorthand and
7  thereafter transcribed by me; that the transcript
8  constitutes a full, true and correct record of said
9  proceedings taken on the date and time indicated therein.
10      Further, that I am a disinterested person to
11 said action.
12      IN WITNESS WHEREOF, I have hereunto
13 subscribed my hand and affixed my official seal this
14 _____ day of _____, 2007.
15
16
17
18
19    _____
      ROSIE S. SCOTT
      Certified Shorthand Reporter
20    My Commission Expires
      8/16/08
21
22
23
24
25

Page 31

1           WITNESS CERTIFICATE
2  Ronald V. Weilbacher versus Progressive Northwestern
   Insurance Company, Case No. 3:05-cv-0204-TMB
3
4  DANIEL QUINN            Taken May 31, 2007
5    I hereby certify that I have read the foregoing
   deposition and accept it as true and correct, with the
6  following exceptions:
7  ==================================================
8  Page   Line   Description   Reason for Change
9  ==================================================
10
11
12
13
14
15
16
17
18
19
20
21
22
23 _____      _____
   (Date read)    (Sign name here)
24
   (Use additional paper to note corrections as needed,
25 dating and signing each one.) (RS)

COMPANY&gt;
COMPANYPHONE&gt;

EXHIBIT _S_
Page _8_ of _8_   8 (Pages 29 to 31)